UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| LUIS TORRES, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:20-cv-3464 |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| BERRY CORPORATION, ARTHUR T. SMITH, CARY BAETZ, GARY A. GROVE, FERNANDO ARAUJO, KURT NEHER, KENDRICK F. ROYER, BRENT S. BUCKLEY, KAJ VAZALES, and EUGENE VOILAND, | |
| Defendants. | |

Plaintiff Luis Torres ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Berry Corporation ("Berry" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired: (a) Berry common stock pursuant and/or traceable to the Company's initial public offering conducted on or about July 26, 2018 (the "IPO" or "Offering"); or (b) Berry securities between July 26, 2018 and November 3, 2020, both dates inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Berry was founded in 1909 and is headquartered in Dallas, Texas.  The Company was formerly known as Berry Petroleum Corporation and changed its name to Berry Corporation in February 2020.

3.     Berry purports to be an independent upstream energy company and engages in the development and production of conventional oil reserves located in the western United States.  The Company's properties are located in the San Joaquin and Ventura basins, California; Uinta basin, Utah; and Piceance basin, Colorado.  As of December 31, 2019, Berry had a total of 3,541 net producing wells.

4.     On June 29, 2018, the Company filed its Registration Statement on Form S-l for the IPO, which, after an amendment, was declared effective by the SEC on July 25, 2018 (the "Registration Statement").  On or around July 26, 2018, Berry conducted the IPO, upon which the Company began trading on the NASDAQ Global Select market ("NASDAQ"), issuing 13 million shares of Berry common stock at $14 per share, generating over $138 million in proceeds before expenses.  On July 27, 2018 Berry filed its Prospectus on Form 424B4 with the SEC (the "Prospectus" and, collectively with the Registration Statement, the "Offering Documents").

{00405938;2 }

5. The Offering Documents were negligently prepared, and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing their preparation. Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, the Offering Documents and Defendants made false and/or misleading statements and/or failed to disclose that: (i) Berry had materially overstated its operational efficiency and stability; (ii) Berry's operational inefficiency and instability would foreseeably necessitate operational improvements that would disrupt the Company's productivity and increase costs; (iii) the foregoing would foreseeably negatively impact the Company's revenues; and (iv) as a result, the Offering Documents and the Company's public statements were materially false and/or misleading and failed to state information required to be stated therein.

6. On November 3, 2020, post-market, Berry reported its financial and operating results for the third quarter of 2020. Among other results, Berry reported non-GAAP EPS and revenue that both fell short of estimates. In addition, Berry reported that during the quarter, "the Company undertook certain operational improvements that caused temporary reductions in our production. Notably, we performed some plugging and abandonment activity that resulted in temporary shut-in of nearby wells. Additionally, improved steam management reduced overall costs but temporarily increased water disposal and well maintenance needs, resulting in a slight decrease in production."

7. On this news, the Company's stock price fell $0.15 per share, or 5.28%, to close at $2.69 per share on November 4, 2020, representing an 80.78% decline from the IPO price.

8.      As of the time this Complaint was filed, the price of Berry securities continues to trade below the Offering price, damaging investors.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Berry's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.      Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b). Berry is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

13.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.      Plaintiff, as set forth in the attached Certification, acquired Berry securities pursuant and/or traceable to the Offering Documents issued in connection with the Company's

IPO, and/or purchased or otherwise acquired Berry securities at artificially inflated prices during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.     Defendant Berry purports to be an independent upstream energy company and engages in the development and production of conventional oil reserves located in the western United States.  Berry's common stock trades in an efficient market on the NASDAQ under the symbol "BRY."

16.     Defendant Arthur T. Smith ("Smith") has served as Berry's President, Chief Executive Officer, and a Director of the Company at all relevant times, and has served as Board Chair since February 2019.  Smith signed or authorized the signing of the Offering Documents filed with the SEC.

17.     Defendant Cary Baetz ("Baetz") has served as Berry's Executive Vice President, Chief Financial Officer, and a Director of the Company at all relevant times.  Baetz signed or authorized the signing of the Offering Documents filed with the SEC.

18.     Defendant Gary A. Grove ("Grove") served as an Executive Vice President and the Chief Operating Officer ("COO") of Berry from prior to the start of the Class Period until August 2020.  Grove signed or authorized the signing of the Offering Documents filed with the SEC.

19.     Defendant Fernando Araujo ("Araujo") has served as Berry's COO since August 2020.

20.     Defendants Smith, Baetz, Grove, and Araujo are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

21.     The Exchange Act Individual Defendants possessed the power and authority to control the contents of Berry's SEC filings, press releases, and other market communications.  The Exchange Act Individual Defendants were provided with copies of Berry's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Berry, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

22.     Berry and the Exchange Act Individual Defendants are sometimes referred to herein collectively as the "Exchange Act Defendants."

23.     Defendant Kurt Neher ("Neher") was the Executive Vice President of Business Development of Berry at the time of the IPO.

24.     Defendant Kendrick F. Royer ("Royer") was an Executive Vice President, Corporate Secretary, and General Counsel of Berry at the time of the IPO.

25.     Defendant Brent S. Buckley ("Buckley") was a director and Chairman of the Board of Berry at the time of the IPO.

26.     Defendant Kaj Vazales ("Vazales") was a director of Berry at the time of the IPO

27.     Defendant Eugene Voiland ("Voiland") was a director of Berry at the time of the IPO.

28.     Defendants Neher, Royer, Buckley, Vazales, and Voiland are sometimes referred to herein collectively as the "Securities Act Individual Defendants."

29.     As directors, executive officers and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Berry securities in the IPO for their own benefit and the benefit of Berry.  The Securities Act Individual Defendants were key members of the IPO working group and executives of Berry who pitched investors to purchase the shares sold in the IPO, including in IPO road shows.

30.     The Exchange Act Defendants and the Securities Act Individual Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

31.     Berry was founded in 1909 and is headquartered in Dallas, Texas.  The Company was formerly known as Berry Petroleum Corporation and changed its name to Berry Corporation in February 2020.

32.     Berry purports to be an independent upstream energy company and engages in the development and production of conventional oil reserves located in the western United States.  The Company's properties are located in the San Joaquin and Ventura basins, California; Uinta basin, Utah; and Piceance basin, Colorado.  As of December 31, 2019, Berry had a total of 3,541 net producing wells.

33.     On June 29, 2018, the Company filed its Registration Statement on Form S-l for the IPO, which, after an amendment, was declared effective by the SEC on July 25, 2018.  On or around July 26, 2018, Berry conducted the IPO, upon which the Company began trading on the NASDAQ, issuing 13 million shares of Berry common stock at $14 per share, generating over $138 million in proceeds before expenses.  On July 27, 2018 Berry filed its Prospectus on Form 424B4 with the SEC.

**Materially False and Misleading Statements Issued in the Offering Documents**

34.     In providing an overview of the Company, the Offering Documents stated, in

relevant part:

> Our long-lived, predictable and high margin asset base is uniquely positioned to
> support our objectives of generating top-tier corporate-level returns and positive
> free cash flow through commodity price cycles. We believe that executing our
> strategy across our low-declining production base and extensive inventory of
> identified drilling locations will result in long-term, capital efficient production
> growth as well as the ability to return excess free cash flow to stockholders.
>
> We target onshore, low-cost, low-risk, oil-rich reservoirs in the San
> Joaquin basin of California and the Uinta basin of Utah, and, to a lesser extent, the
> low geologic risk natural gas resource play in the Piceance basin in Colorado. In
> the aggregate, the Company's assets are characterized by:
>
> - high oil content, which makes up approximately 81% of our production;
>
> - favorable Brent-influenced crude oil pricing dynamics;
>
> - long-lived reserves with low and predictable production decline rates;
>
> - stable and predictable development and production cost structures;
>
> - a large inventory of low-risk identified development drilling opportunities
>   with attractive full-cycle economics; and
>
> - potential in-basin organic and strategic opportunities to expand our existing
>   inventory with new locations of substantially similar geology and
>   economics.

35.     Further, in describing "The Berry Advantage," the Offering Documents stated, in

relevant part:

> We believe that our combination of low production decline rates, high
> margin oil-weighted production, attractive development opportunities and a stable
> cost environment differentiates us from our competitors and provides for low-
> breakeven commodity prices and an ability to generate top-tier corporate level
> returns, positive levered free cash flow and capital-efficient growth through
> commodity price cycles.

*** *

### Our Oil-Weighted, High Margin Production

Our highly oil-weighted production combined with a Brent-influenced California pricing dynamic and stable cost structures has resulted, and is expected to continue to result, in strong operating margins. As of December 31, 2017, our California PUD reserves were 100% oil.

### Our Attractive Development Opportunities

Our estimated development costs associated with our PUD reserves are $8.89 per Boe on a total company basis and $10.95 per Boe in California. We believe that our estimated development costs, when combined with our operating costs, commodity mix and price realizations, present attractive breakeven economics for our development opportunities.

We expect our identified drilling locations to generate attractive rates of return. The following table presents our expected average single-well rates of return on drilling opportunities associated with our California PUD reserves based on the assumptions used in preparing our December 31, 2017 SEC reserve report, including pricing and cost assumptions, which can be found under "Primary Economic Assumptions" on page 6 of our reserve report. Using SEC Pricing as of December 31, 2017, there were approximately 23 MMBoe of PUDs associated with projects in the Piceance basin. Subsequent to year end, as a result of increasingly negative local gas pricing differentials, we revised our current development plan to exclude development in the Piceance basin. As a result, information with respect to our Colorado PUDs as of December 31, 2017 has been omitted from the table below. The table also includes a commodity price sensitivity scenario, which is based on Strip Pricing as of May 31, 2018.

36. In addition, in describing Berry's reserves and assets, the Offering Documents stated, in relevant part:

### Our Development Inventory

We have an extensive inventory of low-risk, high-return development opportunities. As of March 31, 2018, we identified 3,397 gross drilling locations that we anticipate drilling over the next 5 to 10 years, which we refer to as our "Tier 1" locations, and 3,656 additional gross drilling locations that are currently under review. For a discussion of how we identify drilling locations, please see "Business—Our Reserves and Production Information—Determination of Identified Drilling Locations."

We operate over 95% of our productive wells and expect to operate a similar percentage of our identified gross drilling locations. In addition, approximately 76% of our acreage is held by production, including 99% of our

acreage in California. Our high degree of operational control, together with the large portion of our acreage that is held by production, gives us flexibility over the execution of our development program, including the timing, amount and allocation of our capital expenditures, technological enhancements and marketing of production.

37.    In detailing the Offering Documents listed as the Company's competitive strengths, in relevant part:

- ***Stable, low-decline, predictable and oil-weighted conventional asset base***. The majority of our interests are in properties that have produced for decades. As a result, the geology and reservoir characteristics are well understood, and new development well results are generally predictable, repeatable and present lower risk than unconventional resource plays. The properties are characterized by long-lived reserves with low production decline rates, a stable cost structure and low-risk developmental drilling opportunities with predictable production profiles. The nature of our assets provides us with a high degree of capital flexibility through commodity cycles.

- ***Substantial inventory of low-cost, low-risk and high-return development opportunities***. We expect our locations to generate highly attractive rates of return. For example, our proved undeveloped reserves in California are projected to average single-well rates of return of approximately 51%, assuming SEC Pricing as of December 31, 2017, based on the assumptions used in preparing our SEC reserve report, which can be found under "Primary Economic Assumptions" on page 6 of our reserve report, and 65% assuming Strip Pricing as of May 31, 2018, based on the assumptions found in the Strip Pricing addendum to our reserve report. Our extensive inventory consists of 3,397 Tier 1 gross drilling locations and 3,656 additional gross drilling locations that are currently under review.

                                    ***

- ***Substantial capital flexibility derived from a high degree of operational control and stable cost environment***. We operate over 95% of our productive wells and expect to operate a similar percentage of our identified gross drilling locations. In addition, approximately 76% of our acreage is held by production, including 99% of our acreage in California. Our high degree of operational control over our properties, together with the large portion of our acreage that is held by production, gives us flexibility over the execution of our development program, including the timing, amount and allocation of our capital expenditures, technological enhancements and marketing of production. We expect our operations to continue to generate sufficient levered free cash flow at current commodity prices to fund

maintenance operations and growth. Also, unlike our peers who operate primarily in unconventional plays, our assets generally do not necessitate inventory-constrained and highly specialized equipment, which provides us relative insulation from cost inflation pressures. Our high degree of operational control and relatively stable cost environment provide us significant visibility and understanding of our expected cash flows.

38.     Finally, the Offering Documents touted, as the Company's business strategy, in relevant part:

- ***Grow production and reserves in a capital efficient manner using internally generated levered free cash flow***. We intend to allocate capital in a disciplined manner to projects that will produce predictable and attractive rates of return. We plan to direct capital to our oil-rich and low-risk development opportunities while focusing on driving cost efficiencies across our asset base with the primary objective of internally funding our capital budget and growth plan. We may also use our capital flexibility to pursue value-enhancing, bolt-on acquisitions to opportunistically improve our positions in existing basins.

        ***

- ***Maintain balance sheet strength and flexibility through commodity price cycles***. We intend to fund our capital program primarily through the use of internally generated levered free cash flow from operations. Over time, we expect to de-lever through organic growth and with excess levered free cash flow. Our objective is to achieve and maintain a long-term, through-cycle leverage ratio between 1.5x and 2.0x.

39.     The statements referenced in ¶¶ 34-38, *supra*, were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) Berry had materially overstated its operational efficiency and stability; (ii) Berry's operational inefficiency and instability would foreseeably necessitate operational improvements that would disrupt the Company's productivity and increase costs; (iii) the

foregoing would foreseeably negatively impact the Company's revenues; and (iv) as a result, the Offering Documents and the Company's public statements were materially false and/or misleading and failed to state information required to be stated therein.

## **Materially False and Misleading Statements Issued During the Class Period**

40.     The Class Period begins on July 26, 2018, when Berry's securities began publicly trading on the NASDAQ pursuant to the materially false or misleading statements or omissions in the Offering Documents.

41.     On November 8, 2018, Berry issued a press release announcing the Company's third quarter 2018 earnings.  The press release stated, in relevant part:

> Trem Smith, Berry president and chief executive officer stated, "Our solid third quarter results are a direct reflection of the new culture that now resides at Berry. First, we are executing our plan with excellence which means we are demonstrating the flexibility and adaptability of the plan.  This is a key outcome and has assisted us in staying on plan despite some timing issues in our permitting process. In addition, the results of the entrepreneurship and innovation that is now in Berry are having an impact.
>
> ***
>
> These development projects are exactly the type of opportunity that brought me to Berry and I'm more excited about our ability to maximize our potential than ever. The inventory of new, high value development opportunities in what are thought to be mature fields is growing and our focus on operational excellence and safety coupled with our willingness to return meaningful capital to our shareholders is why I see a company that will prosper throughout the cycle well into the future."

42.     That same day, Berry hosted an earnings call with investors and analysts to discuss the Company's third quarter 2018 results (the "Q3 2018 Earnings Call").  In the scripted portion of the Q3 2018 Earnings Call, Defendant Smith stated, in relevant part:

> Berry is focused on value creation for our shareholders, which means we are focused on executing the plan we have communicated to the markets. Our business model is simple and clear. Our goal is always to generate top tier EBITDA margin, while operating within our levered free cash flow. We manage the value not just through production growth but also operational efficiencies and incident

prevention. Our culture is by definition focused on and build-on our five core values of leadership, entrepreneurship, accountability, ownership and communication. It is a culture of the organization and all the employees now own.

43.    Further, in discussing the Company's operational performance on the Q3 2018 Earnings Call, Defendant Grove stated, in relevant part:

When we internally analyze our current operations, including both the effect of the co-generation facility and our rig program versus an operation without either of those components, we calculate an incremental value savings of approximately $12.2 million for the quarter. So as always, our teams are focused on executing our 2018 development plan, while ensuring our focus on safety and environmental impacts. We strive to operate in a safe, efficient and collaborative manner.

44.    On December 14, 2018, Berry filed a Prospectus on Form 424B1 with the SEC (the "December 14, 2018 Prospectus"). The December 14, 2018 Prospectus touted a substantively similar overview of the Company's operational strengths and strategies as what was provided in the Offering Documents, referenced in ¶¶ 34-48, *supra*.

45.    On March 7, 2019, Berry issued a press release announcing the Company's fourth quarter and year end 2018 results. The press release stated, in relevant part:

"Our focus is on value through the cycle. Berry is capital efficient and doesn't have long-term drilling contracts that drive inefficiency. We can drill and move capital to where it provides the best long-term value and do it quickly. We are very flexible and responsive to changing market conditions. As a result, we have decreased our 2019 capital spending by $35 million or 14% with only a little more than 3% reduction in company-wide projected production. The technical knowledge gained over the last year and a half on our assets gives us a high level of confidence in the cash generating capability of these assets for many years to come. At Berry, we are excited about the value creation opportunities in 2019 and beyond."

46.    That same day, Berry hosted an earnings call with investors and analysts to discuss the Company's fourth quarter 2018 results (the "Q4 2018 Earnings Call"). In the scripted portion of the Q4 2018 Earnings Call, Defendant Smith stated, in relevant part:

Most importantly, I want to clearly and concisely communicate to you that all we have done, continued to do and will continue to do is absolutely consistent with our business model. We managed to value not just the production growth, we are basin

agnostic, we have no long-term capital commitments, i.e. we can turn capital off such as a drilling rig and back on within 30 days and always lived within our definition of levered free cash flow, which as a reminder, is we pay our expenses, OpEx, taxes, we pay our financial obligations including interests, we return capital to our shareholders in the form of dividends and we fund a sufficient CapEx to maintain production. The remainder is our levered free cash flow, which we use to grow the value of the company for our shareholders.

\*\*\*

The future looks very bright. In fact, our technical assessment of our current resource and original oil in place indicates that a simple 1% increase in recovery factor could result in the addition of over 20 million barrels of oil in our California assets. A remarkable opportunity and another competitive advantage for Barry [*sic*].

It was just two years ago last week that we created the new Berry. A lot has happened and we are grateful to everyone that has been involved to this point. I am confident we can and will sustain our efforts to improve and exceeded our plan with excellence. We will continue to prosper.

47.     Next, in discussing the Company's operational performance on the Q4 2018 Earnings Call, Defendant Grove stated, in relevant part:

Our entire operating team prides itself on searching out value for our shareholders and will continue to do so in 2019 and beyond. We have a very good team in place to execute on our program and can be very responsive to market changes as shown in our revised guidance. As an example, we do not have any stranded capital as a result of our new development plan. So on behalf of the entire operating team, we're looking forward to 2019 and what it means for Berry.

48.     Further, in discussing the Company's financial performance on the Q4 2018 Earnings Call, Defendant Baetz stated, in relevant part:

For 2018, our operating performance gave us the confidence to return meaningful capital to our shareholders in the form of dividends, which we began in the first quarter as - our quarter as a public company as well as through our share repurchase program, which we initiated in the fourth quarter with almost 450,000 shares acquired by year end.

49.     On March 8, 2019, Berry filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December

31, 2018 (the "2018 10-K").  The 2018 10-K touted a substantively similar overview of the Company's operational strengths and strategies as what was provided in the Offering Documents, referenced in ¶¶ 34-38, *supra*.

50.     Appended as an exhibit to the 2018 10-K was a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Smith and Baetz, attesting that, "the information contained in [the 2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

51.     On May 8, 2019, Berry issued a press release announcing the Company's first quarter 2019 results.  The press release quoted Defendant Smith, who stated, in relevant part, "Berry continues to execute its 2019 development plan in line with our expectations, as our full-year production and spending are on track."

52.     On May 9, 2019, Berry hosted an earnings call with investors and analysts to discuss the Company's first quarter 2019 results (the "Q1 2019 Earnings Call").  In the scripted portion of the Q1 2019 Earnings Call, Defendant Smith stated, in relevant part:

> We are not driven by quarter-by-quarter results. We are fixated on long-term value that is created throughout the cycle. As I've said numerous times, the Berry business model is simple. We pay our expenses and financial obligations including interest and return capital to our shareholders in the form of dividends while sufficiently funding CapEx to maintain production and subsequently growing value and production out of, what we call, levered free cash flow. By having a simple business model, a flexible plan and a management team obsessed with increasing shareholder value, and data driven decision making, we are able to respond to shifting market conditions and manage what we can't control, but we can and do mitigate, like global and regional commodity pricing and the political environment [. . .].

53.     On August 7, 2019, Berry issued a press release announcing the Company's second quarter 2019 results.  The press release stated, in relevant part:

> Trem Smith, Berry Petroleum board chair, chief executive officer and president stated, "Berry continues to generate significant intrinsic value for our shareholders.

We are always focused on protecting and growing our base production. As planned, the ongoing development of our California oil assets has positioned us to realize considerable value growth through production increases for the remainder of 2019 and beyond. In planning for this robust second half growth, we drilled 210 wells in the first half of the year, of which 133 of them will begin to contribute to production in the second half of the year. As our 6.5% growth in current production indicates, some have already started to contribute. In fact, current California production has substantially increased compared to June and we expect to see this continue through the remainder of the year."

"Since going public a year ago, Berry has declared $47 million in dividends; repurchased 4% of its shares and grown California production by 11% over the past twelve months. This has been done from our free cash flow. At Berry, we will continue to execute as promised, always managing to value and returning capital to shareholders as key components to our strategy."

54.     On August 8, 2019, Berry hosted an earnings call with investors and analysts to discuss the Company's second quarter 2019 results (the "Q2 2019 Earnings Call").  In the scripted portion of the Q2 2019 Earnings Call, Defendant Smith stated, in relevant part:

. . . our track record of consistently delivering on our promises and growing value is yet to be fully recognized by the market. As I've reported previously, we've continued to perform as we said we would, we've grown over production from our existing asset base, we've returned capital and earnings to our investors through our fixed dividend and share repurchases, and we have lived within free cash flow. No other small- or mid-cap E&P company that we are aware of can make this claim.

Again, Berry's assets are substantially different from the resource plays and our manufacturing-like business model is different too. In light of this, we continuously review and advance our core business strategy to help ensure we are maximizing the value to our investors.

55.     On November 7, 2019, Berry issued a press release announcing the Company's third quarter 2019 results.  The press release stated, in relevant part:

"It is clear from Berry's strong third quarter production that our California oil assets respond to investment and the capital deployed during the first half of the year is now driving value. We expect Berry's production for the year will be at the mid-point of our guidance, while spending will come in just under the mid-point of guidance," stated Trem Smith, Berry Board Chair, Chief Executive Officer and President. "Since becoming a public company in 2018, we have grown production and consistently paid a substantial dividend within levered free cash flow. Our focus continues to be on responsible production while creating value for our

shareholders through a combination of growth and return of capital. This year we expect to see double-digit production growth at about 12% company-wide, provide an attractive dividend yield, and buy back 4% of our stock. We are well positioned to continue this strategy in 2020 as we are well hedged for the remainder of 2019 and throughout 2020.  In short, Berry is in a strong position to continue to create and deliver top-tier value in the market."

56.     That same day, Berry hosted an earnings call with investors and analysts to discuss the Company's third quarter 2019 results (the "Q3 2019 Earnings Call").  During the scripted portion of the Q3 2019 Earnings Call, Defendant Smith stated, in relevant part:

This quarter was extremely productive for Berry. We delivered according to plan, growing total Company production by 8% and California production by 10%, since the second quarter. And we're confident this growth will continue into the fourth quarter.

Our focus continues to be on creating value for our shareholders across market cycles through a combination of growth and returning capital. Specifically, this year, we expect to see double-digit production growth of about 12% companywide, providing attractive dividend yield, and have repurchased 4% of our stock.

*** 

.  .  . Berry has grown low-risk production from the existing asset base, has production heavily weighted towards oil benefits from Brent-based pricing resulting in attractive margins, and has based on management estimates at least a 20-year inventory of future drilling locations.

57.     On February 27, 2020, Berry issued a press release entitled, "Berry Corporation (BRY) Reports Strong Fourth Quarter and Full Year 2019 Results; Continues to Deliver Top Tier Industry Returns, Achieved Double Digit California Production Growth; Replaced Nearly 300% of California Reserves."  The press release stated, in relevant part:

"We had a great fourth quarter and 2019. Our business model works and when we invest capital in development drilling, our assets respond, creating additional value. Our top tier returns and strong production and reserve profile, achieved while generating excess levered free cash flow, demonstrate the strength of our financial principles. In 2019, we grew California oil production more than 15% year over year; increased our California reserves, entirely oil, 23% before production on a year-over-year basis; and we paid $85 million to return capital to our shareholders by repurchasing 6% of our outstanding shares while continuing to pay one of the

highest dividend yields in the industry.  In 2020, you can expect more of the same from Berry. We are committed to generating strong oil growth on a lower capital spend; continuing our substantial return of capital and, at today's pricing, generating solid excess levered free cash flow," stated Trem Smith, Berry board chair, chief executive officer and president.

58.     That same day, Berry filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K").  The 2019 10-K touted a substantively similar overview of the Company's operational strengths and strategies as what was provided in the Offering Documents, referenced in ¶¶ 34-38, *supra*.

59.     Appended as an exhibit to the 2019 10-K was substantively the same SOX certification as referenced in ¶ 50, *supra*, signed by Defendants Smith and Baetz.

60.     Also on that same day, 2020, Berry hosted an earnings call with investors and analysts to discuss the Company's fourth quarter 2019 results (the "Q4 2019 Earnings Call"). During the scripted portion of the Q4 2019 Earnings Call, Defendant Smith stated, in relevant part:

Our business model is working. This is demonstrated by our total returns to shareholders and strong production and reserve profile which we delivered while generating excess levered free cash flow.

***

Turning to 2020 now we are building on the momentum from 2019 and excited to augment our work in the year ahead primarily through three key focus areas.

One operational execution and capital discipline; two regulatory engagement; and three focus on environmental social and governance or ESG initiatives. First we remain intently focused on planning for and executing operational and financial strategies. Our 2020 capital program reflects our disciplined and returns-focused approach and commitment to value creation.

Given shareholder expectations for greater returns the volatility and current weakness in commodity prices and the challenging market environment we are moderating our 2020 capital to a range of $125 million to $145 million down from the $211 million in 2019. It is worth noting that our 2020 plans anticipate primarily sandstone development which does not require high-pressure cyclic steam or

hydraulic stimulation. Our abundant inventory of opportunities and rolling two year budget planning enables us to adapt to the evolving regulatory environment in California without changing our financial or value creation principles.

We expect our 2020 plan to generate year-over-year production growth while producing attractive excess levered free cash flow.

\*\*\*

By working with the legislators and regulators at all levels of the government on the front end of the regulatory process we are gaining insight making progress and effectively minimizing the impact of new regulations and legislation and mitigating the risk of permitting delays. In 2019 California state regular legislators and regulators have imposed new idle well management regulations. We have and we will continue to comply with these new regulations. In addition we also abandoned wells earlier than required as part of our planned development in certain reservoirs.

Accordingly for both these reasons we increased our plugging and abandonment spending in 2019 to approximately $27 million and our 2020 plans include a similar level of activity. Barry [*sic*] is committed to being responsible and conscientious producer.

61.     Next, in discussing the Company's operational performance on the Q4 2019 Earnings Call, Defendant Grove stated, in relevant part:

We are committed to operating our properties at the highest levels.

For example in the fourth quarter we spent approximately $2.9 million to address some inherited long-term delayed maintenance on some of our equipment and we additionally rolled out our new computerized maintenance management system to ensure the reliability of all of our equipment moving forward.

\*\*\*

Cost control is a key item for us as we move forward. Even as we move more of our production to 100% oil operations we focus on OpEx control opportunities. We remain committed to being a top-tier operator in the state and believe we can meet both operational and future ESG goals collectively.

62.     On May 6, 2020, Berry issued a press release announcing the Company's first quarter 2020 results.  The press release stated, in relevant part:

"The seasoned Berry management team has led organizations and teams through several downturns. We will use our past experience to navigate Berry through this

one. We understand that, by definition, plans are dynamic and must be modified as evolution of the data requires. Berry's key characteristics of quick decision making, adaptability, flexibility and resiliency make it especially well-positioned to succeed in this unique, dynamic world. To that end, we continue to reduce costs and improve our efficiency providing value in the short, medium, and long-term. We will maximize our cash position to ensure we have maximum flexibility regardless of market fluctuations. Managing cash flow is nothing new for Berry, and as we have historically demonstrated, we will manage the company to ensure it is strongly positioned to capitalize on the eventual market improvements."

63.     On May 7, 2020, Berry hosted an earnings call with investors and analysts to discuss the Company's first quarter 2020 results (the "Q1 2020 Earnings Call").  During the scripted portion of the Q1 2020 Earnings Call, Defendant Grove stated, in relevant part:

For full year 2020, we plan to spend nearly $15 million on plugging and abandonment activities, or ARO. That satisfies our obligations under the California mandated idle well management plan. We will continue to be a leader in environmental, social, and governance initiatives across the entirety of our operations, showcasing our operating processes and methods of safely producing both from the sandstones and diatomite assets.

*** 

We want to make the most logical and programmatic decisions, using all of the data available to us at any time. Some examples of those cost controls we've implemented are, again, reducing or delaying steam in areas that are either very young in development or very mature; utilizing our new computerized maintenance system to optimize our long-term maintenance work across the company; looking for contractor rate reductions; reducing overtime and overall labor costs, both company and contractors; and continuing to manage our remaining highest cost categories, including well servicing, chemicals, and processing costs.

64.     In addition, when asked a question regarding the Company's curtailing of wells, Defendant Grove responded, in relevant part:

Now, on the steam side, yes, we have reduced some steam in certain areas. A lot of those are in conjunction with maybe some profile control we want to do. By that, how we inject steam in a particular injector and where that steam goes in that particular well to sweep oil to those surrounding producers.

So we've done some of that to date. And I think more importantly though, is that we look at areas where we can reduce steam that won't have any immediate or long-term impact, if you will, to the reservoirs themselves. So we're taking advantage of

that and right now, I would say, we've earned about 81 million a day, plus or minus, in the quarter, MMBtus per day. And we're looking to probably burn at least initially probably in the mid-70 millions going forward into the second quarter, plus or minus, as we look at all of the reservoirs.

65.     On August 4, 2020, Berry issued a press release announcing the Company's second quarter 2020 results.  The press release stated, in relevant part:

"While market conditions improved over the latter part of the quarter we still anticipate, and have planned for, a prolonged impact of the global demand destruction caused primarily by COVID-19 to continue for the next few quarters. Our experienced Berry management team is successfully managing through this downturn by protecting our cash flow, maintaining our strong liquidity position and positioning the company to thrive when the market returns. Through sustainable cost and cash savings and efficiency improvements, we reduced our Unhedged OpEx costs by 16% quarter over quarter. We also improved our hedge position in 2021 to weather the continued volatility we expect through the first half of next year and we are determined to continue to build cash through the year. We currently plan to recommence drilling with one rig in early October, which would continue to work throughout 2021. As we have said before, the Berry business model is designed to create value in any cycle, and we are confident we will continue to do so in this one."

66.     On August 5, 2020, Berry hosted an earnings call with investors and analysts to discuss the Company's second quarter 2020 results (the "Q2 2020 Earnings Call").  During the scripted portion of the Q2 2020 Earnings Call, Defendant Smith stated, in relevant part:

We continue to streamline our in-house permitting review process to expand throughput on CalGEM's additional permitting requirements and to work toward our 2020 plugging and abandonment plan. We will meet all our obligations to the state, as we always do.

I want to reiterate that the Berry business model is designed to create value in any cycle, including this one. Our experienced leadership has weathered several downturns in the past, and we are navigating through this one as well. As exemplified by the strategic initiatives we have already implemented, we are well positioned for the market to return, which it will.

67.     Next, in discussing the Company's operational performance during the Q2 2020 Earnings Call, Defendant Grove stated, in relevant part:

. . . we have been reducing cost in manageable and sustainable ways. These are not personnel or salary cuts, but rather, efficiency opportunities like vendor rate reductions and well servicing efficiencies.

To highlight a few examples, surface repair and maintenance was down 18%. Well servicing was down 20%, and our chemical usage was down 13% quarter-over-quarter. Even more telling is that those 3 areas were down 50%, 41% and 19% respectively from January to June. We also actively decreased our steam volumes during the quarter through effective steam management without impacting our reservoir conditions, reducing our total gas burn rate 11% quarter-over-quarter. We burned 72,500 MMBtu per day during the second quarter at an average un-hedged price of $1.74 per MMBTu. Furthermore, we have been calibrating our cost and volume reduction associated with production. As we reduce steam, our water disposal requirements increase, which can have a negative production impact in the short term. We continue to balance cost savings with potential production impacts concentrating on incremental value creation as always.

***

While we reduced capital and paused our drilling program, we have not reduced our abandonment or ARO activities and we remain fully committed to our obligations under the California mandated idle well management plan and our role as a leader in environmental, social and governance initiatives. We have abandoned 79 wells to-date in our annual plan, targeting approximately 150 to be completed by year end.

68.     In addition, when asked a question regarding operational expenses, Defendant Grove responded, in relevant part:

So we control a lot of that. The steam itself, obviously, we control pretty dramatically. I will tell you that at some point in the future, we will want to bring steam back online, most likely, and because we will be redirecting it. So our steam management happens all the time. So there's times when we reduce steam at a particular interval but we put it in a different interval. What we have chosen to do right now is we took the steam out of that interval and we have to put it back in a different interval due to the, again, the market conditions as we sit today. As that moves forward, we will continue to bring that steam, some of it, back online.

69.     The statements referenced in ¶¶ 40-68, *supra*, were materially false and misleading because the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, the Exchange Act Defendants made false and/or misleading statements

and/or failed to disclose that: (i) Berry had materially overstated its operational efficiency and stability; (ii) Berry's operational inefficiency and instability would foreseeably necessitate operational improvements that would disrupt the Company's productivity and increase costs; (iii) the foregoing would foreseeably negatively impact the Company's revenues; and (iv) as a result, the Offering Documents and the Company's public statements were materially false and/or misleading and failed to state information required to be stated therein.

**The Truth Emerges**

70.     On November 3, 2020, post-market, Berry reported its financial and operating results for the third quarter of 2020.  Among other results, Berry reported non-GAAP EPS and revenue that both fell short of estimates.  In addition, Berry reported that during the quarter, "the Company undertook certain operational improvements that caused temporary reductions in our production.  Notably, we performed some plugging and abandonment activity that resulted in temporary shut-in of nearby wells.  Additionally, improved steam management reduced overall costs but temporarily increased water disposal and well maintenance needs, resulting in a slight decrease in production."

71.     On this news, the Company's stock price fell $0.15 per share, or 5.28%, to close at $2.69 per share on November 4, 2020, representing an 80.78% decline from the IPO price.

72.     As of the time this Complaint was filed, the price of Berry securities continues to trade below the Offering price, damaging investors.

73.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Berry's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Berry securities in the IPO or purchased Berry securities thereafter in the stock market pursuant and/or traceable to the Company's Offering Documents issued in connection with the IPO; or (b) Berry securities during the Class Period; and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

75.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Berry securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Berry or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

76.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

77.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

{00405938;2 }

78.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Offering Documents for the IPO, or during the Class Period, misrepresented material facts about the business, operations and management of Berry;

- whether the Securities Act Individual Defendants negligently prepared the Offering Documents for the IPO and, as a result, the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;

- whether the Exchange Act Individual Defendants caused Berry to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Berry securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

79.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

80.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Berry securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Berry securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

81.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

82.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 11 of the Securities Act Against All Defendants)

83.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

84.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

85.     The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

86.     Berry is the registrant for the IPO.  Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

87.     As issuer of the shares, Berry is strictly liable to Plaintiff and the Class for the misstatements and omissions in the Offering Documents.

88.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

89.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

90.     Plaintiff acquired Berry shares pursuant and/or traceable to the Offering Documents for the IPO.

91.     Plaintiff and the Class have sustained damages.  The value of Berry securities has declined substantially subsequent to and because of Defendants' violations.

## COUNT II

### (Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)

92.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

93.     This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

94.     The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Berry within the meaning of Section 15 of the Securities Act.  The Securities Act Individual Defendants had the power and influence and exercised the same to cause Berry to engage in the acts described herein.

95.     The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

96.     By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants)**

97.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

98.     This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

99.     During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to

defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Berry securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Berry securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

100.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Berry securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Berry's finances and business prospects.

101.    By virtue of their positions at Berry, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants.  Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Exchange Act Defendants knew

or recklessly disregarded that material facts were being misrepresented or omitted as described above.

102.    Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.   As the senior managers and/or directors of Berry, the Exchange Act Individual Defendants had knowledge of the details of Berry's internal affairs.

103.    The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Berry.  As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Berry's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Berry securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Berry's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Berry securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

104.    During the Class Period, Berry securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares

of Berry securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Berry securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Berry securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

105.    By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

106.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

**(Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)**

107.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

108.    During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Berry, and conducted and participated, directly and indirectly, in the conduct of Berry's business affairs.  Because of their senior positions, they knew the adverse

non-public information about Berry's misstatement of income and expenses and false financial statements.

109.    As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Berry's financial condition and results of operations, and to correct promptly any public statements issued by Berry which had become materially false or misleading.

110.    Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Berry disseminated in the marketplace during the Class Period concerning Berry's results of operations.   Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Berry to engage in the wrongful acts complained of herein.   The Exchange Act Individual Defendants therefore, were "controlling persons" of Berry within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Berry securities.

111.    Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Berry.   By reason of their senior management positions and/or being directors of Berry, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Berry to engage in the unlawful acts and conduct complained of herein.   Each of the Exchange Act Individual Defendants exercised control over the general operations of Berry and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

112.    By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Berry.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 20, 2020                    Respectfully submitted,


                                             */s/ Willie C. Briscoe*
                                             Willie C. Briscoe
                                             Texas Bar No.: 24001788
                                             The Briscoe Law Firm, PLLC
                                             12700 Park Central Drive, Suite 520
                                             Dallas, Texas 75251
                                             Telephone: 972-521-6868
                                             Facsimile: 281-254-7789
                                             wbriscoe@thebriscoelawfirm.com

                                             POMERANTZ LLP
                                             Jeremy A. Lieberman
                                             (*pro hac vice* application forthcoming)
                                             J. Alexander Hood II
                                             (*pro hac vice* application forthcoming)

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

**CERTIFICATION PURSUANT**
**TO FEDERAL SECURITIES LAWS**

1.    I, Luis Torres _____, make this

declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities

Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Berry Corporation ("Berry" or the "Company") and authorize

the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Berry securities at the direction of plaintiffs counsel, or in order to

participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a class of investors who purchased or

acquired Berry securities during the class period, including providing testimony at deposition and trial, if

necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this

action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Berry

securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as

set forth in the Complaint, beyond my pro-rata share of any recovery, except such reasonable costs and

expenses directly relating to the representation of the class as ordered or approved by the Court.

{00405700;1 }

8.   I declare under penalty of perjury that the foregoing is true and correct.


**Executed** _11/16/2020_____
　　　　　　　　**(Date)**




_Luis Torres_
_____
　　　　**(Signature)**


Luis Torres
_____
　　**(Type or Print Name)**

**Berry Corporation (BRY)**                                                                 **Torres, Luis**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 4/8/2019 | 80 | $12.5000 |