# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| LUIS TORRES, ALLIA DEANGELIS, DARRICK INMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BERRY CORPORATION, ARTHUR T. SMITH, CARY BAETZ, GARY A. GROVE, BRENT S. BUCKLEY, KAJ VAZALES, and EUGENE J. VOILAND,<br><br>Defendants. | Case No. 3:20-CV-3464-S<br><br>AMENDED CLASS ACTION COMPLAINT<br><br>JUDGE KAREN G. SCHOLER<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Luis Torres and Allia DeAngelis ("Lead Plaintiffs") and additional Plaintiff Darrick Inman (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Class Action Complaint (hereafter the "Complaint" or the "Amended Complaint") against Defendants Berry Corporation ("Berry" or the "Company"), Arthur T. Smith ("Smith"), Cary Baetz ("Baetz"), Gary A. Grove ("Grove"), Brent S. Buckley ("Buckley"), Kaj Vazales ("Vazales"), and Eugene Voiland ("Voiland") (collectively the "Defendants"), allege the following based upon personal knowledge as to Plaintiffs and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about

the Company, numerous interviews with former employees of the Company or the Confidential Witnesses ("CWs") and other information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of all persons or entities, other than Defendants, who:  (1) purchased or otherwise acquired Berry's common stock pursuant and/or traceable to Berry's Registration Statement issued in connection with its July 26, 2018 Initial Public Offering ("IPO"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"); and/or (2) purchased or otherwise acquired Berry's common stock between July 26, 2018 and November 3, 2020, both dates inclusive (hereafter the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Berry is an energy company that focuses on the development and production of conventional oil reserves principally in California with over 90% of its total proved reserves located in the San Joaquin Basin.  The oil and gas industry in California is heavily regulated, and oil producers are required to obtain a variety of permits from the regulators to drill and efficiently produce oil.  Defendants, in fact, recognized that the recovery methods utilized by the Company can take many years to fully develop and are heavily dependent on the timely issuance of permits from the local and federal governments.  As such, the Company repeatedly told investors in its filings with the SEC that mitigating the risk of permitting delays was one of the core elements of its business strategy.

3.     The Company went public pursuant to an IPO on July 26, 2018.  The Registration Statement that Defendants used to sell shares in the IPO, however, was materially false and misleading in two important respects:  (1) it contained misleading statements about the potential risk of permitting delays and the inability to drill oil in identified sites when these risks had either already occurred or had a high risk of occurring in the near future, and (2) it omitted to disclose chronic internal deficiencies—which existed well before the Company went public—that prevented the Company from obtaining certain permits, the disclosure of which was mandated by SEC Regulation S-K.  Indeed, several months before the Company went public, according to CW4, CW5 and CW7, the Company had already experienced severe delays in securing permits that threatened production, and, in fact, CW5 presented a Strengths, Weaknesses, Opportunities and Threats ("SWOT") analysis to the highest level of management, which identified that the Company's repeated failure to secure timely permits was a major threat to its business.[1]

4.     After the Company went public, between August 2018 and August 2020, Defendant Smith, the Company's Chief Executive Officer ("CEO"), Defendant Baetz, the Company's Chief Financial Officer ("CFO"), and Defendant Grove, the Company's Chief Operating Officer ("COO"), made materially false and misleading statements on nearly a dozen occasions, assuring investors that the ability to secure permits was a non-issue at the Company.  For example, at an Investor Day held in May, 2019 Defendant Grove spoke at length about the process for obtaining permits, and told investors that "we don't have a permitting problem," and Defendant Smith went even further at the same event and remarked that: ***"So we do not have a permitting problem, as Gary said five times at least I'll say it another 20 times."***  (Emphasis added).  Between the end of 2019 and early 2020, when analysts asked specific, pointed questions about permitting delays,

---

[1] Facts detailing each CW's position, tenure, responsibilities and access to information provided are set forth herein in ¶¶ 37-39, 41-70.

Defendant Grove repeatedly referred to the delay as a "tiny issue" and misleadingly claimed that the delay was associated with a specific permit required only for fracking, but there were no delays or other problems with obtaining any other kind of permit.  The Company's own Annual Report for Fiscal Year 2019 filed in February 2020 (hereafter the "2019 10-K") contained inconsistent admissions that rendered Defendants' earlier statements in the Class Period false when made.  In the 2019 10-K, the Company admitted that it experienced delays in obtaining Underground Injection Control Permits ("UIC Permits"), a permit required to inject steam into oil wells to increase production, but deflected blame for the delay on regulatory changes.  However, even this half-truth was misleading in light of the following facts:

- CW1, CW4 and CW5 state that the delays in obtaining UIC Permits were not caused by any alleged regulatory changes.  CW5 states that, by no later than 2019, the failure to obtain timely permits was principally the fault of senior management at the Company.

- The detailed accounts of numerous CWs confirm that throughout the Class Period, Defendants did not obtain timely permits because of:

  - (a) the failure to plan sufficient lead time to secure UIC Permits, which take several years to obtain;

  - (b) the Company's repeated submission of faulty data in application packages, leading to denial by local regulators;

  - (c) Grove's decision to flout regulations that required producers to obtain UIC Permits for cyclic steam wells; and

  - (d) incorrect well plans that caused a mismatch between the actual location of the wells and the location of the corresponding permit.

- CW3 states that the failure to obtain permits became a drastic problem no later than June 2019.

- Numerous CWs confirm that the repeated failure to secure UIC Permits was pervasive throughout the Class Period and had negative, tangible consequences.  For instance, CW1 states that the Company ceased production on two rigs in the fall of 2019 because Defendants failed to account for the necessary lead time to acquire permits.  CW2 states that the failure to obtain UIC Permits caused the Company to write down its reserves.  CW6 confirms that the failure to acquire UIC Permits caused the Company to fall

behind on production for desired wells.  And CW7, a neutral third-party consultant hired to address permitting problems at the Company, confirms that the Company could not inject steam and increase production because of a lack of UIC Permits in, at least, hundreds of wells between January 2019 and May 2020.

5.      The failure to obtain permits caught up with the Defendants by early 2020, and in April 2020, the Company abruptly announced that it would drastically slash its capital expenditures and then targeted production to remain flat to two percent down for Fiscal Year 2020 due to "current market conditions."  This plan remains in effect for Fiscal Year 2021 and part of Fiscal Year 2022 even though the economy has rebounded and oil prices have skyrocketed. However, in 2020, Defendants concealed from investors that, according to CW4, the revised plan to reduce production for the next two years was presented to the Board as a cost reduction measure before the first lockdown was instituted in California and well before the economy began to experience any negative consequences from the pandemic.  Nevertheless, even after April 2020, Defendants continued to make false statements about the permitting process and the number of permits that the Company had on hand.  According to CW1 and CW4, the number of permits on hand that Defendants touted to investors in the summer of 2020 was false because these purported permits were either obtained for the wrong location or because the wells could not be steamed to increase production due to a failure to obtain UIC Permits.

6.      The CW accounts pled in this Complaint, from sources that directly reported to or regularly interacted with Defendants Smith, Baetz and Grove, demonstrate that Defendants either had actual knowledge of the truth when they made the false and misleading statements detailed herein, or were reckless as to the truth of their statements:

- CW1, who directly reported to Grove, regularly met with the Defendants in person and took written notes of his discussions with them, some of which CW1 shared with Plaintiffs. In early 2019, the Company hired Megan Silva ("Silva") to oversee the permitting process. Smith publicly touted her hiring to investors as a "monster move."  A note from a meeting between CW1, Silva, Smith and Baetz that occurred on March 4, 2020 states that Silva

warned the group that Berry's permitting process and production targets did not match the actual permit flow and implementation plan and that, as a result, the Company would miss its production targets. According to another contemporaneous note of a meeting between CW1, Smith, Baetz and Silva held on October 17, 2019, Silva and CW1 told Smith and Baetz that Berry's well inventory did not align with the permitting. CW1 explained to Plaintiffs that, in this meeting, CW1 and Silva told Smith and Baetz that over 90% of the permits in the pipeline were unprofitable. As a result, Grove directed CW1 to drill at second tier locations. CW1 also repeatedly warned Smith and Grove in emails concerning the magnitude of the permitting problems starting, at least, in the summer of 2019. CW1, who met with Grove on a weekly basis, also shared with Plaintiffs text messages that he sent to Grove, and which Grove responded to, warning about the failure to build lead time to mitigate the external regulatory barriers.

- CW3 repeatedly raised concerns about the failure to obtain timely permits in meetings with Smith, Baetz and Grove. On at least one occasion at these meetings, Smith himself chastised employees for failing to obtain timely permits.

- CW4 also regularly met with Smith, Baetz and Grove to discuss how the failure to obtain permits negatively impacted production and told these Defendants about the reasons why the Company had failed to secure UIC Permits. CW4 created a dashboard with granular data on a Microsoft Excel file for sites that the Company intended to drill, the types of wells located in those sites and specific details about permit submissions. This dashboard contained completion deadlines for permits and tracked projects that fell behind schedule. CW4 showed the information on this dashboard to Smith and Grove on a regular basis at in-person meetings throughout the Class Period.

7.      While Defendants continue to conceal the full truth about the severe permitting problems at the Company, the truth has begun to emerge through a series of partial disclosures and/or materializations of concealed risks. On April 1, 2020, the Company abruptly issued a press release and announced that due to "current market conditions," the Company would revise its 2020 production target significantly downwards, with growth expected to remain flat to 2% down.

8.      On this news, the Company's stock price declined by over 16.6% from its previous day closing price of $2.41 on March 31, 2020 to close at $2.01 on April 1, 2020, on heavy trading volume.

9.      On August 4, 2020, the Company announced that average daily production decreased by an additional 5% for the second quarter of 2020 compared to the first quarter of 2020.

6

10.     As a result, the Company's stock price declined by over 7% from its previous day closing price of $4.90 on August 4, 2020 to close at $4.55 on August 5, 2020, on heavy trading volume.

11.     On November 3, 2020 the Company announced that average daily production decreased yet again by 5% for the third quarter of 2020 compared to the second quarter of 2020. On this news, the Company's stock price declined by over 5% from its previous day closing price of $2.84 on November 3, 2020 to close at $2.69 on November 4, 2020, on heavy trading volume.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities upon the partial disclosures and/or materializations of the concealed risks thereof, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, and 77o) and under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

15.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27(a) of the Exchange Act (15 U.S.C. §78aa(a)) and 28 U.S.C. §1391(b). Many of the acts and conduct that constitute the violations of law complained of herein occurred

in this District.  The Company maintains its headquarters in Dallas, Texas, which is situated within this District.

16.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

17.     Plaintiffs, as set forth in their previously filed declarations (ECF Nos. 1 (Torres) and 13 (DeAngelis)) and attached as Exhibits 1 and 2 to the Declaration of Brian P. O'Connell to this Complaint for additional Plaintiff Darrick Inman, acquired the Company's securities pursuant and/or traceable to the Offering Documents and/or otherwise acquired the Company's securities at artificially inflated prices during the Class Period, and were damaged as a result of the federal securities law violations alleged herein.

18.     Defendant Berry is incorporated under the laws of Delaware with its principal place of business located at 16000 N. Dallas Pkwy, Ste 500, Dallas, Texas.  Berry's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "BRY."

19.     Defendant Smith has served as the President, CEO and as a member of the Board of Directors of Berry since March 2017.  Smith signed the misleading Registration Statement and made the materially false and misleading statements more fully described in Paragraphs 71 through 81, 84, 86, 98 and 102.

20.     Defendant Baetz has served as the Executive Vice President, CFO and a member of the Board of Directors of Berry since May 2017.  Baetz signed the misleading Registration

Statement and made the materially false and misleading statements more fully described in Paragraphs 71 through 81, 88 and 106.

21.     Defendant Grove served as the Executive Vice President and COO of the Company from May 2017 to September 2020.  Grove made the materially false and misleading statements identified in Paragraphs 88, 90, 92, 94, 96, 100 and 104.

22.     Defendant Buckley has served as a member of the Board of Directors at Berry since February 2017 and served as the Board's Chairperson from June 2017 to February 2019.  Buckley signed the misleading Registration Statement.

23.     Defendant Voiland served as a member of the Board of Directors at Berry throughout the Class Period.  Voiland signed the misleading Registration Statement.

24.     Defendant Vazales served as a member of the Board of Directors at Berry from February 2017 to September 2018.  Vazales signed the misleading Registration Statement.

25.     The Defendants referenced above in ¶¶ 19-24 are sometimes referred to herein collectively as the "Individual Defendants."

26.     The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and/or market communications alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  The Individual Defendants are liable for the false and misleading statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

**Background**

27.    Berry is an energy company that focuses on the development and production of conventional oil reserves in the western United States.  As of December 31, 2020, the Company had 347 employees.  The Company's predecessor, Berry Petroleum Company, went public in 1989, but subsequently filed for bankruptcy on May 11, 2016.  In February 2017, Berry LLC appeared out of the bankruptcy as a stand-alone company and a wholly owned subsidiary of Berry, which was incorporated in Delaware in the same month.  In July 2018, Berry completed its IPO and the Company's common stock began to trade on the NASDAQ.

28.    The vast majority of the Company's asset base consists of oil reserves in the San Joaquin Basin of California with over 90% of its total proved reserves located in that state.  Its remaining proved reserves are located in Utah and Colorado.  Throughout its history as a public company, Berry has touted the low risk profile of its properties given that the wells have produced oil for decades, particularly in California, as well as the fact that the Company exercises operational control over virtually all of its producing wells, enhancing a high degree of flexibility towards executing business plans, meeting budget targets, allocating capital expenditures and the marketing of production.  With similar enthusiasm, the Company routinely touts its "experienced, principled and [] disciplined management team" as another source of the so-called "Berry Advantage" that allows Berry to "optimize" the value of its assets and business.

29.    California, where virtually all of the Company's asset base is located, is one of the most regulated states in the United States.  In order to drill wells in California, an oil producer is required to obtain a variety of permits from the California Geologic Energy Management Division ("CalGEM").  As the Company has repeatedly recognized, the recovery methods that it utilizes

take several years to fully develop and heavily depend on the timely issuance of permits from regulatory bodies at the federal and state level.  A failure to secure regulatory approval or permits in a timely manner inevitably has a severely negative impact on production and the Company's present and future business prospects.  Throughout the Class Period, the Company repeatedly told investors in SEC filings and investor conference calls that it interfaced and worked closely with regulators on the front end of the process to mitigate the risk of permitting delays.  Indeed, the Company claimed that mitigating the risk of permitting delays was one of the six principal elements of its business strategy in each Annual Report filed with the SEC on Form 10-K for the Fiscal Years 2018, 2019 and 2020.

**The Regulatory Landscape for Permits**

30.     Thermal wells require heat, in the form of steam, to efficiently generate oil.  According to Berry's Annual Report filed on Form 10-K for Fiscal Year 2018 ("2018 10-K), the Company's assets in California "consist of heavy crude oil, which requires heat, supplied in the form of steam, injected into the oil producing formations to reduce the oil viscosity, thereby allowing the oil to flow to the wellbore for production."  2018 10-K at 10.

31.     As of December 31, 2018, Berry had 7,030 drilling locations. 4,066 of its California locations required thermal recovery, and 1,766 of those were thermal diatomite wells and 2,300 were thermal sandstone wells.  Likewise, as of December, 2019, Berry had 10,859 drilling locations, and 6,143 of those were thermal sandstones and 3,198 were thermal diatomite wells. *See* Berry Corp. Form 10-K for Fiscal Year 2019 at 19 ("2019 10-K").  Berry's drilling locations in California continue to be "primarily focused on [] thermal Sandstones, thermal Diatomite and Hill Diatomite."  *See* Berry Corp. Form 10-K for Fiscal Year 2020 at 19 ("2020 10-K").

32.    Diatomite is a "soft, silica-rich sedimentary rock comprising diatom remains that forms most commonly in lakes and deep marine areas."[2] Sandstone is a "clastic sedimentary rock whose grains are predominantly sand-sized ..."[3]

33.    In California, separate permits are required to drill and steam wells.  CalGEM is the chief regulator of permits in the state.  Moreover, a county where the drilling site is located may require permits for oil and gas drilling ("Drilling Permits"), and drilling on federal land requires a permit from the Bureau of Land Management ("BLM").

34.    Steam injection is the main type of thermal stimulation of oil reservoirs.  There are several different forms of the technology, with the two main ones being cyclic steam stimulation and steam flooding.  Both are most commonly applied to oil reservoirs, which are relatively shallow and contain crude oils that are very viscous at the temperature of the native underground formation.  Steam injection is widely used in the San Joaquin basin.[4]  Steam flooding and cyclic stimulation work as follows:

---

[2] *See Oilfield Glossary- Diatomite*, SCHLUMBERGER,
https://glossary.oilfield.slb.com/en/terms/d/diatomite (last visited Oct. 21, 2021).
[3] *See Oilfield Glossary- Sandstone*, SCHLUMBERGER,
https://glossary.oilfield.slb.com/en/terms/s/sandstone (last visited Oct. 21, 2021).
[4] *See* https://en.wikipedia.org/wiki/Steam_injection_(oil_industry).



Source: Wikipedia, Oil and Gas News

35.     As demonstrated above, steam flooding involves injecting the reservoir with steam to create hot water, pushing the oil to reduce its viscosity, so it can be produced from the oil producing well.  Cyclic steam stimulation involves injecting steam into the reservoir with one well, heating the oil, and then pumping the heated oil into the surface from the same well.

36.     To inject steam into oil producing formations, an oil producer needs a UIC Permit. As Defendant Grove explained at an Investor Day Conference in May 2019, a UIC Permit "allows us to inject fluids and allows us to inject steam, allows us to inject water.  [W]e need that permit. You get it, it covers a certain area."  (May 16, 2019 Investor Day Conference Transcript at 32). As the California Department of Conservation explains, "[i]njection is often accomplished in a

manner that will increase oil and gas production."[5]   UIC Permits also regulate the amount of water that an oil producer can dispose of during the drilling and production process.

37.     At the Investor Day Conference held on May 16, 2019, Defendant Grove claimed that it generally takes "6 months to 12 months" to receive a UIC Permit. (May 16, 2019 Investor Day Conference Transcript at 32).   However, numerous CWs confirm that the amount of time required was actually substantially longer than 6 to 12 months, demonstrating the urgent need to build sufficient lead time in advance of drilling at a particular location.   For instance, CW1 was a Drilling Operations Manager at Berry between August 2019 and November 2020, and directly reported to Defendant Grove.   CW1 is a chemical engineer, who has worked in the oil and gas industry for approximately 20 years.   CW1 managed Berry's drilling sites and well completions and oversaw the Company's abandonment and workover teams.   CW1 states that UIC Permits have one of the longest lead times and it can take between 12 to 24 months to obtain them.   CW1 explains that seeking approval for UIC Permits from CalGEM is a time intensive and laborious process, which requires the Company to demonstrate that all wells in a given area are deemed competent with no mechanical integrity issues.   CW1 further explains that ultimate approval for a UIC Permit often requires the wells to be pressure tested or involves the inclusion of cement bond logs that confirm the integrity of the area.   Further, according to CW1, the UIC Permit process requires a robust risk analysis of the conditions of every wellbore within the area of review.

38.     CW2 served as a Senior Engineer and then as a Production Manager at Berry between November 2017 and June 2021.   As a Production Manager, CW2 supervised all

---

[5] *See Injection Wells - Frequently Asked Questions*, CALIFORNIA DEPARTMENT OF CONSERVATION,
https://www.conservation.ca.gov/calgem/general_information/Pages/class_injection_wells.aspx
(last visited Oct. 21, 2021).

production engineers at Berry.  CW2's principal responsibility was to ensure that actual oil production met the Company's forecasts for each specific month.  CW2 worked out of Berry's Bakersfield office, and reported to the Vice President of Operations, Kent Fink, who directly reported to Defendant Grove.  CW2 states that it took between 2 to 5 years for Berry to procure UIC Permits.

39.     CW3 was an Environmental and Regulatory Manager at Berry from June 2019 to September 2021.  CW3 supervised various aspects of regulatory compliance and permitting at Berry, and directly reported to Silva, who later became the Executive Vice President of Regulatory and Corporate Affairs, and was identified as one of the key members of management on Berry's website before her departure in the middle of 2021.  Both Defendant Smith and Grove publicly told investors that Silva was the key person at Berry responsible for executing on a well-planned strategy to procure timely permits.  CW3 states that it took Berry between *two to three years* to get a UIC Permit approved.

40.     Berry was also required to get a variety of other permits.  For instance, regulations in California required the Company to secure Well Stimulation Treatment Permits ("WST Permits") for hydraulic fracturing ("fracking").  Oil and gas operators sometimes use hydraulic fracturing when pore space in the rock making up the oil or natural gas reservoir is too tight to allow the flow of fluids or gasses to the well.  *See* Well Stimulation Treatment, California Dept. of Conservation, https://www.conservation.ca.gov/calgem/Pages/WST.aspx (last visited Oct. 21, 2021).  On November 19, 2019, California issued a moratorium on any new fracking and high-pressure cyclic steam permits.  This moratorium applied only to new applications.

**Berry Had Chronic Internal Deficiencies That Caused the Company to Fail to Secure Timely Permits Throughout the Class Period**

41.      Several former employees with knowledge of Berry's permitting problems and a third-party consultant at Cornerstone Engineering Inc. ("Cornerstone"), who worked closely on permitting issues, confirmed that Berry had severe problems with securing timely permits throughout the Class Period, and that these problems negatively impacted the Company's production levels and targets.

42.      CW1 states that the Company experienced significant declines in production because of its inability to secure permits for both drilling as well as for injecting steam.  Between August 2019 and November 2020, CW1 states that drilling was significantly impeded because of Berry's failure to secure timely permits.  Specifically, CW1 recounts that Berry ceased production at two rigs in the fall of 2019 because the Company failed to secure the required permits.  CW1 attributes the failure to the Company's inability or unwillingness to properly account for the necessary lead time in acquiring the permits.  CW1 explained that the lead time needed to be at least twelve months, but Berry frequently fell behind on its plans, and did not even have a three-month lead time in place to drill wells pursuant to the schedule.  CW1 further explained that when Berry failed to hit its internal production targets because of a lack of permits, the Company would then simply revise its forecast.  According to CW1, at Aera Energy LLC ("Aera"), CW1's prior employer, CW1 never ceased production due to a failure to receive timely permits.  In contrast, CW1 personally had to lay down (*i.e.*, idle) ***two of Berry's three rigs*** because of a lack of timely permits.  As another example, CW1 states that Berry drilled 40 wells that required the injection of steam at the Olig Potter formation and spent $20 million drilling the wells, but failed to obtain UIC Permits, creating serious water disposal constraints and ultimately limiting its ability to produce

oil.  CW1 warned Defendants about the unprofitability of drilling these wells six months before they were actually drilled.

43.     On April 1, 2020, after previously conditioning the market to expect double digit growth in production in California, Berry issued a press release that purported to provide updated guidance in light of "current market conditions" and revised targeted production for 2020 to be flat to down 2%.  While this press release still claimed that Berry continued to file for and receive various permits to increase its available inventory, CW1 confirms that the Company masked its preexisting problems and hid from investors how the chronic failure to secure permits caused the Company to radically change its plans even without the "current market conditions."  CW1 notes that Berry regularly revised production targets and capital expenditure plans when it failed to meet its stated goals.

44.     CW1 further states that Berry frequently misrepresented the number of actual, available permits that it had received.  For example, in the summer of 2020, Berry touted that it had received hundreds of permits, but, according to CW1, Defendants withheld that the Company failed to obtain the UIC Permits necessary to inject steam into the wells.  CW1 reported that 95% of the permits publicly touted were illusory because Berry either failed to obtain UIC Permits or obtained Drilling Permits for the wrong location, known as the area of review ("AOR"), because the geologist had changed the location before drilling commenced, thus requiring the permit application to be resubmitted.  CW1 affirms that CW1 directly told Defendant Grove about these specific problems on a regular basis.  CW1 also states that Berry regularly fell behind on obtaining UIC Permits, yet drilled for heavy oil in wells without using any steam.  Because Berry lacked the UIC Permits for these wells and could not steam them, production in the wells precipitously

17

declined.  According to CW1, this specific problem was prevalent in the wells located in Olig Potter, Fairfield, Southwestern, and Hill.

45.    CW1 further asserts that, in 2020, Defendants provided misleading figures for the number of permits that the Company had obtained because the actual drilling sites lacked the necessary permits, including UIC Permits, that would allow the Company to increase production.

46.    CW2 confirms the account of CW1 that the failure to secure permits and poor well management caused serious declines in production levels.  CW2 further states that Berry's failure to secure required UIC Permits not only lowered production, but also caused the Company to write down its reserves.  CW2 explains that once Proved Undeveloped Reserves are booked with the SEC, the driller has five years to drill the wells before the permits expire.  According to CW2, Berry's repeated failure to secure timely permits within the five-year window caused the number of its proved reserves to decline.  CW2 also states that Berry wrote down diatomite assets because of a lack of permits.  While Berry reported booked reserves to investors, according to CW2, Berry failed to acquire the necessary UIC Permits and other permits to actually drill the wells.

47.    Between late 2019 and early 2020, to dampen the impact of lower production, CW2 reports that Defendants embarked on an illegal scheme to inject hot water into wells for which they did not have UIC Permits.  CW2 explains that injecting hot water into a well reduces the viscosity of the heavy oil and thereby improves production.  CW2 further explains that injecting hot water into a producing well is illegal unless required to remedy a well control issue, such as to limit oil backflow, or to intervene by freeing rods from thick oil.  CW2 notes that CalGEM fines companies that utilize hot water for production.  According to CW2, Berry undertook this risky and illegal endeavor to improve production on underperforming wells.  CW2 states that this trend first began in Potter but now Berry is using hot water company-wide.

48.     According to CW2, in the summer of 2020, Berry was unable to drill wells in the Pliocene formation because Berry needed UIC Permits to drill the heavy oil, but failed to obtain them.  CW2 blamed the failure to secure the UIC Permits on a breakdown of internal processes at the Company.  CW2 states that Berry did not utilize another rig for drilling new wells between April 2020 to October 2020 principally due to the failure to secure the necessary permits rather than a general downturn in the industry.  CW2 further recounts that Berry took several measures to uneconomically increase production during the Class Period in light of the permitting problems. According to CW2, Berry regularly submitted applications for permits in connection with unprofitable wells during the Class Period.  As a result of Berry's failure to secure UIC Permits and other permits to increase production, CW2 states that Berry frequently overestimated its actual oil production.  Even at the tail end of the Class Period, in November 2020, CW2 describes how the new COO of Berry who replaced Defendant Grove, Fernando Araujo, initiated a "workover program" to fix old wells suffering from reduced production primarily caused by poor planning and a failure to secure timely permits.  As of October 2021, current employees of Berry have told CW2 that this second-rate solution continues to be pursued, and Berry continues to dedicate resources to unprofitable, old wells to mitigate the effects of lost production due to a failure to secure permits.

49.     Strikingly, CW2 confirms that Berry's chronic internal deficiencies and repeated failure to obtain the necessary permits exist to this day.  As of late 2021, CW2 reports that Berry had seventeen incomplete applications for UIC Permits, but had only initiated the process to obtain two of them.  CW2 further reports that Berry did not seriously increase its effort to secure UIC Permits until four months after the end of the Class Period.

50.     CW3, the former Environmental and Regulatory Manager at Berry, confirms that the failure to secure timely permits remained a major issue at the Company even when CW3 left the Company in September 2021.  CW3 explains that Berry failed to implement written processes for navigating permits, which made the permitting process difficult to execute.  CW3 tried to implement best practice business strategies that CW3 had learned from working at another oil company, such as flow diagrams and win-loss charts.  However, CW3 reports that management at Berry was not receptive to implementing CW3's recommendations.  Berry eventually used a software solution called Generwell but, according to CW3, resistance from senior management yet again hampered the implementation of this project.

51.     CW3 also confirmed the accounts of other CWs that Berry drilled wells that required steam, but could not use steam because of a lack of UIC Permits.  CW3 believes that the failure to obtain permits became a drastic problem at Berry long before CW3 joined the Company in June 2019.  According to CW3, the UIC Permit review process and approval slowed down to a virtual halt in 2019 because Defendant Grove claimed that cyclic steam wells did not require UIC Permits even though the regulations clearly defined cyclic steam wells as injection wells.  As a result, Berry applied for a normal oil and gas permit for a cyclic steam well and then operated the well as a normal oil and gas well, knowingly foregoing the steam enhancement necessary to drive the anticipated production.

52.     CW3 also corroborates CW1's account that Berry used only conventional drilling techniques in the Olig Potter lease.  These wells contained heavy oil and also needed steam injection, but CW3 concurs with CW1 that Berry was forced to utilize conventional drilling because it failed to obtain UIC Permits.  As a result, Berry produced substantially less oil in these wells.

53.     According to CW3, CalGEM frequently contacted managers at Berry via email, including CW3, and criticized the Company for submitting faulty and unreliable data in the permitting packages and required Berry to resubmit the packages after rectifying the errors, causing further delays.  CW3 states that the most significant feedback received from CalGEM regarding the poor data in the permitting packages was in the summer of 2021.  At that time, a senior reviewer from CalGEM sent an email to CW3 concerning the poor data in the permitting packages.  CW3 printed this email and delivered it personally to Defendant Smith's administrative assistant.

54.     CW4 was a Planning Analyst, Process Controller and then promoted to a Regulatory Supervisor, who worked at Berry from March 2018 to November 2020.  As a Regulatory Supervisor starting in September 2020, CW4 was responsible for coordinating the process of receiving permits for wells.  CW4 worked out of the Bakersfield, California office and directly reported to Silva, who directly reported to Defendant Smith and participated in weekly roundtable discussions with Smith.  CW4 led weekly meetings with senior management to provide updates on Berry's long-term planning process for obtaining permits.  According to CW4, Silva and Defendant Baetz attended these meetings.  CW4 also met weekly with Defendant Grove to discuss the status of permits.  In 2019, CW4 developed a Long Lead Planning Dashboard (LLPD) to track permitting on well sites.  CW1 confirms the existence of the LLPD and notes that it was originally a tool used by Aera that was subsequently adapted by Berry.

55.     CW4 corroborates CW1's account that the production of oil was negatively impacted at Berry due to a failure to secure timely permits.  In fact, CW4 confirms that the chronic internal deficiencies at Berry that caused the Company to fail to secure timely permits existed in the spring of 2018, months before the Company went public.  Specifically, CW4 recalls

21

conversations with senior management in April of 2018 concerning how wells had either been permitted incorrectly, permitted in the wrong drilling location or otherwise needed to be reevaluated with a requirement that a new application for permits be submitted to regulators.

56.     In the spring of 2019, CW4, Silva and other managers at Berry regularly discussed, in conversations as well as in formal meetings, how Berry's permitting problems did not lie with the regulatory bodies but instead were due to Berry's own failure to acquire the necessary permits in a timely manner.  CW4 also reported that during this time, wells had not been planned correctly relative to the area for which they were permitted.  These discussions continued into 2020 and Berry still failed to rectify the permitting problems.  CW4 confirms that Berry specifically and repeatedly failed to obtain UIC Permits.  According to CW4, the Operations group at Berry included wells in the Company's forecasts that the Company knew would not be drilled because UIC Permits had not been obtained and the wells could not be steamed.  As a result, producible oil in the wells was dramatically lower than forecasted.  CW4 confirms that the failure to obtain UIC Permits constrained the amount of water that could be disposed, which ultimately harmed production.  CW4 also corroborates CW1's account that Defendants misrepresented the number of permits on hand because many of these permits were associated with uneconomic wells.  For example, CW4 confirms that the Company lost money on wells located in Olig Potter.

57.     In the winter of 2019, well before the outbreak of the COVID-19 pandemic and months before the first stay at home order took effect in California on March 19, 2020, CW4 recalls that Defendants initiated a cost reduction plan because they knew that the Company would not meet its production targets due to the repeated failure to secure the necessary permits.  Defendants presented this cost reduction plan to the Board of Directors in the spring of 2020, several months before the announcement of the revised guidance and downward projection of production targets

was publicly announced in April 2020.  Each division at Berry was tasked at the time with promulgating an individualized cost savings plan, and CW4 received an email from Defendants with instructions.  According to CW4, Defendants misled both investors and the Company's Board of Directors by attributing the production decline to deteriorating macroeconomic conditions, and failed to disclose that the failure to secure the necessary permits in order to drill wells was a pre-existing and systemic problem that existed for years.

58.     CW5 was an Engineering Lead at Berry between April 2016 and March 2019.  CW5 reported to the Asset Manager, Zac Hale, who directly reported to Defendant Grove.  CW5's main responsibilities included managing the development of assets, and optimizing value through cost reduction and product improvement.  According to CW5, permitting at Berry started to become difficult in late 2017 and early 2018, approximately six months *before* the Company went public.  CW5 noted that there were weekly meetings to review outstanding permits for submission and direct rigs accordingly, however, the packages were not ready with sufficient lead time as they were often only one week ahead of drilling the rig, when the norm is to procure them, at least, one year in advance.  As a result, CW5 states that the Company would constantly rearrange the rig schedule and move wells back and forth to determine which wells needed permits.  In the middle of 2018 and before the Company went public, CW5 also performed a SWOT analysis, which showed that Berry's failure to secure timely permits was a threat to its business.  CW5 presented the SWOT analysis to a steering committee that consisted of management at the highest levels before the Company went public.  CW5 further asserts that, by no later than 2019, the failure to secure timely permits was principally the fault of senior management at Berry and not due to any changes in the regulatory environment.

59.     CW6 joined Berry in August 2012 and left the Company in August 2020.  CW6 first worked at Berry as a Production Engineer, then as a Field Manager, and then as an Asset Manager beginning in February 2019.  As an Asset Manager, CW6 oversaw operations for 10,000 daily barrels of oil, and oversaw the technical staff that supported operations and development plans for the South Midway-Sunset asset.  CW6 directly reported to Defendant Grove.  CW6 attended long term planning meetings held every week to discuss permitting, as well as budgeting meetings with senior management in which permitting was discussed.  CW6 confirms that Berry lost production in wells because of its inability to acquire UIC Permits.  According to CW6, because Berry had poorly planned its lead time, it frequently fell behind on permitting for desired wells.

60.     According to CW6, it was widely known in 2019 and 2020 that UIC Permit regulations were changing, and that permit applications needed to align with the new standard, yet Berry failed to adapt to the changes despite advance knowledge.  Specifically, CW6 observed that in 2019 and 2020, Berry was unable to steam several wells in the Pliocene formation in Kern County because the Company failed to obtain timely UIC Permits.  CW6 estimates that there were potentially hundreds of proved locations in the Pliocene formation, and Berry drilled some of these wells, but their long-term potential was uneconomic because the Company could not utilize steam to increase production without UIC Permits.  CW6 believes that these wells were written down by Berry's auditors due to Berry's failure to secure the UIC Permits.  CW6 believes that Berry never submitted a UIC Permit packet for these wells to CalGEM for approval.  Similarly, CW6 also recalled conversations in budgeting meetings about how wells in the North Midway-Sunset asset were drilled as conventional oil and gas wells because Berry did not timely obtain UIC Permits. Even as of September 2021, CW6 states that Berry was still waiting for UIC Permits to be approved

in the North Midway-Sunset field.  CW6 confirms that one of the main causes of the failure to secure timely permits was that the quality of data in Berry's packages was poor, and Berry submitted applications without the complete, required information.

61.     In early 2020, CW6 also recalls that Berry pushed to drill more marginal wells because it was limited in its ability to drill better wells due to a lack of permits.  CW6 confirms that this strategy was already planned months before it was deployed in the spring of 2020—long before the Company announced a significant slowdown in production in 2020 due to market conditions.

62.     CW7 is a contractor-consultant at Cornerstone, who was retained as a third-party consultant by Berry from December 2017 to May 2021 to assist in streamlining the permitting process.

63.     CW7 confirmed that chronic internal deficiencies that prevented the Company from securing timely permits already existed in December 2017.  According to CW7, Defendants' own failure to secure timely permits before California issued the November, 2019 moratorium on new permits associated with fracking and high-pressure cyclic steaming diminished the Company's inventory.

64.     Between January 2019 and May 2020, CW7 assisted with the permit packages for 863 wells.  According to CW7, a majority of these wells required steam injection and Berry had failed to timely secure the needed UIC Permits to steam them.

65.     In March 2019, CW7 recalls that production in the Southwestern property slowed down because Berry could not secure abandonment permits to safely drill new wells.  CW7 states that this issue was caused by Berry's failure to provide adequate data to the predecessor of CalGEM.  CW7 further states that, in the Southwestern project, Berry intended to drill 48 thermal

25

diatomite wells on November 7, 2019, but the Company did not have permits to use high pressure cyclic steam in these wells to generate production. Berry failed to submit applications for these wells before the moratorium for new high pressure cyclic steam permits took effect on November 19, 2019.

66. CW7 confirms that Defendants took an unusually long time to properly submit adequate paperwork in order to secure wells between October 2019 and December 2019, including at the Hill property in the Tulare formation; slow permitting submissions repeatedly hampered the Company's ability to secure timely permits.

67. CW7 also provides specific examples of how Berry's production targets were negatively impacted by the failure to secure timely permits in early 2020, months before Defendants revised targets and blamed "current market conditions" for the revision. For example, according to CW7, Berry submitted batches of conventional oil and gas permits to Kern County for drilling in the Olig Potter formation on January 6, January 7, January 13, March 1, March 2 and March 3, 2020. CW7 observes that Berry sought conventional oil and gas permits in this area, but Defendants knew that it was unprofitable to drill the wells without utilizing steam. CW7 states that faulty data was presented in applications for permits related to these wells. In fact, between December 2019 and early 2020, CW7 estimates that Defendants sought Drilling Permits for approximately 540 wells that the Company did not even intend to drill because of a lack of UIC Permits, the lack of which prevented the steaming necessary to efficiently produce oil.

68. CW7 further confirms that, with respect to the Pliocene formation in the South Midway-Sunset, production was negatively impacted by the failure to obtain UIC Permits. According to CW7, Berry's failure to secure UIC Permits for these wells in the Pliocene formation was entirely due to Defendants' own actions and not caused by any alleged regulatory change.

69.     CW7 describes other ways in which production yields suffered in early 2020 because of poor planning for permits.  Specifically, CW7 describes the 21-Z project in the Tulare formation in February 2020 where Berry changed drilling plans midstream, slowing down the permitting submission process.  Because 21-Z involved over one hundred wells, and was near a school and small neighborhood, CW7 states that the permitting process was more strenuous, and involved more intense interactions with regulators.  While Berry submitted an application for the permit to the County in February 2020, according to CW7, the numerous modifications and poor coordination among Berry employees led the Company to submit an application for a permit that did not match the locations of the actual drilling sites.  Specifically, CW7 explains that the locations of the drilling sites were not physically verified before Berry submitted the permits, and Berry employees merely used Google earth to identify the drilling locations.  CW7 recalled that it then took two full months to merely draft up plans for these wells.

70.     CW7 also confirms that Berry's permits in the Fairfield wells in the Potter formation in North Midway-Sunset were not suitable because the permits did not match the variances required for drilling.  According to CW7, asset managers and operations managers, as well as the geologists, all knew that the permits were not going to be suitable, but Berry simply wanted to say it had permits, whether or not they were suitable.

**Defendants Used Material Misstatements and Omissions in the Registration Statement to Sell Berry Shares to Public Investors**

71.     On July 26, 2018, Berry sold 10,497,849 shares of common stock pursuant to the Registration Statement at $14 per share.  The Registration Statement contained untrue statements of material fact and omitted to state other facts necessary to make the statements not misleading under the circumstances in which they were made.  In particular, the Registration Statement couched numerous risks to the Company's core operations as merely possible or remote when the

risks had already materialized or already had a high risk of occurring in the near term.  With respect

to regulatory and permitting risks and the Company's inability to drill wells at the time scheduled,

the Registration Statement stated:

> Investing in our common stock involves risks that include the speculative nature of oil and natural gas exploration, competition, volatile commodity prices and other material factors. You could lose all or part of your investment. You should bear in mind, in reviewing this prospectus, that past experience is no guarantee of future performance. You should read carefully the section of this prospectus entitled "Risk Factors" beginning on page 34 for an explanation of these risks before investing in our common stock and "Cautionary Note Regarding Forward-Looking Statements" on page 56 of this prospectus. ***In particular, the following considerations may offset our competitive strengths or have a negative effect on our strategy or operating activities:***
>
> *****
>
> > • Our business requires substantial capital investments. We may be unable to fund these investments through operating cash flow or obtain any needed additional capital on satisfactory terms or at all, which could lead to a decline in our oil and natural gas reserves or production. ***Our capital investment program is also susceptible to risks, including regulatory and permitting risks, that could materially affect its implementation.***
>
> *****
>
> > • ***We may not drill our identified sites at the times we scheduled or at all.***

(Emphasis Added).

72.     The statements identified in Paragraph 71 were materially false and misleading

when made because they omitted the following material information necessary to make them not

misleading under the circumstances in which they were made:  (a) significant regulatory and

permitting risks had already had a material impact on the Company's competitive strengths,

strategy, and operating activities, (b) the chronic internal deficiencies at the Company that caused

a serious failure to obtain timely permits, including UIC Permits, had already emerged several

months before the Company went public, and thus (c) a significant risk that the Company would

not drill at identified sites at the times scheduled had already materialized or had a high risk of occurring.  The misleading nature of the purported disclosure in Paragraph 71 is confirmed by, at least, the following facts:  (a) CW4, CW5 and CW7 confirm that the Company had already failed to secure timely permits several months before the IPO, (b) a SWOT analysis prepared and presented by CW5 to the highest levels of management at the Company before the IPO concluded that the failure to secure timely permits was already a threat to the Company's business, and (c) CW4, CW5 and CW7 confirm that this "threat" was caused by, among other things, Defendants' submission of faulty data to regulators and Defendants' failure to build sufficient lead time to ensure timely receipt of permits.

73.     The Registration Statement further stated the following with respect to permitting delays or delays specifically associated with water disposal constraints, steam injection and well stimulation:

> ***Drilling for and producing oil and natural gas are high risk activities with many uncertainties that could adversely affect our business, financial condition or results of operations.***
>
> Our future financial condition and results of operations will depend on the success of our development, production and acquisition activities, which are subject to numerous risks beyond our control, including the risk that drilling will not result in commercially viable or economically desirable oil and natural gas production or may result in a downward revision of our estimated proved reserves due to:
>
> • poor production response;
>
> • ineffective application of recovery techniques;
>
> • increased costs of drilling, completing, stimulating, equipping, operating, maintaining and abandoning wells; and
>
> • ***delays*** or cost overruns caused by equipment failures, accidents, environmental hazards, adverse weather conditions, ***permitting or construction delays***, title disputes, surface access disputes and other matters.

\*\*\*\*\*

Further, many additional factors **may curtail, delay or cancel our scheduled** drilling projects and ongoing operations, including the following:

- **delays imposed by, or resulting from, compliance with regulatory requirements, including limitations on water disposal, emission of greenhouse gases ("GHGs"), steam injection and well stimulation;**

- pressure or irregularities in geological formations;

- **shortages of or delays in obtaining equipment and qualified personnel or in obtaining water for steam used in production or pressure maintenance;**

- lack of available gathering facilities or delays in construction of gathering facilities;

- lack of available capacity on interconnecting transmission pipelines; and

- other market limitations in our industry.

**Any of these risks can cause substantial losses**, including personal injury or loss of life, damage to property, reserves and equipment, pollution, environmental contamination and regulatory penalties.

(Emphasis Added).

74.     The statements identified in Paragraph 73 were materially false and misleading when made because they omitted to disclose that the failure to timely obtain UIC Permits had already significantly increased the risk that:  (a) drilling projects would be curtailed or delayed or cancelled, (b) water disposal and steam injection requirements would be limited, (c) obtaining water for steam used in production would either be delayed, curtailed or cancelled, and (d) the high risk that (a)-(c) would occur would cause substantial losses.  The misleading nature of the purported disclosure in Paragraph 73 is confirmed by the same specific facts described in Paragraph 72.

75.     Berry used this materially false and misleading Registration Statement to raise approximately $110 million of net proceeds from investors after deducting underwriting discounts and offering expenses payable by the Company.

**Defendants Failed to Disclose Known Trends and Uncertainties and Significant Risk Factors Pursuant to Items 303 and 503 of SEC Regulation S-K**

76.     SEC Regulation S-K required Defendants to describe, in the Registration Statement as well as all SEC filings and investor communications during the Class Period, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material impact . . . on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii) ("Item 303") (2017).  "Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations."  SEC Release Nos. 33-8056; 34-45321; FR-61.

77.     The SEC has emphasized that the disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future."  S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17.  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See* Comm'n Guidance Regarding Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

78.     Item 503 (now codified as Item 105) required the Defendants to include in the Registration Statement a "discussion of the most significant factors that make the offering

speculative or risky."  17 C.F.R. § 229.503(c) (2011).  Item 503's purpose is "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." Sec. Offering Reform, S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004).  The discussion of risk factors must be specific to the particular company and its operations, and must explain how the risk affects the company and/or the securities being offered.  Generic or boilerplate attempts to disclose potential risks and shield oneself from liability do not tell investors how the specific risks could affect their investment.  *See* Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

79.     Put simply, Item 503 required Defendants to disclose the most significant risks that **could** adversely affect Berry's present or future business expectations and prohibited the Defendants from relying on generic risks that could apply to virtually any other energy company in the industry.

80.     Throughout the Class Period, Defendants omitted to disclose in the Registration Statement and other communications with investors that Berry had failed to obtain timely permits because of chronic internal deficiencies at the Company as opposed to any regulatory changes that were out of Defendants' control, and that this failure severely limited the ability to inject steam into wells and created water disposal constraints, both of which negatively impacted production rates.  Moreover, Defendants failed to disclose that the lack of proper and timely permits was a direct result of, among other things, their:  (a) failure to build sufficient lead time to secure permits such as UIC Permits, which took several years to obtain, (b) repeated submission of faulty data in application packages that were ultimately denied, (c) decision to flout regulations that required producers to obtain UIC Permits for cyclic steam wells, and (d) failure to correctly match the

location of the wells to the actual area for which the wells were permitted.  Nor did Defendants ever disclose that this severe problem caused the Company to engage in desperate measures in 2020 such as drilling wells that could not be steamed, illegally injecting hot water into wells, and attempting to remedy old wells, all in an effort to  artificially increase production.  These trends and uncertainties had already begun to emerge long before the Company went public. Yet Defendants have omitted their existence to this day despite the fact that numerous CWs confirm that the problems persist.  Item 303 affirmatively required the Defendants to disclose the severe delays in receiving permits and the resulting negative impact on production.

81.     Defendants also violated their affirmative disclosure duties imposed by Item 503 (now Item 105).  Berry's permitting problems, which CW4, CW5 and CW7 confirmed emerged before the Company went public, at the very least, ***could*** adversely affect Berry's present or future business expectations, and, in fact, had a negative impact on those expectations, yet Defendants failed to disclose these risks.

### Additional Allegations Applicable Only to the Exchange Act Claims

82.     Plaintiffs make the additional allegations contained in Paragraphs 84 through 107 below with respect to their claims under Sections 10(b) and 20(a) of the Exchange Act only. Plaintiffs disclaim any reliance upon these allegations or incorporation of their allegations in their Securities Act claims (Counts I and II).

83.     Berry, Smith and Baetz are makers of the statements contained in the Registration Statement because Berry is the Issuer of the statements and each one of these Defendants signed his name to those statements, indicating that he was a maker thereof.  In addition, Berry, Smith, Baetz and Grove made reckless misrepresentations after the IPO as particularized in Paragraphs 84 through 107 below.

**Additional Misrepresentations and Omissions Made by Berry, Smith, Baetz and Grove After the IPO and Between August 2018 and August 2020**

84. On August 23, 2018, the Company held a conference call with investors to announce the financial results for the second quarter of 2018, in which Defendant Smith made the following materially false and misleading statements regarding the Company's "advanced planning" for and alleged mitigation strategy for permits:

> Operationally, we are very good at and intend to improve our core strengths, including our ability to thermally stimulate reservoirs, for example. And I should mention here that we have a Berry-first proactive approach to permitting and working with our regulatory partners in California, Utah, Colorado and Texas. ***By planning for activity well in advance, taking the lead on regulatory efforts impacting or potentially impacting Berry and building exceptional relationships with our regulators, we work to mitigate the risks associated with permitting our activities.***

(Emphasis added).

85. The statements identified in Paragraph 84 were materially false and misleading when made because, as numerous CWs confirm:  (a) Berry had already failed to plan wells "in advance" to secure permits such as UIC Permits, (b) the lack of UIC Permits in particular severely limited the Company's ability to inject steam and expand water disposal requirements, and (c) as a result, the Company had already failed to "mitigate the risks associated with permitting our activities" before Smith made these false statements.  *See* ¶¶ 37-39, 41-70.

86. On November 8, 2018, the Company held a conference call to announce the financial results for the third quarter of 2018, in which Defendant Smith made the following materially false and misleading statements claiming "ever-growing efficiency and speed in [Berry's] permitting process everyday":

> Let me explain. We are on target to meet our production goals for the year. The third quarter results show a significant increase in production, particularly in September. Despite delayed receipt of some completion permits from the California Division of Oil and Gas, otherwise known as DOGGR, the regulatory agency in

California responsible for approving permits, these permits were for our Hill lease wells in the Belridge field. We are receiving those permits now and have worked extensively with DOGGR as we develop a strong working relationship recognizing the needs of both Berry and DOGGR. The permitting issues slowed our 2018 development plan by shifting approximately 40 completions to the first quarter of 2019. Gary will go into more detail in his comments. ***The process is now working well and because of our Berry first approach, we are seeing an ever-growing efficiency and speed in our permitting process everyday.*** Prior to our going public, we made the decision to keep our three-rig program in California going through the remainder of 2018. Not only do we have the cash, but we also have an extensive bullpen of high-quality opportunities. ***Our teams were able to draw from our bullpen; bring projects forward, including permitting them; and add them to our development program ready to be executed. In other words, we acted prudently and we're focused on value. This is the leadership behavior that the organization now embraces. And given the abundance of opportunities in our assets, we will be able to continue to do this well into the future***.

(Emphasis added).

87.    The statements identified in Paragraph 86 were materially false and misleading when made because:  (a) the process for obtaining permits was not "working well" at all even before the Company went public as confirmed by CW4, CW5 and CW7, (b) as confirmed by the accounts of all seven CWs, the systemic failure to obtain permits was, in fact, caused by a lack of "efficiency," "speed," the complete failure to "bring projects forward, including permitting them" and a general lack of "prudence" at the highest levels of management, and (c) as a result, the Company was not in a "position to continue to do this well into the future."

88.    On the November 8, 2018 earnings conference call, an analyst specifically asked Defendants about permits and the regulatory landscape in California, and Defendants Baetz and Grove made the following materially false and misleading statements in response:

**Q - Jacob Roberts**

In terms of the delayed procurement in the aquifer exemption and as California transitions to Governor Newsom, I was hoping to hear your guys thoughts on the regulatory landscape going forward.

*****

**A - Cary Baetz**

Yeah. And this is Cary, and I'll jump in with at least one last thing, the permitting side of things. Trem did a good job and Gary did a good job. It was really a process. We have been doing a lot since the company emerged in March of 2017. ***The one thing that we probably are working on better and developing relationship is with DOGGR, understanding exactly what they need, how their process works and getting in front of them.*** *For that reason, we don't think permitting we'll be talking about permitting issues going forward as we continue to develop that relationship and work with them as a part of the team.*

**A - Gary Grove**

And I guess I'll comment -- I'm sorry, I just can't resist. ***It truly is, and we've mentioned this before, it truly is a planning process. And so for us, we just continue to refine and define that thought process and what the timing is to allow us to meet the goals that we have set forward as an enterprise and as a company. So with that, we'll have those challenges, and we'll look for the ways to go through them and get back to exactly where we want to be. And I think we're doing that as well.***

(Emphasis added).

89.     The statements identified in Paragraph 88 were materially false and misleading when made because, as several CWs confirm:  (a) the Company failed to provide "what [CalGEM] needed" and thus permit packages were rejected due to faulty data, (b) the Company's failure to build sufficient lead time was one of the principal reasons why it could not obtain timely UIC Permits, and as a result (c) the Company's planning process for seeking permits was not "doing [] well" when this statement was made.

90.     On March 7, 2019, the Company held a conference call to announce the financial results for the fourth quarter of 2018.  At this conference call, Defendant Grove was again specifically asked pointed questions about permitting delays, and he made the following materially false and misleading statements in response:

**Q - Leo Mariani**

Okay. That's helpful. ***And I guess just with respect to the regulatory side, I guess you guys did mention that you may had a couple of delays. That sounds like that more effective to diatomite side of the business.*** You also talked about having two months of permits in hand per rig wanting to sort of increase that. Clearly, there's a new Governor in place over there in California. ***Can you maybe just give us a little bit more color around the regulatory landscape? Is there a pathway to kind of build the months of permits there? Were there kind of any slowdown as a result of any transitions in government or kind of things getting better? What can you kind of tell us about the regulations?***

**A - Gary A. Grove**

Sure. Sure, Leo. This Gary again, and I'll let Trem follow up, if there's – at a higher level, if needed. So just specifically back on permits again, the drilling permits have not been interrupted. There's the change of government has not done anything there. We're two months in advance of each of our rigs, which is typically where we like to be, if not more. And quite frankly, we're looking to even gaining some inventory there as well.

So, on that side, again, there's no issue. ***The only tiny issue we had specifically was in and around some of the stimulation permits that we need for the diatomite, as you correctly mentioned. We're working with the agencies there to understand the timeframe necessary, and that's truly what the question comes down to, so that we can plan accordingly. And I think we've mentioned before, once we understand that and feel comfortable with it, we'll be able to plan a little bit stronger in and around that particular development. Obviously, we like that area, and we'll continue to go down that path, and ultimately get it to where we feel like we can forecast it within the range of everything else that we have in our inventory.***

(Emphasis added).

91.     The statements identified in Paragraph 90 were materially false and misleading when made because:  (a) permitting delays were not limited to a so-called "tiny issue" "in and around" WST Permits needed for fracking, but severely limited the Company's ability to obtain UIC Permits before this false statement was made, and (b) Defendant Grove omitted to disclose pervasive permitting delays that are confirmed by numerous CWs, and which seriously curtailed the Company's ability to inject steam or dispose of water and thus harmed production rates.

92.     On May 16, 2019, Defendants Smith, Baetz and Grove hosted an Investor Day with analysts and extensively discussed various issues that impacted the Company's business.  In

particular, Smith introduced investors to Silva, the new Vice President of Government, Regulatory and Environmental Affairs hired in April 2019.  Silva was ultimately promoted to the position of Executive Vice President of Corporate Affairs in February 2020 and was identified on Berry's website as one of the core members of upper management.  At this Investor Day, Smith told investors that Silva was hired to streamline and optimize the permitting process at Berry, and Silva spoke at length about the regulatory landscape, the process for receiving permits and the amount of time required to receive each permit.  After Silva gave her introductory remarks, Grove then spoke at length about the permitting process, and made the following materially false and misleading statements:

> We're always going to drilling in packages of some multiple of four for the most part and three of those will be a producer and one of them [ph]. Alright. Now for the fund slide, ready. ***You heard Megan say that we don't have a permitting problem.***
>
> ***Let me just add to that we don't have a permitting problem.*** But we have is a desire to understand the process everywhere and so that we can plan accordingly and get a very consistent timeframe for each of the permits that are required for us. ***And we've been able to do that for the first three of these I'm going to talk about with no problem. The one that we've struggled with recently has been WST and I'll talk about that in a second.***
>
> But, let's just talk about what's required to do our work out here in California. So we need an underground injection control permit that allows us to inject fluids and allows us to inject steam, allows us to inject water. we need that permit. You get it, it covers a certain area, you're done for that certain area, that's it.
>
> ***You don't have to apply every single well, it's a one-time deal for that particular area taking care of. So do we need have for all of these Thermal Diatomite, injectors and Sandstones, producers and Sandstones and the Non-Thermal Diatomite yes, we do. Do we have it in all of those? Yes, they are and all the development areas. Are there some more that we're going to need? Yes, there are as we expand but they're proceeding as expected.***
>
> ***We put those permits in. We have a very good idea of what the timeframe that's going to take typically 6 months to 12 months plus or minus, but we plan on 12:1[ph] the longest one. We don't plan on the shortest one. So we very comfortable with that cycle.***

38

The second one is a drilling permit, very straightforward, we need a drilling permit to go drill a well. If it's on BLM acreage, we need to get a permit from the BLM if it's on county acreage, we need to get permit from the county. And then from Berry it goes to the division of oil and gas. Those permits have its BLM is probably 60 days, if it's county it's 30 days to 45 days, we know that, that happens, we're doing that now, no problems there.

Happens in every single one of them on going as expected. The next one is aquifer exemption permit, hey, you heard Megan talked about. Do we need it in every place yes, we do. Does it -- do we have things that are already inside that earlier boundary? Yes, are those impacted No.

It's only for the things that we want to do that are outside of the initial boundaries that were set up for each field that's what we need in aquifer exemption permit for. Have we got those already for McKittrick and Poso, yes, we've done, yes we have. So we're waiting on the one in Midway Sunset where again it's in progress and as expected. And Megan talked a little bit about the whole timeline and how that works, but we're right in line with that have we make plans on that being for 2019, how we made plans to get that in like I said early third quarter, yes, we have.

So our Thermal Diatomite is predicated on that in the latter half of the year. Think you heard on the last call, you heard me say and you've heard Cary said before about the latter half of the year being more heavy on production. It's because a lot of our Thermal Diatomite is coming online in the latter half of the year. Okay.

And so lastly, let's talk about Well Stimulation permit WST So that's required for us to go out and hydraulically stimulate in Belridge. Okay. It's now required for Thermal Diatomite Well, it's not required for an injector and Sandstone is not required for producer and Sandstones. It is required to go out in Belridge and hydraulically stimulate Diatomite Well -- Non-Thermal Diatomite Well.

So what are we doing with that? ***Well, we're working with the agencies to obtain consistent planning timing, so Megan talked about that. That's one of the goals that she has for us and it will help us in terms of our process. I've said many times, It's a planning process out here, what we do overall it's not that complicated from that standpoint. It's just getting things in the right place and starting at the right time to meet your business plan expectations in that given period.***

And so the thing that I've had to sit and talk about on a couple calls, but I don't want to do anymore is to say that we expected to get a WST permit in a certain time frame and it did not happen. So therefore, we're not -- we don't have these Wells on production at the time. We thought we would, okay. So with that being said when we came out and gave you a when prices dropped and we decided to pull capital back just like we talked about that's what we do if prices go up.

(Emphasis added).

93.     The statements identified in Paragraph 92 were materially false and misleading when made because, as the detailed and particularized accounts of all seven CWs confirm: (a) the Company already had a severe "permitting problem," (b) the severe "permitting problem" was not limited to WST Permits but extended to UIC Permits, (c) the Company's process for obtaining UIC Permits was not "proceeding as expected," (d) the lead time for obtaining UIC Permits was not "6 months to 12 months," but well over a year as confirmed by CW1, CW2 and CW3, (e) all seven CWs confirm that at no time during the Class Period did Defendants "plan on the longest" cycle to build lead time for permits, and (f) the Company was not "working with the agencies to obtain consistent planning timing," but faced rejection at the hands of CalGEM for submitting faulty applications.

94.     After Grove made the specific misrepresentations identified in Paragraph 92, Smith again spoke with investors at the Investor Day, and doubled down on Grove's material misrepresentations:

> Okay, and Berry first is driven by that we've made big moves there, bringing Megan in is a monster move. And in fact our Berry I think at the credibility of Berry went up in Sacramento because Megan had been working for one company.
>
> She left they were all very concerned, oh my gosh, she's getting out of the business, but then went to work for Berry. There must be something to Berry, okay. And that's gives me a lot of faith in what we're trying to do as well. *So we do not have a permitting problem, as Gary said five times at least I'll say it another 20 times.*
>
> *We do not have a permitting problem. It's a planning issue, we plan for it, we made one -- had one glitch here with the WST's. We look forward to getting that on a regular basis, so we can incorporate it in our plans like we do. The UIC the drilling permits and everything else we deal with.*
>
> Okay. That is what you do. And that's what we get paid for. We manage that the relationship between the regulators and the pot and the and the politicians.

(Emphasis added).

95.     The statements identified in Paragraph 94 were materially false and misleading when made for the same reasons identified in Paragraph 93.

96.     On November 7, 2019, the Company held a conference call to announce the financial results for the third quarter of 2019.  On this conference call, Grove was again asked pointed questions by an analyst regarding the regulatory landscape and permitting delays and Grove made the following materially false and misleading statements in response:

**Q - Leo Mariani**

Okay, that's helpful. And I guess, perhaps you could talk a little bit more about the regulatory environment in California. It seems like the new Head of DOGGR has been a little bit more aggressive than the previous head. And I know he is levered some fines on some companies, and I guess there were some trading over some frac permits that were issued as well. How do you think about what the administration from DOGGR's perspective feels about fracking out there these days in California? And how do you think the new head kind of feels about some of the proposed set-backs that were talked about this past spring?

*****

**A - Gary Grove**

*I'll just reiterate a couple of things that Trem has mentioned. So as far as permits for fracking or hydraulic stimulation, they're called WSTs. That has been a little bit delayed, as you mentioned. However, for us that has no impact on us for this year or into the part of 2020, (inaudible) is that we don't -- do not have any outstanding request in for WST permitting at this time.* But it is a direct result of them, putting someone in that share, which has been done. And I would just add the fact that we're in communication with them, our teams led by our Corporate Affairs Group is -- and Trem has been very active in making sure that we are in participation with regulations going forward. So it's probably easiest thing to say. *But right now for us, we don't see any impact there. And lastly, as Trem mentioned, our other permitting is not associated with this. It just permits to drill. And those are moving forward, as you might expect.*

(Emphasis added).

97.     The statements identified in Paragraph 96 were materially false and misleading when made because:  (a) Grove again falsely described the permitting delays as limited to WST Permits for fracking but omitted to disclose the systemic failure to secure UIC Permits, (b) the failure to obtain UIC Permits negatively impacted production because the Company was unable to inject steam or dispose of water to increase production yields, and (c) the UIC Permits were also the "other permitting" associated with serious delays rendering Grove's statements false when they were made.  The falsity of Grove's statements is confirmed by, at least, the following facts:  (a) in an Annual Report filed in February 2020 for the Fiscal Year 2019, the Company admitted that it had in fact suffered permitting delays for UIC Permits in late 2019 although it falsely blamed the delay on regulatory changes, (b) according to CW1, the Company ceased production on two rigs in the fall of 2019 because it lacked the necessary permits, (c) according to CW2, the Company embarked on an illegal scheme to inject hot water into wells in late 2019 to dampen the impact of reduced production from a lack of necessary permits, (d) CW3 confirms that the failure to obtain UIC Permits became a drastic problem before June 2019, (e) CW6 confirms that, in 2019, Berry was unable to steam wells in areas such as the Pliocene formation because the Company failed to obtain UIC Permits, and (f) CW7 identifies numerous occasions where the Company failed to obtain the necessary permits before this false statement was made.

98.     On February 27, 2020, the Company held a conference call to announce the financial results for the fourth quarter of 2019.  At this conference call, an analyst asked Smith, Baetz and Grove specific questions about how the Company was progressing towards receiving timely permits.  Smith and Grove made the following materially false and misleading statements in response:

**Q - Leo Mariani**

Okay. That's helpful. And I guess just from a regulatory perspective apart from Tuesday's legal ruling there and Kern County wanted to just get a sense of how generally the regulatory environment in the state has been progressing. I think you guys have started to kind of get just more regular sandstone permits kind of starting in January. *I wanted to see how that was going thus far in February? And just any updated thoughts you guys have on the current moratorium on cyclic steam permits and WST permits? And how long that could last year in 2020?*

## A - A.T. Smith

Leo, this is Trem. I'll start with the answer to that. First off as you know in 2019 we spent a fair amount of money and we're very focused on building our what we call our corporate affairs group. And Megan Silva runs that group and has given us the platform to build and the network and relationships in Sacramento and launched Livermore and the county in particular that keeps us as aware as any company of what's going on and how to respond.

We've also done through our Berry First. I can't say it enough our Berry First approach in terms of building our credibility as a true partner with California. We do what we say we're going to do. So just so you know the foundation for the conversation that you're talking about is well established. That said we believe that we are participate we know we are participating in the discussions around the moratorium. Our processes are communicated and well are beginning to be well understood.

So I fully anticipate that study to progress. I cannot project exactly when that moratorium will be lifted but I am confident it is truly the intent of the state to lift that with the goal of being safe for the communities and also the environment. And so I'm pretty confident in that today.

*And as far as our sandstones go, those permits as you pointed out R&D coming through. So Cogen in the state have lived up to the words that they said and I'm truly appreciative for that. So thank goodness Gary and his teams have a huge inventory of opportunity that allows us to adapt and I think we've demonstrated that well over the last couple of years.* Gary has a few comments to add to that.

## A - Gary Grove

Yes Leo. So just a couple of other things. *So just to recognize that our plan for this year we do not have any thermal diatomite wells in our plan. And we also don't have anything that requires a WST. So we don't have anything that we're requiring hydraulic fracturing during the year as well. So as Trem mentioned we are looking at sandstone development for this particular calendar year. Now that being said if and when the moratorium is lifted that might change some plans for us and we're nimble enough to be able to make those changes as we move forward and we're continuing to be ready for that opportunity when it arrives.*

43

**A - A.T. Smith**

*And in fact we've built a bull pen [ph] of thermal diatomite wells to be permitted for when that occurs Leo.*

(Emphasis added).

99.     The statements identified in Paragraph 98 were materially false and misleading when made for the same reasons identified in Paragraphs 91, 93 and 97.

100.     On May 8, 2020, the Company held a conference call to announce the financial results for the first quarter of 2020.  At this conference call, Defendant Grove made the following materially false and misleading statements concerning Berry's "intense permitting program" and the number of permits that the Company had already secured to date:

> *Additionally, we proactively began an intense permitting program in the quarter to be ready once we decide to begin our next drilling program. As of today, we have more than 100 wells permitted and another 200 plus moving through the California regulatory system.* Currently, we plan to focus the remainder of the capital in the latter half of this year, subject to market conditions. Our calculated capital efficiency for the first half of 2020 will be better than in the past. However, looking forward, we anticipate that our capital efficiencies will return to more historical levels.

(Emphasis added.)

101.     The statements identified in Paragraph 100 were materially false and misleading when made for the same reasons identified in Paragraph 93.  In addition, the statements were materially false and misleading when made because:  (a) CW7 confirms that, between January 2019 and May 2020, CW7 assisted with the application packages for 863 wells and the Company failed to obtain UIC Permits for the vast majority of these wells, (b) CW2 confirms that, on or about when this statement was made, Berry was unable to drill wells in the Pliocene area because it failed to obtain UIC Permits, (c) according to CW2 and CW6, at this time, Berry engaged in desperate strategies to blunt the impact of a lack of UIC Permits by illegally injecting hot water

into wells and drilling marginal wells, and, (d) both CW1 and CW4 confirm that the number of permits on hand that Grove touted was false and misleading because these purported permits were either obtained for the wrong location or because the wells could not be steamed to increase production due to a lack of UIC Permits.

102.    On the May 8, 2020 conference call, Defendant Smith made the following similar misrepresentations:

> First, our current plan for this year is to pick up a rig late in the third quarter, contingent on oil price improvements. *We heavily weighted our CapEx spend to the first quarter when we increased permitting efforts in the last couple of months. And as Gary mentioned, we have over 100 permits in hand and another 200-plus permits moving through the California regulatory system as we speak. In other words, the permitting process works through the downturn and we will have plenty of wells to drill.* You may also recall that Governor Newsom put all new high-pressure cyclic-steam projects in moratorium late last year while a joint CalGEM-Lawrence Livermore Lab study on safe operations with high pressure cyclic-steam was conducted.

(Emphasis added).

103.    The statements identified in Paragraph 102 were materially false and misleading for the same reasons identified in Paragraph 101.

104.    On August 5, 2020, the Company held a conference call to announce the financial results for the second quarter of 2020.  At this conference call, Defendant Grove again made the following materially false and misleading statements concerning the Company's permitting process and the number of permits that the Company had secured to date:

> *We have continued with our permitting process on all other projects. And as of today, we have roughly 185 drilling permits in hand, all for sandstone wells, as we finish the 2020 permitting program and begin our 2021 program.*
>
> *We also have approximately an additional 190 permits, either at CalGEM or waiting to send to CalGEM.*

(Emphasis added).

105.    The statements identified in Paragraph 104 were materially false and misleading when made for the same reasons identified in Paragraph 101.

106.    At the August 5, 2020 earnings conference call, Defendant Baetz also made the following materially false and misleading statements regarding the number of permits the Company then had on hand, and the alleged ability to be "flexible" and "scale up quicker if the market allows" as a result:

**Q - Charles Meade**

Yes, thank you for that added clarification. And Trem, maybe for -- this might be best for you, but of course, you can kick it anywhere. The -- I'm curious, I'd like -- Leo's question, zeroing in on this 748 acres for $5 million, and I appreciate the color you've already added to it. I wondered if you could give us your thoughts. Is this representative of the sort of opportunity that you see emerging through the back half of '20 into '21? Or is this just kind of a small bite, and we should expect bigger bites further down the line?

*****

**A - Cary Baetz**

Charles, this is Cary. I'm -- just because I have to talk too, just when the other two talked.

So I feel left out. ***But also, I just want to highlight, as Trem and Gary both said, we do have a lot of permits in hand.***

***So it does give us flexibility to do what -- to be very nimble in the Fourth Quarter where we put the rig on the sandstones.***

***It also gives us the ability to scale up quicker if the market allows -- if market did something crazy and pricing became even that much better. I just want to make sure everybody understood that as well.***

(Emphasis added).

107.    The statements identified in Paragraph 106 were materially false and misleading when made for the same reasons identified in Paragraph 101.  In addition, the statements were materially false and misleading when made because:  (a) all seven CWs confirm that the permitting

46

delays persisted throughout the Class Period, (b) CW2 states that a "workover program" was initiated in November 2020 as a method to uneconomically bolster Berry's production numbers with old wells because the Company had failed to obtain timely permits, and (c) CW3 confirms that the failure to secure timely permits remained a major issue at the Company even when CW3 left the Company in September 2021.

**CW Accounts Bolster a Strong Inference of Scienter**

108.    Several CWs regularly interacted with Defendants Smith, Baetz and Grove, and possess direct knowledge of Defendants' scienter during the Class Period concerning the pervasive permitting problems at Berry.  CW1 met at least monthly with Smith, Baetz, and several Vice Presidents of the Company.  CW1 took contemporaneous, written notes of the discussions during these meetings, some of which counsel has reviewed.  A particularly damning contemporaneous note taken by CW1 on March 4, 2020 states that Silva warned the attendees, including Defendants Smith (identified below as "Trem") and Baetz (identified below as "Cary"), that Berry's permitting process and production targets *did not* match the true permit flow and implementation plan.  An actual snapshot of the contemporaneous notes states:

109.    CW1 confirmed that at this meeting Silva told Smith and Baetz that Berry's poor permitting flow would cause Berry to fall short of production targets.  Smith and Baetz were also informed multiple other times that permitting flow did not match production targets.  CW1, who directly reported to Grove and met with Grove on a weekly basis, further states that CW1 repeatedly emailed both Smith and Grove informing these Defendants about the magnitude of problems that led the Company to fail to obtain permits since, at least, the summer of 2019.  CW1 further states that CW1 repeatedly warned both Smith and Grove, on a weekly basis, that the water disposal constraints caused by a failure to obtain timely UIC Permits were then negatively impacting the Company's production targets and business prospects.

110.    According to CW1, Silva, the EVP of Corporate Affairs hired to oversee and streamline the permitting process—an addition that Smith bragged to investors was a "monster move" during the Class Period—also warned Smith, Baetz and Grove, on a weekly basis, regarding the lack of UIC Permits and the negative consequences associated with a failure to obtain timely permits.

111.    In addition to regularly meeting with Grove to discuss permitting problems, CW1 also exchanged text messages with Grove, and CW1 shared the contents of these text messages with Plaintiffs.  On October 17, 2019, CW1 and Grove discussed the looming need to drill at the uneconomic Ethyl D wells because of a failure to obtain permits at more favorable locations.  At 12:20 p.m. and 12:21 p.m. on that day, Grove sent CW1 a text message stating: " . . . Basically, we might go ahead and drill some wells on Ethyl D as you heard me discuss . . . I hate that we have to be so reactive.  Goal is not to be in this position."  CW1 responded with a text message read by Grove and stated that: "***Yes, we plan to build a process with greater lead times and an***

*inventory that gives us more flexibility to mitigate the regulatory inconsistencies and disruptions. Take some changes in asset level technical work and the scheduling tool and tracking will be critical to stay on course.*"   (Emphasis added).  This text was sent on the very same day that CW1 met with Defendants Smith and Baetz and Silva.  CW1's contemporaneous notes from this meeting again show that both CW1 and Silva raised concerns about how well inventory did not align with permitting.  CW1 confirms that CW1 and Silva warned Smith and Baetz, at this meeting, that Berry's failure to obtain UIC Permits caused the Company to drill at less profitable, second-tier locations.  According to CW1, at this meeting, Smith and Baetz approved the plan to drill at second-tier locations.  Some of these second-tier wells included the Ethyl D wells, which were unprofitable without obtaining UIC Permits to inject steam.  Grove then instructed CW1 to drill at the second-tier wells in the Ethyl D location.  CW1 and Grove again discussed these issues in phone calls numerous times in the fall of 2019.  CW1 emphasizes that Berry mostly drilled at second-tier locations throughout CW1's tenure at the Company principally due to a failure to secure the required permits.

112.    On December 31, 2019, CW1 again sent Grove a text message, and urged Grove to increase the lead time for securing permits.  At 10:52 a.m. on that day, CW1 texted:

> "Hi Gary, would you like to speak with me before I leave for the week? One on one. Joe is quiet, but he came by to tell me he understand[s] and agrees completely with what I am trying to communicate. *I feel like it needs to be understood and directed by you and your authority, or the message will not land with the asset. It's quite simple really. We are not feeding the front end with enough lead time to ensure our ability to execute and mitigate the external regulatory barriers*."

(Emphasis added).

At 10:57 a.m. on December 31, 2019, Grove responded to this text message, and stated that he would meet with CW1 to discuss further.

113.    CW4 also met regularly with Smith, Baetz and Grove to discuss how the failure to obtain timely permits had a negative impact on production.

114.    At the end of 2019, CW4 informed Smith and Grove over a dozen times that the permits on the Formax property were faulty, and, as a result, Berry could not drill wells at that location.  In early 2020, CW4 also had a one-on-one meeting with Defendant Smith, and told Smith that CW4 needed support from senior management in various departments to streamline the permitting process.  Smith told CW4 that he would rely on CW4 to plan the permitting.  Again, in early 2020, after a specific conversation between CW4 and Grove regarding Berry's failure to secure the correct permits, Grove told CW4 to speak with Smith directly.  CW4 then informed Smith that faulty information provided in the packages seeking approval for permits prevented the Company from obtaining timely permits.  CW4 also regularly emailed Grove and Smith informing both Defendants that the Company could not drill wells due to a failure to obtain timely permits.

115.    CW1, CW4 and Silva also repeatedly warned Grove that wells expected to be drilled were not feasible because the permits did not accurately match the surface locations.  CW4 understood from CW4's communications with Silva that Silva informed Smith and Grove about these unfeasible wells in weekly roundtable meetings.

116.    CW4 also actually showed the information on the LLPD to Smith and Grove on a regular basis at in-person meetings throughout the Class Period.  The LLPD provided granular data for sites that the Company intended to drill, the types of wells located in those sites and time-lined details about permit submissions.  Further, the LLPD included cycle times for every stage of the permitting process; every date at each level of the permitting process, along with any issues that arose during the permitting process, and when the wells were actually drilled.  The LLPD also

contained deadlines to show when each part of the process was required to commence to meet final completion deadlines, and tracked the projects that fell behind schedule.

117.    CW4 also routinely emailed Defendant Smith a Microsoft Excel file and a Spotfire dashboard that showed high-level metrics, including the exact number of wells in the Company's inventory, how many needed permits, and the status of the permit applications.

118.    CW2 further states that the Company did not take the permitting problems seriously until March, 2021.  According to CW2, in March, 2021, Defendant Smith began to hold daily UIC Permit status meetings.

119.    CW6 states that, beginning in 2019, weekly Long Range planning meetings were held by Silva's team every Wednesday, which tracked the permits from an initial concept to actual drilling.  According to CW6, Defendant Grove attended one of these meetings.  CW6 further corroborates that, at these Long Range planning meetings, the participants reviewed the granular data displayed on the LLPD, which CW6 confirms was a large file with packages of wells ordered by timing based on the requirements of the permitting process and the Company's needs.

120.    CW3 attended monthly sync meetings with Smith, Baetz, Grove and several Vice Presidents of the Company.  At these meetings, CW3 repeatedly raised concerns about the failure to obtain timely permits.  On at least one occasion at one of these meetings, CW3 states that Smith chastised employees for failing to secure timely permits.  CW3 also delivered to Smith's assistant an email, in which CalGEM reviewers criticized the Company for submitting faulty data in permitting applications, which CW3 is sure Smith reviewed.  Less than one month before CW3 left Berry, in August 2021, CW3 attended a meeting with Smith, at which Smith raised concerns about UIC Permits and stressed that the need to obtain them in a timely manner remained critical to the Company's production targets in 2022.

**Defendants' Post-Class Period Half Truth Enhances an Inference of Scienter**

121.    On February 24, 2021, the Company filed its Annual Report for Fiscal Year 2020 on Form 10-K with the SEC.  This Annual Report was signed by Defendants Smith and Baetz and contains their signed certifications pursuant to the Sarbanes-Oxley Act of 2002.  In this Annual Report, the Company stated the following:

> Effective April 2019, CalGEM also finalized new Underground Injection Control ("UIC") regulations, which affects specific types of wells: (i) those that inject water or steam for enhanced oil recovery and (ii) those that return the briny groundwater that comes up from oil formations during production. The key regulations include stronger testing requirements designed to identify potential leaks, increased data requirements to ensure proposed projects are fully evaluated, continuous well pressure monitoring, requirements to automatically cease injection when there is a risk to safety or the environment, and requirements to disclose chemical additives for injection wells close to water supply wells. Our California development and production activities are subject to UIC regulations. ***With the changes in the UIC regulations and its impact on the permitting process, we experienced delays in obtaining the permits required to continue our planned drilling operations over the latter half of 2019 and into 2020. Our 2020 plans were informed, ultimately, by these permitting issues that we began to observe in late 2019 and early 2020, and then were later modified due to the deterioration of market conditions resulting from the COVID-19 pandemic.*** Accordingly, our 2020 results were not significantly affected because we were able to obtain the permits necessary to support our planned activities.

(Emphasis added).

122.    The February 24, 2021 filing admitted for the first time that not only did the Company experience delays in receiving timely permits in late 2019 and early 2020, but that these delays were initially the principal cause of a drastic reduction in production targets in early 2020. Defendants had not previously admitted that the permitting problems were so severe that the Company's "2020 plans were informed, ultimately by these permitting issues" that emerged during the Class Period.  Instead, Smith, Baetz and Grove repeatedly made false statements to investors

about the permitting process during the Class Period as alleged in detail above, and concealed material facts from investors that rendered their Class Period statements false and misleading when made.

123.     Nevertheless, the specific information quoted above from the 2020 10-K was only a partial disclosure because it did not address the full actual reasons for the delays in seeking permits, which were not caused by a sudden change in any regulations but emerged well over a year before the regulatory changes, and were principally caused by pre-existing internal deficiencies at the Company and Defendants' repeated failure to obtain timely permits.   In addition, while Defendants attempted to exploit the pandemic as a reason for delay rather than truthfully addressing their own regulatory misconduct, CW4 confirms that the so-called cost reduction measures that the Company said impacted production were presented to the Board *long before* the first lockdown was instituted in California, and multiple CWs confirm that pervasive production problems in 2020 were caused by the repeated failure to timely secure permits, particularly UIC Permits.

## PARTIAL DISCLOSURES

124.     On April 1, 2020, after touting double digit production growth in previous quarters, the Company abruptly issued a press release announcing that the Company would revise its 2020 production target significantly downwards with growth expected to remain flat to 2% down.  The Company also claimed that it would reduce capital expenditures by 50% from the midpoint of the original 2020 budget, but nevertheless bragged that it "[c]ontinued to file for and receive CalGEM drilling, abandonment and workover permits, increasing its available inventory."

125.    On this partial disclosure and/or the materialization of concealed risks, the Company's stock price declined by over 16.6% from its previous day closing price of $2.41 on March 31, 2020 to close at $2.01 on April 1, 2020, on heavy trading volume.

126.    On August 4, 2020, the Company issued a press release to announce the financial results for the second quarter of 2020.  In this press release, the Company announced that average daily production decreased by an additional 5% for the second quarter of 2020 compared to the first quarter of 2020.  Defendants acknowledged that the decline was the result of reduced drilling activity and alleged cost control measures associated with steam management that temporarily increased water disposal requirements.

127.    On this partial disclosure and/or the materialization of the concealed risks, the Company's stock price declined by over 7% from its previous day closing price of $4.90 on August 4, 2020 to close at $4.55 on August 5, 2020, on heavy trading volume.

128.    On November 3, 2020, the Company issued a press release to announce the financial results for the third quarter of 2020.  In this press release, the Company again announced that average daily production decreased by 5% for the third quarter of 2020 compared to the second quarter of 2020.  Defendants attributed the decline on reduced drilling activity and alleged cost control measures associated with steam management that temporarily increased water disposal requirements as well as plugging and abandoning idle wells.

129.    On this partial disclosure and/or the materialization of the concealed risks, the Company's stock price declined by over 5% from its previous day closing price of $2.84 on November 3, 2020 to close at $2.69 on November 4, 2020, on heavy trading volume.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

130.    Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities that:  (1) purchased or otherwise acquired Berry's common stock pursuant or traceable to Berry's Registration Statement issued in connection with its July 26, 2018 IPO, seeking to pursue remedies under Sections 11 and 15 of the Securities Act; and/or (2) purchased or otherwise acquired the Company's common stock between July 26, 2018 and November 3, 2020, seeking to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act.  Excluded are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

131.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  During the Class Period, average weekly trading volume averaged 3.37 million shares, with 80.47 million shares currently outstanding.  The high average trading volume and weekly turnover creates a strong presumption in favor of market efficiency.  *See Rougier v. Applied Optoelectronics, Inc*., No. 4:17-CV-02399, 2019 WL 6111303, at *11 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, No. 4:17-CV-2399, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019).  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

132.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

133.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

134.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

• whether the Registration Statement contained any material misrepresentations or omissions;

• whether the Individual Defendants have a viable good faith defense to the strict liability otherwise imposed by Section 11 of the Securities Act or whether the Defendants can establish negative causation as a defense to or as a reduction of the strict liability otherwise imposed by Section 11 of the Securities Act;

• For Securities Act claims only, whether Defendants are able to raise a defense of negative causation showing that all or some of the declines following the IPO were caused by specific factors other than their Registration Statement misrepresentations or omissions;

• for Exchange Act claims only, whether any other statements made by Smith, Baetz and/or Grove to the investing public after the IPO misrepresented material facts about the business, operations and management of the Company;

• for Exchange Act claims only, whether the Individual Defendants caused the Company to issue false and misleading statements during the Class Period;

• for Exchange Act claims only, whether the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements;

• for Exchange Act claims only, whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein;

> • whether Smith, Grove and Baetz were control persons of Berry; and

> • whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

135. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

136. With respect to the Exchange Act claims, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

> • Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

> • the omissions and misrepresentations were material;

> • the Company's securities traded in an efficient market;

> • the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

> • the Company traded on the NASDAQ and was covered by multiple analysts;

> • the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

> • Plaintiffs and members of the Class purchased, acquired and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

137. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

138.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the Exchange Act claims herein are based primarily on Defendants' omission of material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

## (Violations of Section 11 of the Securities Act Against Defendants Berry, Smith, Baetz, Buckley, Voiland and Vazales)

139.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 81 and Paragraphs 108 through 138 as if fully set forth herein.   The allegations contained in Paragraphs 82 through 107 are expressly excluded from this claim, which does not allege fraud, recklessness or intentional misconduct.

140.    This claim is asserted by Plaintiffs against Defendants Berry, Smith, Baetz, Buckley, Voiland and Vazales on behalf of all persons who purchased shares of the Company's common stock pursuant to and/or traceable to the Company's IPO, in which the shares registered under the Registration Statement were sold.

141.    The Individual Defendants identified under this Count are strictly liable under the Securities Act as signatories of the Registration Statement for the misrepresentations and omissions contained therein regarding Berry's permitting and production problems, as identified in Paragraphs 71 to 81 above.

142.    Berry is strictly liable as the Issuer under the Securities Act for the misrepresentations and omissions it made in the Registration Statement, as identified in Paragraphs 71 to 81.

143.     None of the Defendants named herein conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement and identified in Paragraphs 71 to 81 above were true, were without omissions of material fact or were otherwise not misleading.

144.     By reason of the conduct alleged herein, each of the Defendants named herein has violated Section 11 of the Securities Act.

145.     Plaintiffs and the Class have sustained damages because the value of their Berry common stock has declined.  This decline is attributable by law to Defendants in the absence of proof that it was caused by other factors, which proof has not been established.

146.     At the time of their purchases, Plaintiffs and the Class were without knowledge of the wrongful conduct alleged herein, and could not have reasonably discovered those facts more than one year prior to the filing of the initial complaint in this action.  The initial complaint was filed within three years of the time that Berry offered the shares covered by the Registration Statement to the investing public.

147.     By virtue of the foregoing, Plaintiffs and the other Class members are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

## COUNT II

**(Violations of Section 15 of the Securities Act Against Defendants Smith and Baetz)**

148.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 81 and 108 through 138 as if fully set forth herein.  The allegations contained in Paragraphs 82 through 107 are expressly excluded from this claim, which does not allege fraud, recklessness or intentional misconduct.

149.    Smith, by virtue of his office and directorship in Berry, is a controlling person of Berry within the meaning of Section 15 of the Securities Act.  Smith managed the day-to-day affairs of the Company and was in possession of material information that rendered the Registration Statement misleading.

150.    Baetz, by virtue of his office and directorship in Berry, is a controlling person of Berry within the meaning of Section 15 of the Securities Act.  Baetz also managed the day-to-day affairs of the Company and was in possession of material information that rendered the Registration Statement misleading.

151.    By virtue of the conduct alleged herein, Defendants Smith and Baetz are liable as control persons for the primary violations of Section 11 by Berry, as alleged in Count I.

152.    Smith and Baetz did not conduct a reasonable investigation or possess a reasonable basis for the belief that the statements contained in the Registration Statement and identified in Paragraphs 71 to 81 above were true, were without omissions of material fact, and were not misleading.

153.    Each of these Defendants is liable to the Plaintiffs and the Class for damages suffered as a result of the primary Securities Act violations of Berry.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Berry, Smith, Baetz and Grove)**

154.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except that the allegations contained in Paragraphs 71 through 75 are not alleged against Grove.

155.    This Count is asserted against Berry, Smith, Baetz and Grove for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

156.    At the time of the Registration Statement and during the Class Period, these Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Berry securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Berry common stock at artificially inflated prices.

157.    Specifically, Berry issued a Registration Statement, which both Smith and Baetz signed as makers of the representations contained therein, which was materially false and misleading as particularized in Paragraphs 71 to 81.  The primary violations alleged under this Count related to the misrepresentations and omissions made in the Registration Statement are brought only against Defendants Berry, Smith and Baetz.

158.    Berry, Smith, Baetz, and Grove further made numerous materially false and misleading statements between August 2018 and August 2020 as particularized in Paragraphs 82 to 107 above.  The primary violations alleged under this Count related to the misrepresentations

and omissions made between August 2018 and August 2020 are brought against Defendants Berry, Smith, Baetz and Grove.

159.     Smith, Baetz and Grove had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them.  In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control.  As the senior managers and/or directors of Berry, these Defendants had knowledge of the details of Berry's internal affairs.

160.     As officers and/or directors of a publicly-held company, Defendants had a duty to disseminate timely, accurate, and truthful information regarding Berry's business and operations. As a result of the dissemination of the aforementioned false and misleading statements and material omissions, the market price of Berry securities was artificially inflated throughout the Class Period.

161.     In ignorance of the adverse facts concerning Berry's operations which were concealed by the misrepresentations and omissions alleged herein, Plaintiffs and the other members of the Class purchased or otherwise acquired Berry securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

162.     During the Class Period, Berry securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, directly relying on the materially false and

misleading statements described herein, and/or relying upon the integrity of the market, purchased or otherwise acquired shares of Berry securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Berry securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Berry securities declined sharply upon public disclosure of the facts alleged herein, to the injury of Plaintiffs and Class members.

163.    By reason of the conduct alleged herein, Berry, Smith, Baetz and Grove knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

164.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period.  Berry, Smith, Baetz and Grove are thus liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## **COUNT IV**

### **(Violations of Section 20(a) of the Exchange Act Against Defendants Smith, Baetz and Grove)**

165.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except the allegations contained in Paragraphs 71 through 75 are not alleged against Grove.

166.    During the Class Period, Smith, Baetz and Grove participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Company's false and misleading statements, and in fact, this is confirmed by the accounts of numerous CWs who regularly interacted with or reported to these Defendants and informed them about the adverse facts that rendered their Class Period statements materially false and misleading when made.

167.    As officers and/or directors of a publicly owned company, Smith, Baetz and Grove had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

168.    Because of their positions of control and authority as senior officers, Smith, Baetz and Grove were able to, and did, control the contents of their direct communications with investors, which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, Smith, Baetz and Grove exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  Smith, Baetz and Grove therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of the Company's securities.

169.    Smith, Baetz and Grove, therefore, acted as controlling persons of the Company. By reason of their senior management positions and/or being directors of the Company, each of these Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  Each of these

Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

170.    By reason of the above conduct, Smith, Baetz and Grove are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant Action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.


Dated:  November 1, 2021


Respectfully submitted,

**POMERANTZ LLP**

*/s/ Omar Jafri*

Joshua B. Silverman
Omar Jafri
Brian P. O'Connell
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:   jbsilverman@pomlaw.com
            ojafri@pomlaw.com
            boconnell@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**

*/s/ Scott Kim*
Phillip Kim
Scott Kim
275 Madison Avenue, 40th Floor
New York, NY 10116
Phone:  (212) 686-1060
Fax:    (212) 202-3827
Email:  pkim@rosenlegal.com
            skim@rosenlegal.com

**Bronstein, Gewirtz & Grossman, LLC**

Eitan Kimelman
60 E 42nd Street, Suite 4600, New York,
New York 10165
Phone: 212-697-6484
Fax:    212-697-7296
Email: eitank@bgandg.com

***Lead Counsel for Plaintiffs***

**GRAVES LAW OFFICE**
Curtis C. Graves
12700 Park Central Drive
Suite 520
Dallas, Texas 75251
Telephone: (214) 321-6940
Facsimile: (866) 770-6949
curtis@cgraveslaw.com

**THE BRISCOE LAW FIRM, PLLC**
Willie C. Briscoe
Texas Bar No.: 24001788
12700 Park Central Drive, Suite 520
Dallas, Texas 75251
Telephone: 972-521-6868
Facsimile: 346-214-7463
wbriscoe@thebriscoelawfirm.com

*Liaison Counsel for Plaintiffs*