**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| LUIS TORRES, ALLIA DEANGELIS, DARRICK INMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>                     Plaintiffs,<br><br>      v.<br><br>BERRY CORPORATION, ARTHUR T. SMITH, CARY BAETZ, GARY A. GROVE, BRENT S. BUCKLEY, KAJ VAZALES, and EUGENE J. VOILAND,<br><br>                     Defendants. | Case No. 3:20-CV-3464-S<br><br>JUDGE KAREN G. SCHOLER<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT**
**OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................1

PROCEDURAL HISTORY....................................................................................................4

STATEMENT OF FACTS ....................................................................................................4

ARGUMENT .......................................................................................................................6

I.  APPLICABLE LEGAL STANDARDS .................................................................6

II.  THE CLASSES SHOULD BE CERTIFIED UNDER FED. R. CIV. P. 23 AND
PLAINTIFFS SHOULD BE APPOINTED AS CLASS REPRESENTATIVES ...............7

A.  Rule 23(a)'s Four Requirements Are Satisfied........................................................7

1.  Numerosity..................................................................................................7

2.  Commonality................................................................................................9

3.  Typicality ..................................................................................................10

4.  Adequacy ..................................................................................................11

B.  Rule 23(b)(3) Class Action Certification Is Appropriate......................................13

1.  Common Questions of Law and Fact Predominate ...............................13

a.  Securities Act Claims....................................................................13

b.  Exchange Act Claims....................................................................14

i.    Cammer 1:  NASDAQ Listing and Trading Volume ........16

ii.   Cammer 2: Analyst Coverage ...........................................17

iii.  Cammer 3: Market Makers and Arbitrageurs Facilitated
Trading...............................................................................17

iv.   Cammer 4: Berry Filed Form S-3 .....................................18

v.    Cammer 5: A Cause-and-Effect Relationship Existed.......19

vi.    Krogman / Unger Factors Enhance Market Efficiency......20

(1) Reliance Is Also Presumed Under
    *Affiliated Ute* ........................................................21

(2) Individual Calculations Will Not Defeat
    Predominance.........................................................22

2.  Class Adjudication Is Superior To Other Available Methods ...............23

III.    PLAINTIFFS SHOULD BE APPOINTED AS CLASS REPRESENTATIVES .............24

IV.    PROPOSED CLASS COUNSEL SHOULD BE APPOINTED.......................................25

V.    CONCLUSION...............................................................................................25

CERTIFICATE OF SERVICE ..................................................................................28

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. U.S.*,
  406 U.S. 128 (1972)........................................................................................3, 14, 21, 22

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ................................................................................................6

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................................6, 7, 12

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013)................................................................................................6, 14, 15

*Asarco LLC v. Ams. Mining Corp.*,
  396 B.R. 278 (S.D. Tex. 2008) ...........................................................................................17

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988)................................................................................................2, 14, 22

*Bell v. Ascendant Solutions, Inc.*,
  422 F.3d 307 (5th Cir. 2005) ..............................................................................................16

*Berger v. Compaq Computer Corp.*,
  257 F.3d 475 (5th Cir. 2001) ..............................................................................................11

*Bywaters v. U.S.*,
  196 F.R.D. 458 (E.D. Tex. 2000)...........................................................................................7

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) .................................................................................. *passim*

*Cheney v. Cyberguard Corp.*,
  213 F.R.D. 484 (S.D. Fla. 2003).........................................................................................21

*City of Ann Arbor Employees' Ret. Sys. v. Sonoco Prod. Co.*,
  270 F.R.D. 247 (D.S.C. 2010) ...............................................................................................9

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)................................................................................................................3, 22

*Erica P. John Fund, Inc. v. Halliburton Co.* (*"Halliburton I"*),
  563 U.S. 804 (2011)................................................................................................................6, 14

*Feder v. Elec. Data Sys. Corp.*,
    429 F.3d 125 (5th Cir. 2005) ................................................................7, 11, 12

*Finkel v. Docutel/Olivetti Corp.*,
    817 F.2d 356 (5th Cir. 1987) ....................................................................21, 22

*Halliburton Co. v. Erica P. John Fund. Inc.* ("*Halliburton II*"),
    573 U.S. 258 (2014)........................................................................................15

*Herman & MacLean v. Huddlesto*n,
    459 U.S. 375 (1983)....................................................................................2, 13

*Hildes v. Arthur Andersen LLP*,
    734 F.3d 854 (9th Cir. 2013) ......................................................................2, 13

*Horton v. Goose Creek Indep. Sch. Dist.*,
    690 F.2d 470 (5th Cir. 1982) ............................................................................6

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) ......................................................................23

*In re BP p.l.c. Sec. Litig.*,
    No. 10-md-2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014) .....................23

*In re Celera Corp. Sec. Litig.*,
    No. 5:10-CV-02604-EJD, 2014 WL 722408 (N.D. Cal. Feb. 25, 2014)............9

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
    No. H-14-3428, 2017 WL 2608243 (S.D. Tex. June 15, 2017)........................10

*In re Constar Int'l Inc. Sec. Litig.*,
    585 F.3d 774 (3d Cir. 2009)............................................................................14

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) .......................................................................9, 12

*In re Dell Inc.*,
    No. A-06-CA-726-SS, 2010 WL 2371834 (W.D. Tex. June 11, 2010) ..............8

*In re Elec. Data Sys. Corp. Sec. Litig.* ("*EDS*"),
    226 F.R.D. 559 (E.D. Tex. 2005)..............................................7, 10, 13, 14, 24

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ........................................................ *passim*

*In re JPMorgan Chase & Co. Sec. Litig.*,
    No. 12 Civ. 03852 (GBD), 2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015)..........23

*In re OCA, Inc. Sec. & Derivative Litig.*,
No. CIV A 05-2165, 2008 WL 4681369 (E.D. La. Oct. 17, 2008) ...........................................8

*In re Reliant Energy ERISA Litig.*,
No. CIV.A. H-02-2051, 2005 WL 2000707 (S.D. Tex. Aug. 18, 2005) ................................24

*In re Reliant Sec. Litig.*,
No. H-02-1810, 2005 WL 8152605 (S.D. Tex. Feb. 18, 2005)..............................................8, 9

*KB Partners I, L.P. v. Barbier*,
No. A-11-CA-1034-SS, 2013 WL 2443217 (W.D. Tex. June 4, 2013) ......................19, 20, 21

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) .................................................................................. *passim*

*Lehocky v. Tidel Techs., Inc.*,
220 F.R.D. 491 (S.D. Tex. 2004).......................................................................12, 18, 24

*Ludlow v. BP, p.l.c.*,
800 F.3d 674 (5th Cir. 2015) ...............................................................................22, 23

*Marcus v. J.C. Penney*,
No. 6:13-cv-736-MHS-KNM, 2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) .......9, 10, 23, 24

*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014)....................................................................................21

*Petrie v. Elec. Game Card, Inc.*,
 308 F.R.D. 336 (C.D. Cal. 2015) .......................................................................................21

*Prause v. TechnipFMC, PLC*,
No. 17-cv-2368, 2020 WL 3549686 (S.D. Tex. March 9, 2020).................................... *passim*

*Pub. Empls' Ret. Sys. Of Miss. v. Merrill Lynch & Co, Inc.*,
277 F.R.D. 97 (S.D.N.Y.2011) ...........................................................................................14

*Rooney v. EZCORP, Inc. ("EZCORP")*,
330 F.R.D. 439 (W.D. Tex. 2019) .......................................................................8, 10, 11, 12

*Rougier v. Applied Optoelectronics, Inc.*,
No. 4:17-CV-02399, 2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ............................. *passim*

*Rougier v. Applied Optoelectronics, Inc.*,
No. 4:17-CV-2399, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019).........................................8

*Slade v. Progressive Sec. Ins. Co.*,
856 F.3d 408 (5th Cir. 2017) ...............................................................................................11

v

*Stirman v. Exxon Corp.*,
  280 F.3d 554 (5th Cir. 2002) ........................................................................................10

*Stoffels v. SBC Communs., Inc.*,
  238 F.R.D. 446 (W.D. Tex. 2006) ................................................................................12

*Stott v. Cap. Fin. Servs. Inc.*,
  277 F.R.D. 316 (N.D. Tex. 2011) .................................................................................13

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) .............................................................................16, 19

*Todd v. STAAR Surgical Co.*,
  No. CV-14-05263-MWF-RZ, 2017 WL 821662 (C.D. Cal. Jan. 5, 2017)...........................17

*Torres v. S.G.E. Mgmt., L.L.C.*,
  838 F.3d 629 (5th Cir. 2016) .......................................................................................13

*Unger v. Amedisys, Inc.*,
  401 F.3d 316 (5th Cir. 2005) ............................................................................... *passim*

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
  669 F.3d 632 (5th Cir. 2012) ..........................................................................................8

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)........................................................................................................9

*Wilson v. LSB Indus., Inc.*,
  No. 15 Civ. 7614 (RA) (GWG), 2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)....................17

*Zeidman v. J. Ray McDermott & Co., Inc.*,
  651 F.2d 1030 (5th Cir. 1981) ........................................................................................8

**Statutes**

Private Securities Litigation Reform Act........................................................................4

Securities Act of 1933................................................................................... *passim*

Section 11 of the Securities Act of 1933 ...........................................................1, 14, 23

Section 15 of the Securities Act of 1933 ...........................................................1, 10, 14

Securities Exchange Act of 1934.................................................................... *passim*

Section 10(b) of the Securities Exchange Act of 1934............................................1, 23

Section 20(a) of the Securities Exchange Act of 1934 .......................................1, 10, 14

**Rules**

Fed. R. Civ. P. 23 .................................................................................................... *passim*

Fed. R. Civ. P. 23(a) ..............................................................................................6, 7, 25

Fed. R. Civ. P. 23(a)(1) ............................................................................................7, 8, 9

Fed. R. Civ. P. 23(a)(2) ..............................................................................................9, 10

Fed. R. Civ. P. 23(a)(3) ............................................................................................10, 11

Fed. R. Civ. P. 23(a)(4) ..................................................................................................11

Fed. R. Civ. P. 23(b)(3) ........................................................................................... *passim*

Fed. R. Civ. P. 23(c) ......................................................................................................24

Fed. R. Civ. P. 23(d) ......................................................................................................24

Fed. R. Civ. P. 23(g)(1)(A) ............................................................................................25

L.R. 23.2 ......................................................................................................................1, 7

L.R. 23.2(b)(1) ............................................................................................................8, 9

L.R. 23.2(b)(3) ................................................................................................................11

L.R. 23.2(b)(4) ................................................................................................................10

L.R. 23.2(b)(5) ................................................................................................................24

L.R. 23.2(c) ......................................................................................................................7

L.R. 23.2(d) ......................................................................................................................7

L.R. 23.2(e) ......................................................................................................................7

L.R. 23.2(f) ......................................................................................................................7

L.R. 23.2(g) ......................................................................................................................7

SEC Rule 10b-5 ................................................................................................................1

Lead Plaintiffs Luis Torres and Allia DeAngelis and additional Plaintiff Darrick Inman (collectively "Plaintiffs") respectfully move, pursuant to Fed. R. Civ. P. 23, and in accordance with Local Civil Rule 23.2, for an Order: (i) certifying the above-captioned securities class action ("Action") as a class action; (ii) certifying the Classes ("Class(es)") as defined below; (iii) appointing Plaintiffs as Class Representatives; and (iv) appointing Plaintiffs' choice of counsel, Pomerantz LLP ("Pomerantz"), as well as The Rosen Law Firm, P.A. ("Rosen") as Class Counsel ("Proposed Class Counsel").[1]

## PRELIMINARY STATEMENT

Plaintiffs move to certify the following class of shareholders seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"):

> All persons or entities, other than Defendants, who purchased or otherwise acquired Berry's common stock pursuant and/or traceable to Berry's Registration Statement issued in connection with its July 26, 2018 Initial Public Offering ("IPO"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act Class"):

Plaintiffs also move to certify the following class of shareholders seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act"):

> All persons or entities, other than Defendants, who purchased or otherwise acquired Berry's common stock between July 26, 2018 and November 3, 2020, both dates inclusive (hereafter the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (the "Exchange Act Class").

The claims are ideally suited for class certification. All Class members were injured by material misrepresentations and omissions in Berry Corporation's ("Berry" or the "Company") Registration Statement used to raise funds from investors in a July 2018 Initial Public Offering ("IPO"), and

---

[1] Herein, unless stated otherwise: "¶" refers to numbered paragraphs of the Amended Class Action Complaint (Dkt. No. 59) ("Complaint"), capitalized terms have the definitions assigned in the Complaint, "Dkt. No." refers to entries on the Action's docket, all emphasis is added, and all internal citations and quotations are omitted, unless otherwise noted.

for more than two years after.  The claims arise from common factual allegations related to Defendants' decision to conceal the existence and magnitude of a failure to secure timely permits that negatively impacted production.

"Rule 23 is a remedial rule [and, as such, is to] be construed liberally to permit class actions, especially in the context of securities fraud suits." *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 670 (S.D. Tex. 2006).  Certification of securities class actions is commonplace and well-justified.  *See, e.g.*, *Prause v. TechnipFMC, PLC*, No. 17-cv-2368, 2020 WL 3549686, at *1 (S.D. Tex. March 9, 2020) (granting class certification).  All requirements for class certification are readily met.  Numerosity is a proverbial slam dunk in securities class action lawsuits involving publicly traded stocks.  Common questions are easily identified.  Plaintiffs are typical of the Classes they seek to represent.  Moreover, Plaintiffs, assisted by proposed Class Counsel, have zealously and successfully prosecuted the claims at issue by defeating multiple attempts to have this case dismissed and continue to aggressively pursue discovery.

The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied.  First, common questions of law or fact predominate over individual issues.  For the Securities Act claims, Plaintiffs only need to show a material misstatement or omission in the Registration Statement.  *See Herman & MacLean v. Huddlest*on, 459 U.S. 375, 382 (1983).  Reliance, loss causation and scienter are not required.  *Id*.; *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013).  For the Exchange Act claims, Plaintiffs can rely on the fraud-on-the-market presumption to establish class-wide reliance pursuant to *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), given that Berry's common stock traded in an efficient market.

The Fifth Circuit has noted that "market efficiency will not even be an issue" for "heavily-traded or well-known stocks" listed on a national exchange.  *Unger v. Amedisys Inc.*, 401 F.3d

316, 322–23 (5th Cir. 2005). Plaintiffs' expert report, attached hereto, demonstrates that Berry's common stock traded in an efficient market pursuant to the five "*Cammer* factors" and three "*Krogman / Unger* factors" routinely analyzed by courts in this Circuit. The Company's stock traded on the NASDAQ in high volume (*Cammer* 1), securities analysts covered it widely (*Cammer* 2), market makers and arbitrageurs facilitated trading in the Company's shares (*Cammer* 3), the Company was eligible to file and did file a Form S-3 with the SEC (*Cammer* 4), and a cause-and-effect relationship between the Company's disclosures and its stock price movements exists (*Cammer* 5). In addition, the Company had a large market capitalization (*Krogman / Unger* 1), a low bid/ask spread (*Krogman / Unger* 2), and a large public float (*Krogman / Unger* 3). Alternatively, reliance can also be presumed under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) because the claims primarily concern omissions of material facts. ¶138.

Individualized damages of any Class member cannot defeat predominance because, as explained by Plaintiffs' expert, damages can be measured on a class-wide basis through the traditionally accepted "out-of-pocket measure" in line with *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

Second, class adjudication is superior to individual litigation of these claims. Incentives to pursue individual, cost-ineffective claims are low. To date, Plaintiffs are not aware of any individual actions that have been filed. It is highly desirable to concentrate all litigation concerning the facts and claims at issue before this Court to avoid inconsistent rulings and to conserve judicial resources. Plaintiffs and Proposed Class Counsel also expect no unusual difficulties in managing the litigation and will use their substantial experience to efficiently bring it to trial.

For all these reasons, Plaintiffs respectfully move the Court to certify the Class, appoint them as Class Representatives, and appoint Pomerantz and Rosen as Class Counsel.

3

**PROCEDURAL HISTORY**

An initial complaint was filed in this Action (Dkt. No. 1) on November 20, 2020. On August 18, 2021, pursuant to the Private Securities Litigation Reform Act ("PSLRA") the Court appointed Luis Torres and Allia DeAngelis as Co-Lead Plaintiffs and approved their selection of Pomerantz and Rosen to serve as Co-Lead Counsel. Dkt. No. 45.

Plaintiffs filed the operative Amended Complaint (Dkt. No. 59) on November 1, 2021 that also named an additional Plaintiff, Darrick Inman. Defendants moved to dismiss the Amended Complaint (Dkt. No. 63) on January 24, 2022. On September 13, 2022 the Court denied the motion to dismiss in full. Dkt. No. 83 ("MTD Order"). Unsatisfied with the result, Defendants moved for reconsideration of the MTD Order (Dkt. Nos. 87, 88) on September 20, 2022. On November 9, 2022, the Court denied Defendants' motion for reconsideration. Dkt. No. 107.

On October 24, 2022, the Court entered a Scheduling Order (Dkt. No. 105), which firmly set a trial date for the three-week docket beginning on September 30, 2024, with various antecedent deadlines. Discovery commenced and is ongoing. The parties submitted their agreed stipulation and proposed protective order and proposed ESI Protocol on December 1, 2022. Dkt Nos. 108, 109.

**STATEMENT OF FACTS**

Throughout the Class Period, Defendants minimized the risk of permitting delays, ¶¶71-74, 84-107, claiming that such risks were mitigated by their supposed-advance planning, ¶84, that they had increased "efficiency and speed" in navigating the permitting process, as well as their "bullpen of high-quality opportunities," ¶86, and repeatedly denied the existence of a "permitting problem," ¶¶88, 92, 94, or otherwise minimized its severity as "a tiny issue." ¶90.

Unbeknownst to investors, even before the Registration Statement was filed, the Company had identified the failure to secure timely permits to develop and drill oil as a major threat to its

4

business, and had already failed to receive the necessary permits. These problems only intensified as the Class Period progressed. The Complaint relies on detailed Confidential Witness ("CW") accounts to support both the severity of the permitting issues that was caused by the Defendants' own actions and Defendants' awareness of the concealed risks.

For example, the Complaint identifies numerous meetings where the CWs met with the Defendants to discuss permitting problems during the Class Period. ¶¶108-20. In one meeting on March 4, 2020, in which CW1 took meticulous notes, CW1 witnessed Megan Silva ("Silva") warn Defendants Arthur Smith ("Smith") and Cary Baetz ("Baetz") that Berry's permitting and production targets did not match the true permit flow. ¶108. CW1 also met with Defendant Gary Grove ("Grove") on at least a weekly basis, and repeatedly told Grove and Smith about the delay in seeking permits and the consequences thereof. ¶109. Similarly, CW3, an Environmental and Regulatory Manager at Berry, attended monthly sync meetings with Smith, Baetz, and Grove. ¶120. CW3 states that Smith was aware of permitting delays and that several permit applications contained faulty data. *Id*. At sync meetings, CW3 repeatedly raised concerns about the failure to obtain timely permits. *Id*. On at least one occasion at these meetings, CW3 states that Smith chastised employees for failing to secure timely permits. *Id*. In addition, CW4 developed a Long Lead Planning Dashboard ("LLPD"), which tracked granular details about permits, including any issues that arose during the process, which was regularly shown to Smith and Grove. ¶¶116-17. The Complaint also contains the actual contents of text messages between CW1 and Grove that demonstrate Grove's knowledge about the Company's failure to build sufficient lead time to receive permits before he made contradictory misrepresentations. ¶¶111-12.

Artificial inflation in Berry's stock price began to be removed by a series of partial disclosures on April 1, 2020, August 4, 2020, and November 3, 2020 that caused the Company's

stock price to repeatedly decline. ¶¶124-29. Defendants revised production targets downwards and reduced capital expenditures based on a failure to secure timely permits. ¶¶5, 43, 57. While Defendants falsely blamed macroeconomic conditions for these events at the time of the partial disclosures, CW4 confirms that the decision to cut production was made before the onset of the global pandemic and Defendants' own post-Class Period admission corroborates that the initial decision to cut production had nothing to do with Covid 19. ¶¶56-57, 121-22.

<u>**ARGUMENT**</u>

**I.      APPLICABLE LEGAL STANDARDS**

Fed. R. Civ. P. 23(a) requires (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation, and Fed. R. Civ. P. 23(b)(3) requires that common questions of law and fact predominate. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Plaintiffs are required to meet these requirements only by a preponderance of the evidence. *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228 (5th Cir. 2009).

At this stage, courts do not "engage in free-ranging merits inquiries." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* Accordingly, while it is appropriate to consider whether a securities market was efficient to support a presumption of reliance for the Exchange Act claims only (market efficiency is not relevant to the Securities Act claims), courts do not delve into merits issues such as materiality, scienter, or loss causation. *Id.* at 465-66; *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812–13 (2011) ("*Halliburton I*").

"Rule 23 is a remedial rule [and, as such, is to] be construed liberally to permit class actions." *Enron*, 529 F. Supp. 2d at 670. The Fifth Circuit has held that "judges should err in favor of certification." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 487 (5th Cir. 1982);

6

*Bywaters v. U.S.*, 196 F.R.D. 458, 463 (E.D. Tex. 2000) (same). The U.S. Supreme Court has also

recognized that securities lawsuits are particularly appropriate for class action treatment. *See*

*Amchem Prods., Inc.*, 521 U.S. at 625 (class action requirements are "readily met in certain cases

alleging . . . securities fraud").

## II.   THE CLASSES SHOULD BE CERTIFIED UNDER FED. R. CIV. P. 23 AND PLAINTIFFS SHOULD BE APPOINTED AS CLASS REPRESENTATIVES

### A.   Rule 23(a)'s Four Requirements Are Satisfied

The four requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy

of representation – are readily established here for both Classes.[2]

### 1.   Numerosity

Rule 23(a)(1) requires a class to be so numerous that joinder of all members is

"impracticable." A plaintiff need not allege the exact number or identity of class members. *See*

*In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 564 (E.D. Tex. 2005) ("*EDS*"), *aff'd sub*

*nom. Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125 (5th Cir. 2005). Indeed, the Fifth Circuit has

held that numerosity is "generally assumed to have been met in class action suits involving

nationally traded securities" because "any class composed of the sellers of a nationally traded

security during a period in which hundreds of thousands or even millions of shares of the security

---

[2] Plaintiffs satisfy the other requirements of Local Rule 23.2. Damages in this case are likely to be in the tens of millions of dollars, and the jurisdiction of the Court is based on the federal securities laws. L.R. 23.2(d). If the Court grants this motion, Plaintiffs will move to seek the Court's approval of a detailed notice program consistent with programs customary in securities class actions to be administered by an experienced administrator. Plaintiffs estimate at this time that notice will cost approximately $80,000, which includes postcard notice to approximately 4,000 banks, brokers, and other nominees, and publishing a summary notice in PR Newswire. L.R. 23.2(e). Plaintiffs anticipate that no discovery will be needed on Class Certification, although should Defendants proffer an expert, Plaintiffs may elect to depose their expert. L.R. 23.2(f). Co-Lead Counsel have litigated this matter on a purely contingent basis, all costs are advanced by Co-Lead Counsel, who will seek the Court's approval of attorneys' fees and reimbursement of expenses after the case is resolved either through settlement or trial. L.R. 23.2(c) and (g).

were traded must necessarily be 'so numerous that joinder of all members is impracticable.'" *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1039 (5th Cir. 1981); *see also In re Dell Inc.*, No. A-06-CA-726-SS, 2010 WL 2371834 at *2 (W.D. Tex. June 11, 2010), *aff'd, appeal dismissed sub nom. Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012); *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-02399, 2019 WL 6111303, at *5 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted,* No. 4:17-CV-2399, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019); *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445 (W.D. Tex. 2019) ("*EZCORP*").

The Company's stock actively traded on the NASDAQ during the Class Period, so while the exact number of Class members is unknown and can be ascertained only through appropriate discovery, Plaintiffs believe the Class consists of hundreds or thousands of geographically dispersed members.  ¶131; L.R. 23.2(b)(1).  During the Class Period, Berry had between 79.5 million to 82.1 million shares outstanding and traded heavily, with an average weekly trading volume of 3.37 million shares.  *See* Declaration of Brian P. O'Connell, Esq. ("O'Connell Decl.") attaching Expert Report of Matthew D. Cain ("Cain") submitted herewith as Ex. A ("Cain Report") ¶¶31-32.[3]  Under these circumstances, Rule 23(a)(1) is satisfied, and joinder is thus impracticable. *See EZCORP*, 330 F.R.D. at 445 (numerosity satisfied where 50 million+ shares outstanding with an average weekly trading volume of 2.7 million shares); *In re OCA, Inc. Sec. & Derivative Litig.*, No. CIV A 05-2165, 2008 WL 4681369, at *7 (E.D. La. Oct. 17, 2008) (numerosity satisfied with 50 million shares outstanding); *In re Reliant Sec. Litig.*, No. H-02-1810, 2005 WL 8152605, at *4

---

[3] Dr. Cain is a leading financial economics expert in securities fraud litigation.  He holds a Ph.D. in Finance from Purdue University, and is a Senior Fellow at the Berkeley Center for Law and Business at the University of California, Berkeley.  *See* Cain Report, ¶¶1-3.  He frequently opines on market efficiency in federal securities actions.  *See* Cain Report, Appendix A.

8

(S.D. Tex. Feb. 18, 2005) (numerosity assumed where 60 million traded shares at issue).  In addition, that at least 325 institutional investors held the stock during the Class Period further supports numerosity.  *See City of Ann Arbor Employees' Ret. Sys. v. Sonoco Prod. Co.*, 270 F.R.D. 247, 251 (D.S.C. 2010) (noting 307 institutional investors indicated the class was likely dispersed geographically and supported numerosity); *In re Celera Corp. Sec. Litig.*, No. 5:10-CV-02604-EJD, 2014 WL 722408, at *2 (N.D. Cal. Feb. 25, 2014) (that more than 254 institutional investors owned Celera shares supported numerosity).[4]

### 2.    Commonality

Commonality exists under Rule 23(a)(2) if the class's "claims [] depend upon a common contention . . . of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  "The threshold for commonality is not high." *Marcus v. J.C. Penney*, No. 6:13-cv-736-MHS-KNM, 2016 WL 8604331, at *3 (E.D. Tex. Aug. 29, 2016).  "To satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014); *Wal-Mart*, 564 U.S at 359; *Prause,* 2020 WL 3549686, at *3.

Commonality is satisfied here because Plaintiffs and Class members were injured by the same course of misconduct.  Common questions include, *inter alia*, whether: (i) Defendants violated the securities laws; (ii) Defendants' public statements misrepresented or omitted material facts; (iii) the Individual Defendants caused Berry to issue false and/or misleading statements or

---

[4] For the same reasons that the Exchange Act Class and the Securities Act Class satisfy Rule 23(a)(1)'s numerosity requirement, L.R. 23.2(b)(1) is also satisfied.

to omit material facts; (iv) Defendants' false and/or misleading statements or omissions were made with scienter (for the Exchange Act only); (v) Berry's stock price was artificially inflated during the Class Period as a result of these misrepresentations or omissions; and (vi) individual Defendants were controlling persons as to Plaintiffs' claims for relief under Section 20(a) of the Exchange Act and Section 15 of the Securities Act. ¶134. Courts routinely find commonality to be met when these specific issues are common to a securities class. *See, e.g.*, *Rougier*, 2019 WL 6111303, at *6; *EZCORP*, 330 F.R.D. at 445-46; *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2017 WL 2608243, at *2 (S.D. Tex. June 15, 2017); *Prause*, 2020 WL 3549686, at *3.[5]

### 3.       Typicality

Rule 23(a)(3) requires that the claims of a class representative be typical of the claims of other class members. "Like commonality, the test for typicality is not demanding." *Marcus*, 2016 WL 8604331, at *3. "The critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class." *Id*. "Plaintiffs can satisfy the typicality requirement by showing that class representatives' claims arise from a similar course of conduct and share the same legal theory." *Cobalt*, 2017 WL 2608243, at *2 (citing *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002)). "Factual differences do not defeat typicality if the claims arise from a similar course of conduct and share the same legal theories." *EDS*, 226 F.R.D. at 565; *Marcus*, 2016 WL 8604331, at *3; *Enron*, 529 F. Supp. 2d at 673-74.

Plaintiffs' claims and injuries are typical of absent Class members' claims, as all Class members were similarly affected by Defendants' wrongful conduct as alleged in the Complaint. *See* ¶132. They assert the same legal theory arising from Defendants' common misrepresentations

---

[5] For the same reasons that the Exchange Act Class and the Securities Act Class satisfy Rule 23(a)(2)'s commonality requirement, L.R. 23.2(b)(4) is also satisfied.

and omissions, the revelation of which caused artificial inflation to dissipate and thus damaged all Class members.  *See* ¶¶124-138.  The typicality requirement is met.  *Rougier*, 2019 WL 6111303, at *6; *EZCORP*, 330 F.R.D. at 446.[6]

### 4.    Adequacy

Rule 23(a)(4) requires evidence that plaintiffs will "fairly and adequately protect the interests of the class," based on three factors: (1) "the zeal and competence of the representative[s'] counsel; (2) the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees, and (3) the risk of conflicts of interest between the named plaintiffs and the class they seek to represent."  *Prause*, 2020 WL 3549686, at *4 (S.D. Tex. March 9, 2020) (quoting *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017)).

First, both Pomerantz and Rosen are highly experienced in securities class actions.  *See also* O'Connell Decl., Exs. B, C  (Pomerantz and Rosen Firm Resumes).  Thus far, Co-Lead Counsel have done an extensive investigation, drafted detailed pleadings, successfully defeated repeated attempts to have the Complaint dismissed, and have prosecuted substantial and ongoing discovery efforts, demonstrating counsel's zeal and competence.

Second, Rule 23(a)(4) requires the class representatives to "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Feder*, 429 F.3d at 129–30 (quoting *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482–83 (5th Cir. 2001)).  But, class representatives "need not be legal scholars."  *Feder*, 429 F.3d at 132 n.4.  Class representatives are considered adequate when they have "familiarity with the complaint and the

---

[6] For the same reasons that the Exchange Act Class and the Securities Act Class satisfy Rule 23(a)(3)'s typicality requirement, L.R. 23.2(b)(3) is also satisfied.

concept of a class action." *Enron*, 529 F. Supp. 2d at 725 (citations omitted).  Class representatives "are entitled to rely on, and be guided, by counsel." *Prause*, 2020 WL 3549686, at *5 (quoting *Stoffels v. SBC Communs., Inc.*, 238 F.R.D. 446, 455 (W.D. Tex. 2006)).  The adequacy of Plaintiffs, who each declared that they are willing to serve as a representative party on behalf of a class, (*see* Dkt. Nos. 1, 29-2 (Torres Certification and Lead Plaintiff Declaration), 13-2 (DeAngelis Certification), 59-2 (Inman Certification)), is beyond doubt.

Plaintiffs have demonstrated their attention, understanding, and oversight of the claims at issue, the case theory and strategy, and the procedural stages, through regular updates from and communications with Pomerantz and Rosen, whose efforts Plaintiffs direct.  Plaintiffs intend to continue to actively participate in further discovery, trial, and any future resolution discussions. *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 502–03 (S.D. Tex. 2004) (adequacy established where plaintiffs were committed to the action, reviewed court papers, and understood complaint's allegations); *EZCORP*, 330 F.R.D. at 446-47 (same).

Third, the adequacy inquiry "serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent." *Feder*, 429 F.3d at 130 (citing *Amchem*, 521 U.S. at 625).  "Significantly, the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." *In re Deepwater Horizon*, 739 F.3d at 813 & n.99

Here, Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Amchem*, 521 U.S. at 625-26, and no actual or potential conflicts exist.  Plaintiffs and all Class members suffered losses from purchasing Berry securities at prices artificially inflated by the false and misleading statements in the Registration Statement, and Defendants' fraudulent misrepresentations for the two years that followed the IPO. *See* ¶133; Dkt. Nos. 1, 13-3, 59-3.  All

were injured by Defendants' same underlying misrepresentations and omissions. *See Stott v. Cap. Fin. Servs. Inc.*, 277 F.R.D. 316, 326 (N.D. Tex. 2011) ("'class interests are not antagonistic for representation purposes'" where "'all class members are asserting [the] common right [of] achieving a maximum potential recovery for the class'") (alterations original).

### B.      Rule 23(b)(3) Class Action Certification Is Appropriate

Class certification under Rule 23(b)(3) is appropriate where common questions of law or fact predominate over potential individual questions and the class action device is superior to other adjudication means. *Prause*, 2020 WL 3549686, at *6. Both requirements are readily satisfied, and the Classes should be certified for the full Class Period alleged in ¶1 of the Complaint.

### 1.      Common Questions of Law and Fact Predominate

"Predominance does not require all questions of law or fact to be common, but only that common questions predominate over individual questions." *EDS*, 226 F.R.D. at 570. "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 645-46 & n.74 (5th Cir. 2016) (internal quotation omitted). Plaintiffs' Securities Act and Exchange Act claims are addressed separately below because the standard for predominance is not the same for these claims as explained herein.

### a.  Securities Act Claims

Liability for Securities Act claims is strict and Plaintiffs "need only show a material misstatement or omission" in the Registration Statement. *Herman*, 459 U.S. 375 at 382. Reliance is not an element of this claim. *See Arthur Andersen LLP*, 734 F.3d at 859. The Securities Act claims here are ideally suited for class treatment because the answers to the core questions for

these claims are common to all Class members, *i.e.*, (i) was there a misrepresentation or omission in the Registration Statement; and, if so, (ii) was it material. *Pub. Empls' Ret. Sys. of Miss. v. Merrill Lynch & Co, Inc.*, 277 F.R.D. 97, 101 (S.D.N.Y. 2011).  In addition, for claims under the Securities Act, damages are based on a straightforward statutory formula common to all Class members.  *See In re Constar Int'l Inc. Sec. Litig.,* 585 F.3d 774, 785 (3d Cir. 2009) ("The formulaic nature of § 11 [of the Securities Act] leaves defendants with little room to maneuver" in opposing class certification.).  Plaintiffs' "control person" claim under Section 15 also requires common proof that the Defendants controlled the Company.  For these reasons, Rules 23(b)(3) is easily satisfied for the Securities Act claims.

### b.  Exchange Act Claims

For the Exchange Act claims, the elements of falsity, materiality, scienter, and loss causation all raise exclusively common questions of law and fact that predominate.  *Amgen*, 568 U.S. at 467; *EDS*, 226 F.R.D. at 570 ("If Defendants are liable to [plaintiff] for these statements, they are liable to all other class members for the same statements, so common questions predominate").  Plaintiffs' "control person" claim under Section 20(a) also requires common proof that the Defendants controlled the Company.  "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810.  Predominance exists here, because reliance is presumed under the fraud-on-the-market doctrine and/or under *Affiliated Ute,* 406 U.S. 128, *see* ¶¶136-138, and mechanical damage tabulations will not predominate over common issues at trial.

In *Basic*, the Supreme Court held that, in efficient markets, the price of a stock "reflects all publicly available information, and, hence, any material misrepresentations." 485 U.S. at 246. Therefore, in an efficient market, Class members are presumed to have relied on public material

information concerning a Company's securities.  *Amgen*, 568 U.S. at 465-70.

The fraud on the market presumption applies when: "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund. Inc.*, 573 U.S. 258, 277-78 (2014) ("*Halliburton II*").  All of these conditions are met.  That Defendants' misrepresentations made in the Registration Statement and numerous conference calls with analysts were publicly known is undisputable, and materiality need not be proved at class certification because it is a common question to be determined at trial.  *See Amgen*, 568 U.S. at 467–68.  Plaintiffs also purchased the Company's shares before the truth was fully disclosed.  *See* Dkt. Nos. 1, 13-2, 59-3.

Finally, the Company's securities traded in an efficient market during the Class Period.  *See* Cain Report ¶¶18-74.  Generally, "market efficiency will not even be an issue" for "heavily-traded or well-known stocks," *Unger*, 401 F.3d at 322-23, because for stocks traded on a national exchange, such as Berry stock that traded on the NASDAQ, the market automatically incorporates publicly known information into the price.  That said, to assess additional indicia of efficiency, federal courts also analyze the five *Cammer* factors, which were identified in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).  These include: "(1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 []; [and] (5) the existence of empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."  *See, e.g.*, *Enron*, 529 F. Supp. 2d at 692-93.  Courts also consider the three *Krogman / Unger* factors, which were

15

identified in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), and *Unger*: "(6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock."   *Unger*, 401 F.3d at 323; *see also, Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 n.10 (5th Cir. 2005).   None of these factors are required or dispositive.  *Unger*, 401 F.3d at  323; *Strougo v. Barclays PLC*, 312 F.R.D. 307, 320–21 (S.D.N.Y. 2016).   Still, ***all*** of them demonstrate here that the Company's shares traded in an efficient market.  *See* Cain Report ¶¶18-74.

i.        ***Cammer* 1:  NASDAQ Listing and Trading Volume**

"The average trading volume is one of the most important factors in determining whether the market for a particular stock is efficient."  *Enron*, 529 F. Supp. 2d at 692 n.69.  Large weekly trading volume provides evidence of market efficiency because it "implies significant investor interest in the company[,] . . . [implying] a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."  *Cammer*, 711 F. Supp. at 1286.  Weekly turnover equal to 2% or more of outstanding shares justifies a "strong presumption" of efficiency and weekly turnover of 1% or more justifies a "substantial presumption."  *Id.* at 1293.

Berry had roughly 80 million shares outstanding during the Class Period such that its stock was liquid.  ¶131.  During the Class Period, the Company's shares traded daily, with moderate to heavy volume, demonstrating an active and broad market for its securities.  *Id.*  The average weekly trading volume during the Class Period was roughly 4.16% of shares outstanding.  Cain Report ¶31.  That Berry's average weekly trading volume during the Class Period was ***over double*** the amount described in *Cammer* as suggestive of efficiency shows that this factor is met.  *Id.*  Moreover, the Company was listed and actively traded on the NASDAQ, a highly efficient, open, developed, and automated market.  ¶¶131, 136.  This provides further evidence of efficiency.  *See*

16

*Rougier*, 2019 WL 6111303, at *11 ("Most courts agree that whether a security is listed on the NASDAQ is a good indicator that the stock trades in an efficient market.").

### ii.   *Cammer* 2: Analyst Coverage

Berry was followed by several securities analysts during the Class Period. *See, e.g.*, ¶¶88, 90, 92, 96, 98, 136. At least 10 investment and advisory firms covered the Company during the Class Period, issuing at least 35 analyst reports. Cain Report ¶35; *see Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 343-44 (S.D. Tex. 2008) (coverage by nine securities analysts favors market efficiency); *Rougier*, 2019 WL 6111303, at *11 (coverage by three securities analysts favored market efficiency). Such significant analyst coverage is "persuasive" evidence of market efficiency, demonstrating that a company is closely followed by investment professionals who make buy and sell recommendations to investors. *Cammer*, 711 F. Supp. at 1286.

Investors also received information about Berry from widespread media coverage and from publicly filed documents with the SEC, *see* Cain Report ¶37, which provides further evidence of market efficiency. Additionally, broad institutional ownership of the Company's securities further demonstrates market efficiency. *Todd v. STAAR Surgical Co.*, No. CV-14-05263-MWF-RZ, 2017 WL 821662, at *7 (C.D. Cal. Jan. 5, 2017) (ownership by 122 major institutions supported *Cammer* factor 2); *Wilson v. LSB Indus., Inc.*, No. 15 Civ. 7614 (RA) (GWG), 2018 WL 3913115, at *12 (S.D.N.Y. Aug. 13, 2018) (ownership by 251 major institutions implies an efficient market). During the Class Period, 325 institutional investors held the Company's stock, *see* Cain Report ¶69, which exceeds the number courts have found to support this factor.

### iii.   *Cammer* 3: Market Makers and Arbitrageurs Facilitated Trading

"The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results

by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. Market makers are entities that frequently buy or sell stock at publicly quoted prices. They support efficient trading of shares. "The presence of a large number of market makers from sizable firms suggests market efficiency." *Lehocky*, 220 F.R.D. at 508. That Berry was listed on the NASDAQ, where a great number of market makers were present, shows that its stock was informationally efficient. *See* Cain Report ¶41. According to Dr. Cain's Report, at least 88 market makers and brokers can be readily identified for Berry's securities, many of which handled a sizeable volume of shares. *See* Cain Report ¶42. This figure exceeds the number that courts typically deem sufficient to satisfy this factor. *See Rougier*, 2019 WL 6111303, at *12 (nine market makers supported efficiency); *Cammer*, 711 F. Supp. at 1283 n.30 (11 market makers supported market efficiency). Moreover, the level of short interest, and options trading are indicators of arbitrage activity. *See* Cain Report ¶74. During the Class Period, the short interest for Berry common stock ranged from 740,627 shares to 2,548,386 shares, and options contracts traded actively. *Id.* ¶¶73-74.

### iv.    *Cammer* 4: Berry Filed Form S-3

Companies meeting the SEC's criteria for raising capital through an abridged Form S-3 registration statement are "presumed to be actively traded and widely followed. . . . [A] company's ability to file an S-3 Registration Statement points to market efficiency." *Krogman*, 202 F.R.D. at 476. This requires that the registrant: (a) has a class of securities subject to the Exchange Act, (b) has filed all necessary filings with the SEC in a timely manner for the past 12 months, (c) has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases, and (d) has a public float of at least $75 million. *See* Cain Report ¶44. This factor is also satisfied because Berry: (i) met the SEC's requirements to file a Form S-3; (ii)

18

filed a Form S-3 during the Class Period; and (iii) adhered to all Form S-3 requirements imposed by the SEC during the Class Period. *See* Cain Report ¶45; *Rougier*, 2019 WL 6111303, at *12.

v.        *Cammer* 5: A Cause-and-Effect Relationship Existed

"[O]ne of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." *KB Partners I, L.P. v. Barbier*, No. A-11-CA-1034-SS, 2013 WL 2443217, at *8 (W.D. Tex. June 4, 2013) (citing *Cammer*, 711 F. Supp. at 1291); *Unger*, 401 F.3d at 324 (the causal connection "goes to the heart of the 'fraud on the market theory'"). However, a demonstration of market efficiency does not require that this—or any other single *Cammer* factor—be satisfied. *Unger*, 401 F.3d at 323 (holding that the *Cammer* factors, "do[] not represent an exhaustive list, and in some cases one of the above factors may be unnecessary[.]"); *see also Barclays PLC*, 312 F.R.D. at 321 ("there would be no need for a five-factor test [] if one factor were dispositive in every context" and "no court has adopted a per se rule that any one *Cammer* factor is dispositive").

Nevertheless, Dr. Cain's Report demonstrates a strong causal connection. To assess this factor, Dr. Cain conducted an event study on daily stock prices. *See* Cain Report ¶¶49-60 and Cain Report Exs. 4-7. An event study provides "a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." *Enron*, 529 F. Supp. 2d at 720. "Event studies are commonly used in securities fraud class actions." *Rougier*, 2019 WL 6111303, at *15 .

Dr. Cain's event study "establishes a clear cause-and-effect relationship between new Company-specific information and Berry [c]ommon [s]tock price movements." *See* Cain Report ¶60. To assess the extent of a "cause-and-effect relationship," Dr. Cain analyzed Berry's quarterly

19

earnings announcements.  Cain Report ¶¶47-48.  These announcements represent an opportunity to test whether the price of the Company's stock would respond to Company specific news.  Cain Report ¶¶47-50. The mix of unanticipated financial results, forward guidance, Defendants' statements and analyst coverage of this information can impact the Company's stock price in an efficient market.  *Id*.  Dr. Cain identified the relevant study period and estimated a regression model to remove non-company specific returns and tested for statistical significance.  Cain Report ¶¶51-56. He compared the returns and trading volume of Berry's common stock on "News Days" versus those metrics on trading days that contained relatively little Company-specific information (the "Least News Trading Days").  Cain Report ¶¶56-57.  Stock price movements following News Days support market efficiency.  *Id*

Here, Dr. Cain found that 44.44% of the 9 earnings announcements studied caused stock movements that were statistically significant at the 95% level.  Cain Report ¶¶56-57, Exs. 6-7. This compared to only 3.61% of the Least News Trading Days with statistically significant stock price movements.  Cain Report ¶¶56-57.  The difference between these two percentages was statistically significant at the 99% level.  *Id.*  In addition, volume increased by nearly double on the News Day compared to on the Least News Trading Day, and the average of the absolute value of abnormal returns following News Days relative to Least News Trading Days was statistically significant at the 95% level.  *Id.*  ¶¶58-60.  These provide strong evidence of a cause-and-effect relationship between the Company's disclosures and the resulting stock price movements.  *Id*.

vi.        *Krogman / Unger* **Factors Enhance Market Efficiency**

In addition to the five *Cammer* factors, courts often consider a company's market capitalization, bid/ask spread, and float – the *Krogman / Unger* factors – to determine market efficiency.  *See Unger*, 401 F.3d at 323; *Krogman*, 202 F.R.D. at 478; *KB Partners*, 2013 WL

20

2443217, at *5.  Each *Krogman / Unger* factor is satisfied here, further demonstrating market efficiency.  Berry's market capitalization averaged $722.96 million over the Class Period, which is nearly double the size of average analyst-covered firms on an inflation adjusted basis.  *See* Cain Report ¶¶61-62 & n.56.  Class certification is routinely granted when the market capitalization of a company is significantly less.  *See, e.g.*, *Rougier*, 2019 WL 6111303, at *13 (citing examples).

Additionally, a company's float indicates market efficiency because a larger float suggests greater liquidity, making it easier to purchase and sell shares in the market.  *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 502 (S.D. Fla. 2003).  Here, the public float of Berry's stock was large – on average, it was over 99% of shares outstanding during the Class Period.  *See* Cain Report ¶67; *see also McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (float of 31% to 43% supported market efficiency).  Finally, Berry's bid/ask spread (*i.e.*, the difference between the price that investors bid to buy the Company's stock and the price that stockholders offer to sell the stock) was smaller than the average of a sample of analyst-covered firms, further demonstrating that Berry's shares traded in an efficient market during the Class Period.  *See* Cain Report ¶¶63-65; *Rougier*, 2019 WL 6111303, at *13; *Cheney*, 213 F.R.D. at 501.

Other courts have also observed that the absence of autocorrelation indicates market efficiency.  *See, e.g., Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 356 (C.D. Cal. 2015).  Berry stock did not exhibit statistically significant autocorrelation during the Class Period.  *See* Cain Report ¶¶70-72.

### (1) Reliance Is Also Presumed Under *Affiliated Ute*

The Complaint pleads (¶138) in the alternative that reliance can also be presumed under *Affiliated Ute*, 406 U.S. 128, because the claims involve "primarily a failure to disclose," rather than affirmative misrepresentations.  *Id.* at 153–54; *see also Finkel v. Docutel/Olivetti Corp.*, 817

F.2d 356, 359 (5th Cir. 1987).  In such cases, "positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material[.]" *Affiliated Ute*, 406 U.S. at 153.  Here, Plaintiffs' allegations regarding the chronic failure to secure timely permits are based on statements rendered misleading because of what they *omitted*.  Specifically, Defendants' public statements concealed material, negative information regarding, *inter alia*, undisclosed facts described by the CWs showing the Company knew that the failure to secure timely permits from regulators to develop and produce oil was a major threat to its business and negatively impacted production targets.  Defendants did not disclose, among other things, that the Company failed to build sufficient lead time to secure permits, regularly submitted permits with faulty data, and regularly flouted regulations that required producers to obtain UIC permits before steaming wells. *See* ¶¶71-107.  As such, reliance is presumed because Defendants repeatedly withheld material information from investors.

**(2) Individual Calculations Will Not Defeat Predominance**

Damages can be measured on a class-wide basis and in a manner consistent with Plaintiffs' theory of liability, as required by *Comcast*, 569 U.S. at 34–35.  "The *Comcast* requirement is easily satisfied in securities cases invoking the *Basic* presumption and seeking out-of-pocket damages because fraud on the market presumes a causal connection between the misrepresentations and the price of the stock." *Rougier*, 2019 WL 6111303, at *15.  While *Comcast* holds that the damages theory must be consistent with the liability theory, it does not require that damages be calculated with certainty at the class certification stage. *See Ludlow v. BP, p.l.c.*, 800 F.3d 674, 685 (5th Cir. 2015) ("*Comcast* requires a 'sound' methodology, not certainty").  The question at the class certification stage is not whether Plaintiffs' damages methodology is correct, but rather, solely, that Plaintiffs have proposed a sound methodology that is consistent with their liability theory. *See*

22

*Marcus*, 2016 WL 8604331, at *10 ("Defendants may disagree with the methodology or feel that another methodology is correct, but that does not make this methodology inconsistent with the Fund's theory of liability.").

While Dr. Cain does not opine on any specific calculation of damages in this Action, his Report shows that damages in a Section 11 action can be mechanically calculated on a Class-wide basis through the statutory formula detailed in Section 11(e) of the Securities Act. *See* 15 U.S.C. §77k(e); Cain Report ¶¶81-82. For the Section 10(b) claims, the damages methodology will be the traditionally accepted "out-of-pocket measure of damages." *See* Cain Report ¶¶75-80. The Fifth Circuit has endorsed this methodology. *See In re BP p.l.c. Sec. Litig.*, No. 10-md-2185, 2014 WL 2112823, at *9 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015) ("out-of-pocket" measure of damages is a "long-standing and widespread practice" in securities fraud cases) (collecting cases); *Rougier*, 2019 WL 6111303, at *15 (finding out-of-pocket measure of damages is an accepted method for calculating Class members' damages). Therefore, damages here can easily be calculated on a class-wide basis at the appropriate time.

### 2.    Class Adjudication Is Superior To Other Available Methods

"In general, securities suits such as this easily satisfy the superiority requirement of Rule 23." *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 Civ. 03852 (GBD), 2015 WL 10433433, at *8 (S.D.N.Y. Sept. 29, 2015) (quoting *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999)). Under Rule 23(b)(3), four factors are to be considered as "pertinent" to the "superiority" evaluation: "(A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

Each of these factors demonstrates the superiority of class action adjudication here. For

23

most of the Class members, the cost of individual litigation would be prohibitively expensive and forcing them to file individual actions would be a waste of judicial and private resources. *See, e.g.*, *Marcus*, 2016 WL 8604331, at *10. Thus, unsurprisingly, Proposed Class Counsel is unaware of any opt out or related litigation initiated by any member of the Class. It is highly desirable to concentrate all litigation concerning the facts and claims at issue before this Court, to ensure consistent rulings and to conserve judicial resources. Plaintiffs and Proposed Class Counsel have substantial experience in securities class action litigation and will manage the case efficiently, and there is no reason to believe that counsel or the Court will experience any unusual management difficulties, such as notice procedures, choice-of-law issues, or the need for extensive subclassing. *In re Reliant Energy ERISA Litig.*, No. CIV.A. H-02-2051, 2005 WL 2000707, at *4 (S.D. Tex. Aug. 18, 2005); *EDS*, 226 F.R.D. at 571; *Lehocky*, 220 F.R.D. at 511. Moreover, the flexibility provided to the Court under Rules 23(c) and (d) will enable it to address and resolve any unexpected management issues.[7]

### III.    Plaintiffs Should Be Appointed As Class Representatives

All the Rule 23 requirements are met and Plaintiffs will adequately protect the Class. To date, aided by their counsel, Plaintiffs have actively overseen the successful prosecution and navigation of the Action through an investigatory phase, past Defendants' motion to dismiss and motion for reconsideration, and into discovery. This track record demonstrates Plaintiffs' attentiveness, dedication, and interest in pursuing the claims at issue, both on their own behalf and for the Class's benefit. Plaintiffs have no conflicts of interest with any Class members, as they are litigating the same legal theories and factual allegations, seeking recovery from the same

---

[7] For the same reasons that the Exchange Act Class and the Securities Act Class satisfy Rule 23(b)(3)'s superiority requirement, L.R. 23.2(b)(5) is also satisfied.

Defendants.  For all these reasons, Plaintiffs respectfully request that the Court appoint them as Class Representatives.

## IV.    PROPOSED CLASS COUNSEL SHOULD BE APPOINTED

Beyond Rule 23(a)'s adequacy of representation prong (*see* §II.A.4., *supra*), factors considered in appointing class counsel are "(i) the work counsel has done in identifying or investigating [claims]; (ii) counsel's experience in handling class actions [] and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit [.]"  Rule 23(g)(1)(A).  These considerations all weigh in favor of appointing as Class Counsel Pomerantz and Rosen, firms that have identified and prosecuted the claims, investigated their legal and factual bases, drafted the complaints, successfully opposed Defendants' motion to dismiss in its entirety, and advanced the Action into discovery.  All the foregoing work has been performed on a wholly contingent basis.

Both firms have extensive experience prosecuting securities claims and achieving substantial recoveries, including among the largest-ever obtained for investors.  *See* O'Connell Decl., Exs. B, C (Pomerantz and Rosen Firm Resumes).  The firms are prepared to continue to devote staff and substantial resources to advance the Action and the Class's interests through discovery, summary judgment, and trial. For these reasons, Plaintiffs respectfully request that the Court appoint Pomerantz and Rosen as Class Counsel.

<b><u>CONCLUSION</u></b>

For these reasons, Plaintiffs respectfully request that the Court issue an Order: (i) certifying the Action as a class action; (ii) certifying the Classes as defined in ¶1 of the Complaint; (iii) appointing Plaintiffs as Class Representatives; (iv) appointing Pomerantz and Rosen as Class Counsel; and (5) granting such other and further relief as the Court may deem just and proper.

**Dated:** February 13, 2023

Respectfully submitted,

**POMERANTZ LLP**

/s/ *Brian P. O'Connell*
Joshua B. Silverman
Omar Jafri
Brian P. O'Connell
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Tel:    (312) 377-1181
Fax:    (312) 377-1184
E-mail: jbsilverman@pomlaw.com
         ojafri@pomlaw.com
         boconnell@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**

*/s/ Phillip Kim*
Phillip Kim
Ha Sung (Scott) Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax:    (212) 202-3827
Email: pkim@rosenlegal.com
         skim@rosenlegal.com

*Lead Counsel for Plaintiffs*

**GRAVES LAW OFFICE**
Curtis C. Graves
12700 Park Central Drive
Suite 520
Dallas, Texas 75251
Telephone: (214) 321-6940
Facsimile: (866) 770-6949
curtis@cgraveslaw.com

**THE BRISCOE LAW FIRM, PLLC**
Willie C. Briscoe
Texas Bar No.: 24001788
12700 Park Central Drive, Suite 520

26

Dallas, Texas 75251
Telephone: 972-521-6868
Facsimile: 346-214-7463
wbriscoe@thebriscoelawfirm.com

*Liaison Counsel for Plaintiffs*

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Eitan Kimelman
60 E 42nd Street, Suite 4600,
New York, New York 10165
Phone: 212-697-6484
Fax:    212-697-7296
Email: eitank@bgandg.com

**LEVI & KORSINSKY, LLP**
Daniel Tepper (*pro hac vice forthcoming*)
55 Broadway, 10th Floor
New York, NY 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171
dtepper@zlk.com

**BRAGAR EAGEL & SQUIRE, P.C.**
Marion C. Passmore
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (415) 568-3599
Facsimile: (212) 214-0506
Email: passmore@bespc.com

*Additional Counsel for Plaintiffs*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 13, 2023, I served a copy of the Memorandum of Law in Support Plaintiffs' of Motion for Class Certification and Appointment of Class Representatives and Class Counsel to counsel of record for Defendants using the CM/ECF system, which will send email notification of this filing to all attorneys of record.

Executed on February 13, 2023

*/s/ Brian P. O'Connell*
Brian P. O'Connell
