# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| LUIS TORRES, ALLIA DEANGELIS, DARRICK INMAN, Individually and On Behalf of All Others Similarly Situated, | **Consolidated Case No.** <br><br> **3:20-CV-3464-S** |
| Plaintiffs, | |
| v. | **<u>CLASS ACTION</u>** |
| BERRY CORPORATION, ARTHUR T. SMITH, CARY BAETZ, GARY A. GROVE, BRENT S. BUCKLEY, KAJ VAZALES, and EUGENE J. VOILAND, | |
| Defendants. | |

**EXPERT REPORT OF MATTHEW D. CAIN, PH.D.**

**February 13, 2023**

9

Table of Contents

1    Qualifications and Compensation ............................................................................................ 1
2    Summary of Opinions ............................................................................................................. 2
3    Case Background .................................................................................................................... 3
    3.1    Overview of the Company and Allegations .................................................................. 3
    3.2    Bases for Opinions on Market Efficiency .................................................................... 5
4    Evaluation of market efficiency factors for Berry Common Stock ........................................ 9
    4.1    *Cammer* Factor 1: Average Weekly Trading Volume .................................................. 9
    4.2    *Cammer* Factor 2: Analyst Coverage ....................................................................... 10
    4.3    *Cammer* Factor 3: Market Makers ........................................................................... 12
    4.4    *Cammer* Factor 4: SEC Form S-3 Filing Eligibility ................................................ 15
    4.5    *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and
    Stock Prices ......................................................................................................................... 16
    4.6    Additional Factor 1: Market Capitalization ............................................................... 21
    4.7    Additional Factor 2: Bid-Ask Spread ........................................................................ 22
    4.8    Additional Factor 3: Public Float ............................................................................... 23
    4.9    Additional Factor 4: Institutional Ownership ............................................................ 23
    4.10    Additional Factor 5: Autocorrelation ....................................................................... 24
    4.11    Additional Factor 6: Options Trading ...................................................................... 25
5    Ability to Calculate Damages on a Class-Wide Basis ......................................................... 26
6    Conclusion ........................................................................................................................... 29
Appendix A ................................................................................................................................. 30
Appendix B ................................................................................................................................. 36
Exhibit 1 ..................................................................................................................................... 39
Exhibit 2 ..................................................................................................................................... 40
Exhibit 3 ..................................................................................................................................... 41
Exhibit 4 ..................................................................................................................................... 42
Exhibit 5 ..................................................................................................................................... 43
Exhibit 6 ..................................................................................................................................... 44
Exhibit 7 ..................................................................................................................................... 45
Exhibit 8 ..................................................................................................................................... 46
Exhibit 9 ..................................................................................................................................... 47
Exhibit 10a ................................................................................................................................. 48
Exhibit 10b ................................................................................................................................. 49
Exhibit 11 ................................................................................................................................... 55

# 1  QUALIFICATIONS AND COMPENSATION

1.    I am a Ph.D. in Finance and a Senior Fellow at the Berkeley Center for Law and Business at the University of California, Berkeley. I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines. My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. Similarly, I was a fellow with the Harvard Law School Program on Corporate Governance from 2018 through 2019, where I participated in research seminars and related activities.

2.    I worked at the U.S. Securities and Exchange Commission ("SEC") as a Financial Economist between 2014 and 2018. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

3.    Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

4.    Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank,

where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

5.    In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached to this Report as **Appendix A**.

6.    I have published research in leading peer-reviewed finance, accounting, law, and economics journals, including the Journal of Financial Economics, Journal of Law and Economics, Journal of Accounting and Economics, Journal of Empirical Legal Studies, and Journal of Financial and Quantitative Analysis. My curriculum vitae, attached as **Appendix A**, further details my publications and previous testimony.

7.    I billed my time at a rate of $850 per hour for my work on this matter and my compensation is in no way contingent on the outcome of this case. My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention. I am being assisted by staff at Fideres Partners LLP, who performed work under my direction. I have no financial or other interest in Fideres Partners' billings in this matter.

## 2   SUMMARY OF OPINIONS

8.    I have been asked by counsel for the Court-appointed Lead Plaintiffs in this matter to determine whether the market for Berry Corporation's ("Berry" or the "Company") Common Stock was efficient during the period from July 26, 2018 to November 3, 2020, inclusive (the "Class Period").[1] In addition, I have been asked to opine on whether the calculation of §10(b) damages on a class-wide basis in this matter is subject to a common methodology, and to describe

---

[1] I understand the Defendants to be Berry Corporation, Arthur T. Smith, Cary Baetz, Gary A. Grove, Brent S. Buckley, Kaj Vazales, and Eugene J. Voiland (collectively the "Defendants"). Source: Amended Class Action Complaint, *Torres v. Berry Corporation*, No. 3:20-cv-03464 (N.D. Texas) (the "Complaint").

2

the method by which §11 damages can be calculated for Class members.

9.    The materials I have considered in forming my opinions are summarized in **Appendix B**.

10.    Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the opinion that the market for shares of Berry's Common Stock was efficient throughout the course of the Class Period.

11.    I have also formed the opinion that damages in this matter can be calculated on a class-wide basis subject to a common methodology.

12.    The remainder of my report is organized as follows: **Section 3** describes the case background and the bases for the reliance requirement and the "fraud on the market" theory relating to market efficiency. **Section 4** presents my analyses of the market efficiency factors during the Class Period in relation to Berry's Common Stock. **Section 5** addresses how damages can be calculated on a class-wide basis subject to a common methodology. **Section 6** contains my conclusions.

## 3    CASE BACKGROUND

### 3.1    Overview of the Company and Allegations

13. Berry is an energy company that focuses on the development and production of conventional oil reserves in the western United States, principally in California. The Company's predecessor, Berry Petroleum Company, went public in 1989, but subsequently filed for bankruptcy on May 11, 2016. In February 2017, Berry LLC appeared out of the bankruptcy as a stand-alone company and a wholly owned subsidiary of Berry, which was incorporated in Delaware in the same month. On June 29, 2018, the Company filed its Registration Statement on Form S-l for the IPO, which, after an amendment, was declared effective by the SEC on July 25, 2018 (the "Registration Statement"). On July 26, 2018, Berry completed its IPO and the Company's common stock began to trade on the NASDAQ under the symbol "BRY." The following day, on July 27, 2018 Berry filed its Prospectus on Form 424B4 with the SEC (the "Prospectus" and, collectively with the Registration Statement, the "Offering Documents"). The vast majority of the Company's asset base consists of oil reserves in the San Joaquin Basin of

3

California with over 90% of its total proved reserves located in that state. Its remaining proved reserves are located in Utah and Colorado.[2]

14.   Plaintiffs allege claims under §11 and §15 of the Securities Act of 1933 (the "Securities Act"), stating that the Offering Documents were negligently prepared, and, as a result, contained false and misleading statements and omissions. Specifically, Defendants allegedly downplayed risks which had already materialized or had a high risk of occurring in the near term, in particular their chronic failure to obtain timely Underground Injection Control Permits ("UIC Permits").[3]

15.   In addition, Plaintiffs allege claims under §10(b) and §20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") for fraud against certain of Berry's current and former officers and directors. Specifically, throughout the Class Period, the Defendants allegedly made reckless misrepresentations and/or failed to disclose that (a) Berry had materially overstated its operational efficiency and speed in obtaining permits; (b) Berry's lack of necessary permits caused delays and halted production, and would foreseeably necessitate operational improvements that would disrupt the Company's productivity and increase costs; and (c) as a result, the foregoing would foreseeably negatively impact the Company's revenues.[4]

16.   The Complaint alleges that a partial revelation of the truth occurred on April 1, 2020, when the Company revised its 2020 production target sharply downwards.[5] The Complaint also alleges that the relevant truth was further revealed on August 4, 2020, when the Company disclosed that average daily production had decreased by an additional 5% compared to Q1 2020.[6] Finally, the Complaint alleges that the relevant truth was further revealed on November 3, 2020, with the Company announcing that average daily production had decreased by an additional 5% compared to Q2 2020.[7] As a result of Berry's alleged wrongful acts and material omissions of fact, investors

---

[2] Complaint ¶¶18; 27-29.

[3] Complaint ¶¶1-3; 37-44; 84-107.

[4] *Ibid.*

[5] Complaint ¶¶7-11.

[6] *Ibid*.

[7] *Ibid*.

allegedly purchased Berry's Common Stock at artificially inflated prices during the Class Period.[8]

17.  **Exhibit 1** graphs the closing stock price and trading volume for Berry's Common Stock shares throughout the Class Period.

### 3.2    Bases for Opinions on Market Efficiency

18.  I understand that Lead Plaintiffs assert in part the "fraud-on-the-market" theory, positing that shareholders rely on the alleged misrepresentations or material omissions of fact made by Defendants through their effect on stock prices in an open and well-developed market. If a market is efficient, meaning that widely available public information is quickly incorporated into stock prices, then all purchasers of the stock are induced into reliance on any misrepresentations or material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price. The fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to §10(b) claims, and was adopted by the U.S. Supreme Court in its *Basic* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[9]

19.  This theory was also reaffirmed by the Supreme Court *in Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in

---

[8] Complaint ¶161.

[9] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[10]

20.   As these cases indicate, stock prices quickly incorporate the valuation effects of public statements in an open, developed, and efficient market. In finance, "semi-strong-form" market efficiency refers to a market in which publicly available information is quickly reflected in a security's market price. Thus, if a company omits important information or provides misleading information to shareholders, the stock price will become distorted and either inflated or deflated relative to the price at which the stock would trade but-for the misleading or omitted information. Thus, in an efficient market, purchasers implicitly rely on a company's misrepresentations or material omissions of fact because they are impounded into the stock price at which trades are made.

21.   Courts and practitioners have argued that markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and the Nasdaq Stock Market ("NASDAQ"), should be granted a presumption of efficiency for virtually all securities traded on them.[11] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other exchange rules practically guarantee a liquid market for securities traded on these exchanges. The fact that Berry's Common Stock traded in such a well-developed market (under the trading symbol "BRY" on the NASDAQ) leads to a strong presumption of market efficiency.[12]

22.   Numerous academics have studied the pricing behavior of stock markets, and some have purported to identify anomalies that call into question the efficiency of markets. However, academics have generally concluded that these anomalies represent random patterns in the data, are often not scientifically reproducible or robust to different statistical modeling choices, and/or

---

[10] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

[11] See *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*"), citing Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, §8.6 (Aug.1988): "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

[12] Complaint ¶18.

are not persistent and have been quickly eliminated by arbitrage trading. For example, Nobel Prize winner Eugene Fama summarizes market efficiency as follows:

> The recent finance literature seems to produce many long-term return anomalies. Subjected to scrutiny, however, the evidence does not suggest that market efficiency should be abandoned. Consistent with the market efficiency hypothesis that the anomalies are chance results, apparent overreaction of stock prices to information is about as common as underreaction. And post-event continuation of pre-event abnormal returns is about as frequent as post-event reversal. Most important, the long-term return anomalies are fragile. They tend to disappear with reasonable changes in the way they are measured.[13]

Similarly, Kewei Hou, Chen Xue, and Lu Zhang conclude that "[m]ost anomalies fail to replicate, falling short of the currently acceptable standards for empirical finance… In all, capital markets are more efficient than previously recognized."[14] Moreover, the existence of anomalies does not directly undermine the premise of market efficiency, as the key question at issue under the fraud-on-the-market theory of reliance pertains to whether alleged misstatements or material omissions of fact would be reflected in stock prices at a given time.

23. Academic research thus provides a strong presumption for market efficiency. I understand that courts have also developed various tests that attempt to weigh in favor of or against the presumption of market efficiency. None of these tests are individually determinative of market efficiency, but when viewed as a whole they can be informative in supporting or rebutting a presumption of market efficiency in relation to the reliance element of the fraud-on-the-market theory. These factors include what courts have referred to as the *Cammer* and *Krogman*[15] factors, as well as other additional metrics.

24. In the following section, I discuss these factors and evaluate them in relation to Berry Common Stock. In doing so, I compare the various factors for Berry's Common Stock: (1)

---

[13] Eugene F. Fama, 1998, Market Efficiency, Long-Term Returns, and Behavioral Finance, *Journal of Financial Economics* 49, at 304.

[14] Kewei Hou, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, *Review of Financial Studies* 33, at 2071.

[15] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*").

benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

25.  One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."[16] In this study, these authors examined two samples of firms. One sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[17] The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock... Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[18]

26.  The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[19] Therefore, I interpret the sample of MRK Covered firms as those

---

[16] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage? *Accounting Review* 88, at 667-705 (the "MRK Study").

[17] MRK Study at 678, 681-682.

[18] MRK Study at 667.

[19] MRK Study at 681 (footnotes omitted).

---

8

eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets. I then compare several of Berry's market efficiency factors to the samples of firms in the MRK Study to assess whether Berry's characteristics are consistent with firms operating in efficient markets.

27.   I understand that courts view these market efficiency analyses as relevant to the evaluation of the fraud-on-the-market theory relating to §10(b) claims, but that the establishment of market efficiency is not required under §11 claims regarding IPO shares. I further understand that courts do not view any single factor as dispositive of market efficiency.[20]

28.   The following section presents my analyses and findings from the evaluation of various market efficiency factors for Berry's Common Stock during the Class Period.

## 4   EVALUATION OF MARKET EFFICIENCY FACTORS FOR BERRY COMMON STOCK

### 4.1   *Cammer* Factor 1: Average Weekly Trading Volume

29.   Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security. Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock. Thomas and Cotter have stated that "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[21]

30.   Stock trading volume refers to the extent to which a firm's equity is traded among investors during a given time period. The first *Cammer* factor for stock trading volume has been defined by

---

[20] *See, e.g.*: *Strougo v. Barclays PLC*, 312 F.R.D. 307, 320–21 (S.D.N.Y. 2016) ("there would be no need for a five-factor test [] if one factor were dispositive in every context" and "no court has adopted a per se rule that any one *Cammer* factor is dispositive"); *In re Pfizer Inc. Sec. Litig.,* 282 F.R.D. 38, 53 (S.D.N.Y. 2012) ("While the Supreme Court has not conclusively defined what constitutes an "efficient" market, several courts rely on the factors set forth in *Cammer v. Bloom,* 711 F.Supp. 1264, 1286–87 (D.N.J.1989), when evaluating whether an efficient market exists. *See, e.g., In re Xcelera.com Sec. Litig.,* 430 F.3d 503, 511 (1st Cir.2005); *Parmalat,* 2008 WL 3895539, at *9).

[21] Randall S. Thomas and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, *Law and Contemporary Problems* 63, at 108.

---

9

the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[22]

31. **Exhibit 2** graphs Berry's Common Stock weekly trading volume as a fraction of shares outstanding throughout the Class Period.[23] The average weekly trading volume of Berry's Common Stock was 4.16% of common shares outstanding over the Class Period. This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court. As a result, Berry's level of stock trading volume throughout the Class Period supports the conclusion that Berry's Common Stock traded in an efficient market throughout the Class Period.

32. I also note that the average weekly trading volume of Berry's Common Stock over the Class Period was 3.37 million shares. According to the authors in the MRK Study, the median weekly trading volume for the MRK Sample firms was 0.034 million shares while the median for the MRK Covered firms was 0.215 million shares weekly.[24] Berry's average weekly trading volume of 3.37 million shares during the Class Period significantly exceeds that of both the median MRK Sample firms and the MRK Covered firms. This further supports the conclusion that Berry's Common Stock traded in an efficient market throughout the Class Period.

## 4.2   *Cammer* Factor 2: Analyst Coverage

33. An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or an industry. Analysts typically participate in company conference calls, analyst-oriented meetings and presentations, and general industry conferences, publish reports in which they may assess recent company business developments, review historical financial performance and provide

---

[22] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels, *supra*).

[23] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[24] MRK Study at 678 (Table 3). The median annual trading volume for MRK sample firms was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK covered firms was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

---

10

forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock. The content of analyst reports includes information that the analyst believes is important for investors. Analyst coverage can be indicative of market efficiency since research analysts ensure that new important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[25]

34. Coverage of a company's stock by research analysts is also reflected by analyst participation in company conference calls, company-hosted "analyst day" conferences and presentations, and general industry conferences.

35. In **Exhibit 3,** I report the analyst coverage of Berry over the Class Period.[26] I identified a total of 35 reports issued by analysts at 10 separate firms. This list includes reports that were produced by firms that conduct thorough and detailed research on Berry and its industry, such as BMO Capital Markets, Wells Fargo, and Piper Sandler Companies, among others. Berry also hosted various earnings calls throughout the Class Period, and the transcripts reflect participation by analysts from large and influential financial firms such as Keybanc Capital Markets, Johnson Rice & Company, and Macquarie Capital Markets.[27] This is a significant degree of analyst coverage which served to disseminate important new publicly available information to investors, including Company news, financial performance, forecasts, and analyst commentary and recommendations.

---

[25] *Cammer*, 711 F. Supp. at 1286.

[26] I obtained analyst reports covering Berry from Investext and Factiva. These statistics represent a lower bound of the analyst coverage of Berry because many analyst reports are provided directly to investors but are not captured by third-party data vendors such as Investext.

[27] Earnings call transcripts released throughout the Class Period were obtained from Bloomberg

36. This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S received no analyst coverage in a given year.[28] Charles M.C. Lee and Eric So documented that on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.[29] Berry's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest. The analyst coverage of Berry during the Class Period supports the conclusion that Berry's Common Stock traded in an efficient market throughout the Class Period.

37. In addition to the analyst coverage documented above, investors could access information about Berry from a variety of other sources.[30] For example, I conducted a search of press and news articles about Berry using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes Dow Jones Newswires, PR Newswire, The Wall Street Journal, Reuters, MarketWatch, Investor's Business Daily, and numerous other outlets. This search identified at least 409 articles throughout the Class Period.[31] Moreover, Berry produced numerous filings containing Company information which were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period. Individual and institutional investors thus had access to publicly available information about Berry from a variety of sources during the Class Period. As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about Berry supports the conclusion that Berry's Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

### 4.3 *Cammer* Factor 3: Market Makers

38. The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market

---

[28] MRK Study at 668.

[29] Charles M.C. Lee and Eric C. So, 2017, Uncovering Expected Returns: Information in Analyst Coverage Proxies, *Journal of Financial Economics* 124, at 336 (see Table 1, Panel B – "COV").

[30] Investors can also receive information from online research forums, such as SeekingAlpha, which offers both free and subscription-based research reports. For example, there were 21 reports published during the Class Period on SeekingAlpha.

[31] The articles were identified through a Factiva search including Berry's company tag, of all available sources.

makers, which are firms that facilitate buying and selling – order flow – in a company's stock during trading hours.[32] Market makers are present on major exchanges as well as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[33]

39.  In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[34]

40.  The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting. However, Berry's Common Stock traded on the NASDAQ throughout the Class Period. This type of large, national exchange reports volume, prices, bid-ask spreads, and other trading details which ensure that it remains well-developed, liquid, and efficient. The *Cammer* court thus stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[35]

---

[32] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[33] Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *Journal of Corporate Law* 19, at 291.

[34] *Cammer*, 711 F. Supp. at 1293.

[35] *Cammer*, 711 F. Supp. at 1292.

---

41.  I understand that courts view large, established stock exchanges with market makers (such as the NYSE and NASDAQ[36]) as being informationally efficient.[37] Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally-efficient and informed trading.[38] Academic research has similarly found that institutional investors can facilitate trading liquidity. As I discuss further in **Section 4.9** below, Berry's Common Stock was widely held by institutional investors by the end of the Class Period (see **Exhibit 10b**).[39]

---

[36] The NYSE Market Model, NYSE, available at: https://www.nyse.com/market-model: "The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery." *See also*: http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess: "NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders. There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services. Definition of a Market Maker: A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)."

[37] *See*, *e.g., Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 572-73 (C.D. Ca. 2012) ("One defendant in *Cammer* contended that only stocks trading on the New York or American stock exchanges should be eligible for the presumption of reliance provided by the theory of fraud on the market. In rejecting that broad distinction, the court noted that 'the inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades.' But the trading location is still important, in one key sense: In an over the counter market, the number of market makers may be a particularly important measure of market efficiency…By contrast, Radient traded on the NYSE Amex during the Class Period which, as Plaintiffs' expert notes, means that it was assigned what that market now calls a Designated Market Maker" (citations omitted); *see also Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D. Ca. 2016), at 6: "The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency."

[38] *See*, *e.g., In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading.") (citations omitted); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.")

[39] Berry Common Stock was held by at least 325 institutional investors at some point during the Class Period (see **Exhibit 10a** and **Exhibit 10b**). Institutional ownership fluctuated on a quarterly basis throughout the Class Period, from a minimum of 95.35% of shares outstanding on September 30, 2020, to a maximum of 117.09% of shares outstanding on March 31, 2019, according to data from Bloomberg and Berry's SEC Filings. (This figure exceeds 100% due to timing differences in the reporting of quarterly institutional holdings data and bi-weekly short interest data). These figures represent a lower-bound estimate of institutional holdings as some institutions may not be reflected in Bloomberg's coverage.

---

14

42. As a result, Berry's public listing on the NASDAQ, a well-developed and established national exchange, satisfies the intent of this *Cammer* factor. Moreover, Berry had at least 88 market makers and brokers providing similar activity over the Class Period.[40] In sum, Berry easily satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venue, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for Berry's Common Stock throughout the Class Period.

### 4.4 *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

43. The fourth *Cammer* factor cited by the court is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[41]

44. Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases, the registrant has a public float of $75 million.[42,43] The logic and intuition behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer.

---

[40] Bloomberg "RANK" function.

[41] *Cammer*, 711 F. Supp. at 1287.

[42] https://www.sec.gov/files/forms-3.pdf.

[43] SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933, General Instructions".

15

45.   To the best of my knowledge, Berry met all the requirements with the SEC throughout the Class Period to be eligible for Form S-3 filing. In addition, Berry filed an SEC form S-3 during the Class Period on August 9, 2019.[44] Thus, Berry satisfies this *Cammer* Factor throughout the Class Period. As a result, this factor supports the efficiency of the market for Berry Common Stock throughout the Class Period.

**4.5   *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices**

46.   The fifth *Cammer* factor relates to whether a company's stock prices quickly respond to and incorporate new value-relevant information.

> The *Cammer* court held: … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[45]

47.   To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I analyzed Berry's quarterly earnings announcements (the "News Days"). These announcements represent a potential opportunity for the public release of new value-relevant Company information to investors. One would not expect every earnings announcement to cause a significant stock price movement for a company since investors and analysts may anticipate the reported performance, or because the information may contain a mix of both positive and negative information. The mix of unanticipated results, forward guidance, executive statements, analyst interpretations of this information, and other company-specific news can cause company stock prices to move in an efficient market. I also considered the fact that other types of news or information could be more or less relevant for a given company during certain time periods.

48.   I compared the stock returns and trading volume of Berry's Common Stock on News Days versus those metrics on trading days that contained the least news during the Class Period (the

---

[44] *See* https://www.sec.gov/Archives/edgar/data/1705873/000170587319000048/a20190809bryforms-3univers.htm

[45] *Cammer*, 711 F. Supp. at 1291.

"Least News Trading Days").[46] The Least News Trading Days provide a benchmark measurement of days in which relatively little Company-specific information was provided to the market. If Berry's stock prices tend to move more significantly following News Days than on the Least News Trading Days, this would support a conclusion of market efficiency.

49.  In order to study the stock price movements for Berry on different trading days, I performed an event study.[47] A generally accepted method for performing an event study is to create a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study method, an economist tests whether the deviation from expected price movements (i.e., the abnormal return) is sufficiently large compared to the usual volatility in the Company stock price return such that simple random movement can be rejected as the cause.

50.  Here, I performed an event study to evaluate whether Berry's Common Stock responded to information disclosed on the News Days. To conduct the event study, I deployed the methodologies described above that are well-established in academic literature and routinely applied and accepted in the context of securities fraud litigation.

51.  In order to isolate the impact of Company-specific news on Berry's stock price during the Class Period, I performed regression analyses to measure the relationship between Berry's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in Berry's

---

[46] Least News Trading Days were identified as dates with no Factiva headlines or SEC filings during the Class Period.

[47] An event study is a standard method to analyze the impact of information on market prices that has been adopted in academic research and a wide variety of other applications. See A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 13.

17

industry. By modeling how Berry's stock price returns moved relative to an overall market index and an industry index, I could also measure its response to Company-specific news.

52.   Because Berry was not a publicly traded company prior to the start of the Class Period, I used the period from July 26, 2018 (the start of the Class Period, Berry's IPO) to October 18, 2018 (60 trading days after Berry's IPO) as the Control Period to estimate a market model used to compute abnormal returns for days during this period (*i.e.*, I use an in-sample fixed Control Period).  For each trading day following October 18, 2018 within the Class Period, I constructed a regression model using data from the prior 60 trading days ("Estimation Window").[48] To study the relationship between Berry's stock price returns and overall market factors, I used the S&P 1500 Composite Total Return Index (the "Market Index"). The Market Index is commonly used by economists as a representation of the overall market. To study the relationship between Berry's stock price returns and changes in industry-wide factors that would be expected to impact all stocks in Berry's particular industry, I used the Dow Jones U.S. Exploration & Production Index (the "Industry Index").[49]

53.   I established the relationship between the daily return of the Company stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[50] As shown in **Exhibit 4**, the event study model revealed a mixed relation between the

---

[48] *See, e.g.,* Mark L. Mitchell and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, *The Business Lawyer* 49, at 568 ("The market model is estimated with regression analysis. The estimation period for this market model equation typically ranges from 100 to 300 trading days preceding the event under study."); A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates."). I commonly employ a 60 trading day Estimation Window for event studies that cover periods including March 2020, due to the abrupt, widespread, and significant increase in return volatility caused by information about the COVID pandemic.

[49] In its form 10K for the fiscal year ended December 31, 2019, Berry compared its performance to the Industry Index. *See* https://www.sec.gov/Archives/edgar/data/1705873/000170587320000014/bryform10-k2019.htm

[50] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. See A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, at 15 ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."); *see also* Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, *Journal of Finance* 50, at 1597.

Company's daily returns and those of the overall stock market throughout the Class Period; however, the coefficient on the Industry Index was positive throughout the Class Period. In other words, movements of the Market Index, and in particular the Industry Index, help explain movements in Berry's stock price. This allowed me to predict the expected daily return of the Company on a date once I had controlled for that day's market and industry returns. I then subtracted the predicted return from the actual return to get the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

54.  Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in the Company stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model. In other words, the standard deviation of errors provides a metric for how much "randomness" remains in the price movement of Berry's Common Stock, after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period.

55. To test for statistical significance, I calculated the t-statistic, which is the test that economists use to determine whether randomness can be rejected as the explanation for an abnormal price movement. The t-statistic measures the number of standard deviations between the actual observation and the predicted movement. It is calculated by dividing the abnormal return by the standard deviation of the errors. Probability theory suggests that under the standard assumption that abnormal returns will be normally distributed with a mean of zero in the absence of new value-relevant company-specific news, based purely on randomness, using a 95% confidence level and a sufficiently large sample size, an abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) approximately 5% of the time in the absence of new company-specific information.[51] In other words, there is a 95% chance that, barring some non-random

---

[51] David I. Tabak and Frederick C. Dunbar, Materiality and Magnitude: Event Studies in the Courtroom, Litigation Services Handbook, The Role of the Financial Expert, Ch. 19 (3rd ed. 2001). The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

explanation, the actual observed return will fall within 1.96 standard deviations of the predicted return.

56. **Exhibit 6** reports the event study results of the 9 days that met the criteria I established for the identification of News Days during the Class Period. The columns list the market impact dates, closing stock price, log return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the t-statistic, the p-value, statistical significance of the stock movement, and a description of the earnings announcement on each date. Overall, 4 out of 9 Berry news announcements caused stock price movements that were statistically significant at the 95% level. I compare this rate with that on the Least News Trading Days in the following exhibit.

57. **Exhibit 7** summarizes the statistical comparison of Berry's Common Stock returns and trading volume following the 9 News Days versus these metrics as measured on the Least News Trading Days. As shown in the exhibit, 44.44% of the 9 earnings announcements caused stock movements that were statistically significant at the 95% level. This compares to 3.61% of the Least News Trading Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at the 99% level. This provides strong evidence of a cause-and-effect relationship between new Company information and Berry Common Stock price movements.

58. This exhibit also shows that the average of the absolute value of abnormal returns following Berry's 9 News Days was 5.47%. This compares to an average of only 2.24% on the Least News Trading Days. The difference between these two averages is statistically significant at the 95% level. This further supports a finding of a strong cause-and-effect relationship between information and Berry Common Stock price movements.

59. Finally, this exhibit reports an average daily trading volume of 1.23 million shares for Berry Common Stock following News Days. This compares to an average daily trading volume of 0.62 million shares on the Least News Trading Days. The difference between these two values is statistically significant at the 90% level, providing further evidence of the cause-and-effect relationship between information and Berry Common Stock price movements.

60. In summary, relative to other trading days, Berry's earnings announcements caused a greater proportion of statistically significant stock price movements, absolute levels of price changes, and increases in trading volume. This finding establishes a clear cause-and-effect relationship between new Company-specific information and Berry Common Stock price movements. As a result, this price impact analysis supports the conclusion that Berry's Common Stock traded in an efficient market throughout the Class Period.

**4.6    Additional Factor 1: Market Capitalization**

61. I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[52] Moreover, the *Krogman* court stated "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[53] As stated previously, the MRK Study found that firms lacking analyst coverage had other indicators of trading in less developed and efficient markets, including smaller market capitalizations. The median market capitalization of the MRK Sample firms was $27.91 million.[54] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[55] This study supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

62. **Exhibit 8** reports Berry's market capitalization throughout the Class Period. This market capitalization averaged $722.96 million over the Class Period. Berry's market capitalization exceeded the MRK Sample firms on an inflation-adjusted basis, and the MRK Covered firms on an inflation-adjusted basis.[56] Berry's number of shares outstanding ranged from 79.5 million shares

---

[52] *Cammer*, 711 F. Supp. at 1287.

[53] *Krogman*, 202 F.R.D. at 478.

[54] MRK Study at 678 (Table 3).

[55] MRK Study at 678 (Table 3).

[56]Source: U.S. Bureau of Labor Statistics, CPI Inflation Calculator, available at: https://www.bls.gov/data/inflation_calculator.htm (last visited February 9, 2023). $27.91 million in December 1996 represented approximately $45.79 million in November 2020; $243.97 million in December 1996 represented approximately $400.30 million in November 2020.

to 82.1 million shares during the Class Period.[57] Given that Berry's market capitalization was higher than that of the MRK Sample firms and the MRK Covered firms on an inflation-adjusted basis, Berry's market capitalization on a stand-alone basis is strongly supportive of market efficiency. In addition, given Berry's shares outstanding available for trading, its sizeable float as discussed below, and the other factors analyzed herein, the market capitalization is consistent with the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

**4.7   Additional Factor 2: Bid-Ask Spread**

63.   The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[58] The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally-efficient market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

64.   I analyzed the bid-ask spread of Berry's Common Stock during the Class Period. **Exhibit 9** reports the monthly average bid-ask spread as a percentage of the bid-ask midpoint over this time period.[59] This spread fluctuated between 0.10% and 0.59% from July 2018 through November 2020, and averaged 0.23% over the Class Period.[60]

---

[57] Shares outstanding during the Class Period obtained from SEC Filings.

[58] *Krogman*, 202 F.R.D. at 478.

[59] I calculated the percent bid-ask spread using daily closing bid and ask quotes. *See, e.g.*, Kee H. Chung and Hao Zhang, 2014, A Simple Approximation of Intraday Spreads Using Daily Data, *Journal of Financial Markets* 17, at p. 94 and p. 103 (Table 2). This study compared data using end-of-day prices to intraday data and documented that the spreads were very similar. *See also*: Farshid Abdi and Angelo Ranaldo, 2017, A Simple Estimation of Bid-Ask Spreads from Daily Close, High, and Low Prices, *Review of Financial Studies* 30, at p. 4439: "An *approximation* of intraday bid-ask spreads with end-of-day quotes provides accurate measures and computational savings" (citations omitted).

[60] I also examined the dates from July 2018 and November 2020 that were part of the Class Period, and report them in **Exhibit 9**. The Class Period dates from July 2018 had an average bid-ask spread of 0.59% and the Class Period

---

22

65. By way of comparison, the MRK Study found that the MRK Sample firms had a median bid-ask spread of 4.55% while the MRK Covered firms had a median bid-ask spread of 1.69%.[61] Berry's average bid-ask spread over the Class Period was lower than the median values of both the MRK Sample firms and the MRK Covered firms, indicating that investors could trade Berry's Common Stock at very low relative cost. As a result, Berry's bid-ask spread supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

## 4.8    Additional Factor 3: Public Float

66. The *Krogman* court also considered the public float of a company in weighing market efficiency.[62] The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

67. **Exhibit 10a** reports the shares outstanding, public float, and shares held by insiders for Berry Common Stock during the Class Period. As shown in the exhibit, Berry insiders held less than 1.13% of the Common Stock throughout the Class Period (average = 0.79%). Thus, approximately 99.21% of Berry's common shares were held by institutions and other outside investors. This large degree of public float for Berry's Common Stock supports the conclusion that it traded in an efficient market during the Class Period.

## 4.9    Additional Factor 4: Institutional Ownership

68. Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the

---

dates from November 2020 had an average bid-ask spread of 0.53%. I noted, however, that neither of these figures was computed using a full month of data.

[61] MRK Study at 678 (Table 3).

[62] In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

69.  I also report the total institutional ownership of Berry's Common Stock in **Exhibit 10a**, which shows that 325 institutions held the stock at some point during the Class Period (a full list of institutional ownership can be seen in **Exhibit 10b**).[63] By comparison, the MRK Study found that the MRK Sample firms had a median of only nine institutional investors while the MRK Covered firms had a median of 40 institutional investors.[64] Berry's institutional ownership base exceeds both of these levels. Thus, the significant institutional ownership base for Berry Common Stock supports the conclusion that the Common Stock traded in an efficient market during the Class Period.

### 4.10  Additional Factor 5: Autocorrelation

70.  Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns. The interval over which autocorrelation is examined tends to be on a daily basis. Thus, if the stock return today predicts tomorrow's stock return with a statistically significant correlation, the returns are said to be autocorrelated. A positive autocorrelation could give rise to "momentum" trading whereby an investor would purchase (sell or short sell) stock when returns are positive (negative) in order to generate profits as the returns continue over subsequent trading days. A negative autocorrelation could give rise to "reversal" trading whereby an investor would sell or short sell (purchase) stock when returns are positive (negative) in order to capture profits when the returns reverse. Autocorrelation may occur occasionally due to random patterns in aggregate stock return data or due to consecutive news days with different types of new information being publicly released. However, if statistically significant autocorrelation in stock returns persists over a sufficient time period such as several quarters and is large enough in magnitude that a trader could earn riskless profits after trading costs, this would imply market

---

[63] Note: Short interest data is reported bi-weekly while updates to institutional holdings via 13-F filings are only available quarterly, and quarter-end dates may occur on non-trading days. As a result, institutional holdings may appear to exceed shares outstanding and the public float due to timing differences of data reporting.

[64] MRK Study at 678 (Table 3).

inefficiency because publicly available information about prior stock price movements would not be fully reflected in current stock prices.

71.  I use an established methodology, i.e., a regression analysis, to test for autocorrelation in Berry's Common Stock returns.[65] This evaluates whether, from a statistical perspective, the stock return on a given day can predict the stock return on the following trading day.[66] After performing the regression to test for this pattern over the sample of trading days throughout the Class Period, if the regression produces a statistically significant result, then it becomes necessary to explore whether this pattern is sufficiently large in magnitude, consistent in direction, and persistent over time such that a trading arbitrage opportunity exists. If, however, the regression does not indicate a statistically significant pattern in the stock returns, then no evidence exists of an autocorrelation anomaly.

72.  **Exhibit 11** presents the results from the autocorrelation test for Berry's Common Stock during the Class Period. The autocorrelation coefficient over the full Class Period is not statistically significant. Moreover, the quarterly autocorrelation coefficients alternate between positive and negative throughout the Class Period, indicating no consistent predictability in the Company's daily stock returns over time. The lack of a consistent and persistent autocorrelation pattern over time would thus not present an arbitrage opportunity for investors. This finding supports the conclusion that Berry's Common Stock traded in an efficient market throughout the Class Period.

### 4.11  Additional Factor 6: Options Trading

73.  Academic studies have shown that options written on company stock help to improve market depth and liquidity, investor interest, and overall market efficiency, as indicated by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and

---

[65] I evaluate abnormal returns, the calculation of which was described in the *Cammer* factor five analysis section of this report (**Section 4.5**).

[66] Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, Journal of Finance 61, at 2367-68; Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, Journal of Financial Economics 6, at 95-101.

frequencies.[67] Thus, options trading on a company's stock can improve price discovery and support a finding of market efficiency, relative to a company without any options trading. According to Bloomberg, Berry's Common Stock had 60,162 call option contracts and 28,479 put option contracts traded during the Class Period. The presence of options trading supports the conclusion that Berry's Common Stock traded in an efficient market during the Class Period.

74. Options trading can provide one means by which any mispricing in the stock price is quickly eliminated by arbitrage traders. Another arbitrage strategy to eliminate mispricing can involve short-selling. **Exhibit 10a** documents the presence of short sellers and short interest in Berry Common Stock, which fluctuated from 740,627 shares to 2,548,386 shares during the Class Period.[68] Overall, the ability of professional and institutional traders to engage in arbitrage trading further supports the conclusion that Berry's Common Stock traded in an efficient market throughout the Class Period.

## 5  ABILITY TO CALCULATE DAMAGES ON A CLASS-WIDE BASIS

75. I have been asked by Counsel to evaluate whether per-share damages can be assessed for all Class members under §10(b) of the Exchange Act based upon a methodology common to all Class members and consistent with Lead Plaintiff's theory of liability. The "out- of-pocket" method of calculating damages represents a standard and well-accepted methodology under §10(b) of the Exchange Act. This approach calculates damages formulaically as the artificial inflation in the prices of Berry securities at the time of purchase minus the artificial inflation in the prices of Berry securities at the time of sale. If securities are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Securities Litigation Reform Act of 1995 ("PSLRA").[69] This limit on damages can also be applied class-wide. I understand that this out-of-pocket methodology has been widely accepted for use across 10(b) matters.

---

[67] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, *Journal of Finance* 53. *See also*: Stephen A. Ross, 1976, Options and Efficiency, *Quarterly Journal of Economics* 90.

[68] These statistics represent short interest on quarter end dates. Short interest fluctuates on a continual basis and could be higher or lower during any given trading day.

[69] The PSLRA states: "in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference

76.   The claims process produces information necessary for the calculation of damages for each Class member, including the purchase and sale information for the security. This information is available from brokerage statements and other documentation of securities transactions. Artificial inflation is quantified for each day of the Class Period and then damages are calculated using the formula described above. As a result, the methodology for calculating damages in §10(b) matters such as this is well-established and formulaic across all Class members.

77.   The quantification of artificial inflation is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and I understand that such analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide.

78.   Event studies are widely employed to calculate artificial inflation. Event studies measure security price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions of fact and/or misrepresentations.[70] To the extent that reliable evidence is introduced to show that a material portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of Berry's securities can be determined on a common, class-wide basis using various accepted methodologies. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during the discovery process, and will be based on the specific set of facts and circumstances in a given case.

79.   A loss causation analysis must also document how artificial inflation evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery. One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that inflation equaled a constant dollar amount above the correct security price over the

---

between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See* 15 U.S.C. §78u-4(e)(1).

[70] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

---

27

Class Period. Alternatively, one can measure "constant percentage inflation," which assumes that each price was inflated by a constant percentage amount above the correct security price over the Class Period. In other instances, artificial inflation may have varied on a daily basis and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents. All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual class member identities or circumstances.

80. To summarize, I have not been asked to calculate damages in this matter. Such loss causation analysis would depend on information produced in discovery and development of the case record. Based on my experience and qualifications and my understanding of the nature of claims in this matter, I conclude that §10(b) damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

81. I have also been asked by Counsel to describe the process by which §11 damages can be calculated. I understand that §11 damages calculations are based on §11(e) of the Securities Act, which provides the statutory formula:

> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.[71]

82. This formula reflects statutory damages recoverable under §11 of the Securities Act. However, Defendants may offset some or all of these damages if they can prove that financial

---

[71] 15 U.S.C. §77k(e).

losses under this formula were not caused by the allegedly false and misleading statements or omissions:

> if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.[72]

83. To summarize, I have not been asked to calculate §10(b) or §11 damages in this matter. However, as described above, such damages calculations can be carried out formulaically across Class members.

## 6  CONCLUSION

84. In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I conducted my analyses, it is my opinion that Berry's Common Stock traded in an efficient market throughout the Class Period. Moreover, it is my opinion that damages in this matter can be calculated on a class-wide basis utilizing a common methodology.

I declare under penalty of perjury that the foregoing is true and correct.

*RESPECTFULLY SUBMITTED*

Matthew D. Cain, Ph.D.

---

[72] 15 U.S.C. §77k(e).

29

## APPENDIX A

## Matthew D. Cain, Ph.D.                                      February 2023

E-mail: mdcain@outlook.com                                              Homepage
Mobile: 574-485-8065                                                         SSRN

### Education

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                         Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics*, forthcoming.

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business

- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance, European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

    LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2023

    LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2022

University of Notre Dame, Mendoza College of Business

    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

    FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013


Purdue University, Krannert School of Management

    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

    MGMT 610: Financial Management I (MBA Core), Fall: 2007


**Expert Witness Experience**

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al*., Case No. 1:20-cv-05518-BMC (E.D. Ny.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022.

- *Bond v. Clover Health Investments, Corp., et al*., Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al*., Case No. 1:19-cv-05705 (S.D. Ny). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

---

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. Ny). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. Ny). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

## APPENDIX B

### Works Considered

**Court Documents:**

*Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

*Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989)

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

*Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D. Ca. 2016)

*In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009)

*In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009)

*In re Pfizer Inc. Sec. Litig.,* 282 F.R.D. 38, 53 (S.D.N.Y. 2012)

*In re Xcelera.com Sec. Litig.,* 430 F.3d 503, 511 (1st Cir.2005)

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001)

*Parmalat,* 2008 WL 3895539

*Strougo v. Barclays PLC*, 312 F.R.D. 307, 320–21 (S.D.N.Y. 2016)

*Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 572-73 (C.D. Ca. 2012)

**Academic Literature:**

Abdi, Farshid and Angelo Ranaldo. A Simple Estimation of Bid-Ask Spreads from Daily Close, High, and Low Prices. *Review of Financial Studies* 30 (2017)

Avramov, Doron, Tarun Chordia and Amit Goyal. Liquidity and Autocorrelations in Individual Stock Returns. *The Journal of Finance* 61.5 (2006): 2365-2394. Print.

Barber, Brad M., Paul A. Griffin and Baruch Lev. The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. *Journal of Corporate Law* 19 (1993): 285. Print.

Braun, Phillip A., Daniel B. Nelson and Alain M. Sunier. Good News, Bad News, Volatility, and Betas. *The Journal of Finance* 50.5 (1995): 1575-1603. Print.

Chung, Kee H. and Hao Zhang. A Simple Approximation of Intraday Spreads using Daily Data. *Journal of Financial Markets* 17 (2014): 94-120. Print.

Fama, Eugene F. Market Efficiency, Long-Term Returns, and Behavioral Finance. *Journal of Financial Economics* 49.3 (1998): 283-306. Print.

Hou, Kewei, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, *Review of Financial Studies* 33, at 2071.

Jensen, Michael C. Some Anomalous Evidence regarding Market Efficiency. *Journal of Financial Economics* 6.2-3 (1978): 95-101. Print.

Kumar, Raman, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, *Journal of Finance* 53.

Lee, Charles MC and Eric C. So. Uncovering Expected Returns: Information in Analyst Coverage Proxies. *Journal of Financial Economics* 124.2 (2017): 331-348. Print.

MacKinlay, A. Craig. Event Studies in Economics and Finance. *Journal of Economic Literature* 35.1 (1997): 13-39. Print.

Mitchell, Mark L. and Jeffry M. Netter. The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission. *The Business Lawyer* (1994): 545-590. Print.

Mola, Simona, P. Raghavendra Rau and Ajay Khorana. Is there Life After the Complete Loss of Analyst Coverage? *The Accounting Review* 88.2 (2013): 667-705. Print.

Tabak, David and Frederick Dunbar. Materiality and Magnitude: Event Studies in the Courtroom. *Litigation services handbook: The role of the financial expert* (2001): 19.1-19.22. Print.

Thomas, Randall S. and James F. Cotter. Measuring Securities Market Efficiency in the Regulatory Setting. *Law and Contemporary Problems* 63.3 (2000): 105-122. Print.

Ross, Stephen A. Options and Efficiency. *The Quarterly Journal of Economics* 90.1 (1976): 75-89.

**Data Sources:**

Bloomberg

Factiva

Investext

SEC Edgar

Factset

Capital IQ


**Other:**

All other documents cited or referred to within this report

**EXHIBIT 1**



Berry Closing Price and Volume 26-Jul-2018 to 30-Nov-2020

Data Source: Bloomberg

## EXHIBIT 2



Berry Common Stock Average Weekly Trading Volume as a Percentage of Shares Outstanding 26-Jul-2020 to 03-Nov-2020

Data Source: Bloomberg, SEC Edgar

50

## EXHIBIT 3

**Summary of Research Analyst Coverage of Berry during the Class Period: 26-Jul-2018 to 03-Nov-2020**

| Analyst Name | Reports Issued During the Class Period |
|---|---|
| BuySellSignals Research | 8 |
| BMO Capital Markets | 5 |
| Wells Fargo Securities, LLC | 5 |
| ValuEngine, Inc. | 4 |
| Piper Sandler Companies | 3 |
| Wright Reports | 3 |
| Corporate Watchdog Reports | 2 |
| Seaport Global Securities LLC | 2 |
| Validea | 2 |
| EVERCORE ISI | 1 |
| **Total** | **35** |

| Analyst Name | Quarters of Coverage During the Class Period |
|---|---|
| Instinet | Q2 2019 |
| Johnson Rice & Company | Q3 2019 - Q2 2020 |
| Keybanc Capital Markets | Q4 2018 - Q1 2019, Q3 2019 - Q2 2020 |
| Macquarie Capital Markets | Q2 2018 - Q3 2018 |
| Piper Sandler & Co | Q1 2019 - Q3, 2019, Q1 2020 - Q2 2020 |
| Seaport Global Securities | Q2 2020 |
| Tudor, Pickering, Holt & Co. | Q3 2018, Q1 2019 |

Data Source: Investext, Bloomberg

41

**EXHIBIT 4**



Coefficients From Fixed and Rolling Event Study Regression for Berry
Common Stock: 26-Jul-2018 to 03-Nov-2020

Dow Jones US Exploration and Production Index (Industry Index)     S&P 1500 Total Return Index (Market Index)

Data Source: Bloomberg

42

**EXHIBIT 5**



Standard Deviation of Errors for Fixed and Rolling Event Study for Berry Common Stock: 26-Jul-2018 to 03-Nov-2020

Data Source: Bloomberg

43

**EXHIBIT 6**

## Event Study Analysis of Berry News Dates for Berry Common Stock

| Date | Closing Price ($) | Log Return | Abnormal Return | Abnormal Dollar Change ($) | t-Stat | p-Value | Sig Level | Earnings Call Announcement |
|---|---|---|---|---|---|---|---|---|
| 23-Aug-18 | 14.03 | 3.85% | 3.78% | 0.52 | 1.4561 | 0.151 | | Q2 2018 Berry Petroleum Corp Earnings Call – Final (CQ FD Disclosure – Factiva) |
| 8-Nov-18 | 14.02 | -5.68% | -3.16% | -0.46 | -1.3955 | 0.168 | | Q3 2018 Berry Petroleum Corp Earnings Call – Final (CQ FD Disclosure – Factiva) |
| 7-Mar-19 | 11.90 | -2.41% | -1.13% | -0.14 | -0.3602 | 0.720 | | Q4 2018 Berry Petroleum Corp Earnings Call – Final (CQ FD Disclosure – Factiva) |
| 9-May-19 | 11.44 | 3.29% | 4.04% | 0.46 | 1.8429 | 0.071 | * | Q1 2019 Berry Petroleum Corp Earnings Call – Final (CQ FD Disclosure – Factiva) |
| 8-Aug-19 | 8.50 | -4.15% | -7.28% | -0.62 | -3.5454 | 0.001 | *** | Q2 2019 Berry Petroleum Corp Earnings Call – Final (CQ FD Disclosure – Factiva) |
| 8-Nov-19[1] | 11.05 | 0.54% | 0.50% | 0.05 | 0.2580 | 0.797 | | Q3 2019 Berry Petroleum Corp Earnings Call – Final (CQ FD Disclosure – Factiva) |
| 27-Feb-20 | 6.10 | -1.06% | 6.33% | 0.40 | 2.6438 | 0.011 | *** | Q4 2019 Berry Petroleum Corp Earnings Call - Final (CQ FD Disclosure - Factiva) |
| 7-May-20 | 3.65 | 15.69% | 13.45% | 0.45 | 2.2179 | 0.031 | ** | Q1 2020 Berry Corporation (Bry) Earnings Call - Final (CQ FD Disclosure - Factiva) |
| 5-Aug-20 | 4.55 | -7.41% | -9.57% | -0.45 | -3.4308 | 0.001 | *** | Q2 2020 Berry Corporation (Bry) Earnings Call - Final (CQ FD Disclosure - Factiva) |

Data Sources: Bloomberg, Factiva , SEC Edgar

[1]Q3 2019 earnings call was held on November 7, 2019 at 5:00 PM EST. As the call was held after market close, I analyzed November 8, 2019 as the relevant market impact date for this earnings call. All other quarterly earnings calls occurred prior to market open or during normal trading hours on the indicated dates.

44

**EXHIBIT 7**

**Comparison of Statistical Significance and Abnormal Returns for Berry News Days vs. Least News Trading Days During the Class Period for Berry Common Stock**

| Statistic | News Days | Days with Least News | p-Value of Difference |
|---|---|---|---|
| N | 9 | 360 | |
| Significant Days at 95% Confidence Level | 4 | 13 | |
| % Significant Days at 95% Confidence Level | 44.44% | 3.61% | 0.000 |
| Average Absolute Abnormal Return | 5.47% | 2.24% | 0.049 |
| Average Volume (Millions) | 1.23 | 0.62 | 0.060 |

Data Sources: Bloomberg, Factiva, SEC Edgar

45

55

**EXHIBIT 8**



Data Source: Bloomberg

**EXHIBIT 9**



Berry Common Stock Average Monthly Bid-Ask Percentage Spread 26-July-2018 to 03-Nov-2020

Data Source: Bloomberg
Note: The percentage bid-ask spread was calculated as the a) the closing ask quote less the closing bid quote divided by b) the average of the bid and ask quotes.

47

57

**EXHIBIT 10A**

## Berry Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings

| Date | Shares Outstanding | Total Institutions Owning Stock | Insider Holdings | Short Interest | Public Float | Insider Holdings as % of Shares Outstanding | Institutional Holdings | Institutional Holdings as % of Shares Outstanding | Institutional Holdings as % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 09/30/2018 | 81,336,762 | 114 | 205,470 | 1,328,929 | 82,460,221 | 0.25% | 80,285,715 | 98.71% | 97.36% |
| 12/31/2018 | 81,642,953 | 134 | 418,707 | 1,624,765 | 82,849,011 | 0.51% | 82,553,277 | 101.12% | 99.64% |
| 03/31/2019 | 82,061,650 | 154 | 479,236 | 2,548,386 | 84,130,800 | 0.58% | 96,089,174 | 117.09% | 114.21% |
| 06/30/2019 | 81,879,170 | 157 | 566,737 | 1,577,101 | 82,889,534 | 0.69% | 88,091,674 | 107.59% | 106.28% |
| 09/30/2019 | 80,973,285 | 154 | 566,737 | 913,615 | 81,320,163 | 0.70% | 88,042,413 | 108.73% | 108.27% |
| 12/31/2019 | 80,997,405 | 188 | 637,740 | 2,434,852 | 82,794,517 | 0.79% | 82,778,294 | 102.20% | 99.98% |
| 03/31/2020 | 79,546,417 | 177 | 761,109 | 2,170,381 | 80,955,689 | 0.96% | 78,746,954 | 98.99% | 97.27% |
| 06/30/2020 | 79,758,415 | 143 | 894,371 | 1,755,608 | 80,619,652 | 1.12% | 77,325,224 | 96.95% | 95.91% |
| 09/30/2020 | 79,870,874 | 129 | 902,002 | 1,047,492 | 80,016,364 | 1.13% | 76,160,673 | 95.35% | 95.18% |
| 12/31/2020 | 79,929,335 | 127 | 902,002 | 740,627 | 79,767,960 | 1.13% | 77,162,500 | 96.54% | 96.73% |
| **Total Institutions over Class Period:** | | **325** | | | **Class Period Average:** | **0.79%** | | **102.33%** | **101.08%** |

Data Sources: Bloomberg, SEC Edgar, Capital IQ

**EXHIBIT 10B**

## Institutions that Held Berry Common Stock at Some Point During the Class Period

| | | | |
|---|---|---|---|
| 1 | 1492 Capital Management, LLC | 27 | AQR Capital Management, LLC |
| 2 | A.R.T. Advisors, LLC | 28 | Arizona State Retirement System |
| 3 | AB CarVal Investors LP | 29 | Arosa Capital Management LP |
| 4 | Acadian Asset Management LLC | 30 | Arrowstreet Capital, Limited Partnership |
| 5 | Adage Capital Management, L.P. | 31 | Ascension Health Master Pension Trust |
| 6 | Advisory Services Network, LLC | 32 | Ascension Investment Management, LLC |
| 7 | Affiliated Managers Group, Inc. (NYSE:AMG) | 33 | Assenagon Asset Management S.A. |
| 8 | AIGEN Investment Management, LP | 34 | Assured Investment Management LLC |
| 9 | AJO, LP | 35 | AXA Investment Managers S.A. |
| 10 | Alambic Investment Management, L.P. | 36 | azValor Asset Management SGIIC, S.A.U. |
| 11 | Alberta Investment Management Corporation | 37 | Baines Creek Capital, LLC |
| 12 | Alera Investment Advisors, LLC | 38 | Bank of America Corporation, Asset Management Arm |
| 13 | AllianceBernstein L.P. | 39 | Barclays Bank PLC, Securities Investments |
| 14 | Allianz Asset Management AG | 40 | Barclays PLC Private Banking & Investment Banking Investment |
| 15 | Allspring Global Investments, LLC | 41 | Barrow, Hanley, Mewhinney & Strauss, LLC |
| 16 | AlphaCrest Capital Management LLC | 42 | Benefit Street Partners L.L.C. |
| 17 | Alyeska Investment Group, L.P. | 43 | Berman Capital Advisors, LLC |
| 18 | American Beacon Advisors, Inc. | 44 | BlackRock, Inc. (NYSE:BLK) |
| 19 | American Century Investment Management Inc | 45 | Blackstone Inc. (NYSE:BX) |
| 20 | Ameritas Investment Partners, Inc. | 46 | Blue Rock Advisors, Inc. |
| 21 | AMG Funds LLC | 47 | BMO Asset Management Corp. |
| 22 | Amundi Asset Management | 48 | BNP Paribas Securities Corp, Asset Management Arm |
| 23 | Analytic Investors, LLC | 49 | BNY Mellon Asset Management |
| 24 | Anthem Insurance Companies, Inc, Asset Management Arm | 50 | Bowling Portfolio Management LLC |
| 25 | Aperio Group, LLC | 51 | Bridgeway Capital Management, LLC |
| 26 | Applied Finance Advisors, LLC | 52 | Brighthouse Investment Advisers, LLC |

| 53 | Brookfield Corporation (TSX:BN) |
| 54 | Brown Advisory Incorporated |
| 55 | Brown Brothers Harriman & Co., Asset Management Arm |
| 56 | California Public Employees' Retirement System |
| 57 | California State Teachers' Retirement System |
| 58 | Capital Fund Management S.A. |
| 59 | Catalyst Capital Advisors LLC |
| 60 | Caymus Capital Partners, L.P. |
| 61 | CBIZ Investment Advisory Services, LLC |
| 62 | Cedar Capital, LLC |
| 63 | Centenus Global Management, LP |
| 64 | Charles Schwab Investment Management, Inc. |
| 65 | Cheyne Capital Management (UK) LLP |
| 66 | Chicago Equity Partners LLC |
| 67 | CI Global Asset Management |
| 68 | Citadel Advisors LLC |
| 69 | Citigroup Inc.,Banking and Securities Investments |
| 70 | Clear Harbor Asset Management, LLC |
| 71 | Clearwater Management Co., Inc. |
| 72 | Columbia Management Investment Advisers, LLC |
| 73 | Connor, Clark & Lunn Investment Management Ltd. |
| 74 | Convergence Investment Partners, LLC |
| 75 | CornerCap Investment Counsel, Inc. |
| 76 | CPP Investments |
| 77 | Credicorp Capital Asset Management |
| 78 | Credit Suisse Asset Management (Switzerland) |
| 79 | Credit Suisse, Investment Banking and Securities Investments |
| 80 | Cushing Asset Management, LP |
| 81 | Cutler Group LP, Asset Management Arm |
| 82 | D. E. Shaw & Co., L.P. |

| 83 | Danske Capital AS |
| 84 | DC Investments Management, LLC |
| 85 | Dean Capital Management, LLC |
| 86 | Dean Investment Associates, LLC |
| 87 | Deep Basin Capital LP |
| 88 | Deka Investment GmbH |
| 89 | DePrince, Race & Zollo, Inc. |
| 90 | Deutsche Asset & Wealth Management |
| 91 | Deutsche Bank Aktiengesellschaft, London |
| 92 | Diageo plc, Pension Arm |
| 93 | Dimensional Fund Advisors LP |
| 94 | Driehaus Capital Management LLC |
| 95 | DuPont Capital Management Corporation |
| 96 | Dynamic Technology Lab Pte Ltd |
| 97 | Eaton Vance Management |
| 98 | Ellevest, Inc. |
| 99 | Ellington Management Group, L.L.C. |
| 100 | Elm Ridge Capital Management, LLC |
| 101 | Employees' Retirement System of The State of Hawaii |
| 102 | Engineers Gate Manager LP |
| 103 | Envestnet Asset Management, Inc. |
| 104 | Ergoteles LLC |
| 105 | ERTS Wealth Advisors, LLC |
| 106 | Evergreen Capital Management LLC |
| 107 | ExodusPoint Capital Management, LP |
| 108 | Factory Mutual Insurance Company, Asset Management Arm |
| 109 | Fidelity International Ltd |
| 110 | Financial Architects, Inc. |
| 111 | First Midwest Bank Trust Division |
| 112 | First Trust Advisors LP |

| | | | |
|---|---|---|---|
| 113 | FMR LLC | 142 | InR Advisory Services, LLC |
| 114 | Founders Capital Management Inc | 143 | Intl Union Uaw Master Pension Sdhy |
| 115 | Foundry Partners, LLC | 144 | Invenomic Capital Management, LP |
| 116 | Fox Run Management LLC | 145 | Invesco Capital Management LLC |
| 117 | Franklin Resources, Inc. (NYSE:BEN) | 146 | Invesco Ltd. (NYSE:IVZ) |
| 118 | Frontier Capital Management Co LLC | 147 | IPG Investment Advisors, LLC |
| 119 | Frontier Investment Management Co | 148 | J.P. Morgan Asset Management, Inc. |
| 120 | Geode Capital Management, LLC | 149 | Jackson National Asset Management, LLC |
| 121 | GLG LLC | 150 | Jacobs Levy Equity Management Inc |
| 122 | GLG Partners, Inc. | 151 | Jane Street Group, LLC, Asset Management Arm |
| 123 | Goehring & Rozencwajg Associates, LLC | 152 | Janus Henderson Group plc (NYSE:JHG) |
| 124 | Goldman Sachs Asset Management, L.P. | 153 | Jefferies Group LLC, Asset Management Arm |
| 125 | Goldman Sachs Group, Investment Banking and Securities Investments | 154 | John Lewis Partnership Pension Trust Limited |
| 126 | Gotham Asset Management, LLC | 155 | JPMorgan Chase & Co, Brokerage and Securities Investments |
| 127 | Grantham Mayo Van Otterloo & Co. LLC | 156 | JPMorgan Chase & Co, Private Banking and Investment Banking Investments |
| 128 | Group One Trading LP, Asset Management Arm | 157 | JS Capital Management, LLC |
| 129 | GSA Capital Partners LLP | 158 | Jump Trading, LLC, Asset Management Arm |
| 130 | GuideStone Capital Management, LLC | 159 | Kaiser Foundation Health Plan Inc., Endowment Arm |
| 131 | GWL Investment Management Ltd. | 160 | Keebeck Alpha, LP |
| 132 | Haafor (Singapore) Pte. Ltd., Asset Management Arm | 161 | Keeley-Teton Advisors, LLC |
| 133 | Hancock Whitney Bank, Asset Management Arm | 162 | Kennedy Capital Management LLC |
| 134 | Harbor Investment Advisory, LLC | 163 | Kern County Employees Retirement Association |
| 135 | HBK Investments L.P. | 164 | KLP Kapitalforvaltning AS |
| 136 | Heartland Advisors, Inc. | 165 | L2 Asset Management, LLC |
| 137 | HighTower Advisors, LLC | 166 | Leap Investments LP |
| 138 | Hotchkis and Wiley Capital Management, LLC | 167 | Legal & General Investment Management Limited |
| 139 | Hudson River Trading LLC, Asset Management Arm | 168 | Legg Mason Investments (Europe) Limited |
| 140 | Independent Financial Partners | 169 | Legg Mason, Inc. |
| 141 | Innealta Capital, LLC | 170 | Loomis Sayles & Company, L.P. |

| | | | |
|---|---|---|---|
| 171 | Lord, Abbett & Co. LLC | 202 | Norges Bank Investment Management |
| 172 | Los Angeles Capital Management LLC | 203 | Northern Trust Global Investments |
| 173 | LSV Asset Management | 204 | Northwestern Mutual Wealth Management Company |
| 174 | MacKay Shields LLC | 205 | Nuance Investments, LLC |
| 175 | Mackenzie Financial Corporation | 206 | NumerixS Investment Technologies Inc. |
| 176 | Macquarie Investment Management Business Trust | 207 | Oaktree Capital Management, L.P. |
| 177 | Macquarie Investment Management Limited | 208 | Ohio Public Employees Retirement System |
| 178 | Managed Account Advisors LLC | 209 | O'Shaughnessy Asset Management, LLC |
| 179 | Manulife Asset Management | 210 | Pacific Investment Management Company LLC |
| 180 | Marathon Asset Management Limited | 211 | Paloma Partners Management Company |
| 181 | Marathon Asset Management, LP | 212 | PanAgora Asset Management, Inc. |
| 182 | Marshall Wace LLP | 213 | Parallel Advisors, LLC |
| 183 | Martingale Asset Management, L.P. | 214 | Park Place Capital Corporation |
| 184 | Meeder Asset Management, Inc | 215 | PDT Partners, LLC |
| 185 | Merrill Lynch & Co. Inc., Banking Investments | 216 | Pearl River Capital, LLC |
| 186 | MetLife Investment Management, LLC | 217 | Penn Mutual Asset Management, LLC |
| 187 | Millennium Management LLC | 218 | Pentwater Capital Management LP |
| 188 | Mirae Asset Global Investments Co., Ltd | 219 | Peregrine Capital Management, LLC |
| 189 | Mobius Capital Management, LLC | 220 | PGIM, Inc. |
| 190 | Moore Capital Management, LP | 221 | Pictet Asset Management Limited |
| 191 | Morgan Stanley Investment Management Inc. | 222 | Planned Solutions Financial & Insurance Services, Inc. |
| 192 | Morgan Stanley, Investment Banking and Brokerage Investments | 223 | PNC Financial Services Group Inc., Banking Investments |
| 193 | Nationwide Fund Advisors | 224 | Point72 Asset Management, L.P. |
| 194 | New Jersey Division of Investment | 225 | Prelude Capital Management, LLC |
| 195 | New York Life Investment Management LLC | 226 | Premier Asset Management LLC |
| 196 | New York State Common Retirement Fund | 227 | Principal Global Investors, LLC |
| 197 | New York State Teachers' Retirement System | 228 | Private Capital Group, LLC |
| 198 | Ninepoint Partners LP | 229 | Proficio Capital Partners LLC |
| 199 | NISA Investment Advisors, LLC | 230 | ProFund Advisors LLC |
| 200 | Nomura Corporate Research and Asset Management Inc. | 231 | ProShare Advisors LLC |
| 201 | Nomura Holdings Inc, Securities & Investment Arm | 232 | Prudential Trust Company, Trust Investments |

| | | | | |
|---|---|---|---|---|
| 233 | Public Sector Pension Investment Board | | 262 | Soros Fund Management LLC |
| 234 | Putnam LLC | | 263 | South Dakota Investment Council |
| 235 | QS Investors, LLC | | 264 | Southern California Edison Company, Retirement Plan Trust |
| 236 | Quadrant Capital Group LLC | | 265 | Spark Investment Management LLC |
| 237 | Quadrature Capital Limited | | 266 | Sprott Asset Management LP |
| 238 | Quantamental Technologies LLC | | 267 | Squarepoint OPS LLC |
| 239 | Quantbot Technologies, LP | | 268 | State of Wisconsin Investment Board |
| 240 | Quantinno Capital Management LP | | 269 | State Street Global Advisors, Inc. |
| 241 | Qube Research And Technologies Ltd | | 270 | Stichting Pensioenfonds DSM Nederland |
| 242 | Rafferty Asset Management, LLC | | 271 | Stichting Pensioenfonds Sabic |
| 243 | Raymond James Financial Inc., Asset Management Arm | | 272 | Stifel Asset Management Corp. |
| 244 | Renaissance Technologies LLC | | 273 | Strategic Advisers LLC |
| 245 | Rhumbline Advisers Ltd Partnership | | 274 | STRS Ohio |
| 246 | RMR Wealth Builders, Inc. | | 275 | SunAmerica Asset Management, LLC |
| 247 | Royal Bank of Canada, Banking & Securities Investments | | 276 | Susquehanna Fundamental Investments, LLC |
| 248 | Royce & Associates, LP | | 277 | Susquehanna International Group, LLP, Asset Management Arm |
| 249 | Russell Investment Management, LLC | | 278 | Swiss National Bank, Asset Management Arm |
| 250 | SailingStone Capital Partners LLC | | 279 | Swisscanto Asset Management AG |
| 251 | San Francisco Sentry Investment Group | | 280 | T. Rowe Price Group, Inc. (NasdaqGS:TROW) |
| 252 | SBAuer Funds, LLC | | 281 | TCI Wealth Advisors, Inc., Asset Management Arm |
| 253 | Schonfeld Strategic Advisors LLC | | 282 | Teachers Insurance and Annuity Association-College Retirement Equities Fund |
| 254 | Schroder Investment Management Limited | | 283 | Teachers' Retirement System of Louisiana |
| 255 | Schroder Investment Management North America Inc. | | 284 | The Oxford Asset Management Company Limited |
| 256 | Securities America Advisors, Inc. | | 285 | The Vanguard Group, Inc. |
| 257 | Security Investors, LLC | | 286 | The Walt Disney Company Retirement Plan Master Trust |
| 258 | SEI Investments Company (NasdaqGS:SEIC) | | 287 | Tower Research Capital LLC |
| 259 | Shenkman Capital Management, Inc. | | 288 | Trexquant Investment LP |
| 260 | Simplex Trading, LLC, Asset Management Arm | | 289 | Triad Hybrid Solutions, LLC |
| 261 | Societe Generale, Securities Investments | | 290 | Tudor Investment Corporation |

| | | | | |
|---|---|---|---|---|
| 291 | Two Sigma Advisers, LP | | 309 | Walleye Capital LLC |
| 292 | Two Sigma Investments, LP | | 310 | WBI Investments, Inc. |
| 293 | U.S. Bancorp Asset Management, Inc. | | 311 | WealthSource Partners, LLC |
| 294 | UBS Asset Management | | 312 | WealthStone Family Office LLC |
| 295 | UBS O'Connor LLC | | 313 | WEDGE Capital Management LLP |
| 296 | United Auto Workers of America, Endowment Arm | | 314 | Weiss Multi-Strategy Advisers LLC |
| 297 | Validea Capital Management LLC | | 315 | Weld Capital Management LLC |
| 298 | Vantagepoint Investment Advisers, LLC | | 316 | Wellington Management Group LLP |
| 299 | Venor Capital Management LP | | 317 | Wells Fargo & Company, Private Banking and Investment Banking Arm |
| 300 | Vericimetry Advisors, LLC | | 318 | Wells Fargo & Company, Securities and Brokerage Investments |
| 301 | Verition Fund Management LLC | | 319 | Western Asset Management Company Limited |
| 302 | Versant Capital Management, Inc. | | 320 | Wexford Capital LP |
| 303 | Victory Capital Management Inc. | | 321 | Winton Capital Group Limited |
| 304 | Virtu Financial LLC, Asset Management Arm | | 322 | Wolverine Asset Management, LLC |
| 305 | Vision2020 Wealth Management Corp. | | 323 | Zacks Investment Management, Inc. |
| 306 | Voloridge Investment Management, LLC | | 324 | Zebra Capital Management, LLC |
| 307 | Voya Investment Management LLC | | 325 | ZKB Asset Management |
| 308 | Waldron Wealth Management, LLC, Asset Management Arm | | | |

Data Source: Capital IQ

54

64

**EXHIBIT 11**

**Berry Common Stock**
**Test for Autocorrelation during the Class Period**

| Quarter | Coefficient on Previous Day's Abnormal Return | t-Stat | p-Value |
|---|---|---|---|
| Q3 2018 | -0.06 | -0.5090 | 0.611 |
| Q4 2018 | -0.24 | -1.6303 | 0.103 |
| Q1 2019 | 0.08 | 0.6922 | 0.489 |
| Q2 2019 | 0.08 | 0.9841 | 0.325 |
| Q3 2019 | -0.16 | -1.7022 | 0.089 |
| Q4 2019 | 0.40 | 1.4426 | 0.149 |
| Q1 2020 | -0.02 | -0.1237 | 0.902 |
| Q2 2020 | -0.12 | -1.1092 | 0.267 |
| Q3 2020 | -0.23 | -1.6048 | 0.109 |
| Q4 2020 | -0.20 | -1.0411 | 0.298 |
| **Class Period** | **0.01** | **0.0684** | **0.945** |

Data Source: Bloomberg
Note: For this calculation, I only considered days that are within the Class Period.