**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

------------------------------------------------------

LUIS TORRES, ALLIA DEANGELIS,  :
DARRICK INMAN, Individually and On  :
Behalf of All Others Similarly Situated,  :
                                                                    :
                    Plaintiffs,  :
                                                                    : CASE NO.: 3:20-CV-3464-S
          v.  :
                                                                    : JUDGE KAREN G. SCHOLER
BERRY CORPORATION, ARTHUR T.  :
SMITH, CARY BAETZ, GARY A. GROVE,  :
BRENT S. BUCKLEY, KAJ VAZALES, and  :
EUGENE J. VOILAND,  :
                                                                    :
                    Defendants.  :
                                                                    :

------------------------------------------------------

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**<u>CLASS REPRESENTATIVES AND CLASS COUNSEL</u>**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants*

## TABLE OF CONTENTS

I.    Factual Background: Plaintiffs' Certification Arguments Are Premised on a Fundamentally Flawed Economic Theory. ............................................................1

II.   LEGAL ARGUMENT ...................................................................................5

    A.    Plaintiffs Bear the Burden of Proving Each Class Certification Requirement with Respect to Each Proposed Class. ....................................................5

    B.    The Proposed '33 Act Class Cannot Be Certified. ....................................6

        1.    Plaintiffs Fail to Offer Evidence to Support Certifying '33 Act Class. ..............................................................................6

        2.    Standing and Tracing Issues Preclude Certification. ...................................7

    C.    The Proposed '34 Act Class Cannot Be Certified. ..................................12

        1.    Individualized Issues of Reliance Predominate. ........................................13

            a.    The Alleged Misstatements Had No Price Impact........................13

            b.    The *Affiliated Ute* Presumption of Reliance Does Not Apply. ...........................................................................19

        2.    Plaintiffs' Damages Cannot Be Calculated on a Class-Wide Basis. .........20

    D.    Plaintiffs Are Inadequate Representatives So Neither Class Can Be Certified. ..........................................................................23

III.  CONCLUSION.........................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
 572 F.3d 221 (5th Cir. 2009) ...............................................................................................21

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013).............................................................................................................13

*In re Anadarko Petroleum Corp. Sec. Litig.*,
 No. 20-cv-00576, 2022 WL 4544235 (S.D. Tex. Sept. 28, 2022)...........................................21

*Basic v. Levinson*,
 485 U.S. 224 (1998)..................................................................................................... *passim*

*Bell Atl. Corp. v. AT&T Corp.*,
 339 F.3d 294 (5th Cir. 2003) ...............................................................................................11

*Berger v. Compaq Computer Corp.*,
 257 F.3d 475 (5th Cir. 2001) ..........................................................................................23, 24

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
 242 F.3d 290 (5th Cir. 2001) .................................................................................................8

*In re BP p.l.c. Sec. Litig.*,
 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).........................................................................23

*Castano v. Am. Tobacco Co.*,
 84 F.3d 734 (5th Cir. 1996) ...................................................................................................6

*Catogas v. Cyberonics, Inc.*,
 292 Fed. App'x. 311 (5th Cir. 2008) .....................................................................................21

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013)...................................................................................................... *passim*

*Dawes v. Imperial Sugar Co.*,
 975 F. Supp. 2d 666 (S.D. Tex. 2013) ...................................................................................21

*In re Dell Inc., Sec. Litig.*,
 591 F. Supp. 2d 877 (W.D. Tex. 2008)...................................................................................21

*Ditcharo v. United Parcel Serv., Inc.*,
 376 F. App'x 432 (5th Cir. 2010) ..........................................................................................24

*In re Dynegy, Inc. Sec. Litig.*,
2005 WL 807076 (S.D. Tex. Mar. 10, 2005)................................................................12

*In re Elscint, Ltd. Sec. Litig.*,
674 F. Supp. 374 (D. Mass. 1987) ...............................................................................11

*In re Enron Corp. Sec.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) .........................................................................25

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
141 S. Ct. 1951 (2021)............................................................................................ *passim*

*Greenberg v. Crossroads Sys., Inc.*,
364 F.3d 657 (5th Cir. 2004) ...............................................................15, 16, 18, 19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)...................................................................................5, 11, 13, 14

*Huddleston v. Herman & MacLean*,
640 F.2d 534 (5th Cir.1981) ........................................................................................19

*IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*,
818 F.3d 775 (8th Cir. 2016) .......................................................................................15

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*,
No. 19-cv-00407, 2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023).............................20, 22, 23

*In re IPO Sec. Litig.*,
227 F.R.D. 65 (S.D.N.Y. 2004), *vacated on other grounds*, 471 F.3d 24 (2d
Cir. 2006) ....................................................................................................................12

*Johnson v. CBD Energy Ltd.*,
2016 WL 3654657 (S.D. Tex. July 6, 2016)....................................................................8

*Karnes v. Fleming*,
No. 07-cv-0620, 2008 WL 4528223 (S.D. Tex. July 31, 2008) .............................................24

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014) .....................................................................5, 6, 22, 24

*Krim v. pcOrder.com, Inc.*,
210 F.R.D. 581 (W.D. Tex. 2002) .............................................................................10, 25

*Krim v. pcOrder.com, Inc.*,
402 F.3d 489 (5th Cir. 2005) .....................................................................................7, 8, 9, 12

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ..................................................................................19

*Levitin v. A Pea in the Pod, Inc.*,
    1997 WL 160184 (N.D. Tex. Mar. 31, 1997) ......................................................10, 11

*Ludlow v. BP, P.L.C.*,
    800 F.3d 674 (5th Cir. 2015) ..............................................................................21, 22, 23

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ........................................................22

*Ogden v. AmeriCredit Corp.*,
    225 F.R.D. 529 (N.D. Tex. 2005) .............................................................................25

*Patterson v. Mobil Oil Corp.*,
    241 F.3d 417 (5th Cir. 2001) ......................................................................................5

*In re Quarterdeck Off. Sys., Inc. Sec. Litig.*,
    No. 92-cv-3970, 1993 WL 623310 (C.D. Cal. Sept. 30, 1993) ..........................10, 11

*Rivera v. Wyeth-Ayerst Labs.*,
    283 F.3d 315 (5th Cir. 2002) ......................................................................................8

*Rougier v. Applied Optoelectronics, Inc.*,
    No. 17-cv-02399, 2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ...........................21

*In re STEC Inc. Sec. Litig.*,
    2012 U.S. Dist. LEXIS 186180 (C.D. Cal. March 7, 2012) ....................................10

*Steering Comm. v. Exxon Mobil Corp.*,
    461 F.3d 598 (5th Cir.2006) ....................................................................................11

*In re U.S. Liquids Sec. Litig.*,
    2002 U.S. Dist. LEXIS 26714 (S.D. Tex. Apr. 30, 2002) .........................................7

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)..............................................................................................5, 11

*Warren v. Reserve Fund, Inc.*,
    728 F.2d 741 (5th Cir. 1984) ...................................................................................10

**Statutes**

15 U.S.C. § 77k(a) .................................................................................................................7

**Rules**

Fed. R. Civ. P. 23 ........................................................................................................... *passim*

Defendants[1] submit this memorandum of law in opposition to Plaintiffs' Motion for Class Certification, Memorandum of Law ("Pl. Mem."), and supporting Appendix (Dkt. #110-12), and respectfully ask the Court to deny that Motion in full for the reasons detailed below.

## I.    Factual Background: Plaintiffs' Certification Arguments Are Premised on a Fundamentally Flawed Economic Theory.

This case has always been a stock drop in search of a misstatement. Plaintiffs initially filed suit in the fall of 2020 on a simple false forecast theory—that Berry allegedly "overstated its operational efficiency and stability" and the stock dropped when its 3Q20 productivity was lower than expected. Compl. (Dkt. #1) ¶¶5-6. Perhaps recognizing the implausibility of this story against the backdrop of COVID, the Amended Complaint posited an entirely new and equally unsupported theory: that the Defendants had engaged in a vast, years-long fraud to artificially inflate the stock price by concealing the truth about "severe permitting problems at the Company," and that Berry's stock price dropped in April, August, and November of 2020 when the previously concealed truth was revealed and/or the concealed permitting risks materialized. AC (Dkt. #59) ¶¶7-11.

But this theory has never fit the facts. Berry, like every other company operating in the highly regulated oil and gas industry (and in California in particular), experienced permitting challenges—surprise denials, requests for additional information, moratoriums, etc.—as investors knew and Berry repeatedly disclosed in its IPO Registration Statement and throughout the class period. *See, e.g.*, Ex. 1[2] (Registration Statement), at A00052 ("[G]overnmental authorities can delay or deny permits and approvals . . . that could increase costs, restrict operations and . . . cause

---

[1] Defined terms take the same meaning as in Defendants' Motion to Dismiss the Amended Complaint and Memorandum in support thereof (Dkt. #63-64), which Defendants incorporate herein and to which Defendants respectfully refer the Court for additional background on the facts and pleadings. Unless otherwise indicated, all citations are omitted and emphasis is added.

[2] "Ex. __" refers to Exhibits to the York-Erwin Decl. contained in the Appendix filed herewith.

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                                                Page 1

us to change[] our business strategy."); Ex. 2 (2019 10-K), at A00378 (similar). But, as Ms. Allen's

analysis[3] demonstrates (and common sense confirms), permitting issues did not impact Berry's

stock price or cause the stock drops on which Plaintiffs' claims are based—that was COVID.

When COVID hit and communities around the world went into lockdown, oil demand

sharply declined causing significant drops in oil prices in March 2020 and subsequent months.

Allen Rpt. ¶¶29-33 & Figs. 2-3. As analysts noted at the time, this led many oil and gas companies

to significantly reduce their capital expenditures and production targets for the year:[4]

> **3/26/20 Wells Fargo "U.S. Oil & Gas E&P Statistics and Valuation Book":**
> "Following the double-whammy of demand destruction (led by corona virus) and
> supply flooding (driven by the collapse of OPEC+ agreements), the U.S. E&P
> sector . . . is searching for a bottom . . . . [W]e believe E&Ps will need to bring 2020
> capital budgets (announced with 4Q19 earnings) down *at least* to maintenance
> levels (~20-25% lower spending) . . . . Indeed, a majority of the 27 E&P's under
> coverage have already cut capital plans for 2020." (Ex. 3, at A00633).

> **3/23/20 BMO, "E&P Model Book – Week 2 of Capex Cuts":**
> "*Capex Cuts Have Been Significant in the Past Two Weeks.* U.S. producers have
> reacted swiftly to lower oil prices with 24 companies already announcing 2020
> budget reductions with total cuts now 30% vs. original plans and total capital
> spending down 37% Y/Y, although some of this week's cuts have averaged ~50%.
> . . .
> *U.S. Oil to Roll in 3Q20 With Steep Exit Rate Declines.* We expect spending
> reductions to lead to oil production declines beginning mid-year and for our
> coverage, which represents over half of U.S. oil production, we model a 9% Y/Y
> exit rate decline for 2020 . . . ." (Ex. 4, at A00682).

Berry did precisely the same thing: on April 1, 2020, it "provided updated guidance in response to

current market conditions," announcing it was reducing "planned 2020 capital expenditures by

approximately 50% from original 2020 budget midpoint of guidance," targeting "2020 production

as being flat to down 2% from 2019," and temporarily suspended its quarterly dividend "until oil

---

[3] The Expert Report of Lucy P. Allen ("Allen Rpt. ¶__") is Exhibit 18 in the Appendix.

[4] Allen Rpt. ¶35 & n.62 (63 of 79 U.S. and Canada E&P companies covered by analysts revised
2020 planned capex in March or April 2020, and 21 revised production targets in the same period).

prices recover" in order to preserve liquidity. Ex. 5 (4/1/20 PR), at A00722. The stock drop following this announcement was not statistically significant (Allen Rpt. ¶54), and contemporaneous analyst reports confirm that the operational adjustments were very much in line with Berry's peers and with analysts' expectations. *Id.* ¶¶62-73; Ex. 6 (4/2/20 UBS Berry Rpt.), at A00728 ("Berry took the proactive steps today to defend its balance sheet and secure additional liquidity by suspending its dividend . . . and reducing capex. . . . We view this constructively."); Ex. 7 (4/5/20 UBS NorAm E&P), at A00739 (Berry's stock drop "was most surprising to us" because "the cuts should not have been much of a surprise"); Ex. 8 (4/5/20 BMO "Capex Cut – Week 4"), at A00816 (detailing recent capex cuts by Berry and more than 30 other oil companies).

Berry's second and third quarter earnings announcements, on August 4 and November 3, 2020, were consistent with the revised guidance issued April 1 and similarly mirrored the market. Allen Rpt. ¶¶77-78; 85-86. On August 4, Berry announced, among other things, that adjusted EBITDA had decreased due to lower oil prices and higher greenhouse gas costs, and that production decreased 5% compared to the previous quarter, "largely due to natural declines as a result of ending our drilling activity in April and improved steam management which reduced costs but temporarily increased water disposal needs and consequently caused a slight decrease in production." Ex. 9 (8/4/20 PR), at A00847-49. Analysts attributed the subsequent price decline to the EBITDA news. Allen Rpt. ¶¶81-82; Ex. 10 (UBS First Read: Berry) at A00864 ("We expect a muted reaction as BRY reported 2Q EBITDA of $57mn which was below consensus of $71mn."). On November 3, Berry announced its 3Q20 earnings, including improved adjusted EBITDA and increased cash reserves despite production decreasing 5% compared to 2Q20, again "largely due to natural declines as a result of pausing drilling activity in April." Ex. 11 (11/3/20 PR) at A00879. The price dip that followed was not statistically significant (Allen Rpt. ¶84), perhaps reflecting

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Page 3

investors' understanding that Berry's cash position was strong and decreased production was a logical consequence of Berry's prudent decision to limit capex in 2020's low-price environment. The first of these consolidated lawsuits was filed shortly after the 3Q20 earnings release, and Plaintiffs have been searching for a viable, non-COVID-related liability theory ever since.

They have not found one. Plaintiffs' present case theory rests on a fundamental misapprehension—that hidden permitting issues, described by mid-level former employees as being worse than what Berry publicly disclosed, artificially inflated Berry's stock price and ultimately caused Plaintiffs' losses. They plainly did not: it was the unprecedented drop in oil prices in the early months of COVID—and not any undisclosed "permitting problems"—that caused Berry and nearly all its industry competitors to reduce capital expenditures and production to conserve cash in the volatile spring and summer of 2020, and triggered the stock declines on the days in question. As detailed in Ms. Allen's Report, both Berry's operational adjustments and its stock price moved in tandem with the U.S. oil and gas market throughout this period, reflecting common challenges across the industry; not a shred of evidence suggests that permitting issues played any role in the announcements that precipitated the stock drops. *See* Allen Rpt. ¶¶42-45.

This is not simply a causation problem (though it will pose an insurmountable obstacle to recovery, should this case proceed to summary judgment or trial); it also has important consequences for class certification, where the Supreme Court has directed courts to consider "*all* probative evidence []—qualitative as well as quantitative—aided by a good dose of common sense" when deciding whether Plaintiffs have proven each of Rule 23's requirements. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1960 (2021) (emphasis in original). Here, as detailed below, Plaintiffs' theory of the case simply does not hold together in the ways it must in order to prove class certification is appropriate.

## II.    LEGAL ARGUMENT

### A.    Plaintiffs Bear the Burden of Proving Each Class Certification Requirement with Respect to Each Proposed Class.

On a motion for class certification, Plaintiffs must "actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*"). For putative damages classes like the ones at issue here, this requires Plaintiffs to demonstrate, separately for each proposed class, (a) that Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation are met, and (b) that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(a), (b)(3); *Patterson v. Mobil Oil Corp.*, 241 F.3d 417, 419 (5th Cir. 2001) ("[C]onsideration of class certification should proceed on a claim by claim basis").  This is "not a perfunctory task"—"it is the plaintiffs['] burden to present evidence showing that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation," and that common questions predominate over individual ones. *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 137 (N.D. Tex. 2014) (quoting *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013)).

Thus a court should certify a class only if, "after a rigorous analysis" it "finds, not merely assumes," that the plaintiff has proven by a preponderance of the evidence that each of Rule 23's requirements is satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). "Frequently [this] 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.* "Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make

a meaningful determination of the certification issues." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996). Here, Plaintiffs cannot carry their burden with respect to either putative class.

**B.    The Proposed '33 Act Class Cannot Be Certified.**

First, Plaintiffs seek to certify a "'33 Act Class" consisting of all persons or entities who "purchased or otherwise acquired Berry's common stock pursuant and/or traceable to Berry's Registration Statement issued in connection with its July 26, 2018 [IPO]" to pursue remedies under Sections 11 and 15 of the '33 Act. AC ¶1. But Plaintiffs cannot satisfy Rule 23's requirements because their lack of standing—and similar standing issues amongst the putative class—make it impossible for Plaintiffs to show typicality, adequacy, or predominance.

**1.    Plaintiffs Fail to Offer Evidence to Support Certifying '33 Act Class.**

As an initial matter, the '33 Act Class cannot be certified because Plaintiffs fail to proffer any evidentiary support at all for certification. They merely ask the Court to assume that Rule 23's requirements are met because '33 Act claims involve common questions as to whether the Registration Statement contained a materially false or misleading statement, and do not require the difficult showing of reliance discussed *infra* with respect to the '34 Act Class.  Pl. Mem. 13-14. But "[t]he Supreme Court has announced a clear directive [that] plaintiffs seeking class certification . . . will not be afforded favorable presumptions from the pleadings or otherwise . . . ." *Kosmos,* 299 F.R.D at 151. Rather, plaintiffs "must" satisfy each of Rule 23's requirements through "evidentiary proof." *Comcast*, 569 U.S. at 33. Plaintiffs' bald assertion—in a single short paragraph lacking any citation to evidence—that the predominance requirement is "easily satisfied" because '33 Act claims always involve common questions is precisely the sort of conclusory proffer the court rejected in *Kosmos* as insufficient to prove predominance or certify a '33 Act class. 299 F.R.D. at 143,  151-52 ("That [plaintiffs'] submissions are akin to no evidence

at all, under *Comcast,* ought to end the Court's [] inquiry").

### 2.     Standing and Tracing Issues Preclude Certification.

More fundamentally, the '33 Act Class also cannot be certified because the proposed class representatives lack standing, and individualized tracing issues would predominate.

Because Section 11 can impose liability for "even innocent material misstatements" in a registration statement, Congress conferred standing to pursue such claims only on the "narrow class of persons" that "acquir[ed]" securities issued pursuant to the challenged registration statement.  *Krim* v. *pcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2005); 15 U.S.C. § 77k(a). Thus, to take advantage of Section 11's relaxed liability requirements, a plaintiff must prove that she can "trace the security for which damages are claimed to the specific registration statement at issue." *Krim*, 402 F.3d at 496. Standing is always a threshold jurisdictional issue, but in the class certification context it is also central to determining whether a plaintiff can prove typicality and adequacy of representation, or that common issues predominate over individualized ones. *See In re U.S. Liquids Sec. Litig.*, 2002 U.S. Dist. LEXIS 26714, at *16-24, *27-31 (S.D. Tex. Apr. 30, 2002) (refusing to certify Section 12 class where plaintiffs failed to offer proof of standing; "standing is a threshold issue requiring evidentiary support in the context of class certification"). Here, Plaintiffs seek certification of a class of all investors who "acquired stock pursuant and/or traceable to Berry's Registration Statement" (AC ¶1), but they offer no evidence (i) that any proposed class representative falls within this definition (i.e., can trace his or her shares to the IPO), or (ii) how Plaintiffs could prove on a class-wide basis that the class members have standing given similar traceability issues. Accordingly, Plaintiffs cannot satisfy their burden of proof with respect to Rule 23's requirements.

***Lack of standing is a jurisdictional bar, and also precludes typicality and adequacy of***

***representation.*** Absent a proposed class representative with standing, no class can be certified. *See Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002) ("Standing is an inherent prerequisite to the class certification inquiry."); *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001) ("This constitutional threshold must be met before any consideration of the typicality of claims or [other Rule 23 requirements]."). Moreover, the Fifth Circuit has set a higher standard than other jurisdictions for proving Section 11 standing: a plaintiff must be able to prove that the shares it "*actually* own[ed]" were "indeed issued under *that* [challenged] registration statement and not another." *Krim*, 402 F.3d at 495, 501 (emphasis in original). And this is true regardless of the statistical likelihood that the shares the proposed class representative acquired may have been issued under the challenged registration statement. *Id.* at 492-502 (rejecting as insufficient proof statistical tracing method showing 99.85% likelihood that plaintiff's shares were from offering). Absent strong evidence directly tracing their shares to the challenged registration statement, courts in this Circuit routinely hold that plaintiffs who acquired their shares after non-offering shares entered the market lack Section 11 standing. *See, e.g.*, *id.* at 491-92; *Johnson* v. *CBD Energy Ltd.*, 2016 WL 3654657, at *5-6 (S.D. Tex. July 6, 2016) ("aftermarket intermingling" of three groups of shares meant there was no "hope of curing . . . standing issues").

That is precisely the case here, where both IPO and non-IPO shares were available to trade in the market from day one. As detailed in Ms. Allen's Report, on July 26, 2018, Berry sold 13,043,497 shares of common stock in its IPO pursuant to the Registration Statement. However, upon completion of the IPO, the Company had "outstanding an aggregate of 81,336,762 shares of common stock"—including 6,186,897 shares of common stock, separate from the IPO shares, that were already "eligible for sale as of the date of [the July 27, 2018 Prospectus]." Ex. 12 (7/27/18 Prospectus), at A01094; Allen Rpt. ¶109. Approximately 61 million additional shares of the

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION                    Page 8
FOR CLASS CERTIFICATION

outstanding common stock (again separate from the IPO shares) were subject to lockup agreements that expired on January 21, 2019, after which those shares too were traded freely on the open market pursuant to a different shelf registration statement filed on Form S-1 on December 10, 2018. Allen Rpt. ¶¶109-11; Ex. 13 (12/10/18 Form S-1), A01199; Ex. 14 (12/11/18 PR), A01551.

It was from this extensively commingled set of publicly traded shares that the proposed class representatives allegedly purchased their Berry stock starting in April 2019. Mr. Torres certified that he purchased 80 shares of Berry common stock on April 8, 2019 (Dkt. #1); Ms. DeAngelis certified that she purchased a total of 350 shares between November 20, 2019 and March 13, 2020 (Dkt. #13-2, 13-3); and Mr. Inman certified that he purchased a total of 2,052 shares on May 8, 2019 and on nine additional dates *after the first alleged corrective disclosure* on April 1, 2020 (Dkt. #59-3). Thus the earliest acquisition by a proposed class representative (on April 8, 2019) did not take place until nine months after the IPO. By that time, the 13 million IPO shares had been commingling in the open market for many months with the initial 6 million freely-tradeable non-IPO shares, and for more than three months with an additional 61 million non-IPO shares sold under the December 10, 2018 shelf registration statement. The vast majority of shares trading in the market on April 8, 2019 and afterwards were non-IPO shares, and there was no way at that point to trace any aftermarket purchase back to the IPO. Allen Rpt. ¶¶108-09. Because none of the proposed class representatives claims to have purchased shares directly in the IPO or can trace his or her shares to the Registration Statement, they lack standing to sue under Section 11, and the '33 Act Class cannot be certified. *See, e.g.*, *Krim*, 402 F.3d at 493-97 (affirming denial of certification for lack of standing because plaintiffs could not demonstrate "stock for which they claim[ed] damages was actually issued pursuant to [the challenged registration statement], not just that it might have been, probably was, or most likely was, issued pursuant to [that] statement").

This lack of standing is not only a jurisdictional bar to certification, it is also fatal to Plaintiffs' efforts to prove typicality and adequacy of representation. *See Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581, 591 (W.D. Tex. 2002) (plaintiffs who lacked Section 11 standing also "have not met the requirements for class certification"). Rule 23(a)(3)'s "typicality" requirement protects absent class members from being represented by a plaintiff whose claims and defenses implicate different interests, issues, or concerns than those of the proposed class. *Warren* v. *Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984). Thus, courts often find typicality is not satisfied and deny certification where a class representative is subject to unique defenses that could become the focus of the litigation. *See id.* (affirming denial of certification for lack of typicality where proposed class representative was subject to unique defenses); *Levitin v. A Pea in the Pod, Inc.*, 1997 WL 160184, at *5 (N.D. Tex. Mar. 31, 1997) (proposed '33 Act class representative who likely lacked standing failed typicality requirement). These same concerns also usually mean a plaintiff cannot prove that he will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

Here, the proposed class representatives' "lack of standing would be a unique defense which would absorb a considerable amount of [their] time and divert attention from the other claims." *In re Quarterdeck Off. Sys., Inc. Sec. Litig.*, 1993 WL 623310, at *3 (C.D. Cal. Sept. 30, 1993) (denying certification of Section 11 class). It also potentially poses a "conflict of interest with the absent putative class members." *In re STEC Inc. Sec. Litig.*, 2012 U.S. Dist. LEXIS 186180, at *15-18 (C.D. Cal. March 7, 2012) (denying certification "because [plaintiffs] seek to certify a Class that includes individuals who may have claims under the Securities Act, but the Class Representatives do not have standing to bring those claims"). Accordingly, the proposed class representatives' lack of standing here demonstrates that "their claims are not typical of the claims alleged by the class and that they could not adequately represent the class on this basis." *In*

*re Quarterdeck*, 1993 WL 623310, at \*3 (denying certification of Section 11 class due to class representatives' lack of standing); *Levitin*, 1997 WL 160184, at \*5 (same re Section 12(a)(2) class); *see also In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 382 (D. Mass. 1987) (same re Section 11).

***Individualized standing issues preclude predominance.*** The same tracing issues also make it impossible to prove that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). A question is "common" if answering it as to the proposed class representatives will resolve it "in one stroke" as to the remainder of the putative class as well. *Wal-Mart*, 564 U.S. at 350 ("What matters . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."). But Rule 23(b)(3)'s predominance requirement is "far more demanding" than mere commonality; it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 601-02 (5th Cir. 2006). "This . . . entails identifying the substantive issues that will control the outcome"—on the *prima facie* case, affirmative defenses, and damages—"assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003). Even where some issues can be decided on a class-wide basis, the existence of an important individual issue can preclude predominance and certification. *See Halliburton II*, 573 U.S. at 265-66 (necessity of proving reliance individually precludes certification); *Comcast*, 569 U.S. at 34-38 (lack of appropriate class-wide damages model precludes certification).

Standing is one such important individual issue here. From the moment the first IPO shares were sold, there were already millions of non-IPO shares available to sell in the market, and the

number of commingled non-IPO shares increased further when the selling stockholders' lockup ended in January 2019. *See supra* 8-9. Even if one or more class members could directly trace their shares to the Registration Statement—a near impossibility on these facts—this tracing cannot be done on a class-wide basis: it would necessarily require extensive individualized inquiries and adjudication regarding the transaction history of each putative class members' shares.[5] *See* Allen Rpt. ¶¶108-09; *Krim*, 402 F.3d at 492-93 (holding statistical analysis cannot substitute for direct tracing, and describing individualized inquiry required to show Section 11 standing). Because common proof of tracing is not possible for investors who acquired their shares after non-IPO shares entered the market, courts have refused to certify classes for lack of predominance in similar circumstances. *See, e.g.*, *In re Dynegy, Inc. Sec. Litig.*, 2005 WL 807076, at *1 (S.D. Tex. Mar. 10, 2005) (denying certification of aftermarket purchaser class where tracing problems precluded showing Section 11 standing on class-wide basis); *In re IPO Sec. Litig.*, 227 F.R.D. 65, 117-18 (S.D.N.Y. 2004) (denying certification of Section 11 class because "the actual tracing of each plaintiff's stock is a necessarily individualized inquiry," defeating predominance), *vacated on other grounds*, 471 F.3d 24 (2d Cir. 2006). Here, as in *In re IPO*, "[w]hile some individual class members . . . might be able to trace their shares successfully, the resulting inquiry would fragment the class action into myriad mini-trials on the subject of tracing." *Id.* at 118. Accordingly, Plaintiffs cannot prove predominance for the proposed '33 Act Class, and certification should be denied.

### C.     The Proposed '34 Act Class Cannot Be Certified.

Plaintiffs also seek to certify a "'34 Act Class" consisting of all persons or entities who "purchased or otherwise acquired Berry's common stock between July 26, 2018 and November 3,

---

[5] Nor could any class consisting only of investors who purchased IPO shares directly from underwriters be certified, since all proposed class representatives lack standing. *See supra* 7-11.

2020" to pursue claims under Sections 10(b) and 20(a) of the '34 Act. AC ¶1. But this proposed class fails Rule 23(b)(3)'s predominance requirement in at least two ways. First, the reliance element will need to be proven individually for each class member: Ms. Allen's Report, combined with the Supreme Court's recent decision in *Goldman*, proves that the challenged statements had no impact on Berry's stock price, thereby rebutting the *Basic* presumption of reliance. Second, Plaintiffs fail to put forth a damages model that is both consistent with their liability theory and can calculate damages on a class-wide basis. Accordingly, the '34 Act Class cannot be certified.

### 1. Individualized Issues of Reliance Predominate.

#### a. The Alleged Misstatements Had No Price Impact.

For a Section 10(b) class, the predominance analysis often turns on whether plaintiffs can rely on the fraud-on-the-market presumption established in *Basic v. Levinson* to prove the element of reliance on a class-wide basis. *See Basic v. Levinson*, 485 U.S. 224, 248 (1998). The fraud-on-the-market theory "facilitates class certification by recognizing a rebuttable presumption of classwide reliance on public, material misrepresentations when shares are traded in an efficient market." *Amgen v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 463 (2013). "[W]ithout [this] presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action: [e]ach plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)." *Halliburton II*, 573 U.S. at 281-82.

A plaintiff may invoke the fraud-on-the-market presumption by showing: "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Id.* at 277-78. The first three requirements "are directed at price impact—whether the alleged misrepresentations affected the [stock] price in the first place."

*Id.* at 278. Once the four requirements are satisfied, a court will presume on a class-wide basis that the plaintiffs and class members relied on the alleged misstatements when they traded stock.

However, even where the stock traded in an efficient market, Defendants can rebut the fraud-on-the-market presumption with "appropriate evidence" that the alleged misstatement did not in fact impact the stock price. *Halliburton II*, 573 U.S. at 279-80. The "fundamental premise" of the presumption is that "investors rely on the market price of a company's security," which, in an efficient market, incorporates all available information, including any false or misleading statements. *Goldman*, 141 S. Ct. at 1957-58. But if the alleged misrepresentations did not actually affect the market price, "*Basic*'s fundamental premise completely collapses, rendering class certification inappropriate." *Id*. at 1959. Thus "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248. "The district court's task [at class certification] is simply to assess all the evidence of price impact . . . and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman*, 141 S. Ct. at 1963. In so doing, courts "should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Id.* at 1960 (emphasis in original). Here, Ms. Allen's analysis of both "front end" and "back end" price movement proves that the challenged statements did not have a price impact, thereby rebutting the *Basic* presumption and precluding predominance.

**The lack of "front-end" price impact alone rebuts the Basic presumption.** Plaintiffs offer no expert testimony at all on price impact—focusing entirely on market efficiency—but Ms. Allen's Report demonstrates that, even using Dr. Cain's methodology, none of the alleged misstatements caused Berry's stock price to increase on the "front end" (i.e., at the time they were

made). *See* Allen Rpt. ¶¶25-26. As described in Ms. Allen's Report, on each of the days on which an alleged misstatement was made, Dr. Cain's market model shows no statistically significant increase in Berry's stock price that can be attributed to an alleged misstatement. *Id.* ¶¶25-28.

This strong evidence of lack of price impact on the front-end is by itself sufficient to rebut the *Basic* presumption of reliance. *See IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 818 F.3d 775, 782 (8th Cir. 2016) ("overwhelming evidence of no 'front-end' price impact rebutted the *Basic* presumption" even where plaintiffs presented evidence of back-end price drop following corrective disclosure). As the Supreme Court recently explained, the price impact that matters for the *Basic* presumption is "front-end price inflation" (i.e., an increase in stock price immediately following the alleged misrepresentation). *Goldman*, 141 S. Ct. at 1961. And while some circuits in some circumstances have allowed price impact to be inferred from a back-end drop under an "inflation-maintenance" theory—which posits that alleged misstatements can have a price impact merely by "maintaining" artificial inflation already built into the stock price—neither the Supreme Court nor the Fifth Circuit has adopted this theory, and the Eighth Circuit has explicitly rejected it. *See Goldman*, 141 S. Ct. at 1959 n.1 ("Although some Courts of Appeals have approved the inflation-maintenance theory, this Court has expressed no view on its validity or its contours" and "[w]e need not and do not do so in this case."); *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665 (5th Cir. 2004) (confirmatory misstatement that does not change stock price does not cause a price impact "[b]ecause the presumption of reliance is based upon *actual movement* of the stock price") (emphasis in original); *Best Buy*, 818 F.3d at 782-83 (reversing certification because back-end drop alone was insufficient evidence of front-end price impact). Because Dr. Cain's own model conclusively shows that the market did not react to any of the alleged misrepresentations at the time, Defendants have proved lack of price impact and rebutted the *Basic* presumption.

***Nor does any "back-end" price drop here suggest front-end impact.*** Even under an inflation-maintenance theory, however, it would be unreasonable to infer front-end price impact from the three back-end stock drops because the press releases that precipitated those drops had nothing to do with permitting and do not "match" the challenged statements under *Goldman*. Where a back-end disclosure directly corrects an earlier alleged misstatement (reveals a truth specifically hidden by it) and causes the stock price to drop, then it is reasonable to infer that the misstatement impacted the price on the front-end. *Goldman*, 141 S. Ct. at 1961. But "[t]hat inference that the back-end price drop equals front-end inflation [] starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* For example, "when the earlier misrepresentation is generic . . . and the later corrective disclosure is specific . . . it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.* Thus, to infer front-end price impact from a back-end price drop, the drop must be precipitated by a disclosure so closely related to (or "matching") the subject of the alleged misstatement that it is reasonable to assume the market was reacting to correction of that misstatement. *See id.*; *Greenberg*, 364 F.3d at 665 ("To raise an inference through a decline in stock price that an earlier false, positive statement affected a stock's price, the plaintiffs must show that the false statement causing the increase was related to the statement causing the decrease."). By contrast, a "mismatch" between the misstatement and corrective disclosure "often will be important evidence" tending to rebut price impact. *Goldman*, 141 S. Ct. at 1961.[6] Here, Plaintiffs allege that three partial "corrective disclosures"—on April 1,

---

[6] To the extent any pre-*Goldman* decisions in this Circuit suggested that consideration of the "fit" between a challenged statement and a corrective disclosure is inappropriate at the class

2020, August 4, 2020, and November 3, 2020—revealed some previously concealed "truth about the severe permitting problems at Berry," and that the resulting stock drops show the stock price was artificially inflated by the alleged misstatements. AC ¶¶7, 124-29. But the allegedly "corrective" disclosures had nothing to do with permitting, and both quantitative and qualitative evidence disproves Plaintiffs' theory.

As an initial matter, Ms. Allen demonstrates that the stock drops on April 1 and November 3, 2020 were not statistically significant. Allen Rpt. ¶¶54-74; 83-88. Absent a statistically significant stock price drop, there is no back-end price "correction" from which to infer a front-end impact. *Id.* Nor can the August 4, 2020 stock drop be attributed to any news about capex or production, both of which were in line with previous guidance. *Id.* ¶¶79-82. Rather, Ms. Allen demonstrates that this drop was in reaction to Berry's quarterly EBITDA and earnings per share coming in lower than consensus estimates due to low oil prices and high greenhouse gas costs.

In any event, all three alleged "corrective disclosures" suffer from a fundamental "mismatch" with the challenged statements such that they cannot show price impact under *Goldman*. Plaintiffs claim each challenged statement was misleading because it concealed the supposed severity of Berry's permitting problems, yet none of the three "corrective" disclosures has anything to do with permitting. Indeed, Plaintiffs concede as much, alleging that Berry only "admitted" to any permitting issues "for the first time" in its 2020 Form 10-K filed on February 24, 2021.[7] AC ¶122. The April 1 press release simply announced that Berry (like the vast majority of

certification stage, that case law is no longer valid. *Goldman* expressly holds that courts must assess whether there is a "mismatch between the contents of the misrepresentation and the corrective disclosure" and the likelihood "that the specific disclosure actually corrected the [] misrepresentation" in assessing back-end price impact for certification. 141 S. Ct. at 1961.

[7] In fact, the 2020 10-K only mentions permitting delays Berry faced as a result of previously disclosed regulatory risks in California, and which were built into the original 2020 production

its peers) was responding to the "current oil price environment" by reducing planned capex and targeting 2020 production as "flat to down 2% from 2019." *Supra* p. 1-4; Ex. 5 (4/1/20 PR), at A00722. This announcement had nothing to do with permitting: it did not correct any previous misstatement on that subject, and the reduced capex and production guidance were consequences of macro-economic conditions in the early days of COVID, not any permitting issues coming home to roost. In fact, contemporaneous analyst reports show that nearly all oil and gas companies were making similar adjustments at the time, significantly reducing capex and production to preserve cash and hopefully ride out the low-price environment. *Id.*; Allen Rpt. ¶¶36-37. Berry's reductions were prudent and necessary operational adjustments in response to unprecedented market conditions; they were not caused by permitting issues, and Plaintiffs offer no evidence suggesting they were. Given this "mismatch," it is not possible to infer from the market's reaction to the April 1 press release that any earlier challenged statement about permitting impacted the stock price when it was made. *Goldman*, 141 S. Ct. at 1961; *Greenberg*, 364 F.3d at 667 ("Without a showing that the allegedly false, positive information was related to the negative information released [later], the plaintiffs cannot demonstrate that this statement artificially inflated the price[.]").

The same is true with respect to the August 4, 2020 and November 3, 2020 earnings releases: neither concerned permitting issues—they merely announced earnings results that flowed logically from the operational adjustments made in April in response to COVID and the rapid drop in oil prices. Allen Rpt. ¶¶44-45. The August 4 press release announced Berry's second quarter financial results, including lower adjusted EBITDA as well as capex and production declines in

---

targets Berry announced on February 27, 2020. AC ¶¶121-22. The 10-K did not admit (nor could it) that permitting delays played any role in the reduced capex and production targets announced in the spring and summer of 2020 due to COVID and dramatic declines in oil prices.

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION                    Page 18
FOR CLASS CERTIFICATION

line with the updated guidance provided on April 1. *Supra* p. 3, 17. The November 3 release announced a similar production decline in 3Q20, along with improved EBITDA and cash reserves. *Id.* As with the April 1 press release, neither of these purported corrective disclosures "corrected" any alleged misstatement by revealing any previously hidden truth about permitting issues.[8]

This fundamental mismatch between the alleged misstatements (about permits and permitting processes) and the three alleged corrective disclosures (about COVID-related reductions to capex and, to a lesser extent, production), means that even a statistically significant price drop following any of those back-end disclosures could not establish front-end inflation. *See* Allen Rpt. ¶¶41-43; *Goldman*, 141 S. Ct. at 1961; *Greenberg*, 364 F.3d at 667. Because Defendants have shown by a preponderance of the evidence that no challenged statement had a price impact, the *Basic* presumption is rebutted and certification must be denied.

**b.        The *Affiliated Ute* Presumption of Reliance Does Not Apply.**

Nor can *Affiliated Ute* save Plaintiffs. That case's narrow presumption of reliance is limited to pure omission cases and "does not apply to 'mixed claims' that allege both misstatements and material omissions." *Krogman v. Sterritt*, 202 F.R.D. 467, 479 (N.D. Tex. 2001) (citing *Huddleston v. Herman & MacLean*, 640 F.2d 534, 548 (5th Cir.1981)). The essence of Plaintiffs' claims here is that Defendants allegedly misrepresented the efficacy of Berry's permitting processes (i.e., they said things were fine when they were not). Because Plaintiffs allege misrepresentations as well as omissions, the fairness concerns underlying *Affiliated Ute*—that

---

[8] Nor did they reflect the "materialization" of any permitting-related risk, though the *causation* concept of "materialization of the risk" cannot stand in for price impact and reliance. *Goldman*'s animating concern—that a "mismatch" between front- and back-end statements means the latter are too attenuated to draw any inferences from them about the former—is even more strongly implicated where there is no disclosure at all on the back end, only a purported "materialization of the risk," which cannot be compared to or "matched" with the subject of the alleged misstatements.

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION                    Page 19
FOR CLASS CERTIFICATION

plaintiffs alleging only omissions would have to prove individual reliance on a non-existent "statement"—are not implicated, and *Affiliated Ute*'s presumption of reliance does not apply.

### 2. Plaintiffs' Damages Cannot Be Calculated on a Class-Wide Basis.

The '34 Act Class also cannot be certified for another, independent reason: Plaintiffs have not shown that damages can be calculated on a class-wide basis consistent with their liability theory, and thus have failed to prove predominance. Under *Comcast*, a class cannot be certified unless the plaintiff proves (a) "that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)," and (b) that its "damages case [is] consistent with its liability case," and "courts must conduct a 'rigorous analysis' to determine whether that is so." 569 U.S. at 28, 35. Here, Plaintiffs fail on both fronts.

Plaintiffs purport to assert two alternative theories of damages: (i) the April 1, August 4, and November 3, 2020, press releases were "corrective disclosures" that revealed the previously hidden truth about permitting issues and thereby caused Plaintiffs' losses, and (ii) "the concealed risk of the permitting issues materialized through the production declines" announced in those press releases and thereby caused their losses.[9] On this record, however, the "corrective disclosure" theory makes no sense:[10] the press releases had nothing to do with permitting, and Plaintiffs cannot legitimately argue that they "cured" the alleged falsity of the challenged statements or "include[d] information previously withheld from the market." *Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at *24 (M.D. Tenn. Feb. 24, 2023); *supra* p.19. In reality, Plaintiffs assert a

---

[9] Pls. Opp. to Mot. to Dismiss (Dkt. #70) at 22; AC ¶¶124-29.

[10] As detailed *supra* §II.C.1.a, Plaintiffs also cannot prove predominance under a "corrective disclosure" theory because the fundamental mismatch between the press releases and the alleged misstatements disproves price impact and rebuts the *Basic* presumption of reliance.

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION          Page 20
FOR CLASS CERTIFICATION

"materialization-of-the-risk" theory,[11] which presents significant impediments to certification.

First, the Fifth Circuit does not recognize materialization-of-the-risk as a valid theory of causation and damages.[12] Fifth Circuit precedent also firmly establishes that damages predicated on such a theory cannot be measured on a class-wide basis, defeating predominance. *See Ludlow v. BP, P.L.C.*, 800 F.3d 674, 691 (5th Cir. 2015) (denying certification because materialization-of-the-risk theory "cannot be applied uniformly across the class"). In *Ludlow*, the plaintiffs alleged that BP "misstated the efficacy of its safety procedures, creating an impression that the risk of a catastrophic failure was lower than it actually was," and "when that risk materialized, in the form of the [Oil] Spill, [] BP's stock price fell as a result." *Id.* The Fifth Circuit refused to certify the class because a materialization-of-the-risk theory necessarily requires "individualized inquiry" as to each shareholder's risk tolerance that would overwhelm common questions:

> Consider the following scenario: The true risk of a major spill was 2%, but BP's statements had improperly represented the risk as 0.5%. Further imagine two different plaintiff-investors. The first is a low-risk pension fund, whose investment policy forbids investing in companies for whom the risk of a catastrophic event is greater than 1%. The second is a high-risk fund whose risk threshold is higher than 2%. Both plaintiffs invested in BP based on BP's statements . . . . In this hypothetical, . . . [the low-risk fund] would not have bought BP stock at all had it

---

[11] Allen Rpt. ¶¶94-96. A "materialization-of-the-risk" theory alleges that a decline in share price results from materialization of a concealed risk "in the form of unfavorable developments," rather than "by public disclosure" of the alleged fraud. *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 910 (W.D. Tex. 2008). Unlike *In re Anadarko Petroleum Corp. Sec. Litig.*, No. 20-cv-00576, 2022 WL 4544235, at *7 (S.D. Tex. Sept. 28, 2022), and *Rougier v. Applied Optoelectronics, Inc.*, No. 17-cv-02399, 2019 WL 6111303 at *17 (S.D. Tex. Nov. 13, 2019), Plaintiffs here expressly assert a materialization-of-the-risk theory in the AC and their briefing. And the corrective disclosures in those cases, unlike here, addressed the subject matter of the challenged statements. *Id.*

[12] *See, e.g.*, *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 709 (S.D. Tex. 2013) ("Fifth Circuit has not adopted the materialization-of-the-risk theory" and it "may be foreclosed by" *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009)); *In re Dell*, 591 F. Supp. 2d at 911 n.3 (*Catogas v. Cyberonics, Inc.*, 292 Fed. App'x. 311 (5th Cir. 2008) "suggests a plaintiff must allege a corrective disclosure," rather than materialization of the risk). While Plaintiffs need not prove causation at the class certification stage, they cannot rely on an invalid causation theory to show that damages can be calculated on a class-wide basis.

> known the true risk . . . . By contrast, the high-risk fund still might have purchased the stock . . . . [W]here the economic loss depends on the posture of the plaintiff vis-à-vis risk tolerance, that loss causation, and thus damage, cannot be presumed nor can it be found class-wide.

*Id.* at 689-691. Because Plaintiffs rely on a similar materialization-of-the-risk theory here, predominance cannot be established and class certification must be denied.[13]

Plaintiffs will likely try to distinguish their damages theory from the one asserted in *Ludlow* by arguing that Dr. Cain presents[14] a "traditionally accepted out-of-pocket" damages model. Pl. Mem. 3, 22-23. But any damages model, including the "out-of-pocket" model, would have to overcome the individualized inquiry problem posed by Plaintiffs' materialization-of the-risk theory and identified in *Ludlow*. Moreover, Plaintiffs' reliance on the "out-of-pocket" model raises an additional problem: it is inconsistent with their theory of liability. In the recent decision in *Indiana Pub. Ret. Sys.*, the court rejected the same "out-of-pocket" distinction pressed by Plaintiffs here, finding that the plaintiff's expert's "out-of-pocket" damages model only purported to measure the impact of "corrective disclosures" and failed to "factor in the risk on which Plaintiff bases its materialization-of-the-risk theory." 2023 WL 2592134 at *24. As a result, the court concluded that the plaintiff's damages model was inconsistent with its theory of liability and

---

[13] Allen Rpt. ¶¶97, 100-101. Additionally, damages calculated based on the entire stock drop following materialization of a risk would include consequential damages resulting from the negative event itself and not just the price inflation attributable to the concealed risk at the time of the alleged misstatement. *Id.* ¶99. Thus, this approach cannot "measure only those damages attributable" to the alleged misstatements as required by *Comcast*. 569 U.S. at 35.

[14] Notably, Dr. Cain does not provide any detail or explanation; he merely asserts that the "out-of-pocket" model is commonly used in Section 10(b) cases and therefore appropriate here. Cain Rpt. (Dkt. #112-2), ¶¶75-83. This is insufficient to carry Plaintiffs' burden. *See, e.g., Kosmos*, 299 F.R.D. at 152 (denying certification due to lack of "quality proof on predominance" supporting class-wide damages); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) ("When a class plaintiff presents a damages model that is vague, indefinite, and unspecific . . . the class cannot be certified.").

denied class certification as to those claims. *Id.* at 23-25 (relying on *Comcast* and *Ludlow*). The same is true here. Dr. Cain's "out-of-pocket" damages model only purports to measure the "price impact of corrective disclosures"—not how any allegedly concealed permitting risks affected Berry's stock price—and is therefore fundamentally inconsistent with Plaintiffs' materialization-of-the-risk theory of liability. Cain Rpt. ¶¶75-83; *see also* Allen Rpt. ¶¶98-99; *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) (denying certification because "[f]ollowing *Comcast* . . . courts have rigorously examined proposed damages methodologies . . . for disconnects between damages and liability. . . . Plaintiffs cannot avoid this hard look by refusing to provide the specifics of their proposed methodology."). Because Plaintiffs have failed to offer a damages model that is both capable of measuring damages on a class-wide basis and consistent with their theory of liability, the '34 Act Class cannot be certified.

> **D.      Plaintiffs Are Inadequate Representatives So Neither Class Can Be Certified.**

Given the deep flaws in Plaintiffs' theory of the case, it should come as little surprise that no experienced institutional investor has stepped forward to lead this litigation. Instead, two different groups of Plaintiffs' counsel have cobbled together three retail investors—each of whom purports to have lost only a few hundred to a few thousand dollars, and none of whom has made any effort to actively participate in the litigation or appears knowledgeable about the securities laws, class actions, or this case generally.

For either class to be certified, Plaintiffs must prove that the proposed class representatives can "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). There is no presumption of adequacy—"[a]dequacy is for the plaintiffs to demonstrate; it is not up to defendants to disprove [it][.]" *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 481 (5th Cir. 2001). Moreover, the Reform Act "raises the standard adequacy threshold" and constitutes an

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION                    Page 23
FOR CLASS CERTIFICATION

"emphatic command that competent plaintiffs, rather than lawyers," direct securities class actions. *Id.* at 483-84. Plaintiffs must therefore show a "willingness and ability . . . to take an active role in and control the litigation"; they must "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation" and their "understanding should not be limited to derivative knowledge acquired solely from counsel." *Id.* at 479, 482-83 & n.18.

Here, the proposed class representatives fail on every front. Plaintiffs' proof of adequacy boils down to the conclusory assertion that "Plaintiffs have demonstrated their attention, understanding, and oversight of the claims at issue, the case theory and strategy, and the procedural stages, through regular updates from and communications with [Plaintiffs' counsel], whose efforts Plaintiffs direct." Pl. Mem. 12. But this is precisely the type of boilerplate representation rejected by courts as insufficient to satisfy Plaintiffs' burden. *See, e.g.*, *Kosmos*, 299 F.R.D. at 146 (denying certification for lack of adequacy based on "conclusory pronouncements" that plaintiff "received and reviewed reports and correspondence," "reviewed pleadings," and "consulted with lawyers"); *Ditcharo v. United Parcel Serv., Inc.*, 376 F. App'x 432, 438 (5th Cir. 2010) (similar).

Moreover, Plaintiffs' representation is rebutted by their own deposition testimony, which firmly demonstrates they are mere bystanders to this lawyer-driven litigation.[15] Plaintiffs did not meaningfully review or contribute to the drafting of the original Complaint or the Amended Complaint.[16] They do not understand key components of the claims they assert, and cannot

---

[15] *See Karnes v. Fleming*, No. 07-cv-0620, 2008 WL 4528223, at *3 (S.D. Tex. July 31, 2008) (rejecting assertions of understanding and oversight based on contradictory deposition testimony).
[16] *See, e.g.*, Ex. 15 at A01553, DeAngelis Tr. 32:8-14 (Q. Did you contribute in any way to the drafting of the Complaint or the Amended Complaint? A. I did not. My attorneys did. I trusted them to handle that.); *id.* 33:2-4: (Q. [D]id you read it before it was filed[]? A. I did not.); Ex. 17 at A01579, Inman Tr. 27:18-20; 28:1-5; 45:24-46:6 (same); Ex. 16 at A01565, Torres Tr. 43:8-12; 44:16-18; 44:24-45:23 (same).

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION        Page 24
FOR CLASS CERTIFICATION

articulate why the statements they challenge were false or misleading.[17] And they are not meaningfully participating in key strategic decisions in this case and are instead "rely[ing] on counsel to deal with all the legal planning[.]"[18]

In sum, Plaintiffs' knowledge of their own case is minimal and derived entirely from counsel. Such lawyer-driven litigation, nominally helmed by inexperienced and passive class representatives, is exactly what Rule 23(a) was designed to protect against. *See, e.g.*, *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 732-33 (S.D. Tex. 2006) (plaintiffs inadequate where they demonstrated "nearly total if not complete reliance on class counsel . . . for all information about the facts of the case" and did "not read the majority of documents given to them by their attorneys, nor even read the complaints carefully"); *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 535 (N.D. Tex. 2005) (similar); *Krim*, 210 F.R.D. at 588 (similar). Because Plaintiffs have failed to put forth an adequate class representative for either class, certification must be denied.

## III.   CONCLUSION

For the foregoing reasons, Defendants respectfully ask that the Court deny Plaintiffs' Motion for Class Certification in full.

---

[17] *See, e.g.*, Ex. 15 at A01553, DeAngelis Tr. 92:2-6 (Q. Have you read any pages [of the Registration Statement]? A. No. I took a look—well, I took a look at just the first page. And then said [to my lawyers], "You guys tell me what's—what's happening. Parse it for me."); Ex. 17 at A01579, Inman Tr. 31:10-15 (Q. Do you have any other bases for asserting that the statements in the [AC] are false or misleading? A. Just what was provided to me by the investigation of my legal counsel.); Ex. 16 at A01565, Torres Tr. 27:3-24 (similar).

[18] Ex. 16 at A01565, Torres Tr. 82:18-25; *see also* Ex. 17 at A01579, Inman Tr. 37:9-12 (Q. Have you participated in any strategic decisions related to this case? A. Strategic decisions? I don't believe so, no[.]);*id.* at 42:24-43:1 (Q. Did you have any input into the drafting of this [Opposition to Defendants' Motion to Dismiss]? A. No[.]);*id.* at 46:7-11 (Q. Have you . . . ever reviewed any documents filed by defendants in this action? A. No[.]); Ex. 15 at A01553, DeAngelis Tr. 51:15-17 (same); Ex. 16 at A01565, Torres Tr. 79:17-21 (same).

Dated:  April 14, 2023

Respectfully submitted,
*/s/ Douglas W. Greene*
**BAKER & HOSTETLER LLP**

C. Shawn Cleveland (Texas No. 24012433)
Tamara D. Baggett (Texas No. 24058573)
2850 North Harwood Street, Suite 1100
Dallas, TX 75201
Phone: 214-210-1200
Fax: 214-210-1201
scleveland@bakerlaw.com
tbaggett@bakerlaw.com

Douglas W. Greene (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: 212-589-4200
Fax: 212-589-4201
dgreene@bakerlaw.com
ztaylor@bakerlaw.com

Genevieve G. York-Erwin (*Pro Hac Vice*)
999 Third Avenue, Suite 3900
Seattle, WA 98 104-4040
gyorkerwin@bakerlaw.com
Phone: 206-332-7079
Fax: 206-624-73 17

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that this brief was electronically filed with the Clerk of the Court using the CM/ECF system, which will send email notification of this filing to all attorneys of record.


_/s/ Tamara D. Baggett_
Tamara D. Baggett