# EXHIBIT 18

A01595

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| LUIS TORRES, ALLIA DEANGELIS, DARRICK INMAN, Individually and On Behalf of All Others Similarly Situated, : : : : : | Case No. 3:20-CV-3464-S |
| Plaintiffs, : | |
| v. : : | |
| BERRY CORPORATION, ARTHUR T. SMITH, CARY BAETZ, GARY A. GROVE, BRENT S. BUCKLEY, KAJ VAZALES, and EUGENE J. VOILAND, : : : : : | |
| Defendants. : : : : : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# EXPERT REPORT

# OF

# LUCY P. ALLEN

**April 14, 2023**

A01596

## Table of Contents

I.     Scope of Assignment ...................................................................................................1

II.    Qualifications and Remuneration .............................................................................1

    A.  Qualifications...................................................................................................1

    B.  Remuneration...................................................................................................2

III.   Materials Considered ................................................................................................2

IV.   Summary of Findings.................................................................................................3

V.    Background.................................................................................................................5

    A.  Company Background .....................................................................................5

    B.  Summary of Allegations .................................................................................7

        1.  Alleged Misrepresentations and Omissions..........................................7

        2.  Alleged Corrective Disclosures .............................................................8

VI.   Assumptions and Fundamentals ...............................................................................9

VII.  An Analysis of Market Reaction at the Time the Alleged Misstatements Were Made.....12

VIII. The Alleged Corrective Disclosure Period Was a Period of Unprecedented Events, Including a Dramatic Decrease in Oil Demand and an Increase in Oil Supply as a Result of Covid .........................................................................................................14

    A.  Because of Covid and the resulting oil price war, oil prices fell by more than 70%, one of the largest drops in history................................................................14

    B.  In response to the dramatic and unprecedented drop in oil prices during the Alleged Corrective Disclosure Period, the vast majority of E&P companies drastically reduced their FY 2020 operational plans ....................................19

    C.  Due to the dramatic and unprecedented drop in oil prices during the Alleged Corrective Disclosure Period, many E&P companies went bankrupt ........................24

IX.   There Is No Link Between Berry's Stock Price and the Alleged Misrepresentations During the Alleged Corrective Disclosure Period Because It Was a Period of Unprecedented Events During Which Berry's Production and Capex Reductions Were Expected and Were Viewed *Positively* By the Market ...........................................26

    A.  The alleged corrective disclosures did not disclose any permitting issues for Berry – the basis of the actual alleged misrepresentations ....................................27

    B.  Reducing production and capex (which Plaintiffs allege was caused by permitting issues) did not impact Berry's stock price during the Alleged Corrective

A01597

Disclosure Period as those measures were expected given the extraordinary market conditions ....................................................................................................27

C. Reducing production and capex was viewed *positively* by the market during the Alleged Corrective Disclosure Period ........................................................................28

D. After the alleged Class Period, analysts concluded that Berry had been able to "largely side-step an oil price collapse via effective risk management" .....................30

X. A Detailed Analysis of Each Alleged Corrective Disclosure Confirms That There Was No Price Impact And No Link Between Berry's Stock Price and the Alleged Misrepresentations During the Alleged Corrective Disclosure Period...............................31

A. April 1, 2020 – Berry's announcement of reduced production and capital expenditures guidance on the first alleged corrective disclosure date did not impact Berry's stock price ......................................................................................31

1. There was no statistically significant price reaction following the April 1, 2020 alleged corrective disclosure ..........................................................32

a. According to Plaintiffs' expert's model and his claim of increased volatility due to Covid, there is no statistically significant reaction to this alleged corrective disclosure................................................................32

b. Using an alternative event study model similarly shows that there was no statistically significant price reaction..............................................36

2. Berry's production and capex reduction was in line with those announced by other E&P companies ...............................................................................36

3. Not one analyst expressed surprise at Berry's April 1 announcement of lower production and capex guidance; most analysts did not even issue reports on the announcement while those that did assessed the decline in production and capex as *positive* ......................................................................................39

4. Not one analyst lowered their price target for Berry due to Berry's revised guidance regarding production and capex ..........................................................42

5. Consistent with a lack of statistically significant price reaction, Berry's trading volume on April 1, 2020 was in line with the trading volume on other days during that time..............................................................................44

B. August 4, 2020 – Berry's announcement of its Q2 2020 production and capex results on the second alleged corrective disclosure date did not impact its stock price....................................................................................................................45

1. Berry's announcement of Q2 2020 production was in line with analyst consensus estimates and thus in an efficient market should not impact Berry's stock price ................................................................................................46

2. Berry announced *higher than expected* Q2 2020 capex, inconsistent with Plaintiffs' claim that Berry had to cut its capex due to permitting delays............47

A01598

3.  Berry's announcement of Q2 2020 results included negative news unrelated to the alleged misrepresentations, including higher costs ..........................................47

C.  November 3, 2020 – Berry's release of its Q3 2020 production and capital expenditures results on the third alleged corrective disclosure date did not impact Berry's stock price ..................................................................................................48

1.  There was no statistically significant stock price reaction following the November alleged corrective disclosure according to Plaintiffs' own expert and according to an alternative event study model ................................................49

2.  Berry's Q3 2020 production was largely in-line with analyst consensus estimates, consistent with the lack of a statistically significant price reaction ......50

3.  No analysts lowered their price targets for Berry directly following Berry's Q3 2020 production or capex results ...................................................................51

D.  Berry's alleged corrective disclosure after the end of the alleged Class Period, which said that permitting delays had informed the Company's 2020 plans, did not impact Berry's stock price and did not elicit any analyst commentary, consistent with a lack of price impact from the alleged misrepresentations ................52

XI.  The Cain Report Does Not Propose a Methodology That Can Measure Damages Consistent with Plaintiffs' Theory of Liability ...................................................................53

XII.  It Is Virtually Impossible to Determine or Trace whether a Berry Share Acquired in the Market Came from the Shares Sold in the IPO .............................................................58

A.  Once non-IPO shares enter the market, it is virtually impossible to determine whether a Berry share purchased by a member of the proposed class was traceable to the IPO ..............................................................................................................58

B.  Non-IPO shares were already available to trade at the time of the IPO ......................59

A01599

## I.    SCOPE OF ASSIGNMENT

1.     I have been asked by counsel for Defendant Berry Corporation ("Berry," the "Company," or "BRY") to review and comment on Plaintiffs' claims as alleged in the Amended Class Action Complaint dated November 1, 2021 (the "Amended Complaint") and to review and comment on the Expert Report of Matthew D. Cain, Ph.D. filed on February 13, 2023 (the "Cain Report"). In particular, I have been asked to analyze the price impact of the allegedly false and misleading statements and omissions regarding permitting issues that Plaintiffs allege were the cause for Berry stock price to be inflated during the alleged Class Period (July 26, 2018 through November 3, 2020) and which Plaintiffs allege were disclosed through a series of alleged corrective disclosures about production and capital expenditures ("capex") that were actually caused by permitting issues. Second, I was asked to evaluate whether the Cain Report's proposed common methodology is capable of measuring damages on a class-wide basis, consistent with Plaintiffs' theory of liability in this case. In addition, I was asked to examine whether shares purchased during the alleged Class Period can be traced back to shares sold in Berry's July 26, 2018 Initial Public Offering ("IPO").

## II.    QUALIFICATIONS AND REMUNERATION

### A.    Qualifications

2.     I am a Managing Director of NERA Economic Consulting ("NERA") and a member of NERA's Securities and Finance Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide. NERA's Securities and Finance Practice, which performs research in securities and financial markets, dates from the early 1970s and employs a research staff of more than 100 professionals holding degrees in economics, finance, and mathematics. The practice group counts among its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

3.     I have an A.B. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Before joining NERA, I was an Economist for both President George

1

A01600

H. W. Bush's and President Bill Clinton's Council of Economic Advisers, providing economic analysis on regulation and health care policy issues. In my over 25 years at NERA, I have been frequently engaged as an economic consultant or expert witness in numerous projects involving securities and financial economics. In the course of this work, I have analyzed issues relating to class certification in securities class action cases and the effect of information on stock prices. My resume with recent publications and testifying experience is included as Appendix A.

### B.    Remuneration

4.      NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $1,150 per hour. NERA's fees are not in any way contingent on the outcome of this matter.

## III.    MATERIALS CONSIDERED

5.      In preparing this report, I considered the following materials:

a)      Pleadings in this matter:

    i.    Class Action Complaint, filed November 20, 2020;

    ii.    Amended Class Action Complaint, filed November 1, 2021;

    iii.    Memorandum in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint, filed January 24, 2022;

    iv.    Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint, filed April 11, 2022;

    v.    Reply Memorandum in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint, filed June 6, 2022;

    vi.    Plaintiffs' Sur-Reply in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint, filed June 24, 2022;

    vii.    Order on Defendants' Motion to Dismiss the Amended Class Action Complaint, filed September 13, 2022;

    viii.    Memorandum in Support of Defendants' Motion for Reconsideration and/or Clarification, filed September 20, 2022;

    ix.    Order on Defendants' Motion for Reconsideration and/or Clarification, filed November 9, 2022;

2

A01601

      x.      Plaintiffs' Motion for Class Certification, including Memorandum of Law and Appendices, filed February 13, 2023

b)     Expert Report of Matthew D. Cain, Ph.D. filed February 13, 2023, including materials considered and turned over;

c)     Berry filings with the Securities and Exchange Commission ("SEC");

d)     E&P companies' filings with the SEC;

e)     Institutional holdings for Berry from FactSet Research Systems, Inc. and SEC filings filed by institutions and Berry beneficial owners;

f)     Berry's press releases, conference call transcripts, and presentations from Factiva, Berry website, and FactSet Research Systems, Inc.;

g)     News stories on Berry, other E&P companies, and the oil and gas industry, from Factiva and Google;

h)     Analyst reports on Berry, other E&P companies, and the E&P industry from Refinitiv Eikon;

i)     Financial data, including:

     i.     Oil price data from FactSet Research Systems, Inc.;

     ii.     Price data on Berry and other E&P companies from Bloomberg, L.P. and FactSet Research Systems, Inc.;

     iii.     Production data from FactSet Research Systems, Inc.;

     iv.     Index data from Bloomberg, L.P.;

     v.     Analyst estimates and price targets from Bloomberg, L.P. and FactSet Research Systems, Inc.;

     vi.     Index members and weights for the Dow Jones U.S. Exploration & Production Index from S&P.

j)     Legal decisions; and

k)     Academic literature and textbooks on finance, securities, valuation and statistics.

## IV.    SUMMARY OF FINDINGS

6.     Plaintiffs contend that during the alleged Class Period, Berry made misleading statements relating to its permitting process. According to Plaintiffs, the alleged "truth" was revealed to the market through "a series of partial disclosures and/or materializations of

3

A01602

concealed risks" when Berry announced revised production and capex guidance quarter to quarter declines in oil production that were allegedly caused by permitting issues.[1]

7.      I find that there is no link between Berry's stock price and the alleged misrepresentations during the period when the alleged corrective disclosures happened as it was a time of unprecedented events during which Berry's production and capex reductions were both expected and viewed *positively* by the market. Thus, the alleged corrective disclosures were neither new news nor bad news and in an efficient market would not be the cause of a stock price decline. During the time of the alleged corrective disclosures, the dramatic decrease in oil demand caused by COVID-19 ("Covid") coupled with the increase in oil supply caused by an oil price war between Saudi Arabia and Russia sent oil prices to historical lows. In March 2020 alone, the month after Berry announced its initial 2020 guidance, oil prices fell by more than 70%. In response to these events, E&P companies in North America announced production and capex reductions. Many E&P companies, including those considered by analysts to be Berry's peers such as Whiting Petroleum and California Resources Corporation, went bankrupt, with many of them citing low oil prices as a reason for their bankruptcy.

8.      A detailed analysis of each of the alleged corrective disclosures confirms that there was no price impact and no link between Berry's stock price and the alleged misrepresentations during the time period when the alleged corrective disclosures were made.

> **April 1, 2020:** I find that there is no price impact from the April 1, 2020 alleged corrective disclosure because there was no statistically significant price reaction, the market did not consider this alleged corrective disclosure to be negative or a surprise, analysts viewed the reduced guidance for production and capex as *positive,* and not one analyst lowered their price target due to Berry's revised guidance.

> **August 4, 2020:** I find that there is no price impact from the August 4, 2020 alleged corrective disclosure because Berry's Q2 2020 quarter to quarter production decline, the allegedly corrective information announced on this date, was expected by the market and thus in an efficient market should not impact Berry's stock price. Instead, I find that Berry's price decline on August 4, 2020 was due to negative news unrelated to the alleged misrepresentations, including unexpectedly higher costs.

> **November 3, 2020:** I find that there is no price impact from the November 3, 2020 alleged corrective disclosure because there was no statistically significant price reaction

---

[1] Amended Complaint, ¶¶7-12.

A01603

and Berry's Q3 2020 production was in-line with the market's estimates and thus not new news.

9.      It is my understanding that Plaintiffs are *not* claiming that the alleged misstatements caused Berry's stock price to rise when made.  Nevertheless, I analyzed the market reaction after each alleged misrepresentation and found no evidence of a price increase that could be attributed to the alleged misrepresentations.

10.      Dr. Cain claims that "damages in this matter can be calculated on a class-wide basis subject to a common methodology."[2] I find that Dr. Cain's proposed methodology cannot be used to measure class-wide damages consistent with Plaintiffs' theory of liability. Dr. Cain's proposed methodology is very general, includes no specifics about this case, and does not explain how it could be used to determine the damages that were caused by the risk that was allegedly concealed by the alleged misrepresentations. Dr. Cain proposes to measure the price reaction when the concealed risks regarding permitting issues allegedly materialized in production declines but fails to propose a method to determine the damages that were caused by the risk that was concealed by the alleged misrepresentations. Dr. Cain's common methodology would purportedly measure the *materialization of the risk* in production declines but this does not directly correspond to the original allegedly concealed risk of permitting issues. Furthermore, his method does not account for any mechanism to account for individual risk preferences at the time the alleged risks should have been disclosed.

11.      At the time of the IPO there were additional non-IPO shares of Berry that were immediately available to trade. Once Berry's non-IPO shares enter the market, it is virtually impossible to determine or trace whether a Berry share acquired in the market came from the shares sold in the IPO.

## V.      BACKGROUND

### A.    Company Background

12.      Berry is a California-based exploration and production ("E&P") company focused on onshore assets characterized by having "low geologic risk, long-lived, oil reserves in

---

[2] Cain Report, ¶11.

A01604

conventional reservoirs."[3] Berry's assets are primarily located in the San Joaquin and Ventura basins within California.[4] The Company also has operations in Utah and Colorado.[5]

13.      The Company's IPO was on July 26, 2018.[6] Since the IPO's completion, Berry's common stock has traded on the NASDAQ under the ticker symbol "BRY." During the alleged Class Period, Berry's market capitalization ranged from $151 million to $1,484 million.[7]

14.      Throughout the alleged Class Period, Berry was subject to "stringent federal, state, and local laws and regulations governing the discharge of materials into the environment or otherwise relating to environmental protection" that could affect the "issuance of certain permits or approval of projects."[8] In particular, being located in California, Berry was regulated by the California Geologic Energy Management Division ("CalGEM"), "California's primary regulator of the oil and natural gas industry on private and state lands."[9]

15.      In 2019, CalGEM enforced a series of new regulations. Specifically, Underground Injection Control ("UIC") regulations became more stringent in April 2019.[10] UIC regulations govern wells that "inject water or steam for enhanced oil recovery" and aim to "prevent the degradation of underground sources of drinking water."[11] The April 2019 regulatory revisions included strengthened testing requirements for identifying well leaks, strengthened "data requirements to ensure proposed projects are fully evaluated," and other regulatory changes

---

[3] Berry FY 2019 Form 10-K, filed February 27, 2020, p. 1.

[4] Berry FY 2019 Form 10-K, filed February 27, 2020, pp. 1, 11.

[5] Berry FY 2019 Form 10-K, filed February 27, 2020, pp. 1, 11.

[6] "Berry Petroleum Corporation Prices Initial Public Offering," *Globe Newswire,* July 25, 2018, 7:32 p.m. See, also, Amended Complaint, ¶ 1.

[7] Data from Bloomberg L.P.

[8] Berry FY 2019 Form 10-K, filed February 27, 2020, pp. 22-23.

[9] Berry FY 2019 Form 10-K, filed February 27, 2020, p. 23.

[10] Berry FY 2019 Form 10-K, filed February 27, 2020, p. 23. See also, "Updated Underground Injection Control Regulations; Final Text of Regulations," *California Department of Conservation*, https://www.conservation.ca.gov/calgem/general_information/Documents/UIC_regs_workshop/Final%20Text%20of%20the%20UIC%20Regulations%20(Clean).pdf, accessed April 14, 2023.

[11] "Underground Injection Control," *California Department of Conservation*, https://www.conservation.ca.gov/calgem/general_information/Pages/UndergroundinjectionControl(UIC).aspx, accessed April 13, 2023.

A01605

meant to strengthen UIC requirements.[12] Additionally, in November 2019, CalGEM announced a moratorium on the approval of new high–pressure cyclic steam wells.[13] In January 2020, CalGEM notified operators including Berry, that the moratorium announced in November 2019 would also prohibit new underground oil-extraction wells from using high-pressure cyclic steaming processes.[14]

### B.    Summary of Allegations

16.    Plaintiffs seek to certify, (1) pursuant to the Securities Exchange Act of 1934, a class consisting of all purchasers of the common stock of Berry between July 26, 2018 and November 3, 2020 ("10b-5 Class"), and (2) pursuant to the Securities Act of 1933, a class of investors who acquired Berry's common stock pursuant and/or traceable to Berry's Registration Statement issued in connection with its July 26, 2018 IPO ("Section 11 Class").[15] Plaintiffs allege that during the alleged Class Period Berry made misleading statements relating to its permitting process and that through "a series of partial disclosures and/or materializations of concealed risks" the alleged "truth" was revealed to the market.[16]

### 1.    Alleged Misrepresentations and Omissions

17.    Plaintiffs contend that Berry made misleading statements on several occasions during the alleged Class Period.[17] In particular, Plaintiffs claim that Berry concealed "the potential risk of permitting delays and the inability to drill oil in identified sites" and Berry's "chronic internal deficiencies" that allegedly prevented the Company from obtaining certain permits.[18] Moreover, Plaintiffs allege that the Company misleadingly assured "investors that the

---

[12] "Underground Injection Control," *California Department of Conservation*, https://www.conservation.ca.gov/calgem/general_information/Pages/UndergroundinjectionControl(UIC).aspx, accessed April 13, 2023.

[13] "California Announces New Oil and Gas Initiatives," *California Department of Conservation*, https://www.conservation.ca.gov/index/Pages/News/California-Establishes-Moratorium-on-High-Pressure-Extraction.aspx, accessed April 14, 2023.

[14] Berry FY 2019 Form 10-K, filed February 27, 2020, p. 24.

[15] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Memo in Support of Class Cert"), filed February 13, 2023, p. 1, and Amended Complaint, ¶1. See, also, Berry Form 424(b)(4), dated July 25, 2018 ("Prospectus").

[16] Amended Complaint, ¶7.

[17] See, Amended Complaint, ¶¶71-75, 84-107.

[18] Amended Complaint, ¶3.

A01606

ability to secure permits was a non-issue at the Company" when such risks either already occurred or "had a high risk of occurring in the near future."[19]

### 2.  Alleged Corrective Disclosures

18.    The Amended Complaint alleges that "[w]hile Defendants continue[d] to conceal the full truth about the severe permitting problems at the Company, the truth ha[d] begun to emerge through a series of partial disclosures and/or materializations of concealed risks."[20] In particular, Plaintiffs claim that the "partial disclosures and/or materializations of concealed risks" were revealed to the market when Defendants "revised production targets downwards and reduced capital expenditures based on a failure to secure timely permits."[21] The specific alleged corrective disclosures are summarized below:[22]

      a)  <u>April 1, 2020</u>: On this date, during market hours, Berry issued a press release announcing a reduction in its "capital expenditures by 50% from the midpoint of the original 2020 budget" and a revision to its 2020 production target "with growth expected to remain flat to 2% down."[23]

      b)  <u>August 4, 2020</u>: On this date, after market close, Berry issued a press release announcing its financial results for 2Q 2020 (*i.e.*, the fiscal quarter ended June 30, 2020) and that its "average daily production decreased by an additional 5% for the second quarter of 2020 compared to the first quarter of 2020."[24]

      c)  <u>November 3, 2020</u>: On this date, after market close, Berry issued a press release announcing its financial results for 3Q 2020, and that its average daily

---

[19] Amended Complaint, ¶¶3-4.

[20] Amended Complaint, ¶7.

[21] Amended Complaint, ¶7 and Memo in Support of Class Cert, filed February 13, 2023, p. 6.

[22] Amended Complaint, ¶¶124-129.

[23] Amended Complaint, ¶124.

[24] "Berry Corporation (BRY) Reports Second Quarter 2020 Results; Achieved Significant Operating Expense Reductions; Added 2021 Oil Hedges," *Globe Newswire*, August 4, 2020, 5:13 p.m.

A01607

production in the third quarter had declined 5% compared to the second quarter of 2020.[25]

19.    Figure 1 below shows Berry's daily stock price and trading volume from the IPO to March 31, 2021, along with the alleged misrepresentations and alleged corrective disclosures.



## VI.    ASSUMPTIONS AND FUNDAMENTALS

20.    To analyze price impact of the alleged misrepresentations, I examined Plaintiffs' allegations as well as publicly available information related to Berry. I reviewed Plaintiffs' claims in the Amended Complaint and other pleadings, the expert report of Plaintiffs' expert Dr.

---

[25] "Berry Corporation (BRY) Reports Third Quarter 2020 Results; 2020 Plan Intact with Lower Operating Expense and Continued Cash Building," *Globe Newswire*, November 3, 2020, 4:15 p.m.

A01608

Cain, and examined the alleged misrepresentations and the alleged corrective disclosures (including what information was allegedly false, when the alleged "truth" was allegedly revealed to the market, and what information was alleged to be corrective). Further, I analyzed publicly available information related to Berry, including analyst reports, SEC filings, and news stories from Bloomberg and Factiva.[26]

21.    Analyst reports are periodic reports issued by professional financial analysts who perform research and analysis on specific industries and companies. Analysts analyze companies by studying information about the company and the stock, such as SEC filings, as well as participating on conference calls and attending investor conferences where they can ask questions directly to management. Analysts use this information to model and value companies and industries using financial techniques such as discounted cash flow models and valuation multiples. Using these valuations, analysts typically issue price targets (*i.e.*, what price they expect the stock of a company to be in a certain time period), provide estimates reflecting their expectations of the company's future financial performance (such as estimates of future revenue, profits and earnings per share ("EPS")), and give recommendations to buy, hold, or sell the stock. Analysts typically issue reports after new information relevant to the valuation of the stock or company is released. These reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge and sentiment at the time. The review of analyst reports is a standard and generally accepted methodology for determining what information is important to the market in valuing a stock, and thus, for determining whether a piece of information had price impact. Plaintiffs' expert Dr. Cain explains that "[t]he content of analyst reports include information that the analyst believes is important for investors" and that "research analysts ensure that new important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently."[27]

22.    Plaintiffs' expert Dr. Cain claims that the market for Berry's stock was efficient throughout the alleged Class Period, and thus "widely available public information [was] quickly

---

[26] Bloomberg is a commonly used provider of financial data and news, and Factiva is an online news reporting service and archive owned by Dow Jones & Company, Inc. that aggregates news content from nearly 33,000 sources from around the world.

[27] Cain Report, ¶33.

A01609

incorporated into [the] stock price."[28] For the purpose of this analysis, I have been asked to assume Plaintiffs' claim of market efficiency. Note that in an efficient market, only new news should affect the stock price and confirmatory or repeated news (*i.e.*, news that has already been publicly disclosed) should not impact the market or cause a statistically significant price reaction.[29]

23.    An event study can be used to test whether the stock price reacts following a particular announcement. An event study is a commonly accepted statistical analysis that measures the movement in a stock's price after an event or public announcement, typically adjusting for the movement in the overall market and/or industry.[30] Academics often use an event study to determine how stock prices respond to new information.[31] An event study typically uses a statistical analysis called a regression to estimate the relationship between the company's daily stock returns and the daily returns of market and/or industry indices.[32] Using the regression results and the returns of the indices, the predicted stock price movement and abnormal stock price movement (or the amount the stock price moves in excess of the predicted amount) can be calculated for the day or period being tested. Then, the statistical significance of the abnormal stock price movement can be tested.[33]

---

[28] Cain Report, ¶¶10, 18.

[29] See, for example, Richard A. Brealey, Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, NY, 10th ed., 2011), p. 330. ("If the market is efficient, prices impound all available information.") See, also, Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 8th ed., 2009), p. 345.

Courts have similarly noted that confirmatory news should not cause a statistically significant price reaction. See, for example, *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004). ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price.")

[30] See, for example, Alexander, Janet C., "The Value of Bad News in Securities Class Actions," *UCLA Law Review* 41: 1994, Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38: 1982, and Dunbar, Frederick C., and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001), ch. 19.

[31] See, for example, MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35: 1997, and Bowman, Robert G., "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting* 10(4): 1983.

[32] Regression analysis is used to estimate the relationship between two or more variables. See, for example, Hogg, Robert V. and Elliot A. Tanis, *Probability and Statistical Inference* (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997).

[33] The results of the event study are based on the 5% significance level, the standard typically applied by courts and academics. See, for example, Freedman, David A., and David H. Kaye, "Reference Guide on Statistics,"

A01610

## VII.    AN ANALYSIS OF MARKET REACTION AT THE TIME THE ALLEGED MISSTATEMENTS WERE MADE

24.     It is my understanding that Plaintiffs are *not* claiming that the alleged misstatements caused Berry's stock price to rise when made. It does not appear that Plaintiffs are alleging price impact because Berry's stock price increased at the time the alleged misrepresentations were made.[34] Nevertheless, I analyzed the market reaction after each alleged misrepresentation and found no evidence of a price increase that could be attributed to the alleged misrepresentations.[35]

25.     Using both Dr. Cain's event study methodology as well as the alternative event study methodology (described in Section X.A.1 below) I tested the price reaction after each of the alleged misrepresentations.[36] Based on the results of both event study models, there was no statistically significant price increase in Berry's stock after six of the eight alleged misrepresentations.

26.     On the two days with statistically significant increases in Berry's stock price (February 27, 2020 and May 7, 2020),[37] I found no evidence that the price increase was due to the alleged misstatements but instead found that the price increase was due to positive news unrelated to the alleged misrepresentations.

27.     Specifically, analyst commentary on February 27, 2020 and May 7, 2020 indicates that the positive price reactions were due to Berry's strong financial results, not the alleged misrepresentations:

---

*Reference Manual on Scientific Evidence* (Washington, D.C.: Federal Judicial Center, 3rd ed., 2011), pp. 211-302, and Fisher, Franklin M., "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80: 1980.

[34] See, for example, Memo in Support of Class Cert, pp. 21-22.

[35] See, Amended Complaint, ¶¶71-75, 84-107. Note this does not include July 26, 2018, the date of the IPO.

[36] Dr. Cain's event study methodology uses a rolling control period of 60 trading days prior to each date tested. His methodology uses the S&P 1500 Composite Total Return Index to control for market movements and uses the Dow Jones U.S. Exploration and Production Index to control for industry movement. Price reactions to the alleged misrepresentations according to Dr. Cain's methodology are from Dr. Cain's backup ("CAIN_0000926 fixed_rolling_reg_results_60days_2023-02-13.xlsx"). Alternative event study applies a methodology, and uses the same 60 trading day control period prior to each event tested and the Custom E&P Index described in Section X.A.1. to control for industry and market movements.

[37] Note the Amended Complaint, ¶100 states that the alleged misrepresentation regarding the 1Q 2020 conference call occurred on May 8, 2020. However, the 1Q 2020 conference call occurred on May 7, 2020 (See, Berry 1Q2020 earnings call, May 7, 2020).

A01611

**February 27, 2020:**[38] Analyst commentary indicates that the positive price reaction on February 27, 2020 was due to Berry's strong financial results, not the alleged misrepresentation. For example, Piper Sandler analysts noted a "solid update from BRY as EBITDA exceeded street expectations."[39] BMO analysts similarly noted that "Berry reported a strong 4Q19 with California delivering 18% Y/Y production growth, while better oil realizations offset higher cash operating costs leading to EBITDAX being above expectations."[40]

**May 7, 2020:**[41] Analyst commentary indicates that the positive price reaction on May 7, 2020 was due to Berry's strong financial results, not the alleged misrepresentation. For example, UBS noted the quarter was "[a]bove [c]onsensus" and BMO noted that "Berry reported better 1Q20 EBITDAX driven by higher oil realizations and lower operating costs."[42]

28.    For the six alleged misrepresentation dates with no statistically significant positive reactions (August 23, 2018, November 8, 2018, March 7, 2019, May 16, 2019, November 8, 2019, and August 5, 2020) I analyzed whether there was negative confounding information on that same date that could have muted what otherwise might have been a positive reaction to the alleged misrepresentations.[43] I found no such instances for any of the alleged misrepresentations. In addition, I found that on these six dates, along with no statistically significant increases in Berry's stock price, there were no indication that any analyst increased their price target or valuation of Berry due to the alleged misrepresentations.[44]

---

[38] Plaintiffs allege Berry made misleading statements in its conference call regarding 4Q 2019 results. Amended Complaint, ¶98.

[39] Piper Sandler analyst report, dated February 26, 2020.

[40] BMO analyst report, dated February 26, 2020.

[41] Plaintiffs allege Berry made misleading statements in its conference call to discuss 1Q 2020 results. Amended Complaint, ¶100.

[42] UBS analyst report, dated May 6, 2020 and BMO analyst report, dated May 7, 2020.

[43] November 7, 2019 and August 4, 2020 alleged misrepresentations occurred after market close and hence the dates shown are the following trading day.

[44] Note August 5, 2020 is both an alleged misrepresentation and an alleged corrective disclosure. A review of analyst commentary following the August 5, 2020 alleged misrepresentations show that there was no change in analyst price targets and there is no evidence that there was any increase or decrease in Berry's value attributable to those alleged misrepresentations or the alleged corrective disclosure.

13

**VIII.** **THE ALLEGED CORRECTIVE DISCLOSURE PERIOD WAS A PERIOD OF UNPRECEDENTED EVENTS, INCLUDING A DRAMATIC DECREASE IN OIL DEMAND AND AN INCREASE IN OIL SUPPLY AS A RESULT OF COVID**

### A. Because of Covid and the resulting oil price war, oil prices fell by more than 70%, one of the largest drops in history

29.    On February 26, 2020, Berry announced its initial full year 2020 guidance;[45] however, shortly after Berry's announcement, oil prices began to decline and within weeks had fallen more than 70% due to sudden and unprecedented events – an oil price war between Saudi Arabia and Russia broke out that suddenly increased oil supply while the wide imposition of lock-downs and stay-at-home orders in response to Covid caused oil demand to plummet. This time period of unprecedented events, which began in March 2020 and continued throughout the rest of the alleged Class Period, is also the time period during which Plaintiffs claim the alleged "truth" regarding Berry was revealed to the market through Berry's announcement of guidance revisions and production declines (the "Alleged Corrective Disclosure Period").

30.    **Figure 2** below shows oil spot prices for Brent, the oil benchmark particularly relevant to Berry,[46] in relation to select events relevant to oil price changes between January and April 2020.

---

[45] "Berry Corporation (BRY) Reports Strong Fourth Quarter and Full Year 2019 Results; Continues to Deliver Top Tier Industry Returns, Achieved Double Digit California Production Growth; Replaced Nearly 300% of California Reserves," *Globe Newswire,* February 26, 2020, 9:07 p.m.

[46] See, for example, Berry Corporation, Form 10-K for the year ended December 31, 2019, pp. 2-3. Equity analysts covering Berry understood that Berry was exposed to the market price of Brent. See, for example, the commentary by Wells Fargo: "California oil markets are more correlated with global supply and demand fundamentals, which are primarily reflected in Brent pricing, as opposed to West Texas Intermediate (WTI) pricing, which has been affected by infrastructure bottlenecks." "BRY: Initiating Coverage At Outperform," Wells Fargo, August 20, 2018.

A01613



**Figure 2: Brent Crude Oil Spot Price**
**January 2, 2020 to April 30, 2020**

**Notes and Sources:**
Data from FactSet Research Systems, Inc., the Center for Disease Control and Prevention, Johns Hopkins, and news articles.

31.     As the chart shows, even though in late January 2020 Covid was already declared a public health emergency, oil prices remained relatively steady and even slightly increased during early and mid-February. It was not until March, after Berry announced its initial 2020 production and capital expenditures guidance, that the oil price war broke out and created an extraordinary imbalance between demand and supply for oil and "sent crude oil prices to historic low levels."[47] By March 31, 2020 (the day before the first alleged corrective disclosure when Berry lowered its production and capex guidance[48]), oil prices had declined to $15, representing a 78% decline from the start of the year and a 73% decline from February 26, 2020 (the date when Berry announced its initial 2020 production and capex guidance[49]). Oil prices at $15 per

---

[47] "COVID-19's Impacts on Utah's Oil & Gas Industry," January 2021, Kem C. Gardner, Policy Institute – The University of Utah, David Eccles School of Business.

[48] "Berry Corporation (bry) Adjusts 2020 Plans; Heightened Focus on Building Cash in 2020 and Ensuring Flexibility Through 2021," April 1, 2020, 9:27 a.m.

[49] "Berry Corporation (BRY) Reports Strong Fourth Quarter and Full Year 2019 Results; Continues to Deliver Top Tier Industry Returns, Achieved Double Digit California Production Growth; Replaced Nearly 300% of California Reserves," *Globe Newswire,* February 26, 2020, 9:07 p.m.

A01614

barrel were the lowest levels in over two decades.[50] Some of the key dates and events during this unprecedented time period include:

- Early 2020: Covid and associated shutdowns cause economic disruption and reduce demand for oil (especially in China, one of the world's largest oil importers).[51]

- March 5, 2020: The Organization of the Petroleum Exporting Countries ("OPEC") propose production cuts intended to "deal with the effects of the spreading coronavirus on demand." [52]

- March 6, 2020: OPEC and non-OPEC allies fail to agree on a reduction in production as Saudi Arabia could not convince Russia to commit to deeper supply cuts.[53]

- March 8, 2020: Saudi Arabia cuts its oil prices, setting off a price war on oil with Russia.[54] When U.S. markets open on March 9, "U.S. crude oil tumble[s]

---

[50] Based on the Crude Oil Brent Global Spot price from FactSet Research Systems, Inc. between January 3, 2000 and March 30, 2020. The lowest price was $16.51 on November 15, 2001.

[51] "Why oil prices are crashing and what it means," *CNN*, March 9, 2020, 4:21 p.m. ("The coronavirus has undermined energy demand worldwide, but especially in China, which is now the number one importer of crude oil, guzzling roughly 10 million barrels a day. Factories have been idled and thousands of flights canceled around the world as the coronavirus outbreak that began in Wuhan, China, has become a global pandemic. The International Energy Agency said Monday that it expects demand will contract this year for the first time since the recession in 2009 that followed the global financial crisis."). See also, "The Coronavirus Crash Of 2020, And The Investing Lesson It Taught Us," *Forbes*, February 11, 2021, 2:55 p.m. ("As the pandemic began [its] spread in March and government officials around the world shutdown economic activity, panic triggered by the economic consequences and uncertainty led to a stock market crash that included the three worst point drops in U.S. history. [...] Between Feb. 12 and March 23, the Dow lost 37% of its value. By [the] middle of March, panic was rising. As the US went into lockdown mode, over 20 million jobs were lost, businesses closed and the virus continued [its] spread. Investors watched as their retirement savings lost 30% in two weeks, and speculation about how bad it could get created even more fear among investors.").

[52] "OPEC Proposes a Large Cut in Oil Output," *The New York Times*, March 5, 2020, 9:16 a.m.

[53] "After a Long Fall in Oil Prices, a Crash," The Wall Street Journal Online, March 15, 2020, 5:30 a.m. See also, "OPEC+ fails to agree on massive supply cut, sending crude prices to 2017 lows," *CNBC*, March 6, 2020, 12:12 p.m. ("OPEC and non-OPEC allies failed on Friday to agree on how much oil production to cut amid the coronavirus outbreak, with Russia reportedly refusing to give the green light to the deepest supply cuts since the global financial crisis. Oil prices initially slipped Friday afternoon on reports that Moscow said it wasn't prepared to approve a further reduction in production. Later, Reuters also reported that OPEC and its allies had even failed to agree on rolling over existing cuts, further weighing on crude prices. Then a statement by the oil group said it would continue discussions and made no mention of any cuts.").

[54] "Oil nose-dives as Saudi Arabia and Russia set off 'scorched earth' price war," *CNBC*, March 9, 2020, 5:33 p.m. ("Oil prices fell through the floor in early trading Monday, tanking as much as 30% after Saudi Arabia slashed its

16

from $41 a barrel to around $30 in a matter of minutes, going on to post its biggest one-day drop since the first Gulf War in 1991."[55]

- March 11, 2020: The World Health Organization ("WHO") declares Covid a pandemic.[56]

- March 19, 2020: California became the first U.S. state to issue a mandatory stay-at-home order for all of its residents.[57]

- April 6, 2020: At this point, 43 U.S. states have imposed stay-at-home orders or other restrictions.[58]

32. News articles published at the end of March 2020 illustrate the extreme impacts that these events had on global oil markets over that month:

> Saudi Arabia launched the offensive at the beginning of the month after Russia, its partner in the so-called Opec+ alliance, refused to join in making deeper cuts to crude production to support prices. **In response, the kingdom has said it will open the taps to demonstrate its power in the market. But the decision was made before it became clear how badly coronavirus would hit global demand**, raising hopes Saudi Arabia can be convinced to alter its stance — even as it remains at odds with Russia over how to respond to the crisis. **One Saudi source familiar with the kingdom's energy policy conceded the collapse in oil demand — now estimated at being between 10 per cent and 25 per cent of the 100m barrel a day global market — had far exceeded their projections in early March, before the start of widespread lockdowns and flight cancellations. The global oil industry is now facing the prospect of running out of storage in a matter of weeks as the most severe demand slump in history coincides with rising supplies.**[59]
>
> **The global oil industry is facing its biggest demand drop in history**, with traders and analysts forecasting crude consumption could fall as much as a quarter

crude prices for buyers. The kingdom is reportedly preparing to open the taps in an apparent retaliation for Russia's unwillingness to cut its own output.").

[55] "After a Long Fall in Oil Prices, a Crash," The Wall Street Journal Online, March 15, 2020, available via Factiva.

[56] "WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020," World Health Organization, March 11, 2020.

[57] "California governor issues statewide order to 'stay at home' as coronavirus cases soar," *CNBC,* March 20, 2020, 9:50 p.m.

[58] "43 states now have stay-at-home orders for coronavirus. These are the 7 that don't," *CBS,* April 6, 2020, 7:30 p.m.

[59] "US puts pressure on Saudi Arabia to end oil price war," Financial Times, March 25, 2020, 5:26 p.m., emphasis added.

17

next month because of widespread lockdowns across the western world as the pandemic spreads. […] **Oil prices have fallen more than half in the past month as widespread lockdowns in Europe and North America have slashed oil demand. While demand has collapsed, the supply of oil has also increased rapidly because of the price war between Saudi Arabia and Russia**. Saudi Arabia on Monday said it planned to raise exports even further, as its own domestic consumption drops during the pandemic.[60]

33.    The chart below shows oil prices throughout the alleged Class Period. As shown in the chart below, oil prices remained substantially below the pre-Covid/pre-oil war levels throughout the Alleged Corrective Disclosure Period (purple dotted line).



Figure 3: Brent Crude Oil Spot Price
July 1, 2018 to November 30, 2020

**Notes and Sources:**
Data from FactSet Research Systems, Inc. and Amended Class Action Complaint filed November 1, 2021.

---

[60] "US crude oil price falls below $20," *Financial Times*, March 30, 2020, 11:16 a.m., emphasis added.

A01617

**B.** **In response to the dramatic and unprecedented drop in oil prices during the Alleged Corrective Disclosure Period, the vast majority of E&P companies drastically reduced their FY 2020 operational plans**

34.     The abrupt and dramatic declines in oil prices at the beginning of the Alleged Corrective Disclosure Period, detailed above, had widespread and immediate consequences on the budgeting and operational decisions of oil and gas companies, particularly E&P companies such as Berry. Given this volatile environment, E&P companies had to focus on preserving capital and protecting their balance sheets.[61]

35.     In response to the dramatic oil price decline, the vast majority of E&P companies in North America announced reductions to their planned operations in 2020.[62] These announcements piled in so quickly that analysts covering the E&P industry increased their coverage substantially in March and April 2020.[63] Several analysts published frequent "tracker" reports to document the companies that were announcing revisions to their previously issued 2020 guidance and capital budgets in response to the unprecedented dramatic decline in the price

---

[61] Wells Fargo analysts state that the most prevalent theme among management teams and investors is "concern over 'protecting the balance sheet' through this commodity downturn" and that "there is a lot of fear from investors that even short term oil prices below $20/bbl WTI will expose the weak spot of the industry with mass bankruptcies." They also highlight how management teams are "clearly committed to protecting their balance sheets," and that this is "validated by the urgency with which almost every operator in our coverage … have cut 2020 budgets rather than trying to defend volumes." Wells Fargo analyst report, April 2, 2020. UBS analysts say this is "an environment where most of the [E&P] group will need to cut capital (and dividends) and muddle through the coming months." UBS analyst report, March 31, 2020. A March 23, 2020 article states that "[o]il and gas companies are among some of the world's biggest and best capitalized businesses now scrambling for cash as the coronavirus continues its spread around the world. Hard hit by the demand-sapping pandemic and rising crude supply from Saudi Arabia, oil majors and shale producers are looking to boost their balance sheets." "Energy Majors Are Hoping For The Best But Preparing For The Worst – Energy Journal," *Dow Jones Institutional News*, March 23, 2020, 9:36 a.m.

[62] I constructed a list of North American E&P companies based on selected April 2020 Oil and Gas Exploration and Production industry reports that mentioned Berry published by five analyst firms (BMO April 5, 2020, RBC April 16, 2020, Wells Fargo April 3, 2020, UBS April 5, 2020, and Piper Sandler April 16, 2020). Four analysts (BMO, RBC, Wells Fargo, and Piper Sandler) provided a list of companies with announced budget cuts. Of the 79 North American E&P companies identified (excluding Berry), 63 revised 2020 planned capital expenditures in either March or April 2020.

[63] Oil and Gas Exploration and Production industry analyst reports that mentioned Berry about doubled in March and April, 2020 compared to typical coverage over 2019. There were on average 45 analyst reports per month in 2019, compared to 105 and 96 in March and April of 2020, respectively. Analysis based on a search for analyst reports available from Refinitiv Eikon, with "Berry" as related keywords in the Oil & Gas Exploration and Production industry. Excludes reports for which Country identifier did not include United States.

19

of oil over the Alleged Corrective Disclosure Period.[64] For example, RBC published weekly reports titled "Global Oil & Gas: Budget & Activity Tracker" that listed companies with corporate budget and production revisions within the past week. Piper Sandler regularly published reports titled "2020 Upstream Budget Revision Tracker" that reported companies' budget revisions and changes in rig counts.

36.     When companies initially announced their changes in operating plans in early March, they faced tremendous uncertainty. Companies' initial announcements generally included plans to reduce capex, but many companies were less specific about how their other operational guidance (including production guidance) would be affected. In particular, with respect to 2020 guidance, many companies only indicated in their initial announcements that their previously issued guidance should no longer be relied upon and that they would wait until their Q1 2020 earnings announcement to provide more details on updated guidance.[65] Furthermore, among the companies that did announce specific revisions to their production and capital expenditures guidance in March, many had to make follow-up announcements weeks later that revised down their operating plans even further.[66]

37.     Below I provide a few examples of these announcements:

> a) Diamondback Energy, Inc. ("Diamondback," Ticker: FANG) announced changes to its plan for 2020 on three occasions in March, at one point stating that "Diamondback's revised 2020 capital budget and

---

[64] See, for example, RBC weekly reports on March 20, March 27, April 2, April 9, April 16, and April 23, 2020; Piper Sandler reports on March 24, 2020. See also, e.g., BMO reports on March 23, March 27, and April 5, 2020, which were weekly trackers of capex cuts by US E&P companies.

[65] See, for example, "Centennial Resource Development Provides Update to 2020 Capital Program," *Globe Newswire*, March 19, 2020, 4:05 p.m., "QEP Resources Provides Operational and Financial Update," *Dow Jones Institutional News*, March 12, 2020, 8:00 a.m., "Whiting Petroleum Corporation Prioritizes Cash Flow and Announces $185 Million Reduction to 2020 Capital Budget," *Business Wire*, March 16, 2020, 6:59 a.m., "Callon Reduces 2020 Capital Program by Over 25% and Provides Operational and Hedging Updates," *PR Newswire*, March 17, 2020, 7:00 a.m., and "Callon Petroleum Company Announces First Quarter 2020 Results," *PR Newswire*, May 11, 2020, 6:00 a.m.

[66] See, for example, "Murphy Oil Corporation Announces 35 Percent Capital Expenditure Reduction for 2020," *Business Wire*, March 12, 2020, 7:55 a.m. and "Murphy Oil Corporation Announces Additional Cost Savings Initiatives," *Business Wire*, April 1, 2020, 5:04 p.m., "Cimarex Announces Reduction in 2020 Capital Plans," *PR Newswire*, March 17, 2020, 6:17 p.m. and "Cimarex Announces Further Reduction to 2020 Capital Plans; Curtails 30% of May Volumes," *PR Newswire*, April 15, 2020, 4:21 p.m., "Cenovus responds to low oil prices with reduced 2020 capital spending," *Globe Newswire*, March 10, 2020, 12:50 a.m. and "Cenovus Energy Provides Corporate Update," *Globe Newswire*, April 2, 2020, 6:00 a.m.

A01619

operating plan reflects the swift changes we have made in short order as our industry deals with a market that is changing daily due to an unprecedented global demand shock."[67] On March 9, 2020, Diamondback announced that it was "reducing activity immediately from nine completion crews to six and expects to drop two drilling rigs in April 2020 and a third later in the second quarter of 2020" and would reduce its capital budget for the year as a result of the "recent and expected oil price weakness."[68] On March 19, 2020, Diamondback announced that their stated reductions in activity were "expected to reduce its capital budget for 2020 by $1.2 billion at the midpoint to $1.5 - $1.9 billion from its previously announced $2.8 - $3.0 billion capital budget," or a 41% decrease, and that the company "expects production to decline from the first quarter of 2020 through the end of the year."[69] A later announcement on March 31, 2020 specified their revised 2020 plans.[70]

b) On March 11, 2020, PDC Energy, Inc. ("PDC," Ticker: PDCE) announced that the company "expects to reduce its full-year capital investments by 20 to 25 percent" compared to its original guidance, would not be deploying a second drilling rig in the Delaware Basin as originally planned, and that activity during the second quarter in the Wattenburg Field would be reduced from three drilling rigs to two drilling rigs. PDC stated that these actions were taken in response to the "current and expected price weakness to prioritize our balance sheet and liquidity."[71] Nearly a month later, the company announced

---

[67] "Diamondback Energy, Inc. Provides Revised 2020 Guidance and Updated Hedge Positions," *Globe Newswire*, March 31, 2020, 6:00 a.m.

[68] "Diamondback Energy, Inc. Provides Operational Update" *Globe Newswire*, March 9,2020, 6:30 a.m.

[69] "Diamondback Provides Supplemental Operational Update," *Globe Newswire*, March 19, 2020, 6:00 a.m.

[70] "Diamondback Energy, Inc. Provides Revised 2020 Guidance and Updated Hedge Positions," *Globe Newswire*, March 31, 2020, 6:00 a.m.

[71] "PDC Energy Announces Update to 2020 Operating Plan," *Globe Newswire*, March 11, 2020, 5:33 p.m.

A01620

that its planned 2020 capital budget would be reduced further, to a nearly 50% reduction compared to original 2020 plans.[72]

c) On March 11, 2020, Matador Resources Company ("Matador," Ticker: MTDR) announced several actions it expected to take over the next several months "to reduce its capital spending and protect its balance sheet" and "position [the company] for the long run," including reducing its operated drilling program in half, from six rigs to three rigs, before June 30, 2020.[73]

d) On March 19, 2020, Centennial Resource Development, Inc. ("Centennial," Ticker: CDEV) announced that it had decided to cut its 2020 capital expenditures budget by approximately 50% compared to the guidance it had provided in late February 2020 as "a result of the recent decline in crude oil prices and ongoing uncertainty regarding the oil supply-demand macro environment."[74]

e) On March 19, 2020, Continental Resources, Inc. ("Continental," Ticker: CLR) announced a 55% decrease in its 2020 capital budget and reduced their average rig count in Oklahoma and the Bakken by about 64% as a way to "implement cost saving initiative across its operations."[75] With this revised budget, they expected that 2020 production would be down less than 5% year-over-year, though the company planned to "provide additional details surrounding its 2020

---

[72] "PDC Energy Announces Supplementary Update to 2020 Plan Including Reduced Operating Activity and Incremental Cost Saving Initiatives," *Globe Newswire*, April 14, 2020, 11:00 a.m.

[73] Specifically, Matador announced plans to "release one of its six operated rigs by the end of March 2020 and expects to release two of its remaining five rigs before the end of the second quarter of 2020, after which Matador expects to operate three rigs for the remainder of the year." "Matador Resources Company Provides Update on 2020 Operational Plan," *Business Wire*, March 11, 2020, 6:00 a.m.

[74] "Centennial Resource Development Provides Update to 2020 Capital Program," *Globe Newswire*, March 19, 2020, 4:05 p.m.

[75] "The Company will be reducing its average rig count from 9 to approximately 3 in the Bakken and 10.5 to approximately 4 in Oklahoma. The Company has taken action to implement cost saving initiatives across its operations as part of its ongoing commitment to remain free cash flow positive." "Continental Resources Announces Revised 2020 Capital Budget of $1.2 Billion And Provides Operational Update," *PR Newswire*, March 19, 2020, 6:30 a.m.

A01621

guidance updates as part of its first quarter 2020 earnings release."[76] On April 7, 2020, Continental released another announcement discussing how they would be "reducing [the company's] production for April and May 2020 in a similar range" as their estimated 30% decline in "global crude oil and product demand."[77]

f)  On March 23, 2020, in response to "substantial decrease in oil and natural gas prices," Laredo Petroleum, Inc. ("Laredo," Ticker: LPI) announced a 36% reduction in its 2020 capital budget and an 8% reduction in 2020 oil production compared to 2019.[78] Laredo also noted that it "plans to release additional details on full-year 2020 operational plans in association with its first-quarter 2020 earnings release. Guidance issued on February 26, 2020 should no longer be relied upon."[79]

g)  On March 17, 2020, Callon Petroleum ("Callon," Ticker: CPE) announced that the company would be reducing its 2020 capital budget by nearly 27% and cutting its current operated rig count of nine to five before the end of the second quarter of 2020. With these changes, Callon stated that it would experience "relatively flat year-over-year production growth versus the predecessor companies' combined 2019 production volumes." These actions were taken in response to "recent changes in the macroeconomic outlook."[80]

---

[76] "Continental Resources Announces Revised 2020 Capital Budget of $1.2 Billion and Provides Operational Update," *PR Newswire*, March 19, 2020, 6:30 a.m.

[77] "Continental Resources Announces Suspension of Quarterly Dividend and Production Update," *PR Newswire*, April 7, 2020, 6:30 a.m.

[78] "Laredo Petroleum Announces 2020 Capital Budget Reduction of 36% and Provides Operational and Hedging Updates," *Globe Newswire*, March 23, 2020, 4:15 p.m.

[79] "Laredo Petroleum Announces 2020 Capital Budget Reduction of 36% and Provides Operational and Hedging Updates," *Globe Newswire*, March 23, 2020, 4:15 p.m.

[80] "Callon Reduces 2020 Capital Program by Over 25% and Provides Operational and Hedging Updates," *PR Newswire*, March 17, 2020, 7:00 a.m.

23

h) On March 12, 2020, given "current market conditions and recent commodity price volatility," Murphy Oil Corporation ("Murphy": Ticker: MUR) announced its plans to reduce its 2020 capital budget by nearly 35% and release operated rigs and frac crews.[81] On April 1, 2020, Murphy announced a further reduction of 2020 capital expenditures, bringing the total reduction to 46% from the original 2020 guidance.[82]

### C. Due to the dramatic and unprecedented drop in oil prices during the Alleged Corrective Disclosure Period, many E&P companies went bankrupt

38.     As the price of oil dropped in early 2020, several publications warned that this could spur bankruptcy filings across the oil industry. For example, a news article published on March 11, 2020 states that "sustained pricing below US$40 a barrel raises the potential of bankruptcies for over-leveraged, or debt-ridden, companies. A large number of shale oil producers fall under that category."[83] Another news article on March 11, 2020 quotes an industry expert stating that the low oil prices were expected to bankrupt thirty to fifty oil and gas producers.[84] On April 2, 2020, a Wells Fargo analyst wrote that even low oil prices in the short term would "expose the weak spot of the industry with mass bankruptcies."[85]

39.     Starting from April 2020, many companies indeed went bankrupt. On April 30, Whiting Petroleum, a small cap oil E&P company similar to Berry, became "the first high profile Chapter 11 filing of the current crisis."[86] On July 15, 2020, California Resources Corporation, a

---

[81] "Murphy Oil Corporation Announces a 35 Percent Capital Expenditure Reduction for 2020," *Business Wire*, March 12, 2020, 7:55 a.m.

[82] "Murphy Oil Corporation Announces Additional Cost Savings Initiatives," *Business Wire*, April 1, 2020, 5:04 p.m.

[83] "Oil Price War Raises Risk of Defaults, Shutdowns in Industry," *The Strait Times*, March 11, 2020.

[84] Wheeler, Everett, "Oil Price Crash Could Spur M&A, Bankruptcies in US Shale Oil Patch," *SNL Energy Finance Daily*, March 11, 2020.

[85] "U.S. E&Ps: Surfing In A Hurricane," Wells Fargo analyst report, April 2, 2020.

[86] Egan, Matt, "The Oil Bankruptcies Are Just Beginning. Here's Who Could Be Next," *CNN Wire*, April 30, 2020. Both Berry and Whiting Petroleum (Ticker: WLL) were listed as small and midcap ("SMID") oil companies in "U.S. E&Ps: Surfing In A Hurricane," Wells Fargo analyst report, April 2, 2020.

24

California-based E&P company that was once regarded as Berry's closest peers, filed for bankruptcy.[87]

40.    Many companies that filed for bankruptcy explicitly cited low oil prices as a reason for their bankruptcy filing:

a)  On April 15, 2020, Yuma Energy, Inc. filed for bankruptcy. Their former CEO cited oil prices as a reason for their restructuring and said, "Our revenues and cash position have eroded to the point of unsustainability primarily driven by the severe downturn in oil prices."[88]

b)  On April 26, 2020, Diamond Offshore Drilling filed for bankruptcy. They specifically cited the "price war" between Saudi Arabia and Russia and challenges arising from Covid as driving oil prices down and thus contributing to the company's bankruptcy.[89]

c)  On May 14, 2020, Ultra Petroleum Corp. filed for bankruptcy and their CEO commented that a debt restructuring was the best solution to navigate the "challenging low commodity price environment."[90]

d)  On May 22, 2020, Unit Corporation filed for bankruptcy and their CEO stated that they faced challenges due to the "severe downturn in commodity prices, which has only worsened with the COVID-19 pandemic."[91]

e)  On June 29, 2020, Lilis Energy filed for bankruptcy and its CEO cited the "severe downturn in commodity prices" as the reason.[92]

---

[87] According to Evercore analyst report on Berry dated August 23, 2018, "the closest public comp to BRY is California Resources Corporation (CRC)." For California Resources Corporation's bankruptcy filing, see "California Resources Corporation Agrees on Comprehensive Balance Sheet Restructuring with Key Creditors," *Business Wire*, July 15, 2020, 9:18 p.m.

[88] "Yuma Energy, Inc. Files for Chapter 11 Protection," *PRNewswire*, April 15, 2020, 8:34 p.m.

[89] Diamond Offshore Drilling, Inc. Form 10-Q, dated June 30, 2020, filed on August 3, 2020, pp. 10-11.

[90] "Ultra Petroleum Corp. Signs Restructuring Support Agreement for Comprehensive Balance Sheet Restructuring… ," *Globe Newswire*, May 14, 2020, 8:59 p.m.

[91] "Unit Corporation Voluntarily Files Chapter 11 Cases to Restructure Balance Sheet," *Business Wire*, May 22, 2020, 8:32 p.m.

[92] "Lilis Energy Voluntarily Files for Chapter 11 Bankruptcy; New Director Appointed," *Globe Newswire*, June 29, 2022, 7:00 a.m.

A01624

f) On July 15, 2020, California Resources Corporation filed for bankruptcy due to "unprecedented market conditions, including oversupply and reduced demand due to COVID-19."[93]

g) On September 30, 2020, Oasis Petroleum Inc. announced that they filed for bankruptcy, and stated that the "severe downturn in oil and gas prices, as well as the unprecedented impact of the COVID-19 pandemic" forced the company to restructure.[94]

## IX. THERE IS NO LINK BETWEEN BERRY'S STOCK PRICE AND THE ALLEGED MISREPRESENTATIONS DURING THE ALLEGED CORRECTIVE DISCLOSURE PERIOD BECAUSE IT WAS A PERIOD OF UNPRECEDENTED EVENTS DURING WHICH BERRY'S PRODUCTION AND CAPEX REDUCTIONS WERE EXPECTED AND WERE VIEWED *POSITIVELY* BY THE MARKET

41. As will be discussed below, there is no link between Berry's stock price and the alleged misrepresentations during the Alleged Corrective Disclosure Period. The alleged corrective disclosures did not disclose to the market any permitting issues for Berry and none of the analysts attributed Berry's reduced production and capital expenditures to permitting delays or any other problem related to permitting. Moreover, even the announced reductions in production and capex on the alleged corrective disclosure days, which Plaintiffs allege were caused by permitting issues, did not impact Berry's stock price during the Alleged Corrective Disclosure Period since those measures were not only expected, but actually perceived as positive, due to the unprecedented market conditions, thus severing the link between Berry's stock price and the alleged misrepresentations. In fact, after the end of the alleged Class Period, analysts concluded that Berry was able to "largely side-step" the oil price collapse "via effective risk management."[95]

---

[93] "California Resources Corporation Agrees on Comprehensive Balance Sheet Restructuring with Key Creditors," *Business Wire*, July 15, 2020, 9:18 p.m.

[94] "Oasis Petroleum Takes Action to Strengthen Balance Sheet with the Support of its Lenders and an Ad Hoc Committee of Noteholders," *PR Newswire*, September 30, 2020, 1:17 a.m.

[95] Wells Fargo analyst report, dated February 23, 2021.

26

A01625

**A.    The alleged corrective disclosures did not disclose any permitting issues for Berry – the basis of the actual alleged misrepresentations**

42.    The alleged corrective disclosures did not disclose any permitting issues for Berry, which are the basis of Plaintiffs' alleged misrepresentations. Specifically, Plaintiffs contend that Berry had made misleading statements regarding the Company's permitting process and that Berry's failure to obtain timely permits was due to 1) "the failure to plan sufficient lead time to secure UIC Permits, which take several years to obtain"; 2) "the Company's repeated submission of faulty data in application packages, leading to denial by local regulators"; 3) "Grove's [Berry's COO] decision to flout regulations that required producers to obtain UIC Permits for cyclic steam wells"; and 4) "incorrect well plans that caused a mismatch between the actual location of the wells and the location of the corresponding permit."[96]

43.    However, none of the alleged corrective disclosures provided the market with information about permitting delays that Berry allegedly omitted, nor did the market learn about any of the alleged issues at Berry that allegedly caused permitting delays. The alleged corrective disclosures did not contain information regarding Berry's alleged failure to plan sufficient lead time, alleged submission of faulty data, alleged decision to flout regulations, or allegedly incorrect well plans. Further, during the Alleged Corrective Disclosure Period, none of the analysts following Berry attributed Berry's reduced production and capital expenditures to permitting delays or any other problem related to permitting.

**B.    Reducing production and capex (which Plaintiffs allege was caused by permitting issues) did not impact Berry's stock price during the Alleged Corrective Disclosure Period as those measures were expected given the extraordinary market conditions**

44.    Even though the alleged corrective disclosures did not disclose to the market any permitting delays that Berry was allegedly having, Plaintiffs claim that these allegedly corrective disclosures were nonetheless corrective of the alleged misrepresentations because Berry disclosed lower production and capex. According to Plaintiffs' theory, Berry's reduced guidance for 2020 production and capex announced on April 1, 2020, the first alleged corrective disclosure, and Berry's quarter to quarter production declines announced in August and

---

[96] Amended Complaint, ¶4.

A01626

November on the latter two alleged corrective disclosure dates were due to Berry's permitting issues.[97] However, during the Alleged Corrective Disclosure Period, Berry's reduction in production and capital expenditures did not negatively impact the Company's stock price, thus severing the link between Berry's stock price and the alleged misrepresentations.

45.    As discussed in Section VIII, during the Alleged Corrective Disclosure Period, the demand for oil plummeted due to Covid while oil supply increased due to a price war between Saudi Arabia and Russia. These unprecedented events created a huge imbalance between demand and supply and sent "crude oil prices to historic low levels."[98] In response, E&P companies in North America drastically reduced their planned FY 2020 capital expenditures and/or production, and many companies even went bankrupt.

### C.    Reducing production and capex was viewed *positively* by the market during the Alleged Corrective Disclosure Period

46.    In light of the unprecedented market conditions, analysts covering E&P companies, including analysts covering Berry, viewed production curtailment and capital expenditures reduction positively. For example, commenting specifically on Berry's revised guidance, UBS analysts explicitly stated that they viewed the announcement as "proactive" and "constructive":

> Berry took the **proactive** steps today to defend its balance sheet and secure additional liquidity by suspending its dividend (post April) and reducing capex. Additionally, BRY layered in additional hedges. **We view this constructively.** [UBS, 4/2/2020, emphasis added]

47.    Similarly, Evercore commented that the new guidance showed that Berry is uniquely positioned to reduce capital expenditures "without a significant degradation" of production:

> The more recent re-set in oil prices (waterborne crudes have fared better than landlocked) has proven a new challenge for BRY. […] BRY enjoys a significant hedge position […] and **uniquely is positioned to significantly reduce capital outlays […] without a significant degradation of anticipated 2020 production […].** Unique amongst peers, BRY has ~40% of 2021e anticipated production

---

[97] Amended Complaint, ¶43, and Memo in Support of Class Cert, pp. 5-6.

[98] Holst, Thomas, "COVID-19's Impacts on Utah's Oil & Gas Industry," Kem C. Gardner, Policy Institute – The University of Utah, David Eccles School of Business, January 2021.

28

A01627

hedged as well which should buffer some of the uncertainties surrounding 2021 as the year progresses. While the business cannot be starved or capital forever, **this does show the flexibility of the business model and ability to withstand a 12-18 month period of below mid-cycle oil prices.** [Evercore, 4/1/2020, emphasis added]

48.    Analysts covering other E&P companies that announced capex and/or production reductions also commented positively on those measures. For example, the SunTrust analyst covering Centennial Resource Development, an independent oil producer focused in the Delaware Basin, questioned the company's decision to "continue drilling at all" after the company announced that it would reduce its drilling activity from five rigs to one rig:

> While we believe reducing activity is the necessary measure to take, **we question the decision to continue drilling at all in the current commodity price environment**, though understanding the challenge CDEV faces in balancing its leverage with a likely declining production base. [SunTrust report on Centennial, 3/19/2020, emphasis added]

In contrast, companies that announced "quicker/deeper" measures than anticipated received positive comments from analysts:

> **Impact: Positive** - The measures are quicker/deeper than anticipated. Management is clearly focused on the viability and sustainability of its company. [RBC report on Matador, 3/11/2020, emphasis added]

See Section X.A.3 for further examples.

49.    In sum, during the Alleged Corrective Disclosure Period, reductions in production and capex were not only not viewed as news that could negatively impact a company's stock price, but rather were viewed as positive and necessary actions that companies would need to take to protect their balance sheet and liquidity given the dramatically lower oil prices. As such, during the Alleged Corrective Disclosure Period, Berry's announcement of lower production and capital expenditures guidance and Berry's quarter-to-quarter decline in oil production did not negatively impact Berry's stock price, thus severing any link between Berry's stock price and the alleged misrepresentations.

A01628

**D.    After the alleged Class Period, analysts concluded that Berry had been able to "largely side-step an oil price collapse via effective risk management"**

50.    On February 23, 2021, Berry announced full year 2020 results that were in line with Berry's April 1, 2020 guidance and announced the reinstatement of its quarterly dividend.[99] Berry's full year 2020 capital expenditures totaled $69 million, *above* Berry's April 1, 2020 guidance of $65 million, while Berry's 2020 total production declined 2% year over year, also in line with Berry's guidance of "flat to down 2%."[100] Moreover, within California, the region that is the focus of Plaintiffs' claim,[101] Berry actually achieved a 1% year over year increase in production. [102] Berry's 2% year over year decline was due to the "the natural decline of [the Company's] Rockies properties in the absence of development activity."[103] Plaintiffs do not allege that Berry had permitting problems relating to its Rockies properties.

51.    The Wells Fargo analysts covering Berry commented positively on Berry's full year 2020 results and Berry's reinstatement of quarterly dividends:

> **Bottom Line - Slight Positive on Dividend Reinstatement**. 4Q20 capped off a year where BRY was able to largely side-step an oil price collapse via effective risk management. During 2020, the company reaped the benefit of ~$142mm of cash flow augmenting hedge settlements, including ~$35mm in 4Q20 which drove post-hedge realized pricing of ~$56/bbl. [Wells Fargo, 2/23/2021, emphasis original]

---

[99] "Berry Corporation (BRY) Reports Fourth Quarter and Full-Year 2020 Results; Reinstates Quarterly Dividend," *Globe Newswire*, February 23, 2021, 6:16 p.m.; and "Berry Corporation (BRY) Adjusts 2020 Plans; Heightened Focus on Building Cash in 2020 and Ensuring Flexibility Through 2021," *Globe Newswire*, April 1, 2020, 9:27 a.m.

[100] "Berry Corporation (BRY) Reports Fourth Quarter and Full-Year 2020 Results; Reinstates Quarterly Dividend," *Globe Newswire*, February 23, 2021, 6:16 p.m.; and "Berry Corporation (BRY) Adjusts 2020 Plans; Heightened Focus on Building Cash in 2020 and Ensuring Flexibility Through 2021," *Globe Newswire*, April 1, 2020, 9:27 a.m.

[101] "Background" section and the "The Regulatory Landscape for Permits" section of the Amended Complaint focused their discussions on Berry's operations and the permitting environment in California. According to Plaintiffs, California is "where virtually all of the Company's asset base is located" and "is one of the most regulated states in the United States." Amended Complaint, ¶29.

[102] "Berry Corporation (BRY) Reports Fourth Quarter and Full-Year 2020 Results; Reinstates Quarterly Dividend," *Globe Newswire*, February 23, 2021, 6:16 p.m.

[103] "Berry Corporation (BRY) Reports Fourth Quarter and Full-Year 2020 Results; Reinstates Quarterly Dividend," *Globe Newswire*, February 23, 2021, 6:16 p.m.

30

**X.    A DETAILED ANALYSIS OF EACH ALLEGED CORRECTIVE DISCLOSURE CONFIRMS THAT THERE WAS NO PRICE IMPACT AND NO LINK BETWEEN BERRY'S STOCK PRICE AND THE ALLEGED MISREPRESENTATIONS DURING THE ALLEGED CORRECTIVE DISCLOSURE PERIOD**

**A.    April 1, 2020 – Berry's announcement of reduced production and capital expenditures guidance on the first alleged corrective disclosure date did not impact Berry's stock price**

52.    On April 1, 2020, after the oil price war and Covid had taken its toll on oil prices, Berry issued a press release that revised its prior 2020 plans "in response to current market conditions." According to Berry, the revised plan put "heightened focus on building cash in 2020 and ensuring flexibility through 2021."[104] The changes that Berry announced included the temporary suspension of its quarterly dividend and reductions to its 2020 production and capital expenditures guidance. Specifically, Berry revised its 2020 production guidance to be "flat to down 2% from 2019," representing approximately a 7.4% decline in the mid-point compared to the prior guidance given on February 27, 2020. [105] The downward revision in 2020 capital expenditures guidance was approximately 50% ($65 million versus prior guidance of $125-$145 million).

53.    Plaintiffs claim that Berry's announcement of revised guidance was corrective of the alleged misrepresentations because the revision was allegedly caused by Berry's "chronic failure to secure permits." However, as will be shown below, even assuming liability and assuming Plaintiffs' claim with regard to the cause of guidance revision is true, market evidence and analyst commentary following the April 1, 2020 allegedly corrective disclosure shows that there was no link between Berry's stock price and the alleged misrepresentations during the Alleged Corrective Disclosure Period.

---

[104] "Berry Corporation (BRY) Adjusts 2020 Plans; Heightened Focus on Building Cash in 2020 and Ensuring Flexibility Through 2021," *Globe Newswire*, April 1, 2020, 9:27 a.m.

[105] The production guidance range provided on February 27, 2020 was 29.5-32.5 Mboe/d (mid-point of 31 Mboe/d), whereas the new guidance range was 28.42-29.0 Mboe/d (mid-point of 28.71 Mboe/d). "Berry Corporation (BRY) Adjusts 2020 Plans; Heightened Focus on Building Cash in 2020 and Ensuring Flexibility Through 2021," *Globe Newswire*, April 1, 2020, 9:27 a.m.

A01630

#### 1. There was no statistically significant price reaction following the April 1, 2020 alleged corrective disclosure

54.     I tested Berry's stock price reaction on April 1, 2020 using a simple adjustment to the event study methodology put forward by Dr. Cain and an alternative event study methodology and found it was not statistically significant using both methodologies.

##### a. According to Plaintiffs' expert's model and his claim of increased volatility due to Covid, there is no statistically significant reaction to this alleged corrective disclosure

55.     I tested Berry's stock price reaction on April 1, 2020, implementing a simple adjustment to the event study methodology put forward by Dr. Cain, to make it more consistent with his own findings that volatility in March 2020 increased significantly, and found it was <u>not</u> statistically significant.

56.     Dr. Cain uses an event study methodology in his analysis of whether Berry stock was trading in an efficient market, specifically to test whether Berry stock was responding to news on quarterly earnings announcements dates. Dr. Cain uses a rolling control period of 60 trading days prior to each day in the alleged Class Period to test whether the movement of Berry's stock price, after controlling for market and industry movements, was within the range of normal expected daily variation.[106] Dr. Cain's event study methodology uses the S&P 1500 Composite Total Return Index to control for market movements and the Dow Jones U.S. Exploration and Production Index to control for industry movements.[107] Dr. Cain's model results in a negative relationship between Berry and the market on multiple days.[108]

57.     Dr. Cain did not specifically examine the price reaction on April 1, 2020 in his report as it was not a quarterly announcement date,[109] although the results of his methodology using a rolling control period of 60 trading days on this date are in his backup calculations. However, as discussed above, during the 60-day period before Berry's April 1, 2020

---

[106] Cain Report, ¶52 and Dr. Cain's backup ("CAIN_0000926 fixed_rolling_reg_results_60days_2023-02-13.xlsx").

[107] Cain Report, ¶52.

[108] Dr. Cain's backup ("CAIN_0000926 fixed_rolling_reg_results_60days_2023-02-13.xlsx"). Cain's model covers 574 trading days from the IPO on July 26, 2018 to the end of the alleged Class Period on November 3, 2020. Of these, the models for 349 of these days have negative market index coefficients.

[109] Dr. Cain defined news as days of earnings announcement in his tests for purposes of assessing market efficiency.

32

announcement (*i.e.,* from January 6, 2020 to March 31, 2020), there was a dramatic shift in the stock market, which Dr. Cain himself recognizes. In particular, Dr. Cain states that a short control period needs to be used "for event studies that cover periods including March 2020, due to the abrupt, widespread, and significant increase in return volatility caused by information about the COVID pandemic." [110] However, for the alleged corrective disclosure on April 1, 2020 the majority of Dr. Cain's 60-day control period would include time periods *before* the dramatic increase in volatility in Berry's stock price and the market in general. Thus, Dr. Cain's event study model (as is) does not control for the high volatility of Berry's stock price when the April 1, 2020 alleged corrective disclosure was made. The chart below shows the daily absolute returns of Berry's stock price, along with the averages during different time periods, including the control period used by Dr. Cain.



Figure 4: Absolute Value Daily Returns of Berry
January 2, 2020 to April 30, 2020

**Notes and Sources:**
Data from Bloomberg, L.P. Average from March to April 2020 excludes April 1, 2020 return as that is an alleged corrective disclosure.

---

[110] Cain Report, footnote 48.

A01632

58.     As the chart shows, in the first two months of 2020, which overlap with the majority of Dr. Cain's 60-day control period, fluctuations in Berry's stock price were nowhere near the elevated levels in March and April 2020 when the alleged corrective disclosure was made. In fact, during Dr. Cain's control period, the average of the absolute value of Berry's returns was approximately 5%, while the average of the absolute value of Berry's returns was approximately 8% from March to April 2020 and *10%*, almost double, during March 2020.

59.     Moreover, the chart below shows the volatility of Berry's returns and Dr. Cain's industry index, the Dow Jones U.S. Exploration and Production Index, during Dr. Cain's control period, during March 2020, and from March to April 2020.[111] As demonstrated below, the volatility in Berry's stock price was substantially lower during Dr. Cain's control period than it was around the alleged corrective disclosure on April 1, 2020.

---

[111] The standard deviation of a stock price's returns is a common way to measure stock price volatility. Standard deviation is a measure of how much a set of numbers varies from their average; the higher the standard deviation relative to the average, the higher the variation. See, for example, Richard A. Brealey, Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, NY, 10th ed., 2011), Ch. 7 and Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), Section III.E.

A01633



**Figure 5: Volatility of Berry and Dow Jones US Exploration and Production Index**

Notes and Sources:
Data from Bloomberg, L.P. Standard deviation from March to April 2020 excludes April 1, 2020 return as that is an alleged corrective disclosure.

60.      Simply adjusting Dr. Cain's event study methodology to be consistent with his own findings about volatility in March 2020 by using a control period that starts in March 2020 (*i.e.*, a control period with volatility closer to the level around the alleged corrective disclosure) results in no statistically significant reaction on April 1, 2020 at the 5% significance level. The lack of an observable statistically significant price reaction is considered by academics,[112] as well as courts,[113] as providing evidence of no price impact.

---

[112] See, for example, the study in the *International Journal of Economics and Finance* which concludes there is no impact from an event given the lack of a statistically significant reaction: "On the announcement day (day zero), the abnormal return for the bank sector is -0.066% and for both the service and industrial sector is -0.293% and -0.368% respectively, with no significant impact as the t-statistics accept the null hypothesis that the downgrading event has no impact." See, Abdeldayem, Marwan M. and Ramzi Nekhili, "Credit Rating Changes and Stock Market Reaction in the Kingdom of Bahrain," *International Journal of Economics and Finance*, 8(8):2016, pp. 23-32. See, also, Fisher, Franklin M., "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80(4): 1980.

[113] See, for example, Erica P. John Fund, Inc. v. Halliburton Company, No. 3: 02-CV-1152-M (N.D. Tex. July 25, 2015, ("To show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard […] Coffman found an intraday statistically significant price reaction on Day 1 only at a 90% confidence level, which is less than the 95% confidence level both experts require in their regression analyses and which the Court finds is

### b. Using an alternative event study model similarly shows that there was no statistically significant price reaction

61.     An alternative event study methodology uses a custom index of oil-focused small-cap E&P companies (the "Custom E&P Index") to control for market and industry movements.[114] Specifically, the Custom E&P Index includes a total of 18 E&P companies that analysts compare Berry to in their reports and includes only companies with a market capitalization smaller than $2 billion and with oil making up over 50% of their total production. To better account for the heightened volatility around the alleged corrective disclosure, this methodology uses a control period from March to April 2020 (excluding April 1, 2020). In addition, this model is different from Dr. Cain's in that it does not result in a negative relationship between Berry and the index used. This alternative event study also yields no statistically significant reaction on April 1, 2020 at either the 5% level or the 10% level.[115]

### 2. Berry's production and capex reduction was in line with those announced by other E&P companies

62.     Berry's revised guidance announced on April 1, 2020 cut its capital expenditures guidance by approximately 50% while cutting its production guidance by approximately 7%. The magnitude of the cuts were in line with those announced earlier by other E&P companies. The table below, which is directly from one of the analysts following the E&P industry at the time, shows the magnitude of production and capital expenditure cuts of E&P companies including Berry, based on a Wells Fargo analyst report issued on April 2, 2020, the day after

---

necessary. [...] In contrast, with and without a multiple comparison adjustment, Allen found no price impact on December 21, 2000. The Court agrees with Halliburton that there was no price impact on December 21, 2000, and finds that Defendants have rebutted the *Basic* presumption as to the allegedly corrective disclosure made on that date.")

[114] The custom index is an equal-weighted index made up of 18 small-cap, oil-focused North American E&P companies. I constructed a list of North American E&P companies based on selected April 2020 Oil and Gas Exploration and Production industry reports that mentioned Berry published by five analyst firms (BMO April 5, 2020, RBC April 16, 2020, Wells Fargo April 3, 2020, UBS April 5, 2020, and Piper Sandler April 16, 2020). I limited the 79 North American E&P companies identified (excluding Berry) by including those with a market capitalization on March 31, 2020 of less than $2 billion and over 50% of their FY 2020 production in oil. This resulted in 18 companies: Athabasca Oil Corporation, Battalion Oil Corporation, Bonanza Creek Energy, Inc. (now known as Civitas Resources, Inc.), Callon Petroleum Company, Centennial Resources Development, Inc. (now known as Permian Resources Corporation), Crescent Point Energy Corp., Cardinal Energy Ltd., Earthstone Energy, Inc., Enerplus Corporation, Magnolia Oil & Gas Corp., Matador Resources Company, Murphy Oil Corporation, Northern Oil and Gas, Inc., Penn Virginia Corp (now known as Ranger Oil Corporation), Ring Energy, Inc., Talos Energy, Inc., Tamarack Valley Energy Ltd., and Whitecap Resources Inc..

[115] For details, see Appendix B.

A01635

Berry's announcement. The top panel of the table shows the cuts announced by large cap U.S. E&P companies while the lower panel, which includes Berry, shows the cuts announced by small-cap and mid-cap companies. As the table shows, the capital expenditure cuts by small-cap and mid-cap companies averaged 42%. Among them, Centennial (Ticker: CDEV) cut its capital expenditures by 50% and Earthstone Energy (Ticker: ESTE) cut its capital expenditures by 67%. With regard to production, Berry's 7% cut was also in line with the average of the small-cap and mid-cap E&P companies. While large cap companies on average cut their capital expenditures and productions by a smaller percentage, Continental Resources announced a 55% cut in capital expenditures and a 10% cut in total production.

A01636

**Figure 6: U.S. E&P's Changes in Guidance
for Capex and Oil Production
as of April 2, 2020**

| Company Ticker | % Change in Guidance[1] | | |
| --- | --- | --- | --- |
| | Capex | Oil Production | Total Production |
| (1) | (2) | (3) | (4) |
| AR | -13% | | 0% |
| CLR | -55% | | -10% |
| CXO | -26% | | |
| DVN | -44% | | |
| EOG | -31% | -10% | |
| EQT | -6% | | 0% |
| FANG | -41% | -10% | -5% |
| MGY | -42% | | |
| MRO | -21% | | |
| NBL | -32% | | |
| PE | -41% | | |
| PXD | -43% | | |
| WPX | -23% | -6% | |
| XEC | -45% | | |
| **Average (Large Cap)** | **-33%** | **-9%** | **-4%** |
| BRY | -52% | | -7% |
| CDEV | -50% | | |
| ESTE | -67% | -14% | -11% |
| LPI | -36% | -12% | -6% |
| MTDR | -34% | | |
| PDCE | -22% | -9% | -5% |
| WLL | -31% | | |
| **Average (Small & Mid-Cap)** | **-42%** | **-11%** | **-7%** |

**Notes and Sources:**
Table from April 2, 2020, Wells Fargo analyst report "U.S. E&Ps: Surfing In A Hurricane."
[1] % change compared to original guidance (at midpoint), which appears to refer to guidance pre-Covid.

63.    Moreover, the comparison above likely underestimates the magnitude of the reduction contemplated by other E&P companies, since even though Berry eventually executed on the plan announced on April 1, 2020, many companies announced follow-up revisions that further reduced their budget and production levels in April and May. For example,

a)  Noble Energy, Inc. ("Noble," Ticker: NBL) announced on March 17, 2020 that the company would be reducing its 2020 capital budget nearly by 30%.

38

A01637

One month later, the company announced further cuts to its 2020 capital budget, representing a total 50% reduction in planned 2020 capital budget.[116]

b) Cimarex Energy Co. ("Cimarex," Ticker: XEC) announced on March 17, 2020 that the company would be reducing its 2020 capital budget by 45%, but later announced on April 15, 2020 that capital expenditures for 2020 would be reduced further to an overall 55% reduction from original guidance and that production volumes for May would be curtailed by approximately 30%.[117]

c) PDC announced on March 11, 2020 that the company would reduce planned 2020 capital expenditures by 20-25% compared to original guidance and would reduce rig counts.[118] Nearly a month later, the company announced that its planned 2020 capital budget would be reduced further, to a nearly 50% reduction compared to original 2020 plans.[119]

64.    In sum, the magnitudes of the capital expenditure and production cuts that Berry announced on April 1, 2020 were in line with those announced by other E&P companies. Given the market conditions and the announcements by other E&P companies, it is not surprising the UBS analyst covering Berry commented that Berry's revised guidance "should have been expected"[120] and that it was considered positive.

**3.    Not one analyst expressed surprise at Berry's April 1 announcement of lower production and capex guidance; most analysts did not even issue reports on the announcement while those that did assessed the decline in production and capex as *positive***

65.    A review of analyst commentary following Berry's announcement of revised guidance provides direct evidence of no link between Berry's stock price and the alleged

---

[116] "Noble Energy Reduces 2020 Expenditure Guidance by $550 Million, Focuses on Protecting Returns, Cash Flow, and Balance Sheet," *Business Wire*, March 12, 2020, 4:30 p.m., "Noble Energy Takes Proactive Steps Focused on Liquidity and Balance Sheet Strength," *Business Wire*, April 15, 2020, 7:15 a.m.

[117] "Cimarex Announces Reduction in 2020 Capital Plans," *PR Newswire*, March 17, 2020, 6:17 p.m., "Cimarex Announces Further Reduction to 2020 Capital Plans; Curtails 30% of May Volumes," *PR Newswire*, April 15, 2020, 4:21 p.m.

[118] "PDC Energy Announces Update to 2020 Operating Plan," *Globe Newswire*, March 11, 2020, 5:33 p.m.

[119] "PDC Energy Announces Supplementary Update to 2020 Plan Including Reduced Operating Activity and Incremental Cost Saving Initiatives," *Globe Newswire*, April 14, 2020, 11:00 a.m.

[120] UBS analyst report, April 2, 2020.

A01638

misrepresentations during the Alleged Corrective Disclosure Period. Specifically, following the April 1, 2020 alleged corrective disclosure, none of the analysts following Berry expressed surprise, most of the analysts did not even issue a report on this day, and according to one analyst that actually issued a report, the revised guidance "should have been expected."[121] The minimal commentary from analysts is not surprising, given that many other E&P companies had already announced similar measures in response to the dramatically lower oil price that resulted from an international oil price war and Covid. Analysts regarded the revisions made by Berry and other companies as a "proactive" step that was essential given the market conditions.[122]

66.     I obtained analyst reports covering Berry from Refinitiv Eikon, which is a commonly used data provider for financial professionals. Based on data from Refinitiv Eikon, there were five analysts that issued reports specifically covering Berry during late 2019 and early 2020, specifically: BMO, Wells Fargo, UBS, Piper Sandler (known as Piper Jaffray prior to January 2020), and Evercore.[123]

67.     Among the five analysts covering Berry, three of them (Wells Fargo, BMO, and Piper Sandler) did not even issue analyst reports on Berry and did not comment on Berry's announcement either on the date of the announcement or in the following weeks.[124] Analysts covering a company typically issue reports after material new information about the company is released, and these reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge. The lack of analyst commentary shows that those analysts did not view Berry's revised guidance as surprising and unexpected information that would significantly alter the value of Berry's stock.

---

[121] UBS analyst report, April 2, 2020.

[122] UBS analyst report, April 2, 2020.

[123] The list excludes analysts that did not perform the typical functions described by Dr. Cain, including "participat[ing] in company conference calls, analyst-oriented meetings and presentations, and general industry conferences, publish[ing] reports in which they may assess recent company business developments, review[ing] historical financial performance and provid[ing] forecasts of future operating performance, or mak[ing] investment recommendations." Those analysts include Watchdog Report, TheScreener, BuySellSignals, Probes Reporter, New Constructs, ValuEngine, Sadif Investment Analytics, and Zacks Equity Research.

[124] On April 3, 2020 Wells Fargo issued its weekly "US Oil & Gas E&P Statistics and Valuation Handbook" in which the analyst simply summarized Berry's revised guidance but did not comment on it. On April 4, 2020, BMO issued its weekly "E&P – US" report titled "Capex Cut – Week 4," in which the analyst only included a one line summary of Berry's revised guidance but did not comment on it. Piper Sandler did not issue a report covering Berry until after Berry's Q1 2020 earnings announcement in May.

A01639

68.     Both of the analysts that issued reports after the April 1, 2020 announcement commented *positively* on Berry's guidance revision. UBS commented that Berry's guidance revisions were constructive "proactive steps" that "should have been expected":

> **Proactive Steps: Should Have Been Expected**
> Berry took the **proactive** steps today to defend its balance sheet and secure additional liquidity by suspending its dividend (post April) and reducing capex. Additionally, BRY layered in additional hedges. **We view this constructively.** [UBS, 4/2/2020, emphasis original and added]

Evercore commented that the new guidance showed that Berry is positioned to reduce capital expenditures "without a significant degradation" of production:

> The more recent re-set in oil prices (waterborne crudes have fared better than landlocked) has proven a new challenge for BRY. […] BRY enjoys a significant hedge position […] and uniquely **is positioned to significantly reduce capital outlays […] without a significant degradation of anticipated 2020 production […].** Unique amongst peers, BRY has ~40% of 2021e anticipated production hedged as well which should buffer some of the uncertainties surrounding 2021 as the year progresses. While the business cannot be starved or capital forever, **this does show the flexibility of the business model and ability to withstand a 12-18 month period of below mid-cycle oil prices.** [Evercore, 4/1/2020, emphasis added]

69.     A review of analyst commentary on other E&P companies that similarly announced production and capital expenditure cuts during the same time period further confirmed that analysts viewed those measures positively and regarded them as essential given the market conditions. For example, on March 11, 2020, Matador Resources Company announced updated operational and financial plans, including reducing the company's active rig count by 50%. As shown below, analysts covering Matador considered the company's announcement to be "essential" and "positive." For example, the SunTrust analyst covering Matador issued a report on the same day commenting positively on the updated plan:

> Matador released an update this morning highlighting the company's responses to the recent weakening of the oil markets including all management taking reduced salaries. These initiatives include a 50% reduction in the company's active rig count by mid-year, planned reductions in LOE and G&A, pursuit of additional divestitures, and perhaps most notably, voluntary reductions in base salary for all executive officers, board members, and vice presidents.
>
> […]

41

A01640

> **We believe today's updated 2020 operational and financial plans are essential in today's materially changed oil environment despite impacting the company's future trajectory versus the preliminary 2020 plan** and projected cash flow outspend based on a $50-$55/bbl range. [SunTrust, 3/11/2020, emphasis added]

Similarly regarding Matador's announcement, RBC analyst commented:

> **Impact: Positive** - The measures are quicker/deeper than anticipated. Management is clearly focused on the viability and sustainability of its company. [RBC, 3/11/2020, emphasis added]

70. As another example, on March 19, 2020, Centennial Resource Development, announced a 50% reduction in capital expenditure. The Cowen analysts covering Centennial viewed this as a "necessary decision":

> **CDEV announced a sharp reduction in activity to 1 rig from 5 prior. This translates to a ~50% capex reduction, a necessary decision** that narrows outspend (still ~$115mn on ~$36/bbl on our model) but sees oil entering steep exit/exit declines (-26% in '20, -20% in '21). [Cowen, 3/19/2020, emphasis added]

The SunTrust analysts covering Centennial, while similarly viewing the production cut as a "necessary measure," questioned the company's decision to continue drilling at all:

> While we believe reducing activity is the necessary measure to take, **we question the decision to continue drilling at all in the current commodity price environment**, though understanding the challenge CDEV faces in balancing its leverage with a likely declining production base. [SunTrust, 3/19/2020, emphasis added]

71. Similarly, Regarding MEG Energy Corporation's announcement of budget cut, TD Securities analysts commented that the announcement was "positive":

> 2020 budget reduced by 20% following a precipitous drop in oil prices since last Friday.
> **Impact: SLIGHTLY POSITIVE** [TD Securities, 3/11/2020, emphasis added]

### 4. Not one analyst lowered their price target for Berry due to Berry's revised guidance regarding production and capex

72. Further evidence that Berry's revised guidance was expected by the market is that even before Berry announced its capital expenditure and production cuts, the vast majority of the analysts covering Berry already lowered their price targets. In contrast, after Berry's April 1, 2020 announcement, the vast majority of the analysts did not further change their price target.

A01641

73.     According to I/B/E/S (Institutional Brokers' Estimate System), a service that "gathers and compiles the different estimates made by stock analysts on the future earnings for publicly traded companies,"[125] there were eight analysts issuing price targets for Berry in March and April 2020.[126] As the chart below shows, among those eight analysts, seven lowered their price target for Berry in March 2020 but none on April 1, 2020. After April 1, 2020, the only analysts that lowered their price target for Berry, Well Fargo, expressly explained that it was a reduction due to an industry change. Specifically, the Wells Fargo analysts lowered their price target for Berry in a report dated April 2, 2020 covering the whole US E&P industry. The Wells Fargo analysts explained that they were "lowering estimates as U.S. oil market heads into a 'perfect storm' in 2Q20" and did not mention Berry's April 1, 2020 announcement in that report.[127]



**Figure 7: Berry Stock Price and Analysts' Price Target**
*Feb. - Apr. 2020*

**Notes and Sources:**
Data from FactSet Research Systems, Inc. and I/B/E/S obtained via FactSet Research Systems, Inc. Events from Complaint. BMO price target history from BMO analyst report, dated November 3, 2020. Excludes price target history of unknown analyst with similar history to BMO. Unknown analyst assumed to be UBS as follows the same pattern seen in UBS analyst reports. Wells Fargo price target history from Wells Fargo analyst report, dated February 23, 2021.

---

[125] "I/B/E/S Estimates," Refinitiv, https://www.refinitiv.com/en/financial-data/company-data/ibes-estimates.

[126] I/B/E/S data accessed through FactSet Research Systems, Inc.

[127] Wells Fargo analyst report dated April 2, 2020, titled "U.S. E&Ps: Surfing In A Hurricane."

A01642

### 5. Consistent with a lack of statistically significant price reaction, Berry's trading volume on April 1, 2020 was in line with the trading volume on other days during that time

74.    Berry's trading volume on April 1, 2020 was in line with the average daily trading volume during the same time period, which is consistent with no statistically significant price reaction. On days when new information material to a company's stock price is released to the market, one would typically expect abnormally large trading volumes.[128] The chart below shows Berry's trading volume on each day in March and April 2020 (which covers one month before the April 1, 2020 announcement and one month after). As can be seen from the chart, Berry's trading volume on April 1, 2020 was in line with daily trading volumes in the months around it.



**Figure 8**
**Berry's Trading Volume on April 1, 2020 vs. Other Trading Days in March and April 2020**

Notes and Sources:
Data from FactSet Research Systems, Inc.

---

[128] See, for example, *Cammer v. Bloom*, 711 F. Supp. at 1286, ("The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."). See, also, Cain Report. ¶¶59-60.

A01643

### B. August 4, 2020 – Berry's announcement of its Q2 2020 production and capex results on the second alleged corrective disclosure date did not impact its stock price

75.     On August 4, 2020, after the close of trading, Berry released its financial results for Q2 2020. Berry reported in-line production, higher than expected capital expenditures, lower than expected EBITDAX,[129] and lower than expected EPS.[130] Following the announcement, Berry's stock price dropped by approximately 7% by the end of day on August 5, 2020. According to Dr. Cain's event study and an alternate event study, Berry's stock price drop on August 5, 2020 was statistically significant.[131]

76.     Plaintiffs claim that Berry's financial results for Q2 2020 was corrective of the allegedly misrepresentations by pointing to Berry's daily production, which showed a 5% quarter over quarter decline.[132] However, Berry's production decline was not new news as it was expected by the market and thus in an efficient market should not impact the stock price.[133] Instead, as will be discussed in more detail below, Berry's stock price drop following the earnings announcement was due to factors unrelated to production and thus unrelated to Plaintiffs' claim.

---

[129] EBITDAX refers to earnings before interest, taxes, depreciation, amortization, and exploration expenses. See, for example, Berry Form 8-K, filed August 27, 2021, Exhibit 10.1.

[130] For comparison between Berry's Q2 2020 financial results vs. analyst consensus, see Wells Fargo analyst report dated August 4, 2020.

[131] As discussed above in Section X.A.1, the alternative model uses the Custom E&P Index. For August 5, 2020, the alternative model uses the same 60 trading day control period as Dr. Cain's methodology. For details, see Appendix B.

[132] Amended Complaint, ¶126. Berry Corporation, "Berry Corporation (BRY) Reports Second Quarter 2020 Results; Achieved Significant Operating Expense Reductions; Added 2021 Oil Hedges," *Globe Newswire*, August 4, 2020, 5:13 p.m.

[133] In an efficient market, only new news should affect the stock price and confirmatory or repeated news (i.e., news that has already been publicly disclosed) should not impact the market or cause a statistically significant price reaction. See, for example, Richard A. Brealey, Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, NY, 10th ed., 2011), p. 330. ("If the market is efficient, prices impound all available information.") See, also, Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 8th ed., 2009), p. 345.

Courts have similarly noted that confirmatory news should not cause a statistically significant price reaction. See, for example, *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004). ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price.")

A01644

1. **Berry's announcement of Q2 2020 production was in line with analyst consensus estimates and thus in an efficient market should not impact Berry's stock price**

77.    Berry's Q2 2020 total production (including oil, natural gas, and NGLs) and Berry's Q2 2020 production of oil alone were both in line with consensus estimates when announced on August 4, 2020.[134] The table below shows Berry's actual production vs. consensus as reported by Wells Fargo.

**Figure 9**
**Berry's 2Q 2020 Production vs. Consensus**

| | Actual | vs. Consensus | |
| | 2Q20 | 2Q20E | % Change |
| | (1) | (2) | (3) |
| | | | (1)/(2)-1 |
| **Production** | | | |
| Crude oil (Mbbl/d) [1] | 25.6 | 25.5 | 1% |
| Natural gas (Mmcf/d) [2] | 19.2 | 17.4 | 10% |
| NGL (Mbbl/d) [1] | 0.3 | 0.3 | -10% |
| **Total Prod (mboe/d):** [3] | **29.1** | **28.7** | **1%** |

Notes and Sources:
Table in August 4, 2020 Wells Fargo analyst report, "First Look - YTD Spend Implies Higher FY20 Capex."

[1] Thousand barrels of oil per day.

[2] Million cubic feet per day.

[3] Thousand barrels of oil equivalent per day. Natural gas volume converted to barrels of oil equivalent by dividing natural gas volume by six. See, for example, Berry FY19 Form 10-K, filed February 27, 2020, p.8.

---

[134] There are four analyst reports available through Refinitiv Eikon that compared Berry's Q2 2020 results with consensus estimates, including Wells Fargo, BMO, UBS, and Piper Jaffray. Comparisons by Wells Fargo analysts appear to be the most accurate and comprehensive. BMO analyst report indicates that Berry's oil production exceeded consensus, but Berry's total production missed consensus. The BMO report references Bloomberg as its data source; however, the Bloomberg data that I obtained indicated that Berry's total production exceeded consensus estimate, consistent with the results reported by Wells Fargo. UBS did not cite the source of its consensus estimates and did not report consensus estimates for Berry's oil production. Piper Sandler report indicates Berry missed expectations on oil production based on data from FactSet Research Systems, Inc.; however, data I obtained from FactSet Research Systems, Inc. indicates that Berry's oil production exceeded expectations, consistent with the findings reported by Wells Fargo and BMO.

A01645

78.     As the table shows, Berry's daily crude oil production and total daily production were both within 1% of consensus estimates. In an efficient market, information that is not new and unexpected should not impact a company's stock price.[135] Thus, in an efficient market, Berry's Q2 2020 production level, which was in line with market expectations, should not impact Berry's stock price.

### 2. Berry announced *higher than expected* Q2 2020 capex, inconsistent with Plaintiffs' claim that Berry had to cut its capex due to permitting delays

79.     Plaintiffs claim that the alleged artificial inflation in Berry's stock price was partially removed when Berry "reduced capital expenditures based on a failure to secure timely permits."[136] However, Berry's Q2 2020 capital expenditures were actually higher than what the market expected. Specifically, for Q2 2020, Berry's capital expenditures totaled $17 million, approximately 50% higher than consensus estimates of $11 million.[137] If Berry concealed from investors permitting delays and the impact of those delays, and if as Plaintiffs claim those concealed permitting delays would cause Berry to reduce capital expenditures, then one would expect Berry's capital expenditures to be lower than market expectations, rather than higher.[138]

### 3. Berry's announcement of Q2 2020 results included negative news unrelated to the alleged misrepresentations, including higher costs

80.     A comparison of Berry's actual financial results for Q2 2020 vs. consensus estimates show that Berry missed EBITDAX and EPS estimates by wide margins. Specifically, Berry's Q2 2020 EBITDAX was $57 million, approximately $6 million lower than consensus

---

[135] See, for example, Richard A. Brealey, Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, NY, 10th ed., 2011), p. 330. ("If the market is efficient, prices impound all available information.") See, also, Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 8th ed., 2009), p. 345.

Courts have similarly noted that confirmatory news should not cause a statistically significant price reaction. See, for example, *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004). ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price.")

[136] Memo in Support of Class Cert, p. 6.

[137] Berry reported capex of approximately $17 million in the Q2 2020 press release. See, "Berry Corporation (BRY) Reports Second Quarter 2020 Results; Achieved Significant Operating Expense Reductions; Added 2021 Oil Hedges," *Globe Newswire*, August 4, 2020, 5:13 p.m. Consensus estimates reported by Bloomberg.

[138] Furthermore, Berry noted in its press release on August 4, 2020 that its inventory has increased in Q2 2020, and this is inconsistent with Plaintiffs' claim that Berry's financial results for Q2 2020 was negatively affected by reduced production. See, "Berry Corporation (BRY) Reports Second Quarter 2020 Results; Achieved Significant Operating Expense Reductions; Added 2021 Oil Hedges," *Globe Newswire*, August 4, 2020, 5:13 p.m.

47

A01646

estimate of $63 million, and Berry's Q2 2020 EPS was 6 cents, whereas consensus estimate was 20 cents.[139]

81.     As Berry explained, the company's EBITDAX miss was due to "to historically low oil prices caused by the OPEC+ supply increase and COVID-19 demand destruction" and the company's EPS miss was additionally caused by an increase in greenhouse gas ("GHG") costs. Thus, Berry's EBITDAX and EPS misses were due to negative news unrelated to the alleged misrepresentations. UBS highlighted these reasons for the misses in the report that it issued on August 5, 2020:

> The miss vs UBSe was driven by weaker realizations; whereby unhedged oil realizations was 88% of Brent vs 95% of Brent in 1Q. Additionally, BRY incurred higher GHG costs which returned to historical levels following a significant decrease in 1Q. The GHG costs are baked into Taxes, other than income, and increased ~150% to $3.94 / boe. We expect to look for further clarity on progression of these costs as well as more color on realizations going forward. [UBS, 8/5/2020]

82.     In sum, Berry's stock price drop following the August 4, 2020 alleged corrective disclosure was not due to factors relevant to Plaintiffs' claim since Berry reported in line production for the quarter. Instead, Berry's stock price drop was caused by factors unrelated to Plaintiffs' claim, including higher costs.

## C.     November 3, 2020 – Berry's release of its Q3 2020 production and capital expenditures results on the third alleged corrective disclosure date did not impact Berry's stock price

83.     Plaintiffs claim that Berry's Q3 2020 financial results announced after market hours on November 3, 2020 were corrective of the alleged misrepresentations because Berry's oil production declined 5% quarter to quarter.[140] However, this announcement did not impact Berry's stock price. According to both Dr. Cain's event study and an alternative event study discussed below, Berry's price reaction after this announcement is *not* statistically significant either at the standard 5% level (or even at the lower threshold of 10% level).[141] Berry's Q3 2020

---

[139] "Berry Corporation (BRY) Reports Second Quarter 2020 Results; Achieved Significant Operating Expense Reductions; Added 2021 Oil Hedges," *Globe Newswire*, August 4, 2020, 5:13 p.m. Consensus estimates based on data reported by Bloomberg.

[140] Memo in Support of Class Cert, pp. 5-6.

[141] See, Dr. Cain's backup ("CAIN_0000926 fixed_rolling_reg_results_60days_2023-02-13.xlsx").

A01647

financial results were "largely in line" with expectations, which is consistent with the lack of a statistically significant price reaction.[142] Moreover, no analysts lowered their price targets for Berry directly following Berry's Q3 2020 production or capex results.

> **1. There was no statistically significant stock price reaction following the November alleged corrective disclosure according to Plaintiffs' own expert and according to an alternative event study model**

84. There was no statistically significant stock price reaction following the November 4, 2020 alleged corrective disclosure according to Dr. Cain's event study at either the standard 5% level or at 10% level. [143] Moreover, using an alternative event study model that uses the Custom E&P Index and the same control period as used in Dr. Cain's event study, yields no statistically significant price reaction at either the 5% level or 10% level.[144] The fact that there was no statistically significant stock price reaction to an announcement that according to Plaintiffs' theory is corrective of the alleged misrepresentations is direct evidence that the alleged misrepresentations had no price impact. The lack of an observable statistically significant price reaction is considered by academics,[145] as well as the courts,[146] as providing evidence of no price impact.

---

[142] UBS analyst report, November 3, 2020.

[143] Dr. Cain's backup ("CAIN_0000926 fixed_rolling_reg_results_60days_2023-02-13.xlsx").

[144] For details, see Appendix B.

[145] See, for example, the study in the *International Journal of Economics and Finance* which concludes there is no impact from an event given the lack of a statistically significant reaction: "On the announcement day (day zero), the abnormal return for the bank sector is -0.066% and for both the service and industrial sector is -0.293% and -0.368% respectively, with no significant impact as the t-statistics accept the null hypothesis that the downgrading event has no impact." See, Abdeldayem, Marwan M. and Ramzi Nekhili, "Credit Rating Changes and Stock Market Reaction in the Kingdom of Bahrain," *International Journal of Economics and Finance*, 8(8):2016, pp. 23-32. See, also, Fisher, Franklin M., "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80(4): 1980.

[146] See, for example, Erica P. John Fund, Inc. v. Halliburton Company, No. 3: 02-CV-1152-M (N.D. Tex. July 25, 2015, ("To show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard […] Coffman found an intraday statistically significant price reaction on Day 1 only at a 90% confidence level, which is less than the 95% confidence level both experts require in their regression analyses and which the Court finds is necessary. […] In contrast, with and without a multiple comparison adjustment, Allen found no price impact on December 21, 2000. The Court agrees with Halliburton that there was no price impact on December 21, 2000, and finds that Defendants have rebutted the *Basic* presumption as to the allegedly corrective disclosure made on that date.")

A01648

**2. Berry's Q3 2020 production was largely in-line with analyst consensus estimates, consistent with the lack of a statistically significant price reaction**

85.    Consistent with lack of a significant price reaction to the Q3 2020 announcement is that the announced production was generally in line with market expectations. In an efficient market, only new news should affect the stock price. As shown in the table below, Berry's total production in the quarter was in line with consensus analyst estimates (as the table below shows), while oil production was 24.1 Mbbl/d, was only 1% smaller than analyst consensus of 24.4 Mbbl/d.

**Figure 10**
**Berry's 3Q 2020 Production vs. Consensus**

|  | Actual 3Q20 | vs. Consensus 3Q20E | % Change |
|---|---|---|---|
|  | (1) | (2) | (3) (1)/(2)-1 |
| **Production** |  |  |  |
| Crude oil (Mbbl/d) [1] | 24.1 | 24.4 | -1% |
| Natural gas (Mmcf/d) [2] | 18.7 | 18.2 | 3% |
| NGL (Mbbl/d) [1] | 0.4 | 0.3 | 51% |
| **Total Prod (mboe/d):** [3] | **27.6** | **27.7** | **0%** |

**Notes and Sources:**
Table in November 3, 2020 Wells Fargo analyst report "First Look - Steady As She Goes, Until 2021 Comes."
[1] Thousand barrels of oil per day.
[2] Million cubic feet per day.
[3] Thousand barrels of oil equivalent per day. Natural gas volume converted to barrels of oil equivalent by dividing natural gas volume by six. See, for example, Berry FY19 Form 10-K, filed February 27, 2020, p.8.

86.    Analyst commentary following the November 3, 2020 alleged corrective disclosure similarly demonstrates that the market did not react significantly to the announcement. Analysts commented that they expected "a largely neutral reaction" from the market, consistent with an absence of a statistically significant price reaction.[147] For example, the title of the UBS

---

[147] UBS analyst report, November 3, 2020.

A01649

analyst report issued on November 3, 2020 described the information in the quarterly announcement as "Largely In-Line, No Surprises."[148] Similarly, BMO analyst covering Berry also commented that Berry's 3Q 20 results was "mostly in line."

### 3. No analysts lowered their price targets for Berry directly following Berry's Q3 2020 production or capex results

87.    Further evidence that the alleged misrepresentations had no price impact is that none of the analysts covering Berry changed their price target for Berry as a result of the November 3, 2020 alleged corrective disclosure. According to I/B/E/S data accessed from FactSet Research Systems, Inc., six analysts issued price targets for Berry in November 2020. As the chart below shows, none of the analysts lowered their price targets for Berry directly following the announcement.



**Figure 11: Berry Stock Price and Analysts' Price Target**
*Oct. - Nov. 2020*

Notes and Sources:
Data from FactSet Research Systems, Inc. and I/B/E/S obtained via FactSet Research Systems, Inc. Events from Complaint. BMO price target history from BMO analyst report, dated November 3, 2020. BMO price target after November 3, 2020 assumed to be equal to price target as of November 3, 2020, consistent with price target history of unknown analyst with similar history to BMO. Excludes price target history of unknown analyst with similar history to BMO. Unknown analyst assumed to be UBS as follows the same pattern seen in UBS analyst reports. Wells Fargo price target history from Wells Fargo analyst report, dated February 23, 2021.

---

[148] UBS analyst report, November 3, 2020.

A01650

88.     In sum, there was no statistically significant price reaction after the November 3, 2020 alleged corrective disclosure, which is consistent with the fact that production results were in-line with analysts' estimates and that not one of the analysts changed their price target for Berry following the announcements. All the market evidence during Alleged Corrective Disclosure Period supports a finding that the alleged misrepresentations had no price impact.

**D.     Berry's alleged corrective disclosure after the end of the alleged Class Period, which said that permitting delays had informed the Company's 2020 plans, did not impact Berry's stock price and did not elicit any analyst commentary, consistent with a lack of price impact from the alleged misrepresentations**

89.     As discussed above, on February 23, 2021, Berry announced FY 2020 financial results: production was in-line with the guidance the company provided on April 1, 2020, and capital expenditures were at $69 million, *above* the Company's April 1, 2020 guidance.[149] Following this announcement of in-line full year 2020 financial results, Berry filed its FY 2020 10-K on the next day. Berry disclosed in the 10-K that its 2020 plans were "informed, ultimately, by" permitting delays that the Company experienced in the latter half of 2019 and into 2020:

> With the changes in the UIC regulations and its impact on the permitting process, we experienced delays in obtaining the permits required to continue our planned drilling operations over the latter half of 2019 and into 2020. Our 2020 plans were informed, ultimately, by these permitting issues that we began to observe in late 2019 and early 2020, and then were later modified due to the deterioration of market conditions resulting from the COVID-19 pandemic. Accordingly, our 2020 results were not significantly affected because we were able to obtain the permits necessary to support our planned activities.[150]

90.     Plaintiffs claim "[t]he February 24, 2021 [10-K] filing admitted for the first time that not only did the Company experience delays in receiving timely permits in late 2019 and early 2020, but that these delays were initially the principal cause of a drastic reduction in production targets in early 2020."[151]

---

[149] "Berry Corporation (BRY) Reports Fourth Quarter and Full-Year 2020 Results; Reinstates Quarterly Dividend," *Globe Newswire*, February 23, 2021, 6:16 p.m., and "Berry Corporation (BRY) Adjusts 2020 Plans; Heightened Focus on Building Cash in 2020 and Ensuring Flexibility Through 2021," *Globe Newswire*, April 1, 2020, 9:27 a.m.

[150] Berry Corporation FY20 Form 10-K, p. 24.

[151] Amended Complaint, ¶122.

91.    A review of market reactions and analyst commentary shows that contrary to Plaintiffs' claim of price impact, there is no evidence that Berry's statement about its permitting delays in late 2019 or early 2020 impacted Berry's stock price. For one, there was no statistically significant price decline following this announcement either using an event study model similar to what Dr. Cain used for the other alleged corrective disclosures (i.e., using 60-day control period and using the same market and industry indices) or using an alternative event study model that uses the Custom E&P Index and a 60-trading-day control period before February 24, 2021.[152]

92.    Moreover, none of the analysts following Berry issued any report on the day when this 10-K was filed. The first analyst report on Berry following the release of FY 2020 10-K was issued by Seaport Global more than a week later, on March 4, 2021, and the Seaport Global analysts did not even mention the permitting issues that Berry discussed in the 10-K.[153]

## XI.    THE CAIN REPORT DOES NOT PROPOSE A METHODOLOGY THAT CAN MEASURE DAMAGES CONSISTENT WITH PLAINTIFFS' THEORY OF LIABILITY

93.    Dr. Cain claims that "damages in this matter can be calculated on a class-wide basis subject to a common methodology."[154] However Dr. Cain's proposed methodology is very general, includes no specifics about this case, and cannot be used to measure class-wide damages consistent with Plaintiffs' theory of liability.

94.    Plaintiffs plead damages under the "materialization of the risk" theory.[155] According to Plaintiffs, "[u]nder this theory, a plaintiff can plead that a concealed risk 'materialized in the form of unfavorable developments that caused the market to drive share price down.'" Plaintiffs allege that "the concealed risk of the permitting issues materialized through the production declines [announced on the three alleged corrective disclosures], and the true extent of the fraud was not revealed until after the end of the Class Period when the Company partially admitted that the failure to secure timely permits caused the Company to

---

[152] For details, see Appendix B.

[153] Seaport Global analyst report, March 4, 2021.

[154] Cain Report, ¶11.

[155] Plaintiffs' Opposition to Motion to Dismiss, filed April 11, 2022, p. 22.

A01652

revise its 2020 plans downwards."[156] Thus, Plaintiffs' theory of liability is a materialization of risk theory under which the concealed risk was never revealed during the alleged Class Period but rather was "realized" through the announcements regarding declines in production.[157]

95.   Based on Plaintiffs' theory, a class-wide common damages methodology should be measuring damages arising from the materialization of the allegedly concealed risks of permitting delays. Instead, what Dr. Cain's proposed damages methodology does, as Dr. Cain himself explains, is to measure damages in situations when the corrective disclosures "revealed the relevant truth that was concealed by alleged material omissions of fact and/or misrepresentations."[158]

96.   According to Plaintiffs, "the relevant truth that was concealed by alleged material omissions of fact and/or misrepresentations" related to problems Berry was allegedly having obtaining timely permits.[159] However, as discussed in Section IX.A above, and as pled in the Amended Complaint, the alleged corrective disclosures in this case did not reveal anything about Berry's alleged permitting delays or issues with permitting. No information directly corrective of the alleged misrepresentations and omissions about permitting delays and problems was disclosed in any of these three alleged corrective disclosures. What is announced are reduced 2020 production and capex guidance and two sequential production declines in Q2 and Q3 that Plaintiffs allege resulted from the materialization of risks related to the permitting issues.[160] Moreover, the only date Plaintiffs point to when the alleged "relevant truth" was revealed to the

---

[156] Plaintiffs' Opposition to Motion to Dismiss, filed April 11, 2022, pp. 22-23.

[157] Plaintiffs seem to plead the materialization of the risk as an *additional* theory to a theory that relies on looking at the price reactions to announcements when the relevant truth (about the true extent of permitting problems) was revealed. However, as explained in this section and elsewhere in this report, the three alleged corrective disclosures do not reveal any information about the allegedly concealed permitting issues. The only date Plaintiffs point to when the relevant truth was revealed is *after* the end of the alleged Class Period, when the Company filed its annual report for FY 2020 on Form 10-K, and in Plaintiffs words, "admitted for the first time that not only did the Company experience delays in receiving timely permits in late 2019 and early 2020, but that these delays were initially the principal cause of a drastic reduction in production targets in early 2020." Amended Complaint, ¶122. Plaintiffs do not allege any loss caused by this "truth." The price did not decline on this day; it increased, even after adjusting for market and industry movements, as described in Section X.D above. If this is Plaintiffs' theory of damages in this case, then there are *no* damages.

[158] "Event studies measure security price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions of fact and/or misrepresentations." Cain Report, ¶78.

[159] Amended Complaint, ¶¶3-6.

[160] Note, as discussed above, the announcements regarding reductions in production were not surprises but rather expected by the market and considered essential in the then extraordinary environment.

54

A01653

market is *after* the end of the alleged Class Period, when the Company filed its annual report for FY 2020 on its Form 10-K, and in Plaintiffs' words, "admitted *for the first time* that not only did the Company experience delays in receiving timely permits in late 2019 and early 2020, but that these delays were initially the principal cause of a drastic reduction in production targets in early 2020."[161] However, Plaintiffs do not allege any loss caused by this "truth."  Importantly, the price did not decline on this day; it *increased*, before and after adjusting for market and industry movements, as described in Section X.D above.

97.     Dr. Cain's methodology refers to corrective disclosures that revealed the relevant truth, but that does not explain how his methodology would be applied to examine the price impact of a risk that materialized but for which the alleged falsity of any prior information was never revealed under a materialization of a concealed risk theory. As the court in a recent case explained, "[a] corrective disclosure cures a prior misleading or incorrect statement and it includes information previously withheld from the market, but a materialized risk is not curative in the same way that a corrective disclosure is curative; a materialized risk (once revealed) may 'cure' inflation in stock price by potentially removing the inflation, but it does not correct prior incorrect information."[162] Plaintiffs' theory is not that through the alleged corrective disclosures the market learned anything new about Berry's permitting process; rather, that Berry's reduced guidance announced on April 1, 2020 and Berry's quarter to quarter production decline announced in August 2020 and November 2020 were due to Berry's permitting issues. As such, Dr. Cain's methodology does not match Plaintiffs' theory of liability.

98.     Under the materialization of the risk theory, the concealed risk, rather than being actually revealed, is "realized." In this case, the information that was allegedly revealed in the alleged corrective disclosures is the materialization of the allegedly concealed risks in the form of production declines and so does not directly correspond to the permitting issues that the company allegedly concealed from the market. Thus, examining the price reaction to the materialization of the concealed risks does not provide direct evidence on how a disclosure of the concealed risk during the alleged Class Period would affect the company's stock price.[163] The

---

[161] Amended Complaint, ¶122, emphasis added.

[162] *Indiana Public Retirement System v. AAC Holdings, Inc., Slip Copy (2023) ("ACC Holdings")*, at 24.

[163] Courts have found this issue to be relevant to a proposed class-wide damages methodology. For example, in the *AAC Holdings* matter, where plaintiffs allege a similar materialization of the risk theory the court found:

A01654

proposed methodology for calculating damages under a materialization of risk theory should address how the concealed risks would factor into the damages model.[164] Dr. Cain did not provide any explanation for how he would or could factor in the allegedly concealed risks into his proposed damages methodology.

99.    Applying Dr. Cain's methodology which is based on the "price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions of fact and/or misrepresentations" could (at best) measure *consequential* damages, without any consideration for whether those losses were *proximately caused* by the allegedly concealed risk that materialized in the form of production reductions.[165] In other words, Dr. Cain proposes to measure the reaction when the risk allegedly materialized but fails to propose a method to determine the damages that were caused by the risk that was concealed by the alleged misrepresentations. Thus, Dr. Cain's methodology does not match Plaintiffs' theory of liability.

100.    Furthermore, according to Plaintiffs' theory, Plaintiffs would presumably allege the stock was riskier in the beginning of the alleged Class Period due to the allegedly concealed permitting issues. Plaintiffs may argue that had investors known the full truth about the allegedly concealed permitting issues, some investors may have been unwilling to take the additional risk, and not invested in the stock at all. To the extent that Plaintiffs argue that some investors would not have invested in Berry *at all* had they known that the risks of permitting problems were

---

"[…] Plaintiff states that it will calculate damages for its materialization of the risk theory […]. Yet, [Plaintiffs' expert] explains that estimating "price inflation often begins by analyzing the impact of the curative events. […] In his references to "curative events" and previously withheld information being "disclosed to the market," it appears that [Plaintiffs' expert] is referring to corrective disclosures rather than a materialization of a risk." (*Indiana Public Retirement System v. AAC Holdings, Inc., Slip Copy (2023)*, at 24.)

[164] The *AAC Holdings* court also notes this issue:

"Moreover, just as the court in *Mulderrig* observed with respect to the plaintiff's expert in that case, [Plaintiffs' expert] has provided no explanation as to how the risk of [Defendant company]'s deceptive marketing claims will be factored into Plaintiff's damages model—that is, how [Plaintiffs' expert] expects to show that the risk affected [Defendant company]'s stock price at the time the risk was concealed or after it materialized (revealed). Although Plaintiff does not have to provide a detailed damages model at this stage of the litigation, it must show that their model is "consistent with its liability case" and that its damages are "attributable to that theory of liability." See Comcast, 569 U.S. at 35. Plaintiff has failed to do so here with respect to its materialization-of-the-risk theory. Therefore, class certification with respect to its Marketing Claim is denied because Plaintiff has failed to establish predominance with respect to this claim.)" (*Indiana Public Retirement System v. AAC Holdings, Inc., Slip Copy* (2023), at 24.)

[165] Dr. Cain's model is not well specified in this case where, as discussed above, Berry's price did not drop because of the materialization of the concealed risks in the form of production declines.

56

A01655

higher, while others might have been willing to invest anyway, then the measure of damages becomes an individual question. In other words, in the but-for world where the alleged permitting risk was properly disclosed, some investors may have still taken on the risk, while others may not have bought at all. In such a scenario, individual issues could predominate and there would not be any common damages method that would apply to all.[166] Dr. Cain's proposed damages methodology does not point to any mechanism it could use to account for the individual preferences of class members.

101.    In sum, Dr. Cain's proposed methodology for calculating class-wide damages does not match Plaintiffs' theory of liability. Dr. Cain proposes to measure the price reaction when the allegedly concealed risks materialized but fails to propose a method to determine the damages that were caused by the risk that was concealed by the alleged misrepresentations and does not account for any mechanism to account for individual risk preferences at the time the alleged risks should have been disclosed. Lastly, to the extent that Plaintiffs argue that some investors would not have invested in Berry at all had they known that the risks of permitting problems were higher, while others might have been willing to invest anyway, then the measure of damages becomes an individual question and Dr. Cain's proposed damages methodology does not point to any mechanism it could use to account for the individual preferences of class members.

---

[166] The court in *Ludlow v. BP* addressed this issue, noted,

> "The problem is that the [Plaintiffs' expert] model here does not provide any mechanism for separating these two classes of plaintiffs. And because it lacks the ability to do so, it cannot provide an adequate measure of class-wide damages under Comcast. [...] Unlike the stock inflation model, the materialization-of-the-risk model cannot be applied uniformly across the class, as Comcast requires, because it lumps together those who would have bought the stock at the heightened risk with those who would not have." (*Ludlow v. BP, P.L.C.,* 800 F.3d 674 (2015), at 691.)

A01656

**XII.** **IT IS VIRTUALLY IMPOSSIBLE TO DETERMINE OR TRACE WHETHER A BERRY SHARE ACQUIRED IN THE MARKET CAME FROM THE SHARES SOLD IN THE IPO**

> **A.** **Once non-IPO shares enter the market, it is virtually impossible to determine whether a Berry share purchased by a member of the proposed class was traceable to the IPO**

102. Given the current system for share ownership, in which individual shares are not given unique identifying characteristics and shares are intermingled in a fungible mass, there is no established and reliable method through which one could determine whether the source for a given share was Berry's IPO once non-IPO shares enter the market.

103. There are two ways that shares can be held. When an investor purchases shares, the investor can obtain a certificate representing those shares, and thereby have the shares registered with the transfer agent under the investor's name. Far more commonly, however, shares are held in "street name." In this case, the depository or other intermediary is the nominee holder of the shares. These shares are registered under the name of the depository or other intermediary, but the investor is still the beneficial owner of the shares in that the investor claims all of the rights and privileges associated with ownership.[167] The depository holds a fungible mass of shares of each security; in other words, the securities of individual investors are indistinguishable within the larger pool of shares registered with that depository.

104. Over the past 50 years, the practice of holding securities at a depository has become widespread. The Depository Trust Company ("DTC") arose as a central location for the "immobilization" of stock certificates and has become the largest depository of shares. DTC is responsible for physical custody of the certificates, as well as the processing of transactions for these stocks.[168] DTC records on its books the shares held by each participating firm, and in turn

---

[167] See "It's Your Stock, Just Not in Your Name: Explaining 'Street Names'," *FINRA,* December 21, 2015, available at https://www.finra.org/investors/insights/its-your-stock-just-not-your-name-explaining-street-names (accessed on April 7, 2023).

[168] See "The Depository Trust Company (DTC)," *DTCC,* available at https://www.dtcc.com/about/businesses-and-subsidiaries/dtc (accessed on April 7, 2023). See also, "DTC Chills and Freezes," *SEC*, May 1, 2012, available at https://www.sec.gov/oiea/investor-alerts-bulletins/ib_dtcfreezes.html (accessed on April 7, 2023).

A01657

each participating firm is responsible for keeping track of the shares owned by each of its customers.

105.    DTC also nets trades across brokers. This occurs through a system of netting through the National Securities Clearing Corporation ("NSCC"), a sister organization of DTC. Through this system, NSCC and DTC are able to drastically lower the number of transactions that require a change in the number of securities held by each firm on the books of the DTC. For example, assume that Bank of America buys 1,000 shares of a security from Goldman Sachs, and, on the same day, Goldman Sachs buys 2,000 shares from Bank of America. Instead of recording two separate transactions, the NSCC will net the transactions and reduce the number of Bank of America's shares on its books by 1,000 and increase Goldman's holdings by the same amount. Thus, transactions between brokers commonly do not result in the physical transfer of shares from one broker to another.[169]

106.    Certificate holders (investors holding shares registered in their own name) do not receive a certificate for each share. Rather, they receive a certificate for each purchase and remaining unsold portion of a particular security. For example, if an investor holds a certificate for 300 shares and decides to sell 100 shares, he or she turns in the certificate for 300 shares and obtains a new certificate for 200 shares. There is virtually no way of determining which 100 of the original 300 shares were sold.

107.    In sum, it is virtually impossible to determine which of the shares purchased after non-IPO shares enter the market are traceable to the IPO.

### B.    Non-IPO shares were already available to trade at the time of the IPO

108.    Publicly available information indicates that non-IPO shares were already available to trade at the time of the IPO.[170] Moreover, as discussed below, evidence indicates that

---

[169] See http://www.dtcc.com/clearing-services/equities-clearing-services/cns.

[170] Institutions that hold over $100 million in U.S. equities must report their holdings of such securities to the SEC on a quarterly basis via Form 13-F. See, https://www.sec.gov/fast-answers/answers-form13fhtm.html ("An institutional investment manager that […] exercises investment discretion over $100 million or more in Section 13(f) securities […] must report its holdings quarterly on Form 13F with the Securities and Exchange Commission (SEC). […] Section 13(f) securities generally include equity securities that trade on an exchange […], certain equity options and warrants, shares of closed-end investment companies, and certain convertible debt securities."). Institutional holdings data referenced in this section are also from Schedule 13Gs and FactSet Research Systems, Inc.

A01658

non-IPO shares *did* trade in the aftermarket. Determining, or tracing, whether shares purchased in the aftermarket came from those non-IPO shares versus shares sold in the IPO would be virtually impossible.

109.    On July 26, 2018, Berry completed its IPO selling a total of 13,043,479 shares of common stock.[171] A portion of the IPO shares came from sales of shares held by existing shareholders ("selling stockholders"). Following the IPO, Berry had a total of 81,336,762 shares outstanding.[172] The additional shares outstanding that were not sold in the IPO were issued pursuant to the reorganization that Berry underwent in February 2017.[173] Relatedly, the IPO prospectus specifically states that 6,186,897 shares, separate from those sold in the IPO, "will be eligible for sale as of the date of this prospectus." [174] It would be virtually impossible to determine or trace whether a share bought in the aftermarket came from these freely tradable non-IPO shares or from the IPO shares.

110.    The publicly available data on institutional holdings immediately following the IPO indicate that some entities held freely tradeable non-IPO shares. As of September 30, 2018, the end of the first quarter following the IPO, institutional investors reported holdings of 79,490,579 shares.[175] These holdings included shares held by certain investors which were subject to trading restrictions ("restricted non-IPO shares").[176] Excluding the shares held by those entities, 84 other institutional investors reported holdings of 19,221,186 shares. Since there were only 13,043,479 shares sold in the IPO, the remaining at least 6,177,707 shares held by

---

[171] The total offering of 13,043,479 shares included 10,497,849 shares of common stock offered by Berry, and 2,545,630 shares of common stock sold by selling stockholders. (The selling stockholders only sold a portion of their holdings in the IPO.) A portion of the proceeds from this offering were used by Berry to buy back 1,802,196 shares of common stock owned by funds affiliated with Benefit Street Partners and Oaktree Capital Management. As a result, after giving effect to the offering and the share repurchase, the number of shares of Berry common stock outstanding increased by 8,695,653. See Prospectus dated July 25, 2018, p. 177 and cover page.

[172]  Prospectus dated July 25, 2018, p. 18.

[173] Prior to the IPO, there were 33,087,889 shares of common stock outstanding and 37,669,805 shares of preferred stock outstanding which were converted into 39,553,220 shares of common stock outstanding at the time of the IPO. See Prospectus dated July 25, 2018, pp. 18, 51, and 193-194.

[174] See Prospectus dated July 25, 2018, p. 192.

[175] Based on data from FactSet Research Systems, Inc.

[176] Based on data from FactSet Research Systems, Inc. Shares held by the directors and officers, IPO selling stockholders, and certain other stockholders at the time of the IPO were subject to a lock-up that restricted the sale of their common stock for a period of 180 days from the day of the IPO (*i.e.*, January 21, 2019). See Prospectus dated July 25, 2018, pp. 177 and 192.

A01659

institutional investors as of September 30, 2018 could presumably not have been sold in the IPO. These shares are thus indistinguishable from IPO shares trading in the aftermarket.

111.   Moreover, data on institutional holdings indicates that restricted non-IPO shares were sold in the aftermarket following the expiration of the lock-up period on January 21, 2019. Between December 31, 2018 and March 31, 2019, the first quarter-end following the end of the lock-up period, multiple IPO selling stockholders sold some of their previously restricted non-IPO shares, thus making it virtually impossible to distinguish these shares from the IPO shares trading in the aftermarket. For example, as illustrated in Figure 12, CI Investments, Marathon Asset Management, and Western Asset Management held a combined total of 12,532,219 restricted non-IPO shares at the time of the IPO and on December 31, 2018. By March 31, 2019, they reported holding 3,014,770 fewer shares than they held at the time of the IPO, indicating that they sold some of their non-IPO shares. For the purchasers of Berry's stock in the aftermarket upon the sale of these non-IPO shares, it would be virtually impossible to trace whether their shares came from the previously restricted non-IPO shares or IPO shares.

| **Figure 12: Berry Holdings of Select Selling Stockholders IPO to March 31, 2019** | | | | |
|---|---|---|---|---|
| | | **Holdings As Of** | | |
| **Selling Stockholder[1]** | **IPO[1]** | **9/30/18[2]** | **12/31/18[2]** | **3/31/19[2]** |
| **(1)** | **(2)** | **(3)** | **(4)** | **(5)** |
| CI Investments | 3,823,643 | 3,823,643 | 3,823,643 | 3,351,359 |
| Marathon Asset Management | 1,958,374 | 1,958,374 | 1,958,374 | 1,268,545 |
| Western Asset Management Company, LLC | 6,750,202 | 6,750,202 [3] | 6,750,202 [4] | 4,897,545 |
| **Total** | **12,532,219** | **12,532,219** | **12,532,219** | **9,517,449** |

**Notes and Sources:**
[1] Data from Prospectus dated July 25, 2018, p. 177.
[2] Data from Form 13F for the relevant quarter-end unless otherwise noted.
[3] Berry holdings for Western Asset Management Company, LLC are not reported on the relevant Form 13F and are assumed to be the same as at IPO which is consistent with data from FactSet Research Systems, Inc.
[4] Data from Western Asset Management Co. LLC Schedule 13G, dated December 31, 2018.

A01660

**\*\*\***

112.    My work in this matter is ongoing, and I reserve the right to supplement this analysis in response to any new information I receive.

113.    I declare under penalty of perjury that the foregoing is true and correct.


_____

Lucy P. Allen

62

A01661



**NERA**
ECONOMIC CONSULTING

**Lucy P. Allen**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

## Appendix A

## LUCY P. ALLEN
## MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

| | |
|---|---|
| 1994-Present | **National Economic Research Associates, Inc.**<br>Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.<br>Senior Vice President (2003-2016).<br>Vice President (1999-2003).<br>Senior Consultant (1994-1999). |
| 1992-1993 | **Council of Economic Advisers, Executive Office of the President**<br>Staff Economist. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force. |
| 1986-1988<br>1983-1984 | **Ayers, Whitmore & Company (General Management Consultants)**<br>Senior Associate. Formulated marketing, organization, and overall business strategies including:<br>Plan to improve profitability of chemical process equipment manufacturer.<br>Merger analysis and integration plan of two equipment manufacturers.<br>Evaluation of Korean competition to a U.S. manufacturer.<br>Diagnostic survey for auto parts manufacturer on growth obstacles. |

1

A01662

Lucy P. Allen

Marketing plan to increase international market share for major accounting firm.

| | |
|---|---|
| Summer 1985 | **WNET/Channel Thirteen, Strategic Planning Department** |

<u>Associate</u>.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

| | |
|---|---|
| 1981-1983 | **Arthur Andersen & Company** |

<u>Consultant</u>.  Designed, programmed and installed management information systems.  Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).  Designed customized tracking and accounting system for shipping company.

## Teaching

1989- 1992    <u>**Teaching Fellow**</u>**, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

## Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2022 Update," (co-author), NERA Report, 2022.

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

2

A01663

Lucy P. Allen

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

"Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

"Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

3

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

## Depositions & Testimony (4 years)

Deposition Testimony before the United States District Court for the District of Oregon in *Oregon Firearms Federation, Inc. et al. v. Tina Kotek et al.*, 2023.

Depositions before the United States District Court for the Southern District of Texas, Houston Division in *Miriam Edwards, et al. v. McDermott International, Inc., et al.,* 2023.

Deposition Testimony before the United States District Court for the District of Harris County, Texas in *Boxer Property Management Corp. et al. v. Illinois Union Ins. Co. et al.*, 2022.

Trial Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2022.

Deposition Testimony before the United States District Court for the Eastern District of Virginia, in *Plymouth County Retirement System, et al. v. Evolent Health, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022.

4

A01665

Lucy P. Allen

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Testimony and Deposition Testimony before the United States District Court, Southern District of California, in *James Miller et al. v. Xavier Becerra et al.*, 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation,* 2019.

5

A01666

Lucy P. Allen

Testimony and Declaration before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2019.

Testimony before the United States District Court, Southern District of New York, in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Deposition Testimony before the United States District Court, Middle District of Florida, in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

6

A01667

**Appendix B**
**Berry Stock Price Reactions Following the Alleged Corrective Disclosures**
**and FY 2020 10-K Filing**

| | | | Berry | Dr. Cain's Event Study | | Alternative Event Study[1] | |
| | | | | Excess | Stat. Sig. | Excess | Stat. Sig. |
| Event Date | Reaction Date | Event | Return | Return | Decrease?[2] | Return | Decrease?[2] |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| *Alleged Corrective Disclosure #1* | | | | | | | |
| 4/1/20 | 4/1/20 | Guidance Revision | -18.15% | -11.29% [3] | No | -10.95% [4] | No |
| *Alleged Corrective Disclosure #2* | | | | | | | |
| 8/4/20 | 8/5/20 | Q2 2020 Press Release | -7.41% | -9.57% | Yes | -8.94% | Yes |
| *Alleged Corrective Disclosure #3* | | | | | | | |
| 11/3/20 | 11/4/20 | Q3 2020 Press Release | -5.43% | -6.35% | No | -0.89% | No |
| *FY 2020 10-K filing* | | | | | | | |
| 2/24/21 | 2/24/21 | FY 2020 10-K filing | 8.29% | 4.31% [5] | No | 0.72% | No |

**Notes and Sources**:

Data from FactSet Research Systems, Inc. and Dr. Cain's backup. Events from Amended Complaint.

[1] The alternative event study uses a custom index to control for industry and market movements. The custom index is an equal-weighted index made up of 18 small-cap, oil-focused North American E&P companies. I constructed a list of North American E&P companies based on selected April 2020 Oil and Gas Exploration and Production industry reports that mentioned Berry published by five analyst firms (BMO April 5, 2020, RBC April 16, 2020, Wells Fargo April 3, 2020, UBS April 5, 2020, and Piper Sandler April 16, 2020). I limited the 79 North American E&P companies identified (excluding Berry) by including those with a market capitalization on March 31, 2020 of less than $2 billion and over 50% of their FY 2020 production in oil. This resulted in 18 companies: Athabasca Oil Corporation, Battalion Oil Corporation, Bonanza Creek Energy, Inc. (now known as Civitas Resources, Inc.), Callon Petroleum Company, Centennial Resources Development, Inc. (now known as Permian Resources Corporation), Crescent Point Energy Corp., Cardinal Energy Ltd., Earthstone Energy, Inc., Enerplus Corporation, Magnolia Oil & Gas Corp., Matador Resources Company, Murphy Oil Corporation, Northern Oil and Gas, Inc., Penn Virginia Corp (now known as Ranger Oil Corporation), Ring Energy, Inc., Talos Energy, Inc., Tamarack Valley Energy Ltd., and Whitecap Resources Inc.

[2] Significance is based on the excess return's t-statistic, calculated as the excess return divided by the standard error of the regression over the sample period. "Yes" indicates that the price reaction is statistically significant at the 5% level.

[3] Consistent with Dr. Cain's own findings that volatility in March 2020 significantly increased, this simply adjusts Dr. Cain's model by using a control period that starts in March, 2020. Cain Report, footnote 48.

[4] Control period is from March 2, 2020 to April 30, 2020.

[5] Applies Dr. Cain's event study methodology to this date (same indices and same control period length (60 trading days prior)) as his backup does not extend to this date.

A01668